WO               IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re Crash of Aircraft N93PC     )<br>                                            )<br>on July 7, 2013, at Soldotna, Alaska   )<br>                                            )<br>_____) | No. 3:15-cv-0112-HRH<br>[Consolidated with<br>No. 3:15-cv-0113-HRH and<br>No. 3:15-cv-0115-HRH] |

O R D E R

Motion to Dismiss

On January 26, 2018, defendant Stolairus Aviation Inc. moved to dismiss the claims against it.[1] Plaintiffs moved to continue the motion in order to take jurisdictional discovery.[2] On April 3, 2018, the court granted plaintiffs' motion to continue, giving plaintiffs time in which to conduct jurisdictional discovery related to specific jurisdiction and giving the parties an opportunity to file supplemental briefing.[3] The parties have timely filed their supplemental briefing,[4] and Stolairus' motion to dismiss is ready for disposition as the parties did not request oral argument on the motion nor is oral argument deemed necessary.

---

[1]Docket No. 146.

[2]Docket No. 156.

[3]Docket No. 165.

[4]Docket Nos. 169 and 172.

Background

On July 7, 2013, a deHavilland DHC-3 "Otter" aircraft operated by Rediske Air, Inc. and piloted by Walter Rediske crashed shortly after take-off from the Soldotna Airport. Rediske and all of the passengers on board were killed in the crash. Rediske's estate and the estates of the passengers (referred to collectively as "plaintiffs" herein) assert wrongful death, negligence, products liability and breach of warranty claims against Stolairus.

Plaintiffs allege that in April 2010, "Defendant Recon Air Corporation . . . modified the subject aircraft when it installed an upgross kit known as Stol Kit STC SA00287NY, a Baron Stol Kit manufactured by Stolairus Aviation, Inc. ('the Stol Kit') on the DHC-3 Otter."[5] Plaintiffs further allege that "on February 8, 2016 the Stol Kit was the subject of an Airworthiness Directive published by Transport Canada."[6] Plaintiffs allege that "[t]he Airworthiness Directive stated that it was being issued to correct an unsafe condition for DHC-3 airplanes that are modified with the Baron Short Take Off and Landing (STOL) kit. . . ."[7] Plaintiffs allege that

> [t]he Airworthiness Directive stated that an investigation of a fatal crash of a turbo-propeller powered DHC-3 airplane modified with a Baron STOL kit determined that the probable cause was a

---

[5] Second Amended Complaint [etc.] at 15, ¶ 72, Docket No. 135; First Amended Complaint [etc.] at 16, ¶ 81, Docket No. 137.

[6] Second Amended Complaint at 15-16, ¶ 73, Docket No. 135; First Amended Complaint at 16, ¶ 83, Docket No. 137.

[7] Second Amended Complaint at 16, ¶ 75, Docket No. 135; First Amended Complaint at 17, ¶ 84, Docket No. 137.

> rearward shift in the center of gravity, which resulted in a stall during takeoff. A center of gravity that is too far aft can contribute to a stall during takeoff and may result in loss of control during other phases of flight.[8]

Plaintiffs allege that the Stol Kit installed on the subject aircraft

> caused the aircraft to crash into the ground. The Stol Kit changed the center of gravity, making the center of gravity too far aft and contributing to and causing a stall and or loss of control of the aircraft. Defendant Stolairus failed to inspect, identify and warn of the change in the center of gravity.[9]

Plaintiffs allege that Stolairus is a Canadian corporation with "its principal place of business" in British Columbia.[10] Plaintiffs allege that jurisdiction of Stolairus is appropriate in this court because Stolairus "provides support for aircraft worldwide, including the United States and specifically Alaska."[11]

Pursuant to Rule 12(b)(2), Federal Rules of Civil Procedure, Stolairus now moves to dismiss plaintiffs' claims against it for lack of personal jurisdiction. In the alternative, pursuant to Rule 12(b)(6), Stolairus moves to dismiss plaintiffs' claims because they are barred by the statute of limitations.

---

[8] Second Amended Complaint at 16, ¶ 76; Docket No. 135; First Amended Complaint at 17, ¶ 85, Docket No. 137.

[9] Second Amended Complaint at 16-17, ¶ 79, Docket No. 135; First Amended Complaint at 17, ¶ 88, Docket No. 137.

[10] Second Amended Complaint at 16, ¶ 78; Docket No. 135; First Amended Complaint at 17, ¶ 87, Docket No. 137.

[11] Second Amended Complaint at 16, ¶ 78, Docket No. 135; First Amended Complaint at 17, ¶ 87, Docket No. 137.

Discussion

"Where [a] defendant[] move[s] to dismiss a complaint for lack of personal jurisdiction, [the] plaintiffs bear the burden of demonstrating that jurisdiction is appropriate." Dole Food Co., Inc. v. Watts, 303 F.3d 1104, 1108 (9th Cir. 2002). If "the motion is based on written materials rather than an evidentiary hearing, 'the plaintiff need only make a prima facie showing of jurisdictional facts.'" Id. (quoting Sher v. Johnson, 911 F.2d 1357, 1361 (9th Cir. 1990)). "In determining whether [a plaintiff has] met this prima facie burden, uncontroverted allegations in [the] complaint must be taken as true, and 'conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor. . . .'" Ochoa v. J.B. Martin and Sons Farms, Inc., 287 F.3d 1182, 1187 (9th Cir. 2002) (quoting Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 588 (9th Cir. 1996)). "Additionally, any evidentiary materials submitted on the motion 'are construed in the light most favorable to the plaintiff and all doubts are resolved in [the plaintiff's] favor.'" Id. (quoting Metro. Life Ins. Co. v. Neaves, 912 F.2d 1062, 1064 n.1 (9th Cir. 1990)).

"Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits." Dole Food Co., 303 F.3d at 1110. Alaska's long-arm statute reaches "to the maximum extent permitted by the due process clause of the Fourteenth Amendment[.]" Alaska Telecom, Inc. v. Schafer, 888 P.2d 1296, 1299 (Alaska 1995).

"[T]here are two forms that personal jurisdiction may take: general and specific." Picot v. Weston, 780 F.3d 1206, 1211 (9th Cir. 2015). The only remaining issue here is whether the court has specific jurisdiction.

> The court employ[s] a three-part test to assess whether a defendant has sufficient contacts with the forum state to be subject to specific personal jurisdiction:
>
> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

Id. (citation omitted).

"For claims sounding in tort," such as plaintiffs assert against Stolairus, the court applies "a 'purposeful direction' test. . . ." Id. at 1212. The "court evaluates purposeful direction using the three-part 'Calder-effects' test[.]" Brayton Purcell LLP v. Recordon & Recordon, 606 F.3d 1124, 1128 (9th Cir. 2010). "Under this test, [']the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" Id. (quoting Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1206 (9th Cir. 2006)). "There is no requirement that the defendant have any physical contacts with the forum." Id.

There is no dispute that Stolairus sold the STOL Kit that was installed on the subject aircraft. But, Stolairus argues that plaintiffs cannot establish that this intentional act was expressly aimed at Alaska because "[t]he placement of a product into the stream of commerce, without more, is not an act purposefully directed toward a forum state." Holland Am. Line Inc. v. Wartsila N. Am., Inc., 485 F.3d 450, 459 (9th Cir. 2007). "Even a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream of commerce into an act purposefully directed toward the forum state." Id. However, "[t]here is purposeful direction when a defendant places a product into the stream of commerce and additional conduct 'indicate[s] an intent or purpose to serve the market in the forum State.'" Trishan Air, Inc. v. Dassault Falcon Jet Corp., Case No. CV 08–7294–VBF(JTLx), 2009 WL 10673286, at *2 (C.D. Cal. Oct. 14, 2009) (quoting Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 112 (1987)).

> Examples of such additional conduct are: "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."

Id. (quoting Asahi Metal, 480 U.S. at 112).

Plaintiffs originally relied on the fact that Stolairus's STOL Kits have been FAA certified in the United States, primarily for use in Alaska. Plaintiffs suggested that STOL Kits are pervasive in Alaska because they "are made specifically for the terrain that pilots must

navigate in Alaska."[12] And, plaintiffs offered evidence that there are a number of Otters and Beavers in Alaska.[13] Plaintiffs argued that this evidence, in connection with Stolairus's admitted contacts with Alaska (the 2009 sale of a STOL Kit to Talkeetna Air Taxi and the 2017 visit to Alaska by two Stolairus employees to give advice to a customer)[14] was sufficient to show that Stolairus did something more than just put its product into the stream of commerce.

The foregoing evidence is not sufficient to make out a <u>prima facie</u> case of specific jurisdiction. All this evidence shows is that the stream of commerce may sweep a STOL Kit into Alaska. It does not show that Stolairus took any action that indicated that it intended to serve the Alaskan market.

But, plaintiffs now have additional evidence. Plaintiffs now have evidence that, at one point in time, Stolairus had a contract with someone in Alaska to purchase the STOL Kit that was installed on the subject aircraft. Plaintiffs argue that this contract is sufficient to show that Stolairus purposefully directed its product toward Alaska, that Stolairus had the purpose or intent to serve the Alaskan market.

Plaintiffs offer a copy of a Stolairus sales sheet, dated March 23, 2010, which indicates that the STOL Kit that was installed on the subject aircraft was being sold to "GLM Corp.

---

[12] Joint Opposition to Defendant Stolairus Aviation Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction at 7, Docket No. 154.

[13] Exhibits 6 and 7, James Brauchle Declaration [etc.], Docket No. 155.

[14] Declaration of Keith Andersen [etc.] at 2, ¶¶ 5-6, Docket No. 147.

(Mike Schilling)" in Kenai, Alaska.[15] When asked about this document at his August 2018 deposition, Andersen explained that Recon Air asked Stolairus to send a quote to Schilling, "a quote that had also been previously sent to Recon Air" because as he recalled that

> Roy, the owner or the president of Recon Air, was not there. And so they wanted this Stol kit quite quickly because they were working on the wing repair, and to expedite it and without Roy signing it, . . . they said send it to Mike Schilling and he'll sign it.[16]

Andersen testified that he faxed the quote to Alaska and that he knew that because the quote was faxed to a 907 area code.[17] Andersen testified that "[t]he quote was sent to Mike Schilling," that Schilling signed the quote[18] and sent it back[19] and that the "effect of that signature" was to "initiate[] the sale."[20] Andersen agreed that Stolairus had entered into a contract with Schilling at that point.[21]

---

[15]Exhibit 2, Declaration of Alisa Brodkowitz [etc.], Docket No. 170.

[16]August 2018 Deposition of Keith Andersen at 43:6-12; 45:15-21; Exhibit 4, Brodkowitz Declaration, Docket No. 170.

[17]Id. at 43:13-25.

[18]A copy of the quote signed by Schilling can be found at Exhibit C, page 4, to Declaration of Brewster H. Jamieson, Docket No. 173.

[19]August 2018 Andersen Deposition at 46:5-6, Exhibit 4, Brodkowitz Declaration, Docket No. 170.

[20]Id. at 55:18-23.

[21]Id. at 56:2-6.

-8-

After receiving the signed quote from Schilling, Andersen faxed the quote to Recon Air on March 23, 2010 and advised Recon Air that Stolairus was "already working on this order and would very much appreciate it if you could fax a copy of a cheque and forward by mail at your earliest convenience."[22] Andersen attached an invoice to the March 23, 2010 fax that showed the "bill to" and "ship to" as Recon Air.[23]

Andersen testified that before the STOL Kit was sent out on April 7, 2010, he was told that

> the sale needs to be in Recon Air's name and that Recon will be paying for it, and that was . . . why the sale . . . ended up in Recon Air's name. That was how the sale was finalized. The sale and the quote that was done to Schilling was basically rescinded and Recon Air was the one that physically purchased the kit. They paid for it.[24]

Andersen explained that this was why there is also a March 23, 2010 sales sheet[25] that shows that the "sold to" is Recon Air, rather than Mike Schilling.[26] Andersen testified that the "completed transaction" was between Stolairus and Recon Air, not Stolairus and Schilling,

---

[22]Exhibit C at 5, Jamieson Declaration, Docket No. 173.

[23]Id. at 6.

[24]August 2018 Andersen Deposition at 46:10-17, Exhibit 4, Brodkowitz Declaration, Docket No. 170.

[25]Exhibit 1, Brodkowitz Declaration, Docket No. 170.

[26]August 2018 Andersen Deposition at 46:17-18, Exhibit 4, Brodkowitz Declaration, Docket No. 170.

although Stolairus never sent Schilling a document cancelling the sale.[27] That the sale was between Stolairus and Recon Air is also supported by a quote that was signed on April 13, 2010 by Recon Air's president.[28] Andersen testified that he "authorized shipping that kit out prior to being paid, which was not normal, and prior to Roy signing the quote" because "Recon Air was a client of ours. . . ."[29]

Andersen was asked whether he understood that the STOL Kit was going to be installed on Schilling's aircraft, and he answered:

> Not 100 percent. And . . . it's difficult in a sense that because Mike Schilling purchases aircraft and Recon Air does rebuilds, they were doing a major rebuild on that Otter and even though maybe Mike Schilling may have owned it, . . . that doesn't mean that Mike Schilling was going to end up owning it when that aircraft left Recon Air.
> Mike Schilling buys and sells and leases out Otters, and so this aircraft – this Otter is typical of many. A STOL kit was put on by Recon Air, and at the end of the day, . . . when the thing is signed out, somebody can come in and buy it from Recon Air or Mike Schilling could sell it to somebody else or whoever was the owner.
> So . . . I'm not privy to any of that information. Mike Schilling has an Otter. It can go into Canada. It can go into Europe. It can go to Florida.[30] It can go into all different types of areas. So from my knowledge of knowing where that Otter is

---

[27]Id. at 55:18-56:22.

[28]Exhibit 1, Andersen Declaration, Docket No. 147.

[29]August 2018 Andersen Deposition at 46:23-47:2, Exhibit B, Jamieson Declaration, Docket No. 173.

[30]There is evidence in the record that Schilling has an operation in Florida that uses Otters. June 2018 Deposition of Keith Andersen at 154:14-25, Exhibit 3, Brodkowitz Declaration, Docket No. 170.

> going to be . . . I don't have that knowledge. I'm not privy to that.[31]

Andersen also testified that

> the only document I have for this STOL kit on that Otter relates to Recon Air. That was the sale. The sale was done to Recon Air, it was paid by Recon Air, and the sales quote was . . . signed by Recon Air. The previous quote to Mike Schilling never [was] completed and therefore is not in our paper documents.[32]

Andersen further explained that, in making his original declaration in support of the instant motion, he did not consider the quote that was sent to Schilling as a "contact" with Alaska because he defined "contacts" as "physical sales", "a sale of a kit or a sale of one of our kits."[33]

The Supreme Court has stated that "[i]f the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot." Burger King Corp. v. Rudzewicz, 471 U.S. 471, 478 (1985). Rather, the court must take "a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." Id. at 479 (citation omitted). When the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual

---

[31]August 2018 Andersen Deposition at 47:9-48:4, Exhibit B, Jamieson Declaration, Docket No. 173.

[32]Id. at 50:7-12.

[33]August 2018 Andersen Deposition at 17:8-12, Exhibit 4, Brodkowitz Declaration, Docket No. 170.

course of dealing" are evaluated here, Stolairus' contract with Schilling is not sufficient to support specific jurisdiction because the real object of the transaction was the sale of a STOL Kit to Recon Air, not the sale of a STOL Kit to someone in Alaska.

Schilling himself avers that he "told Recon Air to obtain and install the STOL kit. My understanding and expectation at the time was that Recon Air would order the kit, pay for the kit, and install the kit; it is my recollection that this is what actually occurred."[34] Schilling further avers that he does "not recall any conversations or other communications with anyone at Stolairus during this process, and I don't have any documents showing any direct contacts with Stolairus."[35] Schilling does not dispute that it is his signature on the March 23, 2010 quote, but he avers that he does not recall this document or have a copy of it in his files.[36] He avers that he understood that Stolairus shipped the STOL Kit directly to Recon Air and that Recon Air paid Stolairus in Canadian dollars with a check drawn on a Canadian bank.[37]

Stolairus had no negotiations with Schilling. Rather, it had a prior relationship with Recon Air, a Canadian company, and it provided, at the request of Recon Air, a quote to Schilling that was identical to the quote it supplied first to Recon Air. Stolairus later received a signed quote from Recon Air, shipped the STOL Kit to Recon Air, and received payment for the STOL Kit from Recon Air.

---

[34]Declaration of Mike Schilling at 1, ¶ 2, Docket No. 175.

[35]Id. at 2, ¶ 3.

[36]Id.

[37]Id. at 2, ¶ 5.

It is significant that Stolairus' contact with Alaska as it relates to the STOL Kit that was installed on the subject aircraft was at the behest of Recon Air. The focus of the personal jurisdiction inquiry is on the defendant's contacts with the forum state. "[T]he relationship must arise out of contacts that the 'defendant himself' creates with the forum State." Walden v. Fiore, 571 U.S. 277, 284 (2014) (quoting Burger King Corp., 471 U.S. at 475). Stolairus did not create any contacts with Alaska in connection with the STOL Kit. The only reason the quote was sent to Schilling in Alaska was because Recon Air requested that it be sent to Schilling in order to facilitate the work Recon Air was doing in Canada on a Canadian registered aircraft.

When the evidence of Stolairus' contacts with Alaska is viewed in the light most favorable to plaintiffs, plaintiffs have failed to make out a prima facie case of specific jurisdiction. The contract with Schilling, which was never completed, and plaintiffs' other evidence do not show that Stolairus purposefully directed the STOL Kit that was installed on the subject aircraft toward Alaska.

As a final matter, plaintiffs request that they be awarded their fees and costs associated with the jurisdictional discovery because Andersen made untrue statements in his original declaration. Specifically, plaintiffs point to Andersen's statement that Stolairus only had two known contacts with Alaska, Andersen's statement that Stolairus did not know the identity of the intended customer for the STOL Kit in question or that the aircraft in question would operate in Alaska, and Andersen's statement that Stolairus had no basis for believing that the

STOL Kit in question would end up in Alaska.[38]  Plaintiffs argue that these statements were all untrue as evidenced by Andersen's deposition testimony that a quote for the STOL Kit in question had been sent to Schilling in Alaska.

While it is not clear what the basis is for plaintiffs' sanctions request (Rule 11, Rule 26, or Rule 37), whatever the basis is, the court is not persuaded that plaintiffs are entitled to sanctions.  The court is not convinced that Andersen submitted an untruthful declaration.

## Conclusion

Stolairus' motion to dismiss is granted because the court lacks personal jurisdiction of Stolairus.[39]  Plaintiffs' claims against Stolairus are dismissed with prejudice.

DATED at Anchorage, Alaska, this 9th day of October, 2018.

/s/ H. Russel Holland<br>United States District Judge

---

[38] Andersen Declaration at 2-3, ¶¶ 5, 6, 10, 11, Docket No. 147.

[39] Because the court has no personal jurisdiction, it need not consider Stolairus' alternative statute of limitations argument.