WO  IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re Crash of Aircraft N93PC ) | No. 3:15-cv-0112-HRH |
| ) | [Consolidated with |
| on July 7, 2013, at Soldotna, Alaska ) | No. 3:15-cv-0113-HRH and |
| _____) | No. 3:15-cv-0115-HRH] |

O R D E R

Honeywell's Motion for Summary Judgment re Wrongful Death Claims

Honeywell International, Inc. moves for summary judgment on the passenger plaintiffs' wrongful death claims for noneconomic damages.[1] Texas Turbine Conversions, Inc. and Recon Air Corporation join in this motion.[2] This motion is opposed.[3] Oral argument was requested and has been heard.

Facts

On July 7, 2013, a deHavilland DHC-3 Otter airplane operated by Rediske Air, Inc. and piloted by Walter Rediske crashed shortly after takeoff from the Soldotna Airport.

---

[1]Docket No. 238. Honeywell originally also moved for summary judgment on plaintiffs' punitive damages claims but those claims were subsequently withdrawn. Docket No. 282.

[2]Docket Nos. 244 and 249.

[3]Docket No. 273.

-1-

Rediske and all of the passengers on board were killed in the crash. The passengers were two families from South Carolina, the McManus family (Chris and Stacey and their minor children, Meghan and Connor) and the Antonakos family (Milton Jr. and Kimberly and their minor children, Olivia, Milton III, and Anastacia). The passenger plaintiffs are Hubert Wayne Clayton, Crisler Johnson, Lawrence McManus, Larry Kessler, Johnnie and Rachel Dickert, and Kathleen McManus. They have brought claims against defendants both individually and as personal representatives of the estates of the passengers. At issue in the instant motion are their wrongful death claims brought on behalf of "[p]laintiffs/decedent[s] and the statutory beneficiaries/surviving family members. . . ."[4] The passenger plaintiffs seek economic and noneconomic damages for their wrongful death claims.[5]

Honeywell, joined by Recon Air and Texas Turbine, (referred to as "defendants" herein) now move for summary judgment dismissing the wrongful death claims for non-economic damages.

Discussion

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets

---

[4]First Amended Complaint [etc.] at 8, Docket No. 137.

[5]Id. at 15, § 80a.

-2-

its initial burden, then the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the nonmovant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. Id. at 255. "'[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.'" Arandell Corp. v. Centerpoint Energy Services, Inc., 900 F.3d 623, 628–29 (9th Cir. 2018) (quoting T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987)).

Alaska's wrongful death statute allows a personal representative to maintain a wrongful death action and provides that

> [t]he amount recovered, if any, shall be exclusively for the benefit of the decedent's spouse and children when the decedent is survived by a spouse or children, or other dependents. When the decedent is survived by no spouse or children or other dependents, the amount recovered shall be administered as other personal property of the decedent but shall be limited to pecuniary loss.

AS 09.55.580(a). Thus, the estate of a decedent who is not survived by a spouse, children or other dependents cannot recover noneconomic damages in a wrongful death action. Sowinski v. Walker, 198 P.3d 1134, 1161 (Alaska 2008). The issue here is whether any of the decedents were survived by "other dependents." The passenger plaintiffs contend that

-3-

Case 3:15-cv-00112-HRH   Document 369   Filed 05/26/20   Page 3 of 13

Johnnie and Rachel Dickert and Kathleen McManus were "other dependents" of the McManus decedents and they contend that Hubert Wayne Clayton was a dependent of the Antonakos decedents. Defendants dispute that any of these individuals could be considered an "other dependent" for purposes of the Alaska Wrongful Death Act.

In order for a person to qualify as an "other dependent", 1) that person must be a close relative of the decedent or someone with a relationship similar to that of a close relative, 2) the decedent must have made significant contributions of support upon which the person was actually dependent at the time of the decedent's death, and 3) there must be evidence that those contributions would have continued. Greer Tank & Welding, Inc. v. Boettger, 609 P.2d 548, 551 (Alaska 1980). "A showing must be made of actual dependency for significant contributions of support over a sufficient period of time to justify the assumption that such contributions would have continued." Id. There must be evidence that the person was "economically dependent" on the decedent, that the person relied on the decedent "to make ends meet." Millo v. Delius, 872 F. Supp. 2d 867, 879 (D. Alaska 2012). A showing of future dependency is not sufficient; dependency must be established based on the circumstances at the time of death. Matter of Estate of Pushruk, 562 P.2d 329, 332 (Alaska 1977). "[D]ependency is a question of fact." Kulawik v. ERA Jet Alaska, 820 P.2d 627, 635 (Alaska 1991).

Kathleen McManus. Kathleen McManus, who is Chris McManus' mother, testified that at the time of the accident, she "did not have to rely on [Chris] for bodily comforts or for

-4-

Case 3:15-cv-00112-HRH   Document 369   Filed 05/26/20   Page 4 of 13

house payments. It was more comfort knowing that in the future everything would be taken care of and there wouldn't be any worry."[6] She testified that at the time of the accident, she owned her own home[7] and that she was retired and lived off her savings, investments, and Social Security.[8] Kathleen McManus testified that she relied on Chris for medical advice.[9] She testified that Chris gave her cash to spend on a trip to Europe and bought her a new patio set.[10] She testified that when they went to dinner, which was about 9-10 times per year, Chris always picked up the tab.[11] Kathleen McManus testified that when she traveled with Chris and Stacey and the children, Chris would pay for hotels and other expenses.[12] She also testified that Chris helped take care of her car.[13] Kathleen McManus testified that she spoke to Chris twice a week as he was driving home from work.[14]

---

[6] Deposition of Kathleen Marie McManus at 24:5-8, Exhibit E, Honeywell International Inc.'s Motion for Partial Summary Judgment on Wrongful Death and Punitive Damages, Docket No. 238.

[7] Id. at 6:3-13.

[8] Id. at 8:7-12.

[9] Id. at 25:13-20.

[10] McManus Deposition at 10:5-20, Exhibit A, Plaintiffs' Opposition to Motion for Partial Summary Judgment on Wrongful Death and Punitive Damages, Docket No. 273.

[11] Id. at 15:1-18.

[12] Id. at 17:2-18:4.

[13] Id. at 20:2-16.

[14] Id. at 31:9-19.

Rachel Dickert. Rachel Dickert is Stacey McManus' mother. In response to the question "[d]id you ever receive any financial support from Chris and Stacey[,]" she answered, "[w]e had, you know, trips with them and dinners. And as -- you know, the TVs that he wouldn't let us buy [and c]omputers."[15] She testified that she did not "think we relied on them [financially]; no. But I always knew if we needed anything, they would help us out, you know, but . . . I didn't expect it."[16] Mrs. Dickert testified that they went on vacation with the McManuses and that when they did, Chris would pay the expenses.[17] Mrs. Dickert said that she "wouldn't say" that they had "plans" to move in with the McManuses but that when Stacey and she

> were putting the basement together when they built this last house . . . she said, well, mama, whenever you and Daddy get where you can't take care of yourselves, this is where we're going to put you and we're going to take care of you.[18]

She also testified that Chris provided guidance on medical issues.[19]

---

[15] Deposition of Rachel Dickert at 7:25-8:5, Exhibit F, Honeywell International Inc.'s Motion for Partial Summary Judgment on Wrongful Death and Punitive Damages, Docket No. 238.

[16] Id. at 15:8-10.

[17] Mrs. Dickert Deposition at 9:5-11:14, Exhibit C, Plaintiffs' Opposition to Motion for Partial Summary Judgment on Wrongful Death and Punitive Damages, Docket No. 273.

[18] Id. at 14:6-18.

[19] Id. at 15:18-16:24.

Johnnie Dickert. Johnnie Dickert is Stacey McManus' father. He testified that the Dickerts own their own home.[20] He testified that they live on Social Security, some income he receives as a board member, and the sale of timber from timberland he inherited.[21] In response to the question, "did you receive financial support from the McManuses," he answered, "No."[22] Mr. Dickert testified that they received gifts such as TVs and telephones.[23] He testified that they also twice received a computer as a gift.[24] He testified that if they went on vacation with Chris and Stacey, the McManuses would cover expenses.[25] Mr. Dickert testified that when they went out to dinner with the McManuses, Chris would usually pay.[26] He testified that he and his wife "were not depending on [the McManuses] for support. I was financially able to take care of myself. And they were just very, very

---

[20]Deposition of Johnnie Dickert at 7:10-11, Exhibit G, Honeywell International Inc.'s Motion for Partial Summary Judgment on Wrongful Death and Punitive Damages, Docket No. 238.

[21]Id. at 9:3-11:24.

[22]Id. at 12:3-5.

[23]Id. at 12:11-17.

[24]Mr. Dickert Deposition at 13:7-18, Exhibit B, Plaintiffs' Opposition to Motion for Partial Summary Judgment on Wrongful Death and Punitive Damages, Docket No. 273.

[25]Id. at 14:21-15:1.

[26]Id. at 17:17-23.

generous. . . ."[27] Mr. Dickert testified that he and wife did not "have plans" to move in with the McManuses,

> but they sort of had an idea that we might, if we got where we were unable to care for ourselves. And my daughter told us, told my wife in particular, that they had a basement down there they were fixing up, and if anything ever happened where we couldn't take care of ourselves, that we were welcome to come and stay with them.[28]

Hubert Wayne Clayton. Clayton is Kimberly Antonakos' father. Clayton testified that he was retired and lived on his Social Security and pension and worked part-time.[29] Clayton testified that the Antonakoses would "give me gifts. We would go on . . . vacation. We'd [go] out and eat together."[30] He testified that Milton Jr. would help him with his yard work.[31] Clayton testified that he "could have gotten by" without the gifts and help but "it sure was nice, you know to, to have what he gave, what he did for me."[32] Clayton testified that when

---

[27]Mr. Dickert Deposition at 25:11-13, Exhibit G, Honeywell International Inc.'s Motion for Partial Summary Judgment on Wrongful Death and Punitive Damages, Docket No. 238.

[28]Mr. Dickert Deposition at 21:2-8, Exhibit B, Plaintiffs' Opposition to Motion for Partial Summary Judgment on Wrongful Death and Punitive Damages, Docket No. 273.

[29]Deposition of Wayne Clayton at 8:25-9:11, Exhibit M, Honeywell International Inc.'s Motion for Partial Summary Judgment on Wrongful Death and Punitive Damages, Docket No. 238.

[30]Id. at 12:6-7.

[31]Id. at 13:7-8.

[32]Id. at 18:14-16.

he went on trips and outings or out to dinner with the Antonakoses that Milton Jr. would pay for dinner and otherwise take care of expenses.[33] He testified that Kimberly and Milton Jr. provided guidance on financial and medical issues.[34]

Plaintiffs argue that the foregoing testimony illustrates that there are questions of fact as to whether Kathleen McManus, the Dickerts and Clayton were financially dependent on any of the decedents. Plaintiffs argue that it takes only a minimal showing to qualify for dependency and they cite to Greer Tank, 609 P.2d 548, in support. There, the question was whether the decedent's ex-wife and her son (Louella and Todd) were dependents of the decedent. The court held that Louella and Todd were dependents because the decedent had provided for them "financially by providing money and goods, and emotionally by his presence and activities with them or contacting them." Id. at 551. The evidence showed that the decedent had provided "at a minimum $2,900.00 toward payment for purchase of a house, $800.00 toward payment for purchase of a car, and additional amounts towards payments for various family expenses, clothing and the like." Id.[35] The court concluded that this was sufficient to support a finding that Louella and Todd were dependents for purposes of Alaska's Wrongful Death Act. Id. Plaintiffs insist that "Greer provides clear authority

---

[33]Clayton Deposition at 14:25-17:23, Exhibit D, Plaintiffs' Opposition to Motion for Partial Summary Judgment on Wrongful Death and Punitive Damages, Docket No. 273.

[34]Id. at 19:23-22:11.

[35]Defendants contend that $3700 in 1974 would the equivalent of $19,217 in July 2019, thereby making this a much more significant amount of financial support than the passenger plaintiffs are suggesting.

-9-

that it takes only a minimal showing to qualify for dependency under the Wrongful Death Act."[36]

Plaintiffs also cite to City of Hooper Bay v. Bunyan, 359 P.3d 972 (Alaska 2015). There, the court concluded that there were questions of fact as to whether a mother was dependent on her son based on evidence that the son "was the main subsistence provider for the family, providing waterfowl, seal, whale, and moose meat" and "did the cooking for the family as well as household chores and repairs." Id. at 980. Plaintiffs argue that this case demonstrates that almost any showing of financial or in-kind benefit is sufficient to defeat a motion for summary judgment on the issue of dependency.

At oral argument, plaintiffs' counsel also cited to North Slope Borough v. Brower, 215 P.3d 308 (Alaska 2009). There, the decedent, Alfred, who lived with his mother Isabel, "hunted and fished for Native subsistence foods that he shared with his mother[,]" and "helped his mother around the house by cooking, cleaning, and doing maintenance work." Id. at 310. "The borough concede[d] on appeal that Isabel's dependence on Alfred's subsistence and non-market support was sufficient to justify the jury's finding that she was an 'other dependent' under the wrongful death statute[.]" Id. at 314. Plaintiffs contend that this case confirms that it does not take much support in order to establish dependency.

---

[36]Plaintiffs' Opposition to Motion for Partial Summary Judgment on Wrongful Death and Punitive Damages at 6-7, Docket No. 273.

But, in this case, the occasional gifts, meals, help with chores, and other assistance provided by decedents is not sufficient to create a question of fact as to dependency. Millo, 872 F. Supp. 2d 867, is instructive on this issue. There, the adult children of the decedent claimed they were "other dependents" because their father "was a constant presence in their lives. He lived near them and spent much of his time with them; hunted and guided with their husbands; helped them construct, repair, and maintain their homes; provided fish and game for their families; and gave them the benefit of his advice and experience." Id. at 880. The court found this evidence insufficient to create an issue of fact, explaining:

> While it is not disputed that Mr. Millo provided his daughters with fish and meat that he caught and hunted, and performed repairs at their homes, no evidence has been presented that the daughters were economically dependent on their father's hunting to make ends meet. Indeed, all three daughters have testified to their financial self-sufficiency. The Millos have been a close family, and have relied on each other to help care for grandchildren and for household tasks. But such reliance is not within the ambit of statutory dependency for wrongful death purposes. And Mr. Millo's provision of his daughters with fish and game, in the circumstances of this case, cannot serve as a basis for statutory dependency. To hold otherwise could extend dependent status to anyone who has been on the receiving end of a generous and successful hunter or fisherman in Alaska.

Id. at 879.

Similarly here, there is no evidence that Kathleen McManus, the Dickerts and Clayton were economically dependent on the decedents. In fact, Kathleen McManus, the Dickerts and Clayton all testified as to their financial self-sufficiency. This is what makes this case different from the cases cited by the passenger plaintiffs. Viewing the evidence in this case

-11-

in the light most favorable to the passenger plaintiffs, no reasonable jury could conclude that Kathleen McManus, the Dickerts, and Clayton were financially dependent on any of the decedents. The undisputed facts show that the adult decedents provided occasional gifts, paid for the occasional vacation, paid for dinners, helped with chores, and provided guidance and support but that Kathleen McManus, the Dickerts, and Clayton did not look to the adult decedents to help them survive financially. The adult decedents were not providing housing, transportation, subsistence foods, and other basic necessities. If providing gifts and paying for vacations was the type of financial support necessary to establish dependency, almost any close family member could be considered an "other dependent". Such a result would not be consistent with the intent of the Alaska Wrongful Death Act. See Greer Tank, 609 P.2d at 550 (citation omitted) (the addition of "other dependent" to the statute "appear[ed] designed to protect the interest of those who, like children and spouses, will suffer financial loss"). In sum, the undisputed evidence establishes that Kathleen McManus, the Dickerts, and Clayton were not dependents for purposes of the Alaska Wrongful Death Act.

Defendants also move for summary judgment dismissing any loss of consortium claims asserted by Ashley Clayton Underwood (Kimberly's sister), Angela McCown Welker (Milton Jr.'s niece), and Maria Catherine McCown Robinette (Milton Jr.'s niece). These individuals were listed in discovery responses by the estates of Milton Jr. and Kimberly as having loss of consortium claims, but were not listed as persons who were "dependent" on Kimberly and/or Milton Jr. at the time of the accident. Defendants argue that loss of

consortium is a category of noneconomic damages that may be recovered by "other dependents" in a wrongful death action, but that because these individuals were not listed as persons who were dependent on any of the Antonakos decedents, any loss of consortium claims they might have should be dismissed.

The passenger plaintiffs "take no position concerning defendant[s'] claims that the nieces are not entitled to consortium."[37] If the personal representatives of the Antonakos estates are not making claims for these three individuals, which their opposition suggests they are not, then any loss of consortium claims asserted by Welker, Robinette, and Underwood must be dismissed.

## Conclusion

Honeywell's motion for summary judgment[38] on the passenger plaintiffs' wrongful death claims for noneconomic damages, in which Texas Turbine and Recon Air join, is granted. The passenger plaintiffs' wrongful death claims for noneconomic damages are dismissed with prejudice. In addition, any loss of consortium claims asserted by or on behalf of Welker, Robinette, and Underwood are dismissed with prejudice.

DATED at Anchorage, Alaska, this 26th day of May 2020.

/s/ H. Russel Holland
United States District Judge

---

[37] Plaintiffs' Opposition to Motion for Partial Summary Judgment on Wrongful Death and Punitive Damages at 13, Docket No. 273.

[38] Docket No. 238.