WO          IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

In re Crash of Aircraft N93PC            )          No. 3:15-cv-0112-HRH
                                         )          [Consolidated with
on July 7, 2013, at Soldotna, Alaska     )          No. 3:15-cv-0113-HRH and
_____  )          No. 3:15-cv-0115-HRH]


O R D E R

Honeywell's Motions in Limine Nos. 1 and 2;
Honeywell's Motion to Strike Affidavit of Colin Sommer

Defendant Honeywell International moves for entry of an order barring any evidence

or testimony related to four specific accidents.[1]  This motion is opposed.[2]  Honeywell also

moves for entry of an order barring any evidence or testimony relating to any other Service

Difficulty Reports and Accident/Incident reports produced in this litigation.[3]  This motion

is opposed.[4]  In addition, Honeywell moves to strike the affidavit of Colin Sommer, which

plaintiffs have offered in support of their opposition to Honeywell's motion in limine No.

_____

[1]Docket No. 391.

[2]Docket No. 466.

[3]Docket No. 392.

[4]Docket No. 463.

-1-

1.[5]  The motion to strike is opposed.[6]  Oral argument was requested on all three motions but is not deemed necessary.

## Background

On July 7, 2013, a deHavilland DHC-3 "Otter" airplane operated by Rediske Air, Inc. and piloted by Walter Rediske crashed shortly after take-off from the Soldotna Airport. Rediske and all of the passengers on board were killed in the crash.  Plaintiffs, which are the estates of the passengers and Rediske, assert wrongful death, negligence, strict product liability, and breach of warranty claims against Honeywell.

A Honeywell TPE 331-10R-511C turboprop engine had been installed in the accident aircraft.  "The TPE331 engine is a lightweight fixed-shaft engine designed to provide primary power for fixed wing aircraft. . . ."[7] "The two stages of compressors and three stages of turbines are mounted on a common shaft and make up the power section of the engine."[8] "The torsion shaft, which is positioned concentrically inside the main shaft, extends through the length of the main shaft.  The torsion shaft is driven by a spline at the end of the main shaft, and it drives the matched bearing and shaft set (high speed pinion) through a spline

---

[5]Docket No. 503.

[6]Docket No. 509.

[7]Studtmann Expert Report at 3, Exhibit A, Honeywell International Inc.'s Motion for Summary Judgment, Docket No. 234.

[8]Id.

-2-

coupling at the front of the torsion shaft."[9] "The torsion shaft is designed to twist slightly with the application of power."[10] "The engine torque sensor gear assembly measures the engine output torque created by the angular displacement between the engine main shaft and the torsion shaft, which occurs when the engine is driving the propellor."[11] "The torsion shaft has two bushings that sit in 'lands' on the shaft . . . to keep the torsion shaft circumferentially within the main shaft."[12] The torsion shaft in the accident aircraft had a part number of 3101758-6.[13] It is undisputed that post accident, the torsion shaft was found fractured.

Plaintiffs contend that the engine was not producing power at impact because the torsion shaft failed in flight. Honeywell disputes that the torsion shaft failed in flight. Honeywell's experts have taken the position that a torsion shaft cannot shear in flight absent a material defect, of which there is no evidence here.

At their depositions, plaintiffs' experts testified about five other incidents or accidents which may have involved in-flight torsion shaft failures:

---

[9]Id. at 4.

[10]Id.

[11]Id.

[12]Honeywell's Memorandum in Support of its Motion for Summary Judgment at 4, Docket No. 235.

[13]Studtmann Expert Report at 19, Exhibit A, Honeywell International Inc.'s Motion for Summary Judgment, Docket No. 234.

1) a 2013 crash of a Mitsubishi MU-2 in Owasso, Oklahoma ("the Owasso Incident"),

2) a 2011 crash of a "crop duster" near Pinkenba, Australia ("the Sigma Incident"),

3) a 1980 incident involving a CASA 212 aircraft ("the CASA Incident"),

4) a 2000 incident involving a Beechcraft "BE-124" aircraft ("the Beech Incident"), and

5) a 2014 crash involving a Thrush S2R aircraft ("the Medicine Lake Incident").

In addition, documents relating to as many as forty-five other accidents or incidents have been produced either in response to discovery or in connection with expert reports/depositions.

Honeywell now moves to exclude any evidence or testimony related to any of these other incidents and accidents.

## Discussion

"Other-accident evidence to prove negligence, design defect, or notice of a defect is admissible on a showing of 'substantial similarity' of the other accidents to the accident which is the subject of the litigation." Smith v. Beech Aircraft Corp., Case No. 97-17135, 1999 WL 274515, at *1 (9th Cir. April 29, 1999); see also, Specter v. Texas Turbine Conversions, Inc., Case No. 3:17-cv-00194-TMB, 2020 WL 7358989, at *2 (D. Alaska Dec. 14, 2020) (same). "The Ninth Circuit has firmly established, and Alaska state law mirrors other jurisdictions in this, that other accidents must be substantially similar, rather than

-4-

merely similar, to be admissible." <u>Specter</u>, 2020 WL 7358989, at *2. But, "[m]inor or immaterial dissimilarity does not prevent admissibility." <u>White v. Ford Motor Co.</u>, 312 F.3d 998, 1009 (9th Cir. 2002). "'The rule rests on the concern that evidence of dissimilar accidents lacks the relevance required for admissibility under [FRE] 401 and 402.'" <u>Specter</u>, 2020 WL 7358989, at *2 (quoting <u>Cooper v. Firestone Tire and Rubber Co.</u>, 945 F.2d 1103, 1105 (9th Cir. 1991)). "'Substantial similarity depends upon the underlying theory of the case. Evidence proffered to illustrate the existence of a dangerous condition necessitates a high degree of similarity because it weighs directly on the ultimate issue to be decided by the jury.'" <u>Id.</u> (quoting <u>Younan v. Rolls-Royce Corp.</u>, No. 09cv2136–WQH–BGS, 2013 WL 1899919, at *9 (S.D. Cal. May 7, 2013)). "The burden is on the proponent of the evidence to demonstrate substantial similarity[.]" <u>Smith</u>, 1999 WL 274515, at *1. But, "[e]ven if the proponent establishes substantial similarity of circumstances, the trial court has discretion to determine admissibility of such evidence and 'must weigh the dangers of unfairness, confusion, and undue expenditure of time in the trial of collateral issues against the factors favoring admissibility.'" <u>Specter</u>, 2020 WL 7358989, at *3 (quoting <u>Escobar v. Airbus Helicopter SAS</u>, No. 13-00598 HG-RLP, 2016 WL 5897554, at *5 (D. Haw. Oct. 7, 2016)). "As the circumstances and conditions of the other accidents become less similar to the accident under consideration, the probative force of such evidence decreases. At the same time, the danger that the evidence will be unfairly prejudicial remains." <u>Nachtsheim v. Beech Aircraft Corp.</u>, 847 F.2d 1261, 1269 (7th Cir. 1988).

As an initial matter, Honeywell contends that plaintiffs are arguing that they do not have to demonstrate substantial similarity because they are proceeding, in part, on the consumer expectation test theory of liability. In a design defect case, "the factfinder can find a product defective . . . if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. . . ." General Motors Corp. v. Farnsworth, 965 P.2d 1209, 1220 (Alaska 1998) (citation omitted). This is known as the "consumer expectation test," id. and under this test, "the emphasis is on the failure of safe performance, rather than on the specific reasons for the failure." Patricia R. v. Sullivan, 631 P.2d 91, 103 (Alaska 1981). In their opposition, plaintiffs state that they are proceeding on the consumer expectation test, which means that they will not have to prove a specific defect. If that is correct, then Honeywell argues that any substantive evidence related to other accidents would be irrelevant because "evidence of other accidents that are substantially similar may be admitted as direct proof of negligence, a design defect, or notice of the defect." Britton v. Dallas Airmotive, Inc., Case No. 1:07–cv–00547–EJL, 2011 WL 13196592, at *4 (D. Idaho May 20, 2011). Honeywell contends that plaintiffs are not pursuing negligence claims or claims for which notice is a required element and that under the consumer expectation test, defectiveness is inferred. Thus, Honeywell argues that evidence related to other accidents would be irrelevant here and any reference to other accidents should be excluded.

-6-

Evidence and testimony related to other accidents may be relevant in this case. While plaintiffs may not be required to prove a specific defect if the consumer expectation test applies in this case, that does not mean that any evidence related to a specific defect is irrelevant. The other accident evidence is not subject to exclusion just because this case might involve consumer expectation test.

Turning then to the other accident evidence, Honeywell first moves to exclude any evidence related to the Owasso Incident. The Owasso Incident involved a 2013 crash of a Mitsubishi MU-2 in Owasso, Oklahoma. The pilot was attempting to land when he advised air traffic control "that he had a 'control problem' and subsequently stated he had a 'left engine shutdown.'"[14] The NTSB determined the probable cause of the accident

> to be: The pilot's loss of airplane control during a known one-engine-inoperative condition. The reasons for the loss of control and engine shutdown could not be determined because the airplane was not equipped with a crash-resistant recorder and the post accident examination and testing did not reveal evidence of any malfunction that would have precluded normal operation.[15]

The Owasso aircraft "was equipped with two 750 shaft . . . Honeywell TPE331-10AV-511M engines[.]"[16] As plaintiffs' expert Colin Sommer has admitted, the torsion shaft in these engines was a different model ("the 2028 shaft") from the torsion shaft in the accident

---

[14]Exhibit D at 1, Honeywell's Motion in Limine No. 1 [etc.], Docket No. 391.

[15]Id. at 2.

[16]Id. at 9.

aircraft in this case ("the 1758 shaft"), with the 2028 shaft being a thinner shaft.[17] Sommer was also an expert in the Owasso case, and there he testified that Honeywell "should have used the larger and more robust Dash 10 torsion shaft [the 1758 shaft] as opposed to just reusing the Dash 6 torsion shaft [the 2028 shaft]."[18]

Honeywell contends that the Owasso Incident is not substantially similar to the accident in this case. Plaintiffs disagree; and in support of their argument in opposition, they offer a February 4, 2021 affidavit from Colin Sommer. In this affidavit, Sommer discusses Honeywell's analytical report of the Owasso aircraft's engines and opines that "[d]ata from" the Owasso Incident "clearly indicates the wear signatures caused by the relative motion between the torsion shaft and main shaft following a failure of the torsion shaft. Continued engine operation following failure of the torsion shaft will result in destruction of the torsion shaft bushing land."[19] Plaintiffs argue that the damages signatures and Honeywell's conclusions of what those signify in the Owasso crash are relevant to this case because they explain the physical evidence in this case. Plaintiffs contend that the Owasso Incident is relevant "regarding the mechanism and damage to the torsion shaft bushing and bushing

---

[17]Video Deposition of Colin Sommer at 50:3-9, Exhibit A, Honeywell's Motion in Limine No. 1 [etc.], Docket No. 391.

[18]Deposition of Colin A. Sommer, P.E., at 89:2-5, Exhibit E, Honeywell's Motion in Limine No. 1 [etc.], Docket No. 391.

[19]Affidavit of Colin A. Sommer, P.E., at 4, ¶ 2, Exhibit B, Plaintiffs' Response in Opposition to Honeywell's Motion in Limine No. 1 [etc.], Docket No. 466.

lands when a torsion shaft shears."[20]  Sommer also avers that the data from the Owasso Incident is applicable to this case even though the torsion shaft installed in the TPE331-10AV engine is different.[21]  More specifically, Sommer avers that although the 2028 shaft has a "slightly different torsional strength capabili[ty], [its] function in the engine and failure mode" is "substantially similar" to the 1758 shaft.[22]  Plaintiffs thus argue that the difference in the torsion shafts is a minor difference.

In reply, Honeywell argues that plaintiffs cannot rely on Sommer's affidavit and it moves to strike the entire February 4, 2021 affidavit as an improper and untimely disclosed expert report.  Honeywell contends that Sommer's February 4, 2021 affidavit contains new, previously undisclosed opinions about a wide range of issues and thus it should be stricken.

Much of Sommer's February 4, 2021 affidavit is irrelevant as plaintiffs do not rely on it in their opposition to Honeywell's motion in limine No. 1 or in any of their other briefing on the instant motions.  The portions of the February 4, 2021 affidavit that plaintiffs do not expressly rely on have not been considered by the court in deciding the instant motions, and these portions of the February 4, 2021 affidavit are stricken from the record.

However, plaintiffs do rely on portions of paragraphs 2 and 3 of the February 4, 2021

---

[20]Plaintiffs Response in Opposition to Honeywell's Motion in Limine No. 1 [etc.] at 6, Docket No. 466.

[21]Sommer Affidavit at 4, ¶ 3, Exhibit B, Plaintiffs Response in Opposition to Honeywell's Motion in Limine No. 1 [etc.] at 6, Docket No. 466

[22]Id.

affidavit. Primarily, plaintiffs rely on Sommer's averment that the "failure signature" in the Owasso Incident, which showed "significant rotational scoring and damage to the torsion shaft aft bushing land[,]" was similar to the failure or damages signature in this case. Honeywell does not argue that this is a new opinion by Sommer and as plaintiffs point out, Sommer testified about the Owasso Incident and Honeywell's analysis at his deposition, stating that "the most significant piece of [the Honeywell report] is Honeywell's verification of the failure of the torsion shaft in flight . . . because Honeywell specifically calls out in that report that when the shaft breaks in flight, that the bushing gets destroyed and the land gets all chewed up underneath the bushing. . . ."[23] Plainly, Sommer's averment in his February 4, 2021 affidavit about the failure or damages signatures from the Owasso Incident is not a new opinion. While it may have been preferable for plaintiffs to have simply relied on Sommer's deposition testimony rather than offering a new affidavit, "[w]here . . . the declaration[] contain[s] no new material information and present[s] no opinions that were not provided to [the opposing party] during the course of discovery, there has been no violation of Rule 26(e) and no basis to strike." Bona Fide Conglomerate, Inc. v. SourceAmerca, Case No. 3:14-cv-00751-GPC-AGS, 2019 WL 1369007, at *10 (S.D. Cal. March 26, 2019) (citation omitted). Thus, the portions of paragraph 2 and 3 of the February 4, 2021 affidavit regarding the failure signature on which plaintiffs rely are not stricken.

_____

[23]Sommer Deposition at 94:18-24, Exhibit C, Plaintiffs' Responses to Honeywell's Motion to Strike Colin Sommer's Affidavit, Docket No. 509.

-10-

Plaintiffs also rely on Sommer's averment in the February 4, 2021 affidavit that although the 2028 shaft has a "slightly different torsional strength capabili[ty], [its] function in the engine and failure mode" is substantially similar to that of the 1758 shaft.[24]  This is a new opinion and contradicts Sommer's testimony from the Owasso Incident litigation. There, Sommer testified that Honeywell should have used "the larger and more robust Dash 10 torsion shaft [the 1758 shaft] as opposed to just reusing the Dash 6 torsion shaft [the 2028 shaft]."[25]  Because Sommer's averment in the February 4, 2021 affidavit regarding the similarities between the torsion shafts is a new, contradictory opinion, this averment is stricken.  This averment has not been considered by the court when deciding whether the Owasso Incident was substantially similar to the accident in this case.

As to that question, the court finds that the Owasso Incident is not substantially similar to the accident in this case because it involved different Honeywell engines (two Honeywell TPE331-10AV-511M versus one TPE 331-10R-511C) and a different torsion shaft (the 2028 shaft versus the 1758 shaft).  There are also other differences, such as there were no allegations in the Owasso Incident that the aircraft was overloaded and/or improperly loaded but there are such allegations in this case.  Also, there were no allegations in the Owasso Incident that the airplane's flaps were in the incorrect position, but there are

---

[24]Sommer Affidavit at 4, ¶ 3, Exhibit B, Plaintiffs Response in Opposition to Honeywell's Motion in Limine No. 1 [etc.] at 6, Docket No. 466.

[25]Sommer Deposition (in the Owasso/Inhofe matter) at 88:24-89:5, Exhibit E, Honeywell's Motion in Limine No. 1 [etc.], Docket No. 391.

such allegations in this case. In addition, the pilots in the two cases had very different levels of flight experience. In the Owasso Incident, the pilot had just completed his MU-2B training the day of the accident and was making his first solo flight in that aircraft when the accident occurred.[26] But, in this case, the pilot had 7,765 hours of flight time. Finally, the crash in this case took place seconds after take-off while the crash in the Owasso Incident occurred during landing, after a 40-minute flight. In sum, the circumstances of the Owasso Incident are not similar enough to the accident in this case to be admissible to "prove negligence, design defect, or notice of a defect. . . ." Smith, 1999 WL 274515, at *1. Evidence related to the Owasso Incident is excluded for the purpose of proving "negligence, design defect, or notice of a defect. . . ." Id.

That does not, however, mean that evidence related to the Owasso Incident might not be admissible for other purposes. The substantial similarity requirement only applies if the evidence is being offered to prove negligence, design defect, or notice of a defect. It is possible that evidence related to the Owasso Incident might be relevant and admissible for another purpose.

Honeywell next seeks to exclude any testimony or evidence related to the Sigma Incident, which involved a non-fatal crash in 2011 involving a Fletcher FU-24 Stallion. The Sigma aircraft had a TPE331-10AV-511M Honeywell engine and a 2028 torsion shaft.[27]

---

[26]Exhibit D at 6, Honeywell's Motion in Limine No. 1 [etc.], Docket No. 391.

[27]Exhibit G at 3-4, Honeywell's Motion in Limine No. 1 [etc.], Docket No. 391.

-12-

According to an engine teardown report, there was an "[i]n Flight loss of power, forced landing and prop strike" and the "[m]ost possible cause for the in flight loss of power was the breakage of the Torsion Shaft resulting in loss of drive to the gear box and propellor. There would still be drive to the Fuel Pump/FCU resulting in the engine still operating but with zero drive to the propellor."[28]  Honeywell argues that any reference to the Sigma Incident should be excluded for a number of reasons.

First, Honeywell argues that any of the reports related to the Sigma Incident are inadmissible hearsay for which a foundation cannot be laid because no one involved in the accident has been deposed or is going to testify at trial.  "Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'"  Orr v. Bank of Amer., NT & SA, 285 F.3d 764, 778 (9th Cir. 2002) (quoting Fed. R. Evid. 801(c)).  "In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay exception under Rules 803, 804 or 807."  Id.  Honeywell argues that any report or testimony regarding the Sigma Incident would plainly be hearsay and thus any reference to the Sigma Incident should be excluded.

Plaintiffs "agree that standing alone the Sigma report cannot be admitted into evidence[,]"[29] but they argue that experts can rely on inadmissible evidence as long as it is

---

[28]Id.

[29]Plaintiffs Response in Opposition to Honeywell's Motion In Limine No. 1 [etc.] at 9, Docket No. 466.

the type of evidence relied on by experts in that field. FRE 703. And according to plaintiffs'

expert Sommer, in his February 4, 2021 affidavit, this is the type of evidence experts in the

field of aircraft accident investigation rely on.[30]

Honeywell did not move to strike this paragraph of Sommer's February 4, 2021

affidavit, but even if it had, it would not matter because the court can determine that experts

routinely rely on reports of other accidents without looking to Sommer's February 4, 2021

affidavit. For instance, in Sommer's expert report, he states that he relied on "[s]imilar

accident data[.]"[31] Similarly, David Studtmann, one of Honeywell's experts, discusses

"Historical Accidents" in his expert report.[32] Plainly, reports of other accidents is a type of

evidence experts in this field rely on. Thus, evidence related to the Sigma Incident will not

be excluded on the grounds that the Sigma report itself is hearsay.

Nonetheless, evidence related to the Sigma Incident is excluded for the purpose of

proving "negligence, design defect, or notice of a defect. . . ." <u>Smith</u>, 1999 WL 274515, at

*1. The Sigma Incident is not substantially similar to the accident in this case primarily

because the Sigma aircraft had a different engine (a Honeywell TPE331-10AV-511M versus

a TPE 331-10R-511C) and a different torsion shaft (the 2028 shaft versus the 1758 shaft)

---

[30]Sommer Affidavit at 7, ¶ 10, Exhibit B, Plaintiffs Response in Opposition to Honeywell's Motion <u>in Limine</u> No. 1 [etc.], Docket No. 466.

[31]Exhibit A at 23, Plaintiffs' Responses to Honeywell's Motion to Strike Colin Sommer's Affidavit, Docket No. 509.

[32]Exhibit B at 5, Honeywell's Reply in Support of its Motion to Strike Colin Sommer's Second Improper and Untimely Affidavit, Docket No. 514.

-14-

from the accident aircraft.  But, to the extent that evidence related to the Sigma Incident might be offered for another purpose, the evidence is not excluded at this time.

Honeywell next argues that any evidence or testimony related to a 1980 incident involving a CASA 212 aircraft ("the CASA Incident") and a 2000 incident involving a Beechcraft "BE-124" aircraft ("the Beech Incident") should be excluded.  These two incidents are identified in "Service Difficulty Reports" contained in the "SDR Database."

> The Service Difficulty Program is an information system designed to provide assistance to aircraft owners, operators, maintenance organizations, manufacturers, and the Federal Aviation Administration (FAA) in identifying aircraft problems encountered during service.  The Service Difficulty Program provides for the collection, organization, analysis and dissemination of aircraft service information to improve service reliability of aeronautical products.  The primary sources of this information are the aircraft maintenance facilities, owners, and operators.[33]

SDRs are "stored in a computerized data bank for retrieval and analysis."[34]  "[T]he Service Difficulty Program is designed to detect trends.  Any report can be very constructive in evaluating design or maintenance reliability."[35]

As Honeywell aptly argues, SDRS themselves are inadmissible hearsay.  But, that does not mean any evidence based on an SDR is inadmissible.  SDRs are a type of evidence

---

[33]Advisory Circular, Exhibit H at 1, Honeywell's Motion in Limine No. 1 [etc.], Docket No. 391.

[34]Id.

[35]Id. at 3.

relied upon by accident investigators. For instance, NTSB "personnel request data from the SDRs to assist in their accident investigations."[36]

But even if experts in aircraft accident investigations would rely on SDRs in forming their opinions, which they would, evidence related to the CASA and Beech Incidents is excluded for the purpose of proving "negligence, design defect, or notice of a defect. . . ." Smith, 1999 WL 274515, at *1. The CASA and Beech Incidents are not substantially similar to the accident in this case.

The SDR for the CASA Incident indicates that the difficulty being reported was "torsion shaft broken No 1 engine" and the brief explanation provided states: "Eng torque indication shifted during climb shut dwn found torsion shaft broke no 1 eng."[37] The SDR also indicates that the aircraft involved had a TPE33151 engine, which is a TPE331-5-251C engine, not the TPE331-10R-511C engine involved in this case. The TPE331-5-251C engine incorporated a different torsion shaft, a 8605 shaft, rather than the 1758 shaft which was in the accident aircraft in this case. In addition, the reference to engine number one implies that there was a second engine, which means this was a multi-engine aircraft, not a single engine aircraft as was the case here. These differences alone are sufficient to show that the CASA Incident is not substantially similar to the accident in this case.

---

[36]Service Difficulty Reports; Final Rule, Exhibit H at 2, Plaintiffs Response in Opposition to Honeywell's Motion in Limine No. 1 [etc.], Docket No. 466.

[37]Exhibit J at 1, Honeywell's Motion in Limine No. 1 [etc.], Docket No. 391.

The SDR for the Beech Incident indicates that it involved a "shaft sheared lt eng gearbox" and the brief explanation provided that "Lt engine flamed out 5 miles from airport, tried to restart, no restart, problem was shear torsion shaft in gear box, replaced torsion shaft in gear box, functional test, checked good."[38]  But, as plaintiff's expert Sommer testified, there is no analysis as to why the torsion shaft sheared and it could have been because of a material defect or something else.[39]  Moreover, the SDR indicates that the Beech Incident aircraft had a TPE331-6-252B engine, which incorporates a different torsion shaft than the one involved here.  In addition, the torsion shaft in the Beech Incident was in a "gear box" but the torsion shaft involved in this case is not located in a gear box.  These differences are sufficient to show that the CASA Incident was not substantially similar to the accident in this case.

In their opposition, plaintiffs argue that just as the Owasso and Sigma Incidents are substantially similar so is the Medicine Lake Incident.  Arthur Coffman, one of plaintiffs' experts, discussed this incident during his deposition.[40]  The Medicine Lake Incident involved a Thrush S2R aircraft which "force landed in a field while performing aerial

_____

[38]Exhibit M at 1, Honeywell's Motion in Limine No. 1 [etc.], Docket No. 391.

[39]Sommer Deposition at 87:1-14, Exhibit A, Honeywell's Motion in Limine No. 1 [etc.], Docket No. 391.

[40]Deposition of Arthur Lee Coffman at 36:1-38:21, Exhibit G, Plaintiffs Response in Opposition to Honeywell's Motion in Limine No. 1 [etc.] at 9, Docket No. 466

-17-

spraying operations. . . ."[41]  "The pilot reported that after making his last pass he attempted to pull up and turn to the north.  While trying to maneuver, the aircraft began to descend of which the pilot was unable to arrest."[42]  The aircraft had a Honeywell TPE331-5-252K engine.[43]  "The teardown and examination of the engine . . . revealed that the type and degree of damage was indicative of an engine that was under power and operating at the time of impact."[44]  The teardown also revealed that "[t]he torsion shaft was sheared just forward of the aft splines."[45]  Coffman testified that he was involved in the teardown and that as soon as the engine was taken out of the box, he "said, Eew, that torsion shaft sheared in flight, because we knew what happened to the airplane on the ground."[46]

Plaintiffs argue that the Medicine Lake Incident is substantially similar to this case because the damage to the bushing land is similar to the damage in this case.  Plaintiffs compare a photo of the torsion shaft that is purportedly from the Medicine Lake Incident

---

[41]Exhibit F at 5, Plaintiffs Response in Opposition to Honeywell's Motion in Limine No. 1 [etc.] at 9, Docket No. 466.

[42]Id.

[43]Id.

[44]Id.

[45]Id. at 11.

[46]Coffman Deposition at 36:7-11, Exhibit G, Plaintiffs Response in Opposition to Honeywell's Motion in Limine No. 1 [etc.] at 9, Docket No. 466.

-18-

with a photo of the torsion shaft from this case.[47]  Plaintiffs argue that these photos show that the two incidents are substantially similar and thus they should be able to refer to the Medicine Lake Incident to show the damage that can occur at the bushing land once a torsion shaft fails and to counter Honeywell's position that a torsion shaft will not fail in flight absent a material or manufacturing defect.

The Medicine Lake Incident is not substantially similar to the accident in this case, in part, because Sommer conceded at his deposition that the Medicine Lake Incident did not involve a torsion shaft shearing in flight but rather "was a prop strike on the ground, and the engine continued to run afterwards."[48]  In addition, the Medicine Lake Incident involved a different Honeywell engine which may have involved a different torsion shaft.  Thus, evidence related to the Medicine Lake Incident is excluded for the purpose of proving "negligence, design defect, or notice of a defect. . . ."  Smith, 1999 WL 274515, at *1.  This evidence may, however, be admissible if offered for another purpose.

Finally, Honeywell moves to exclude the evidence related to some forty-five other accidents or incidents which has been produced in discovery or as part of expert files, most in the form of SDRs, Honeywell engine teardown reports, or NTSB factual reports.  Honeywell first argues that any testimony or evidence related to these other SDRs and

---

[47]Plaintiffs Response in Opposition to Honeywell's Motion in Limine No. 1 [etc.] at 11, Docket No. 466.

[48]Sommer Deposition at 103:8-13, Exhibit O, Honeywell's Reply in Support of its Motion in Limine No. 1 [etc.], Docket No. 498.

-19-

Accident/Incident reports should be excluded because plaintiffs' experts did not rely on them. Honeywell takes the position that Sommer limited the scope of the other relevant accidents to the Owasso, Sigma, CASA and Beech Incidents. The exchange from Sommer's deposition on which Honeywell relies is as follows:

> Q: So if we want to count the torsion shaft shears that we have in flight, we've got the Owasso[.] We've got the Sigma Aerospace field service report from Australia, and we've got [the CASA and Beech] SDRs?"
> A: Correct.
> Q: Is there anything else?
> A: I believe that's everything.[49]

But, as plaintiffs are quick to point out, these are not the only other accidents that Sommer testified about or relied on, as evidenced by the list of exhibits to his deposition.[50] In addition, at one point in his deposition, Sommer refers to "eight different accidents that I referenced earlier[.]"[51] Contrary to Honeywell's contention, Sommer did not limit the scope of other accidents on which plaintiffs' experts relied to the Owasso, Sigma, CASA, and Beech Incidents. Thus, it is possible that evidence related to some of these other accidents/incidents may be relevant.

---

[49]Sommer Deposition at 103:14-21, Exhibit A, Honeywell International Inc.'s Motion in Limine No. 2 [etc.], Docket No. 392.

[50]Exhibit A at 3, Plaintiffs Response in Opposition to Honeywell's Motion in Limine No. 2 [etc.], Docket No. 463.

[51]Sommer Deposition at 54:3-11, Exhibit A, Plaintiffs Response in Opposition to Honeywell's Motion in Limine No. 2 [etc.], Docket No. 463.

Honeywell also argues that testimony and evidence related to these other SDRs and Accident Reports should be excluded because the SDRs constitute inadmissible hearsay; the SDRs and Accident Reports involve accidents or incidents that are not substantially similar; and these documents and reports lack probative value and if admitted, will confuse the jury. But, the court cannot make such determinations at this point. Such determinations will have to be made if and when evidence related to these other accidents is offered. Thus, Honeywell is not entitled to a blanket exclusion of any evidence related to these other accidents/incidents.

Conclusion

Honeywell's motion in limine No. 1 is granted in part and denied in part. Evidence related to the Owasso Incident, the Sigma Incident, the CASA Incident, the Beech Incident, and the Medicine Lake Incident is excluded for the purpose of proving negligence, a design defect, or notice of a design defect. Honeywell's motion in limine No. 1 is otherwise denied.

Honeywell's motion in limine No. 2 is denied. The court declines to exclude any evidence related to the other accidents/incidents at this time.

Honeywell's motion to strike the February 4, 2021 affidavit of Colin Sommer is granted in part and denied in part. The motion is granted as to Sommer's averment that although the 2028 shaft has a "slightly different torsional strength capabili[ty], [its] function in the engine and failure mode" is substantially similar to that of the 1758 shaft.[52] The

---

[52]Sommer Affidavit at 4, ¶ 3, Exhibit B, Plaintiffs Response in Opposition to Honeywell's Motion in Limine No. 1 [etc.], Docket No. 466.

-21-

motion is also granted as to any portions of the February 4, 2021 affidavit not relied on by plaintiffs in their briefing on the instant motions.  The motion is otherwise denied.

DATED at Anchorage, Alaska, this 10th day of June 2021.

/s/ H. Russel Holland
United States District Judge