IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| In re Crash of Aircraft N93PC | ) | No. 3:15-cv-0112-HRH |
| | ) | [Consolidated with |
| on July 7, 2013, at Soldotna, Alaska | ) | No. 3:15-cv-0113-HRH and |
| _____ ) | | No. 3:15-cv-0115-HRH] |

O R D E R

Honeywell's Motion in Limine No. 12

Honeywell moves to exclude any testimony about reports of black smoke, and any alleged cause thereof, from the accident aircraft.[1] This motion is opposed.[2] Oral argument was requested but is not deemed necessary.

Background

On July 7, 2013, a deHavilland DHC-3 "Otter" airplane operated by Rediske Air, Inc. and piloted by Walter Rediske crashed shortly after take off from the Soldotna Airport. Rediske and all of the passengers on board were killed in the crash. A Honeywell TPE 331-10R-511C turboprop engine had been installed in the accident aircraft. Plaintiffs, which are

---

[1]Docket No. 403.

[2]Docket No. 444.

the estates of the passengers and Rediske, assert wrongful death, negligence, strict product liability, and breach of warranty claims against Honeywell.

During the NTSB investigation of the accident, Matt Isham was interviewed as an eyewitness. Isham stated that he saw the accident aircraft as it was taking off and that "the airplane was about 100 feet above the ground and in a 'normal' takeoff attitude."[3] Isham "stated he saw a big puff of black smoke come from the exhaust on the lower right side area of the airplane."[4] Isham stated that "[h]e was familiar with the airplane and stated he had been a passenger in the accident airplane in the past."[5]

On November 20, 2017, plaintiffs' retained private investigator interviewed Isham. During that interview, Isham stated that he saw the accident aircraft as "it was taking off and I seen a big black puff of smoke come out of the exhaust. . . ."[6] Isham explained that when he said the smoke was coming out of the exhaust, he meant that "it's got that exhaust that came out the side there for the turbine."[7] He stated that he could tell that was where the black smoke was coming from and that "it was black coming out, so . . . whether he [the

---

[3]Record of Conversation at 1, Exhibit A, Honeywell's Motion in Limine No. 12 [etc.], Docket No. 403.

[4]Id.

[5]Id.

[6]Interview with Matt Isham at 1, Exhibit B, Honeywell's Motion in Limine No. 12 [etc.], Docket No. 403.

[7]Id. at 2.

pilot] gunned it . . . I don't know."[8]  Isham stated that the black smoke "looked like a continuous stream" and that "it wasn't like crazy exhaust but you could definitely tell he was getting on it."[9]  Isham stated that it was his impression that the pilot was "throttling up[.]"[10]

Honeywell now moves to exclude any testimony about reports of black smoke and any alleged cause thereof.

## Discussion

Honeywell first moves to exclude Isham's witness statements because they are inadmissible hearsay.  Honeywell contends that these witness statements are out of court statements being offered to prove the truth of the matter asserted, namely that black smoke was seen coming from the accident aircraft.

Plaintiffs concede that the NTSB's summary of the Isham interview and the recording and transcription of the private investigator's interview are hearsay.[11]  But, as Honeywell acknowledges in its reply brief,[12] these documents should not be excluded because it is possible that they could be admissible should Isham testify at trial and make contradictory statements on the stand.

---

[8] Id.

[9] Id.

[10] Id.

[11] Plaintiffs Response in Opposition to Honeywell's Motion in Limine No. 12 [etc.] at 2, Docket No. 444.

[12] Honeywell's Reply in Support of Motion in Limine No. 12 [etc.] at 2, Docket No. 491.

Plaintiffs also argue that Isham should be able to testify at trial about his observations. While Honeywell does not dispute that Isham could testify that he saw a puff of black smoke, Honeywell argues that Isham should be excluded from offering any testimony as to the cause of the black smoke. In particular, Honeywell argues that Isham's testimony that the black smoke could have been caused by the pilot throttling up lacks any foundation or basis because Isham was not in the aircraft and could not know what the pilot was doing. Honeywell also argues that any testimony as to the cause of the black smoke would be an expert opinion, which Isham is not qualified to offer as there is no evidence that he is a pilot or an airplane mechanic.

Plaintiff argues that Isham should be able to offer his testimony about the cause of the black smoke pursuant to Rule 701. "Rule 701 allows a lay witness to offer opinions that are (a) 'rationally based on the witness's perception,' (b) 'helpful' to the jury, and (c) 'not based on scientific, technical, or other specialized knowledge within the scope of' expert testimony." United States v. Gadson, 763 F.3d 1189, 1206 (9th Cir. 2014) (quoting FRE 701). Plaintiffs argue that Isham's comments that the pilot was "getting on it" or "throttling up" are rationally based on his perceptions of the aircraft, its flight, and the black smoke.

Isham can offer his testimony about what he saw on the day of the accident but he may not testify as to causation. Causation as to the black smoke involves much more than his layman's observations and necessitates expert testimony. In short, Isham, who has not been disclosed as an expert witness, may not offer an opinion as to what caused the black smoke that he observed on the day of the accident.

Honeywell next argues that plaintiffs' experts, Colin Sommer and Arthur Coffman, should not be allowed to testify about the black smoke because neither "has coherently testified about the relevance of the alleged existence of black smoke" or sufficiently explained "how a broken torsion shaft . . . can result in a puff of black smoke."[13] At his deposition, Coffman was asked whether he had "an explanation for why [the] puff of black smoke occurred?"[14] Coffman responded:

> Because the engine is at its – he's climbing out at a high power setting; I'm going to say probably approaching max torque. And the instant that shears, the engine – it takes approximately two-thirds of the power produced by the power producer to drive the compressor. That's an industry standard. It's been there always with turbine engines. You have an immediate reduction in RPM. It's like you sat on the brake. The fuel control wants to actually give it more fuel because it says, I'm spooling down, I want to give fuel, because the power lever is still asking for fuel.
> So the fuel control, whatever little pressure it has left as the pump's spooling down – and it has a reserve pressure built in there. Fuel is bypassed back – it's adding fuel, trying to accelerate. The airflow is coming down very rapidly. Engines roll back real rapidly when you shut them off like that. So you – the air is – it's like the air – it's like there's brakes on this engine stopping the rotation because so much torque is used to do that. It has this little burst of fuel. And you – so you have a reduction in air, a burst of fuel, and you're going to get a puff of black smoke. This has been reported in other engines that – like spray planes that reported that they sheared a torsion shaft said,

---

[13]Honeywell's Motion in Limine No. 12 [etc.] at 4, Docket No. 403.

[14]Video Deposition of Arthur Lee Coffman at 81:5-6, Exhibit D, Honeywell's Motion in Limine No. 12 [etc.] at 4, Docket No. 403.

-5-

> [w]ell, we got a puff of black smoke. Some of the flaggers or somebody made that comment.[15]

Honeywell contends that while Coffman's testimony appears to establish some relevancy as to the black smoke testimony, it actually does not because Coffman's testimony is based on a fundamental misunderstanding of how the TPE-331 engine operates and how it would react to a failed torsion shaft. Honeywell contends that the foregoing testimony shows that Coffman "believed that the engine would 'spool down' or 'roll back' if the torsion shaft failed, which would then purportedly cause his described 'reduction in air, a burst of fuel, and . . . puff of black smoke.'"[16] But, Honeywell contends that is not what would occur, and that Coffman conceded as much in his rebuttal expert report. In that report, Coffman stated that

> [i]n my career it has been my experience that torsion shaft failure results in the shutdown of the engine. I have since learned that engines may continue to run on the fuel control governor at a minimum fuel flow depending on the condition and settings of the fuel control unit.[17]

Honeywell argues that the foregoing establishes that Coffman's original testimony about the cause of the black smoke was wrong and thus any testimony related to the black smoke would be irrelevant. Honeywell argues that if Coffman were to testify at trial that his theory

---

[15]Id. at 81:9-82:12.

[16]Honeywell's Motion in Limine No. 12 [etc.] at 6, Docket No. 403.

[17]Coffman Rebuttal Report at 2, Exhibit F, Honeywell's Motion in Limine No. 12 [etc.], Docket No. 403.

about the cause of the black smoke applies even though he was completely wrong about the engine design, then this would be a new and undisclosed opinion. It would also be an unreliable opinion, according to Honeywell, as there would have to be testing done in order to prove that the engine could generate black smoke when the torsion shaft shears.

At his deposition, Sommer was asked whether it was correct that "this being a turbine engine, once it's lit off, as long as it has fuel being supplied to it, it's going to continue to run unless something stops it[.]"[18] Sommer responded:

> No, not necessarily. Based upon the witness statement, there's a large puff of black smoke that comes out of the right side of the aircraft which is consistent with the location of the exhaust pipe on this airplane. That large puff of black smoke has to be consistent with an excessively rich fuel mixture to where it was burning up excessive fuel inside the engine. Once the engine is decoupled, without actually doing a test, you have a large number of variables that are going to be trying to control the airplane. You have an overspeed governor, you have an underspeed governor, you have the fuel control, you have the torque limiter. And based upon these other accidents, it is not consistent that the engine is going to continue to run after the torsion shaft fails.[19]

Honeywell argues that this testimony is entirely speculative because as Sommer himself testified, there was no testing done to test his theory that the engine could not continue to run after the torsion shaft failed. Secondly, Honeywell argues that this testimony is based on a fundamental misunderstanding of how the TPE-331 engine operates, as explained above.

---

[18]Video Deposition of Colin Sommer at 70:22-25, Exhibit C, Honeywell's Motion in Limine No. 12 [etc.], Docket No. 403.

[19]Id. at 71:1-16.

Coffman's and Sommer's testimony about the black smoke is relevant because it goes to the question of whether the engine failed in flight. In his expert report, Sommer opined that "[t]he witness statements and video evidence of the crash are supportive of an inflight engine failure. . . ."[20] Plaintiffs contend that Sommer was never asked at his deposition how the black smoke was supportive of an inflight engine failure and when he did mention the black smoke, Honeywell's counsel stated that he was not asking about the accident flight in particular, but was asking generally about TPE-331 engines.[21] As for any argument that there was no testing done, as plaintiffs aptly argue, testing a sheared torsion shaft in flight is an impossible task. And, although Honeywell insists that Coffman and Sommer have misunderstood how the TPE-331 engine works, Honeywell has not offered, at least not in connection with the instant motion, any evidence to support its contention that a TPE-331 engine does not work the way Coffman and Sommer said. Contrary to Honeywell's contention, in his rebuttal report, Coffman did not unequivocally state that the engine would not spool down if the torsion shaft failed. Rather, Coffman merely stated that he had learned that an engine <u>may</u> continue to operate after a torsion shaft fails. With what is currently before it, the court is not convinced that Coffman's and Sommer's testimony about the cause of the black smoke is irrelevant. Coffman's and Sommer's testimony may be wrong as

---

[20]Report of Findings at 21, Exhibit 6, Plaintiff's Responses to Honeywell's Motion in Limine To Exclude the Testimony of Colin Sommer and Arthur Lee Coffman, Docket No. 278.

[21]Sommer Deposition at 71:17-21, Exhibit C, Honeywell's Motion <u>in</u> <u>Limine</u> No. 12 [etc.], Docket No. 403.

regards their understanding of how the TPE331 engine works; but that goes to the weight of their opinions and testimony, not to relevancy. Their testimony about the black smoke is not inadmissible for lack of relevancy.

But even if the black smoke testimony is relevant, which it is, Honeywell argues that it should still be excluded under Rule 403 which provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, [or] misleading the jury[.]" Honeywell argues that Coffman's and/or Sommer's testimony about the black smoke would lead a jury to believe that an engine shutting down can cause black smoke, which Honeywell argues is simply not the case for the engine that was in the accident aircraft.

This is yet another argument that Coffman and Sommer misunderstood how the TPE331 engine operates. Honeywell may be able to prove as much at trial, but this does not create a Rule 403 problem. The black smoke testimony will not be excluded on the grounds that it is more prejudicial than probative.

## Conclusion

Honeywell's motion in limine No. 12 is granted in part and denied in part. The motion is granted as to any opinions from Isham as to the cause of the black smoke. Such opinions from Isham are precluded. The motion is otherwise denied.

DATED at Anchorage, Alaska, this 28th day of June 2021.

/s/ H. Russel Holland
United States District Judge