1          UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF ALASKA
2

3  In re Crash of Aircraft N93PC    )
                                    )  No. 3:15-cv-0112-JMK
4  on July 7, 2013, at Soldotna,    )  (Consolidated with
   Alaska                           )  No. 3:15-cv-0113-JMK and
5  _____     )  No. 3:15-cv-0115-JMK)
                                    )
6

7          TRANSCRIPT OF TRIAL BY JURY - TRIAL DAY 2
      **BEFORE THE HONORABLE JOSHUA M. KINDRED, DISTRICT JUDGE**
8              Tuesday - January 31, 2023
                9:15 a.m. - 4:20 p.m.
9                 Anchorage, Alaska

10 **FOR THE PLAINTIFF:**

11      Law Offices of Michael J. Schneider, P.C.
        BY:  MICHAEL J. SCHNEIDER
12      800 N Street, Suite 202
        Anchorage, Alaska 99501
13      907-274-8201

14      Motley Rice, LLC
        BY:  JAMES RICHARD BRAUCHLE
15      BY:  MARY SCHIAVO
        28 Bridgeside Blvd.
16      Mount Pleasant, South Carolina 29464
        843-513-7626
17
        Thomason & Pracht, LLP
18      BY:  JOHN CHRISTOPHER PRACHT
        P.O. Box 4025
19      Anderson, South Carolina  29622
        864-226-7222
20
   Clerk in attendance: Suzannette David-Waters/Jessica Solnick
21
   _____
22
                    **STACY M. BALDWIN**
23                **Realtime Certified Reporter**
                  **Federal Official Court Reporter**
24                 222 West 7th Avenue, #4
                   Anchorage, Alaska 99513
25        Transcript Produced from the Stenographic Record

**FOR THE DEFENDANT:**

    Adler Murphy & McQuillen LLP
    BY:  MICHAEL G. McQUILLEN
    BY:  GINA MARIE DIOMEDI
    BY:  JOHN A. KELLY
    20 South Clark Street, Suite 2500
    Chicago, Illinois 60603
    312-345-0700

    Perkins Coie, LLP
    BY:  JAMES N. LEIK
    1029 W. 3rd Avenue, Suite 300
    Anchorage, Alaska 99501
    907-279-8561

1        **I N D E X**

2    WITNESSES CALLED BY THE PLAINTIFFS:              PAGE

3    **MATTHEW ISHAM**
     DIRECT EXAMINATION BY MR. SCHNEIDER              107
4    CROSS-EXAMINATION BY MR. KELLY                   124
     RE-DIRECT EXAMINATION BY MR. SCHNEIDER           129
5    **COLIN SOMMER**
     DIRECT EXAMINATION BY MR. BRAUCHLE               130

6

7    FURTHER PROCEEDINGS:

8    OPENING STATEMENT MR. BRAUCHLE                    14
     OPENING STATEMENT BY MR. MCQUILLEN                39
9    CERTIFICATE                                      199

10

11                        EXHIBITS

12   **PLAINTIFFS**              DESCRIPTION
     Exhibit 9                                        137
13   Exhibit 3                                        154
     Exhibit 15                                       158
14   Exhibit 17A                                      171
     Exhibit 17B                                      174
15   Exhibit 17C                                      176
     Exhibit 64                                       184
16   Exhibit 65                                       186
     Exhibit 108                                      189
17   Exhibit 68                                       191

18

19

20

21

22

23

24

25

1                    (Call to Order of the Court at 9:15 a.m.)

2                    DEPUTY CLERK:  All rise.  His Honor, the Court, the

3    United States District Court for the District of Alaska is now

4    in session, the Honorable Joshua M. Kindred presiding.

5                    Please be seated.

6                    THE COURT:  Good morning, everyone.

7                    So as we discussed yesterday, I think the plan will be

8    to bring the jury in.  Plaintiffs can give their opening

9    statement.  Likely we'll take our morning break then, which

10   will afford defense an opportunity to set up the well as they

11   would like and get their technology ready.  Bring the jury back

12   in.  Defense will do their opening statement.

13                   I'm hoping that gets us somewhere close to the lunch

14   break, and then we can start with actual testimony after --

15   after lunch.

16                   However, if we do have a little bit of time, and I'm

17   trying to delay, I wonder if it wouldn't be prudent for

18   plaintiffs to at least introduce the factual stipulations as

19   per Judge Holland's order.  I think he wanted that first into

20   evidence, so maybe we'll be able to do that and then break for

21   lunch.  But we can also just see how fast this morning moves

22   along.

23                   Any issues that we need to discuss this morning before

24   we begin?

25                   MR. BRAUCHLE:  None from the plaintiff, Your Honor.

1           MR. MCQUILLEN:  Just from the stipulations,

2     Your Honor.  I was going to refer to some in the opening.  If

3     they're not going to read until after, is this a problem?  I

4     just want to make sure --

5           THE COURT:  It shouldn't be a problem.  I mean, these

6     are stipulations.

7           MR. MCQUILLEN:  Yeah.

8           THE COURT:  I think the trick is -- I mean, do we

9     have, and I probably should know this, an exhibit number for

10    the factual stipulations at this point in time?  I'm assuming

11    that --

12          MR. MCQUILLEN:  I don't think we have one right now.

13          THE COURT:  Okay.

14          MR. MCQUILLEN:  I'm fine if he wants to refer to them

15    and I will perfect it later.  I mean, they are what they are.

16          THE COURT:  Sure.  And that question is more for the

17    jury instruction; that we'll reference the exhibit at the end

18    of the trial.  But that's fine.

19          MR. MCQUILLEN:  Okay.  Thank you, Your Honor.

20          THE COURT:  I guess -- I'm almost afraid to ask, but

21    any progress on the conversations regarding the economist's

22    reports?  Are we still somewhat at a stalemate as to that

23    issue?

24          MS. DIOMEDI:  No, your Honor.  I guess we don't want

25    to start every morning off with the economist report.

1          But I did go back and do some more looking at what

2     Dr. Frankenfeld testified to about his methodology in his

3     deposition back in 2017.  I think it's relevant to what we're

4     talking about.

5          I'm happy to talk about that now or at any time you

6     think is appropriate.

7          THE COURT:  Well, let's just talk about it later.  I

8     just wasn't sure, fingers crossed, that maybe something had

9     been figured out.  But that's fine.  That update is sufficient.

10          I was thinking last night that I might have made a

11     mistake in sort of a somewhat tenuous ruling I made yesterday

12     regarding the opening statements from plaintiffs.  I don't know

13     that under -- I think pragmatically it makes sense not to

14     mention with specificity what you expect the economist report

15     to read, but I don't know that it's appropriate for this Court

16     to limit what plaintiffs say in their opening statement.  To

17     the extent you provide us a specific dollar figure, this Court

18     is not going to feel handcuffed to that representation to the

19     jury when it makes its ultimate determination about the

20     economist report.

21          But the more I thought about it, the more I thought it

22     wasn't appropriate for this Court to dictate to plaintiffs what

23     they represent to the jury the evidence will be.  But also to

24     caution plaintiffs' counsel that, ultimately, that's a promise

25     that you make that I'm not responsible for allowing you to

1   keep.

2          So I just wanted to rescind that order.  Perhaps it's

3   a suggestion, it -- but it was pragmatic, it wasn't legal, and

4   it wasn't appropriate for this Court to attempt to limit

5   plaintiffs in what they want to provide in their opening

6   statements.

7          So to the extent it impacts what you want to do this

8   morning, I would like to rescind that.  I'm happy to hear if

9   defense thinks I'm wrong about that, but that's sort of what I

10  arrived at last night when I thought about it more.

11         While we have at least a couple of minutes, there were

12  several jury instructions that we still had at least a little

13  bit of a hair on.  I don't have them all figured out at this

14  point in time, but I do have -- Ms. Kelly, do you know what

15  that originally --

16         DEPUTY CLERK:  The original number.  Let's see,

17  were -- this was by the law clerk.

18         LAW CLERK:  It was page 30, Honeywell Instruction

19  Number 25.

20         THE COURT:  Thank you, Ms. Kelly.

21         So we had discussed -- I believe Mr. Schneider had

22  indicated that he wanted some language added.  And this was on

23  page 30 of the packet this Court provided but was originally

24  numbered as Honeywell's Proposed Instruction Number 25.

25  Mr. Schneider had wanted some additional language added and

1   then I think the defense had suggested they were comfortable

2   with some language being added but maybe not the full request

3   from Mr. Schneider.

4           So this instruction will now read -- and we'll provide

5   you, obviously, a clean copy, but just so the parties are

6   aware.  In the paragraph, which would be the third full

7   paragraph, which originally read:  "If both of these things are

8   more likely true than not true for a claimed loss, you must

9   then decide how much money will fairly compensate the

10  plaintiffs for that loss.  Your award must be based upon

11  evidence and not upon speculation, guesswork, or conjuncture."

12          It will now read:  "If both of these things are more

13  likely true than not true for a claimed loss, you must then

14  decide" -- and this is the new language -- "if plaintiffs had

15  proved the amount of damages to such a degree as to allow you

16  to reasonably estimate that amount in deciding how much money

17  you will fairly compensate the plaintiffs for the claimed loss,

18  your award must be based upon evidence and not upon

19  speculation, guesswork, or conjecture."

20          I recognize the parties may want to think about this

21  and have additional arguments, but just so you're aware, that's

22  what the Court is contemplating altering that instruction to

23  read.

24          Yeah, I think that's -- Ms. Kelly, do we have other

25  issues we need to work out this morning?

1          LAW CLERK:  No.

2          THE COURT:  All right.  Very well.

3          I have nothing else, unless the parties have anything

4    else, we can bring the jury in at 9:30.

5          Yes, sir?

6          MR. MCQUILLEN:  One thing, Your Honor.

7          THE COURT:  Yep.

8          MR. MCQUILLEN:  I raise this only to raise it, not to

9    be critical, but just to mention it to everybody.  There was an

10   order that Judge Holland had entered talking about -- that

11   excluded evidence of decedent's character, in ruling number 20,

12   surviving family members, friends, or colleagues, their

13   closeness with any of the decendents and any grief, sorrow, or

14   emotional stress experienced as a result of the accident, that

15   that was excluded.  I just wanted to make sure that applied to

16   the evidence but that applies to the opening statements as

17   well.

18         THE COURT:  And that is at Docket Number 530.  No, my

19   expectations would be that opening statements track any

20   pretrial motions or motions in limine that were litigated.  You

21   know, my approach to opening statements, to a certain extent,

22   is I recognize that, you know, it's not meant to be

23   argumentative.  I do -- I won't go so far as to say I detest,

24   but I have a strong belief that objections or opening

25   statements should be limited to things that are particular

1    egregious.

2           That being said, it is my expectation that the parties

3    will be -- will display throughout their opening statements a

4    fidelity to the rulings that this Court, whether it was myself

5    or Judge Holland, has made.  And to the extent that either

6    party were to go beyond any lines that have been established,

7    I'm going to be open to finding ways to remedy that, whether

8    it's limiting an instruction, cautioning the attorney in front

9    of the jury.

10          What I don't like to do is start off this process by

11   litigating objections during opening statements.

12          And so to the extent if it's a particular egregious,

13   of course object.  We'll deal with it in real time.  However,

14   if you think it's not egregious enough to disrupt opening

15   statement but is something that needs to be addressed and

16   possibly remedied in front of the jury, then that is something

17   I'm willing to do, and I appreciate you bringing that up.  And

18   I have every belief that -- Mr. Brauchle, are you handling the

19   opening statement?

20          MR. BRAUCHLE:  I am, Your Honor.

21          THE COURT:  I have no reason at this point in time to

22   have any distrust in any of the attorneys who have appeared

23   here as far as their character and their ability to comport

24   with Judge Holland's rulings, but I appreciate, you know, the

25   recommendation that there are quite a bit of rulings that

1  Judge Holland made.  And keeping track of them is difficult

2  even for me, so I imagine it is also difficult for you all.

3           But that being said, we'll see how things play out.

4           MR. MCQUILLEN:  Thank you, Your Honor.

5           THE COURT:  Yes, sir.

6           MR. BRAUCHLE:  I am going to introduce each of the

7  decedents -- well, I'm going to say Chris McManus,

8  interventional radiologist from Greenville, South Carolina, his

9  wife Stacey, his child.

10           MR. MCQUILLEN:  Fine.

11           MR. BRAUCHLE:  Okay.  I just didn't want to run -- but

12  I'm not literally is it's --

13              (Whereupon, the Court Reporter

14               interrupted for clarification.)

15           MR. BRAUCHLE:  Mr. McManus, Dr. McManus, was a

16  radiologist.  His wife was president of the PTA.  His daughter

17  was a high school basketball player.  That's it.  One sentence.

18  I just -- I don't want to run afoul of the order.

19           THE COURT:  Well, no.  I mean, we have a couple

20  minutes here, so let's be clear.

21           The way I read the order was to prohibit reference or

22  discussions about the decedent's character, surviving family

23  members, friends or colleagues, closeness with any of the

24  decedents, and any grief, sorrow, and emotional stress

25  experienced because of the accidental deaths, excluded, again,

1   because it is not relevant.

2          I think Judge Holland did allow or suggest that a

3   tasteful photo of each of the decedents is permissible.  I do

4   think it would be permissible to provide some introduction as

5   to who this person was.  Again, there's a line that would be

6   crossed where this is informative to what is effectively

7   either, implicitly or explicitly, a plea for sympathy.

8          If it's something as simply of that, I can't see that

9   running afoul with Judge Holland's ruling at Docket 530.

10          MR. BRAUCHLE:  It's just as simply that.  I had his

11   ruling in mind when I crafted it.

12          THE COURT:  Very well.  All right.

13          Any issues with technology?

14          MR. MCQUILLEN:  I hope not.

15          THE COURT:  None?  All right.

16          MR. MCQUILLEN:  I guess I'll tell you in hour and a

17   half.

18          THE COURT:  Well, we'll keep that going.  We'll see.

19   All right.  Very well.

20          Well, if we are ready to proceed, we can bring the

21   jury in now.

22          Are they here?

23          DEPUTY CLERK:  They are not quite to the jury room

24   yet.

25          THE COURT:  Okay.  All right.  We'll wait.

```
 1              DEPUTY CLERK:  They should be on their way.

 2              (In the presence and hearing of the jury panel.)

 3              THE COURT:  Good morning, everyone.  So as I indicated

 4   yesterday, we are going to begin with opening statements today.

 5              Also during jury selection, I had talked about how I

 6   like to have a consistent schedule for the jury.  And for the

 7   most part, that's true.  We may not be able to do that today,

 8   given that we are doing opening statements, and then we will be

 9   transitioning into actual evidence.  Today may be a little less

10   consistent than I would like, but nevertheless, I want you to

11   know that I will do my best to ensure that you go to lunch the

12   same time every day, and you take your breaks roughly the same

13   time every day.

14              I also need to read you an instruction that I'm going

15   to read you every morning, so you will soon grow very bored

16   with it.  But as I reminded you yesterday and continue to

17   emphasize to you today, it is important that you decide this

18   case based solely on the evidence and the law presented here.

19   So you must not learn any additional information about the case

20   from sources outside the courtroom.

21              To ensure fairness to all parties in this trial, I

22   will now ask whether any of you have learned about or shared

23   any information about this case outside of this courtroom, even

24   if it was accidental.  If you think that you might have done

25   so, please let me know by raising your hand.
```

 1          I see no raised hands.

 2          However, if you prefer to talk to the Court privately

 3   in response to this question, please notify a member of the

 4   court staff at the next break.

 5          Thank you for adherence to my instructions.

 6          Sir, you may begin.

 7          MR. BRAUCHLE:  May it please the Court.

 8                        **OPENING STATEMENT**

 9   MR. BRAUCHLE:

10          Good morning.  Can everybody hear me okay?  Thumbs up?

11   Excellent.  Okay.

12          In the summer of 2013, two families from Greenville,

13   South Carolina traveled to Alaska for an adventure.  They spent

14   some time here, they went on several expeditions, enjoying the

15   ruggedness and the beauty of the state of Alaska.

16          They had scheduled one last trip before they left,

17   which was a bear-viewing trip over in the Chinitna Bay area.

18   They had arranged for a lodge that was going to arrange air

19   transportation to take them from Soldotna over to the lodge.

20          The two families were the McManus family and the

21   Antonakos family.  The McManus family consisted of

22   Chris McManus, an interventional radiologist from Greenville,

23   South Carolina.  This was July 7th, 2013.  It was his 46th

24   birthday.  His wife, Stacey, also from Greenville, was a

25   charitable fundraiser committee member.  Their daughter,

Meghan, 17 years old, varsity basketball player was being
recruited to play at the next level in college.  Their son,
Connor, 14 years old, Eagle Scout.

They were traveling with their good friends, the
Antonakos family.  The Antonakos family consisted of Milton
Antonakos, Jr., known to his friends as Melet, medical
software, a businessman.  His wife, Kimberley, president of the
PTA.  His oldest daughter, Olivia, 16, also high school
basketball player.  His son, Mills, 14, president of his school
class.  And their youngest, Olivia (sic), 11 years old,
aspiring chef.

The lodge arranged for transportation with Rediske Air
from Nikiski.  The aircraft was going to be flown by
Walter Rediske who owned and operated Rediske Air Services.
Mr. Rediske had almost 8,000 flight hours.  He had flown this
trip approximately a hundred times.  They arrived at Soldotna,
and he loaded the aircraft like he did about a hundred or so
times prior.

Excited, they got on the airplane, ready to go for the
short trip across Cooks Inlet.  Olivia, who I just introduced,
was memorializing the trip.  She took out her iPhone, like most
teenagers do, and hit the record button.  It was the last video
of the trip.

What you're about to see is the actual video from the
crash.  It's graphic.  It's disturbing.  But it's the evidence

1    that actually occurred on this flight.  It's going to play a

2    crucial role in this case.  A lot of the evidence in this case

3    is going to involve sounds and visuals that you are going to

4    see on this video.

5         So I ask you to watch it, to listen, and as this trial

6    goes on, you'll understand the importance of different factors

7    within the video.

8              (Video played.)

9         MR. BRAUCHLE:  Why did this happen?  Two words:

10   Engine failure.  This is the engine that was on the aircraft,

11   an Otter, turbine Otter, which means it had a turbine engine.

12   I, admittedly, am not an expert on turbine engines, so I'm

13   going to give you a real brief overview of this engine, what

14   the evidence is going to show, but we will have people with a

15   lot more speciality than I can give, and they'll tell you

16   exactly what's on there.

17             The engine -- as one of the experts will describe, it

18   is basically a jet engine that turns a propeller.  You have

19   what's -- this area here is called the inlet, which sucks air

20   in, goes into these blades here, which are -- you'll hear them

21   called turbine -- or I'm sorry, impellers or compressors.  And

22   what it does is it compresses the air, forces the air up into

23   this section where fuel is introduced, which basically causes

24   mini explosions, and that's what powers the engine.

25             Through the center of this engine is a shaft.  It

connects all these blades. You see these blades here? These blades are metal, they are heavy. Throughout the trial, you'll actually get an opportunity to see them. They'll be here in the courtroom. But through the center of that runs a shaft.

These blades here, when this engine is running at full power, rotates at over 41,000 revolutions per minute. Over 41,000 revolutions per minute.

It then goes into these gears, these series of gears here. Gears -- you'll hear the experts explain it. It's gear reduction. And then it attaches to the propeller because the propeller rotates at a constant speed of 1,590 revolutions per minute. So what the engine does is it takes the over 41,000 revolutions per minute, reduces it to turn this propeller at 1,590 revolutions per minute.

We're going to -- the testimony that you're going to hear, and you're going to hear from several different experts in this case, the first of which you will hear this afternoon is Colin Sommer.

Mr. Sommer is from Colorado. He's a professional engineer. He has spent the majority of his life around aviation. He is a trained aircraft accident investigator. He's investigated over -- I want to say 500, but I'm sure that he will update you on exactly how many aircraft accidents that he has investigated over the last 20 years of his career. He's an accident reconstructionist, and he will explain the

1   methodology and the proper way that you conduct an aircraft

2   investigation and the steps that you have to make a proper

3   accident investigation.

4          You'll also get an opportunity, Mr. Coffman,

5   Arthur Lee Coffman from Texas.  Mr. Coffman is an aircraft

6   mechanic.  He is -- talking to him, he got his aircraft

7   mechanic's license in 1964.  He's also a pilot.  He spent the

8   better part of his career working with turbine engines.  He

9   fixed them.  He sold them.  Was a quality control manager.  Was

10  a service manager.  And for the last 20 to 25 years, he's acted

11  as a consultant for accident investigation or failure

12  investigations regarding turbine engines.

13         You will also hear from Mark Hood.  Mark Hood is also

14  a professional engineer.  His speciality is in metallurgy

15  failure analysis.  He worked for the Department of the Navy for

16  a number of years, doing accident investigation and failure

17  analysis for the Navy, then went into a consulting firm, and

18  for the last 20-plus years has been doing failure analysis and

19  accident investigation.

20         After lunch today, the very first witness you'll meet

21  is Mr. Matt Isham.  Mr. Isham is a nonparty to this case.  He's

22  not a retained expert.  He is not related to any of these

23  parties.  He has no -- no dog in this fight.  He happened to be

24  driving by the Soldotna Airport at the time that this plane was

25  taking off.

1      Mr. Isham has lived in Soldotna for the better part of
2  his life.  He's a heavy-duty mechanic.  He was driving by the
3  airport.  He actually recognized the plane.  He had flown on
4  that plane before.  I think we all recognize that Alaska, most
5  people rely on air travel to get around the state.  I think
6  yesterday when the judge asked the question, who knows a pilot
7  or they're related, everybody on the panel raised their hand.

8      So he, in the Kenai Peninsula, has flown on this plane
9  before.

10      He's going to testify that he saw the airplane in a
11 normal takeoff and that he saw a large stream of black smoke
12 come out the exhaust, and then he lost sight of it as he was
13 driving by and past the building.

14      The airport -- and you'll get an opportunity to see
15 the map, and he's going to explain all this, but the road that
16 he was on parallels the runway, and he was going opposite
17 direction of which the plane was taking off.  The road
18 parallels the runway to the end and then comes -- makes a
19 right-hand turn around the other side.  He lost sight of it as
20 he passed by the buildings.  There's a bunch of hangars.
21 Again, you'll get an opportunity to look at the photograph.

22      And the next time he saw anything was when he made
23 that right-hand turn around the back side of the airport.  He
24 saw -- he saw the smoke and he saw the flames but wasn't even
25 actually sure that that was a plane -- a plane crash.

1          So what is the evidence going to show in regard to

2     this accident and why this was an engine failure.  The experts

3     are going to testify.  You saw the engine, and I showed you the

4     inlet where it sucks in the air.  Well, these blades -- these

5     blades on this engine, when they're rotating at over 41,000

6     revolutions per minute, because they are having to suck in all

7     this air -- and you'll hear Mr. Coffman will describe it as

8     this.  The front of the engine is the world's greatest vacuum

9     cleaner, and the back is the world's greatest leaf blower.

10          But, typically, and they'll tell you this, when an

11    engine that's under power when it hits the ground in an

12    accident, this giant vacuum cleaner sucks up debris, grass,

13    rocks, dirt, and it's usually completely all the way through

14    the engine.  You can see from this photograph.  You'll also

15    hear testimony that the Honeywell investigator that was

16    initially on the scene within a day described a lack of debris

17    in the front of the engine.

18          Now, as I described earlier, again, those metal

19    impellers that are at the front of the engine, the engine is

20    surrounded by a shroud, a metal shroud.  You will hear some

21    people refer to it as a can.  So picture -- and I'll just use a

22    coffee cup just for -- if you have the engine that is circular,

23    the blades sit inside, inside the can.  Now, there's not -- the

24    evidence is going to show there's not hardly any clearance for

25    that blade to rotate around in there.  And that's by design

1  because you don't want air going around the outside of the

2  blades.  You want all the air to be sucked in so that creates a

3  cleaner engine.

4          So you've got these big, heavy metal blades inside

5  this metal can rotating at over 41,000 revolutions per minute.

6  When it hits the ground, the can deforms.  It kind of flattens

7  out.  So when it deforms like that, the blades are no longer

8  the same shape.

9          So these metal blades, rotated in this metal can at

10  41,000 revolutions per minute, tear each other up.  They tear

11  up the inside of the can, what's known as the shrouds, they

12  tear up the blades.  You heard the experts talk about typically

13  what you would expect to see on these blades is all kinds of

14  bending, twisting, sometimes they even get broken.

15          This is a picture of the impeller from our accident.

16  It looks pretty good.

17          This is a picture of an impeller from an accident from

18  an aircraft from a perfectly good engine that we know was under

19  power when it hit the ground.  And you will hear our experts

20  will testify that you can see the distinct differences between

21  the damage that you would see in the impeller that's underpower

22  versus at full power.

23          Our experts will then show the shrouds from our case,

24  which is this right here.  They'll testify that there's not a

25  lot of damage to these; that any of the rotational marks that

1   you see in there are very light.  And then they will show you a
2   shroud from another incident involving -- it's a different
3   engine, but a turbine engine, a good engine that was running at
4   the time of impact and the type of damage that it does to the
5   shroud.

6          This is a picture of the shroud involved in our
7   accident.  Our investigators will talk about and tell you what
8   you see up here.  These marks here are static marks.  And
9   they'll explain that you can't get blade marks to make an
10  impact if the blade is turning.

11         This is a picture of the turbine section.  That's that
12  section where the fuel is introduced.  You will hear the
13  investigators describe that, again, when these blades that are
14  turning at this fast -- unbelievably fast that they are, the
15  big metal blades, when there's an impact with the ground, you
16  would expect to see these blades chewed up, torn, ripped,
17  scraped, and they will say that this, from our accident, looks
18  good.  Looks clean.

19         Here's the shroud of the turbine section from a
20  different accident.  A different type of engine, but a turbine
21  engine nonetheless.

22         And you can see the damage on the shroud again which
23  we don't see in our case.

24         Mr. Coffman will testify, as I said earlier, this
25  aircraft was equipped with a propeller, a Hartzell propeller,

1    four blades.  It rotates counterclockwise which is different

2    than a lot of propeller planes.  But at the front of the

3    airplane is -- in front of the propeller is a big spinner, a

4    metal cone, for better sake of a word.  And you'll hear the

5    testimony from Mr. Coffman, who's investigated a number of

6    accidents, that you would expect that if the aircraft was

7    underpower when it hit the ground that you would see all types

8    of rotational damage on the spinner.  And he will explain and

9    show you the pictures that you don't see the scraping, you

10   don't see the rotational damage that you would expect to see.

11          Again, this is a Hartzell four-bladed propeller.  It's

12   a constant speed propeller.  That's going to be important in

13   this case.  Constant speed means that it has a constant

14   rotation.  And they'll explain this in much greater detail, but

15   it has what's known has a propeller governor that maintains

16   that constant speed.  Meaning, regardless if the pilot moves

17   the power lever, it's always going to turn constant because the

18   governor is what sets the speed.

19          But, again, our experts and the evidence will show,

20   and they'll testify exactly and tell you the system and how it

21   works, and explain why that's important in this case.

22          You're also going to hear a bunch of testimony that

23   propeller investigation, in and of itself, is not a way to

24   determine whether an engine was underpower at the time of

25   impact.  You'll hear one of the investigators say, propellers

1    lie because there are so many different variables on the damage

2    signatures.  And there's different signatures that all the

3    experts will testify on this issue, but some of the things that

4    are important, typically, in an engine that's not underpower,

5    the blades are bent backwards.  The floor in this picture

6    consider would be the front of aircraft, and you can see all

7    these blades are bent to the back.

8            The experts will testify that that is a signature that

9    the aircraft was not underpower.

10           One of the other typical signs that you will hear the

11   investigators talk about is you'll hear the term "chord-wise

12   scratching."  You see these lines that go across the front of

13   the -- of the blades, that's caused by scratching when the

14   blades hit the ground.

15           The investigators will testify that typically -- and

16   you'll hear this -- whether there's an engine -- whether the

17   engine failed or whether the engine is underpower, the blades

18   are going to rotate.  If the engine fails in flight because

19   there's enough inertia and there's air still going through it,

20   you'll hear this term "windmilling," which means that the prop

21   will continue to turn.

22           So a lot of these -- what you'll hear these guys talk

23   about, and I think you will hear this from experts from both

24   sides, what some of these -- one of these signature do is they

25   are just really telling you that the blade was rotating, not

1 necessarily that it was underpower.

2 But there are some power signatures. One that I was

3 just talking about, the scratching up here, typically when a

4 propeller that's underpower hits the ground, there's scratches

5 on both sides of the propellers. And our experts will say that

6 you see some very light scratching on the front end but not on

7 the back end.

8 Some of these blades, and you'll get a chance to see

9 them, do have some nicks on the end, which usually just, again,

10 signifies that it was rotating but not necessarily that it was

11 underpower, which makes sense. Because at the impact site, we

12 will explain, there's a bunch of rocks buried within the soil.

13 Now, the issue in this case, the contention is, the

14 plaintiffs, we contend that the engine failed in flight.

15 Obviously, the other side disputes that. That's the issue that

16 we're really going to ask you to decide at the end of this

17 trial.

18 As I described, this is a turbine engine, which, as

19 the experts will describe, is basically a jet engine that turns

20 a propeller. Now, most people that have traveled commercially

21 on a commercial jet have heard a jet engine. You'll hear it

22 when it gets shut off wind down. And what do I mean by "wind

23 down"? Again, those big metal disks that are rotating at over

24 41,000 RPMs, that's a lot of energy. They just don't

25 instantaneously stop.

1        For instance, you think of it like a ceiling fan.  You
2   turn the power off, it has to kind of bleed off that energy and
3   it slows down.  It just doesn't automatically stop.
4        And just by point of reference, mentioning a ceiling
5   fan, just to show you how fast this engine is going at 41,000,
6   a typical ceiling fan on high is 200 to 300 RPMs versus this
7   engine that's rotating at over 41,000.
8        But -- so, when this engine winds down and those
9   blades slow down, you will hear a very distinct whining sound
10  like, an (indicating), and you'll get to hear -- there's going
11  to be a number of different people that are going to talk about
12  these sounds on both sides.  I ask you to listen to it.
13       But one of the things we're going to ask you to do in
14  trial is to listen to the actual video, the video that you just
15  saw earlier, and listen -- the sound evidence in this case is
16  going to be very important.  And this is just a sample of the
17  typical turbine -- actually this is this turbine engine winding
18  down.
19       (Sound played.)
20       MR. BRAUCHLE:  But -- and that's because these blades
21  and these wheels have so much energy that it does take a
22  distinct amount of energy to wind down.
23       Now as I said earlier, just a few minutes ago, the
24  contention in this case is that we allege an engine failure.
25  Obviously the other side denies that.  So one of the things

1  that's important in this case, and you will hear the experts

2  talk about it, but we're going to ask you to listen to the

3  videos and trust your own ears of whether you hear it, because

4  the evidence is going to show there was no wind down of the

5  engine once it hit the ground.

6      If this engine had been under power when it hit the

7  ground, that whistling, high-pitched sound that you just

8  listened to, you would expect to hear once...

9      (Video played.)

10     MR. BRAUCHLE:  That will be the evidence in this case,

11  and we will ask you to judge that, whether you hear that wind

12  down after the impact on the ground or whether you don't.

13     So how did this engine fail?  You're going to hear

14  testimony from our investigators that based on the signatures

15  of the lack of the damage to the impellers, the shrouds, the

16  lack of things being sucked up into the engine, the signatures

17  on the propellers that I just talked about.

18     After looking at all that, they'll say that their --

19  the original theory based on that evidence was that it did not

20  appear that the engine was producing power when it hit the

21  ground.

22     They will then testify to all the steps that they

23  took, all the inspections they took.  They looked at fuel

24  control units, fuel pumps, boost pumps, went to several

25  different speciality shops that specialize in that equipment to

1  have them taken apart and to eliminate that the failure was

2  related to any of those parts.

3          The part that -- I will also tell you that the parts

4  were CT scanned, which we think a CT scan, we go into the

5  hospital and get our shoulder or our legs or whatever.  These

6  parts are actually put through the CT scanner to be able to see

7  inside of them, even before they were taken apart to make sure

8  that things weren't damaged.

9          And the testimony will be that when they did all of

10  these tests on all these parts and all this in-depth analysis,

11  that none of those parts were bad, none at all.  There was no

12  explanation from the stuff that they used that could have

13  caused the engine to fail in flight.

14          However, when the engine was taken apart -- remember I

15  showed you that main shaft?  Inside of that main shaft is

16  another shaft, and I'm not going to do a whole lot of an

17  explanation on it.  Again I'll defer to the experts, but I

18  think what they're going to tell you is this:

19          Inside that main shaft is a smaller shaft.  That

20  smaller shaft is actually what is connected to the end that

21  works the propeller, and they are going to show you that when

22  they took the engine apart, the shaft was broken.  That's

23  usually connected to this spot here.

24          They are also going to tell you that this section

25  right here, it's not supposed to look like that.  You can see

1    the front end, how that's clean.  This right here, you'll hear

2    them testify that that is what's known as a bushing.  The

3    bushing actually sits in this recessed area.  There should be

4    one here as well.

5         The evidence is going to show that when they took the

6    engine apart, there was no bushing, no remnants there is

7    nothing there.  But I think all the experts agree that there's

8    not evidence that it was never there because that engine

9    couldn't have run for as long as it did without it being there.

10        I think what the experts are going to tell you is that

11   there was one there, but when this shaft breaks and that --

12   again that 41,000 rotation, that's a lot of energy, is now

13   metal.  It's not secured, and that it actually ate that bushing

14   completely away and caused the damage that you see.

15        So that's the -- that's the front end.  They will

16   explain the front end, and you can kind of -- they will show

17   you that, that it's clean there's no damage, but then they will

18   show you this back end.  And our experts will explain that

19   there's the discoloration, the burn marks, these big groves in

20   damage to this shaft which is highly, highly unusual.

21        That's a closeup of the damage.  Mr. Hood will explain

22   how that is caused and why it's caused and why it supports that

23   this engine failed in flight.

24        So our experts are going to say this accident does not

25   happen absent an engine failure.  There's another issue in this

crash.  It's weight and balance.  I think you heard
Mr. McQuillen yesterday explain that they are going to say that
the pilot made some errors, and this is potentially one of the
issues.

So the aircraft has to have what's known as a proper
weight and balance.  I'm not going to -- again, I'll defer to
the experts when they explain that.  Obviously you can't
overload the aircraft with weight, and the balance of the
aircraft, you don't want to put too much weight in the back.
You don't want to put too much weight in the front because it
could make the aircraft unstable.

This aircraft I think everyone agrees -- both sides
will agree was loaded with an aft center of gravity.  The
difference in opinion between what our investigators and the
Honeywell position is this:  You'll hear our investigators say,
yes, it's true, there was an aft center of gravity, but it
wouldn't have caused this plane to fall out of the sky absent
the engine failure.

And Mr. Sommer will explain that when he testifies.
He'll explain that the -- that the lack of thrust and the
weight and how that all -- how that all affects and why you see
what you do see on the video, that when you hear -- and
we'll -- and you're going watch that video a number of times,
but our experts will point out certain points in that video.

Right after takeoff, you hear like a metallic sound.

He'll -- he will say he hears a metallic sound.  He will
testify that that's at the point where he believes that the
shaft had its problem.  He'll also point out that right after
that sound, you notice that the aircraft start to pitch up, and
you hear that -- definitely a distinction -- or he does, a
distinction in the sound of the engine.

And so he's going to explain that -- why an aft center
of the gravity plus the loss of thrust from an engine failure
causes -- is exactly what you see on the video, that the engine
quits.  The nose pitches up.  You hear that sound which he will
explain is the engine unloading, and he will explain what that
means.

And then ultimately the aircraft, because it has that
aft center of gravity, the pilot can't get the nose over, and
then it stalls, and then you get what we see.

Some things that you want -- that we're going to ask
you to consider in this trial as you go through, the evidence
is going show that much of the weight -- if you remember the
photo that I showed you real briefly at the very front, it was
the second one, was the aircraft that had just crashed.  This
aircraft did burn considerably.  It burned a lot of the cargo,
but what the evidence is going to show is that the
investigators in this case could not determine what the weights
were on the aircraft.

There was some cargo.  The evidence will also show

1    that Mr. Rediske, as he was flying out to the lodge, not only

2    was he bringing the people, but because he flew regularly for

3    them, they had some groceries and things that they wanted

4    brought out there.

5           You'll hear testimony that people will talk about from

6    the lodge that they brought him things to load in the aircraft.

7    He loaded them in the aircraft, and at some point said, No,

8    stop, I can't take -- I can't take anymore.

9           But the weights again are estimates, and so that's

10   kind of a best guess.  Our experts will say that it wasn't

11   overweight, and that will be a point of contention.

12          Our experts will say though it was -- based on the way

13   the aircraft reacted during the engine failure, that it must

14   have had an aft center of gravity.  But the important thing

15   that our experts will talk about is there is no crash absent

16   the engine failure.

17          Honeywell, I suspect, will focus on Rediske.  I

18   believe that Mr. McQuillen told all of you that yesterday.  I

19   asked you earlier about the sounds.  Again, you are going to

20   hear a number of different sounds.  You are going to hear what

21   our experts say is based on the video.  We're going to ask you

22   at the end of this trial to trust your own ears and not what

23   somebody tells you you should or shouldn't hear.

24          I suspect that they are going to tell you about a

25   bunch of flight testing that they did.  However, the evidence

1    is going to show that the flight tests actually prove our
2    theory that the engine failed.

3           So there are -- the damages in this case under Alaska
4    law is pecuniary damages to the estates.  What that means is
5    basically money damages to the estates.  You'll hear from an
6    economist who will tell you what the damages are.  They are
7    approximately for the nine people who were killed in this
8    accident, collectively -- between all of them together,
9    approximately $10 million.

10          Don Frankenfeld is the economist, and that -- as is
11   typical in cases like this, that the law -- and the judge will
12   explain the law at the end of the case on how damages are to be
13   calculated, and so Mr. Frankenfeld as an economist works within
14   the confines of the law and comes up with a number and will
15   explain how he arrived at those -- at those numbers and what
16   the losses to the estate are in -- with the law.  Again it's
17   pecuniary or money losses to the estate.

18          The burden of proof, we talked a lot about this
19   yesterday with the Court.  It's our burden of proof to prove
20   that the engine failed.  And the burden is, Are we more likely
21   right than wrong?  You heard the Court yesterday talk about
22   51 percent.  You heard me mention that as well.  That's the
23   standard, and after we hear the -- after you hear the evidence
24   you will weigh it, and you will determine it, Are we more
25   likely right than wrong?

1           There will be some other -- we have the burden of

2   proving that.  Should Honeywell try to fault others.  They will

3   fault Mr. Rediske.  That's already been -- they may also try to

4   point the finger at some other third parties.  If they do that,

5   then they have the burden of proof on those other people that

6   they want to put at fault.  But when it comes to whether this

7   engine failed in flight, we have the burden of proof, which is,

8   Are we more likely right than wrong?

9           At the end of the trial, we're going to get an

10  opportunity -- it reminds me of my time in the Air Force when

11  they taught us how to brief.  We -- I'm going to tell you what

12  they're going to say.  We say it, and then we'll tell you what

13  we just said.

14          So this is the opening.  I'm telling you what the

15  evidence or what I believe the evidence is going to show, we're

16  going to show you that evidence.  And at the end of the trial,

17  I'm going to tell you the evidence we showed you and why it

18  proves that we are more likely right than wrong.  We're going

19  to ask you to trust your common sense and your powers of

20  observation looking at the videos, listening to the videos.

21          Now, I just want to say a few words.  Again I'll

22  introduce myself.  I'm Jim Brauchle.  I represent the McManus

23  family and a couple of members of the Antonakos family.

24          Throughout this trial, you will see that I wear

25  glasses, but they are reading glasses, and now I'm looking at

 1    you over my glasses, because I can see everybody just fine.  I

 2    just can't see up close.  I used to hate when people did that

 3    to me because I thought they were being demeaning.

 4          By all means, I'm not.  It's just I -- you're blurry

 5    now, so if you see me doing that today, and witnesses, opposing

 6    counsel, by all means, I'm not -- I'm not doing that.

 7          The other thing is, none of you have electronics.  We

 8    all do.  Including our phones.  I can assure you that we are

 9    not -- if you see us on our phones, we are not checking sports

10    scores.  We are not playing Ball Sort, even though that is a

11    good game to play on an airplane.  We are not playing that.

12          We are actually communicating with one another about

13    things in the trial, what type of evidence, what type of

14    exhibits and things that we may need to try to make this trial

15    efficient so that it's -- so you're not here longer than you

16    need to be.  I will try for our team to make -- put in our

17    evidence quickly, expeditiously, and give you the information

18    that you need to decide this case.

19          One other thing I'd like to mention:  I'm just going

20    to introduce everybody that's here that you will see in the

21    courtroom just so you have an understanding of who they are.

22          Again I'm Jim Brauchle.  Immediately here in front is

23    Mary Schiavo.  She's my law partner.  Mr. Schneider,

24    Mr. Pracht, and Mr. Moore, they represent the Antonakos family.

25    Mills Ariail is an attorney who represents Mr. Clayton.

1    In the middle is John King.  He's a retired Marine

2  Lieutenant Colonel, career pilot, who is a consulting expert

3  and investigator in this case.

4    Next to him at the end is Dana Miller.  She's a

5  paralegal in this case.  This young lady here, Heather --

6  posted behind the computer, she's our audiovisual person, so

7  you'll see her -- you will see me asking her to put things up

8  on the screen throughout the trial.

9    There are some family members here today, Kathleen

10  McManus, Chris McManus' mother.  Larry McManus, Chris McManus'

11  brother and his wife Pamela.  Next to him, in the back in the

12  wheelchair is Wayne Clayton.  He's Kimberley Antonakos' father.

13    Sitting next to him is Michael Geraghty, who is

14  assisting Mr. Clayton, and I'll apologize.  Yesterday you heard

15  the -- someone's alarm kept going on.  That was Mr. Clayton's.

16  It's his alarm, he has to take medication.  We've got that

17  squared away, so it won't be a distraction during the rest of

18  the trial.

19    Also in the courtroom is Ashley Underwood.  Ashley was

20  Kimberley Antonakos' sister.  Also is Angela Welker, who is the

21  niece of Melet Antonakos.  They will be here throughout the

22  trial.  Who's not here is Stacey's -- is Stacey McManus'

23  parents, the Dickerts.  They are afraid to fly.

24    And then lastly I'll just say this:  This is not a big

25  courthouse.  We have a lot of people, and you say, That's a lot

1    of lawyers, a lot of people.  There's essentially nine

2    different clients here, so instead of having a bunch of lawyers

3    come up here and do this different ways, all the cases are

4    together.  We're all working together, but you'll hear us --

5    everybody through one voice which will either be myself,

6    Mr. Schneider, Mr. Moore, Mr. Pracht, Ms. Schiavo, but you

7    won't hear it repetitively.  So we're trying to streamline this

8    and get you information.

9          Lastly I'll leave you on this:  This is small

10   courthouse.  There are a lot people involved in case, including

11   yourself.  We are probably going to run into each other maybe

12   at some point going through security, maybe outside.

13         If we don't say hello or we don't smile or whatever,

14   we are under strict instructions.  You all are like the

15   president.  No one is supposed to talk to you.  We are not

16   supposed to look you in the eye.  I don't want you to think we

17   are being rude.

18         It's just in fairness to both sides, so it doesn't

19   appear that there's any type of impropriety or anybody is

20   trying to sway anybody.  So I just say that ahead of time.

21         But again, we thank you for your time.  We will try to

22   put in our evidence as quickly as possible and give you exactly

23   what you need and not waste your time.  Again, I just ask you

24   to use your common sense and use the senses that you have in

25   hearing and seeing, and trust -- trust what you see and trust

```
 1   what hear see.

 2          Thank you.

 3          THE COURT:  Thank you, Mr. Brauchle.

 4          Ladies and gentlemen, I think what we are going to do

 5   is take our morning recess just a little bit earlier than

 6   usual.  That will afford you to get your break in, but it will

 7   also give the Court enough time to set up the technology to

 8   allow that.

 9          We're going to try to keep this to about 15 minutes,

10   so we will try to bring you back in roughly at 10:40, but you

11   can return to the jury room, and we'll bring you back in when

12   it is time.

13       (Out of the presence and hearing of the jury panel.)

14          THE COURT:  Please be seated.  Anything we need to

15   take up before or during the recess?

16          All right.  I will back on the bench at 10:40.  We can

17   go off.

18          DEPUTY CLERK:  All rise.  This matter stands in recess

19   until 10:40 a.m.

20      (Proceedings in recess from 10:23 a.m. until 10:39 a.m.)

21       (Out of the presence and hearing of the jury panel.)

22          DEPUTY CLERK:  All rise.  His Honor, the Court, the

23   United States District Court is again in session.

24          MR. SCHNEIDER:  We are ready with our first witness.

25   I suggested they get here over the lunch hour.
```

1          THE COURT:  Okay.

2          MR. SCHNEIDER:  And I didn't -- I mean, if the Court

3     thinks -- I just don't see us getting going.

4          THE COURT:  No, and I represented to the parties

5     yesterday that we wouldn't take testimony until after the lunch

6     break.  I'm going to honor that.  If we end a little bit early,

7     again, if we want to get the stipulations out of the way, that

8     would be great, but I don't mind on the first day excusing them

9     early for lunch.

10          MR. SCHNEIDER:  Thank you.

11          (Pause in proceedings.)

12          (In the presence and hearing of the jury panel.)

13          THE COURT:  Please be seated.

14                    **OPENING STATEMENT**

15     BY MR. MCQUILLEN:

16          Good morning, everyone.  My name is Mike McQuillen.

17     And even after Mr. Brauchle's excellent presentation, I am

18     still proud to appear on behalf of Honeywell on this case.

19          I want to tell you, ladies and gentlemen, all of you

20     probably heard at a very young age -- all of us did, that

21     there's two sides to every story, and what we would like to do

22     for the next hour is to let you know that there's two sides to

23     everything, and if this was easy as Mr. Brauchle said, I don't

24     think we would be here today.

25          So what we want to do over the next hour is turn that

1    coin over and tell you a few things that maybe Mr. Brauchle

2    didn't tell you about.

3           Now, before I get started I want to make it real

4    clear, we, on behalf of Honeywell, extend our sincere

5    condolences to the McManus and Antonakos families as we would

6    to any families who perish in a plane crash, particularly when

7    our products were aboard.

8           But the real question that you're going to have to

9    answer here as jurors is whether our parts in the engine had

10   anything to do with the cause of this accident, and we're here

11   to tell you that they did not, that the cause of this accident

12   was simply and solely pilot error.

13          It was pilot error for two primary reasons:  The pilot

14   overloaded this plane in a tail-heavy situation, too much cargo

15   in the back of the plane which caused, this plane to pitch up

16   uncontrollably at takeoff.  The plane reached an aerodynamic

17   stall, rolled over, and crashed.  A stall is a stall in the

18   wings, not the stall of the engine.

19          Second error you didn't hear about this morning.  The

20   pilot took off using an inappropriate flap setting on the

21   airplane.  That means the flap setting that was not recommended

22   by the manufacturer of this airplane.  A combination of those

23   two things caused this plane to pitch up uncontrollably, roll

24   to the right, and fall down and crash.

25          So what I'd like to do is just take a minute and touch

1    upon a couple things and introduce our team today and tell you
2    a little bit about Honeywell.

3         Honeywell, as you know, is one of the largest
4    manufacturers of aerospace products.  There's rarely an
5    airplane that flies that doesn't have some Honeywell equipment
6    on it.  The engine that we're talking about here today, as an
7    example we will show you in a minute, was made at their Phoenix
8    facility, in Phoenix, Arizona.

9         Some of the people on the team that I'd like to
10   introduce that we'll be working with today, part of the legal
11   team over here is my partner John Kelly; the brains of our team
12   are Gina Diomedi over here and Kathy Larson in the back, our
13   paralegal.  She keeps us tried and true as we go on, and
14   Dave Studtmann is an air safety investigator with Honeywell,
15   who actually was involved in the investigation of this
16   accident, and you'll hear from him during the course of the
17   trial as well.

18        So what I would like to do, ladies and gentlemen, is
19   just talk generally about the stall that we just mentioned, and
20   I'll come back to this end.  What you're looking at here is the
21   abnormal pitch-up of this airplane here, and this is just
22   meant -- simply meant to show that after takeoff, it reached an
23   abnormally high pitch which was uncontrollable.

24        I just want to leave you with that thought, and we'll
25   talk about when we get towards the end of the presentation.

1  The presentation today is going to talk about a few things in
2  relation to that, and we're going to go right to the
3  plaintiffs' own flight path exhibit.  This is one of the
4  exhibits that was prepared by or at least endorsed by the
5  plaintiffs' expert which you heard about this morning.
6          THE COURT:  And, Mr. McQuillen, I apologize profusely
7  for interrupting you, but if we could speak a little bit more
8  slowly, so madam court reporter can capture -- make sure she
9  captures everything.
10          MR. MCQUILLEN:  I apologize.  How is that?  Any
11  better?  I will speak a little slower.
12          So what you're looking at is the plaintiffs' flight
13  path that was prepared or endorsed by Mr. Sommer, and what
14  you'll see is that the plane pitched up, slowed down, reached
15  to a point of stall because it was pitched so high it could no
16  longer get airflow over the wings, rolled to the right, and
17  fell down.
18          We will talk about that at the end of the
19  presentation.  That will be Chapter 3, so let me tell you what
20  you're going to hear today.
21          So what we're going to do here today is we're going to
22  talk about what the presentation is going to go over, and our
23  presentation is going to basically be covered into three --
24  three areas.
25          First, you should know that parties in this case

1   absolutely agree that shortly after takeoff, this plane pitched

2   up.  It climbed until it reached an aerodynamic stall -- that's

3   of the wing, not the engine -- rolled to the right, and then

4   impacted the ground.

5          Okay.  So what we want to do is talk generally about

6   what the presentation is going to consist of, and the

7   presentation will be essentially what we'll talk about first is

8   the product presentation.  We will talk about how it works.

9   We'll talk about the torsion shaft that's inside it.

10         Part two of today's presentation will be our evidence

11  to show why this torsion shaft broke on impact not in the air.

12  That chapter of the book will be divided into five subsections.

13         One, we'll talk about the metallurgical evidence

14  related to the failure of the shaft that was looked at by the

15  metallurgist.

16         Number two, we are going to talk about some of the

17  physical damage that you heard discussed in this morning's

18  presentation.

19         Number three, we are going to talk about a spectral

20  analysis that was down of the sound by one of our acoustical

21  experts who listened to the sound, and you'll see the

22  recordings of that sound.

23         And we will talk about the aircraft performance study

24  that was undertaken to show what the airplane did during the

25  course of flight, and then we will talk about some flight

 1   testing that Mr. Brauchle referred to that, yes, we did do to

 2   try to show what happened here.

 3           The last thing that we will then about is going to be

 4   presentation on pilot error that will come at the very end.

 5           So the next part is going be the product.  So what

 6   you're looking at right in front of you here is what is known

 7   at the Honeywell TPE331 engine.

 8           As I said, this is an engine that is made out in

 9   Phoenix, Arizona, and what I'm going to do is to try to --

10   Your Honor, if I may have permission to turn this on and bring

11   up one of our cameramen, please.

12           THE COURT:  Very well.

13           MR. BRAUCHLE:  Your Honor, would it be appropriate if

14   I sat over there?

15           THE COURT:  That's fine.  That's fine.

16           MR. MCQUILLEN:  So what you're looking at here, ladies

17   and gentlemen, this is an actual engine that's been cut away so

18   you can see some of the insides.  You were explained some of

19   this this morning, and basically I'll just reiterate a couple

20   things Mr. Brauchle said, and then we'll talk in a little more

21   detail.

22           Basically what you have here is -- we will talk about

23   some general principles of the 31 engine -- and, Jeff, if maybe

24   you can just go over here just for a minute or so, if you can.

25   If not, over there is fine.  No problem.

1          So generally what you have here is when -- not to be

2   crude, but if talk to the people in the industry and you ask

3   them how a turbine engine works, they'll tell you suck,

4   squeeze, bang, and blow.  That's the principle behind the

5   turbine engine.  Okay.

6          It sucks air in in the front.  That is that air inlet

7   that Mr. Brauchle was talking about.  Okay.  The air goes

8   through this inlet here, and it gets started -- kind of like a

9   started on your car to get it going.

10          And once the engine gets going, it's sucking air in

11   here.  This is your first stage impeller wheel, right here.  If

12   anyone can see it.  Air comes through here and goes in to first

13   stage impeller.  That's a fancy word for compressor.  We just

14   talked about the suck into the engine.

15          The compressor is the squeeze.  The compressor takes

16   the air and compresses the air, okay, makes it a higher

17   pressure air for combustion in these -- in these turbine

18   engines.  That's the first stage.

19          The air then goes through a little chamber here,

20   follow my finger, comes back into the second stage compressor,

21   where it's compressed again, squeezed a little more.  Okay.

22   That's the cool side of the engine, therefore, marked in blue.

23          After the air comes out of the compressor, now we're

24   going to go to the bang part.  It winds through this chamber

25   here, goes into the combustion chamber where it is ignited and

1	mixed with fuel.  Boom, that's the bang.

2	Those exhaust gases pass over three different stages

3	of the turbine section, the first set of turbine wheels here

4	that are smaller, a second set of wheels here, a little bigger

5	fan blades, and then finally a third section right here.

6	After it -- that's what gets the turbine section

7	moving, and then it blows it out the back end.  Those are the

8	four phases of operation generally of a turbine engine.  Now

9	you know how a turbine engine works.

10	Let's talk about what's next.  That's going to be the

11	torsion shaft.

12	So, Jeff, if I could ask you to come over here.

13	I don't know what will be easiest for you to see.  It

14	might be easier to look on the overhead.

15	So if we start over here and show where the engine is,

16	there's a closer up of the engine.  And what we're going to do

17	is just tell you that the inside of that engine, in the

18	rotating group that you're seeing here, is where that torsion

19	shaft resides.  You can't see it because it's inside.  We'll

20	bring one out in a minute.

21	If you move to the right a little bit, you'll see that

22	that torsion shaft and its coupler extends out.  Where you can

23	see that yellow thing that's rotating, okay, that's a coupler

24	at the end of our torsion shaft.  Okay.  What that is doing,

25	that torsion shaft is going through that coupler into a set of

1    what they call reduction gears.  Reduction gears, it's the same
2    thing that's in your watch.  Right.  The watch has a second
3    hand turns faster and the minute hand turns faster than the
4    hour hand.  They're all connected, but they are moving in
5    different proportions.  Right.  And what you're looking at now
6    is all those reduction gears.
7            So that torsion shaft is connected directly to the
8    reduction gear.  The reduction gear then turns to the propeller
9    shaft, which is right where he's pointing right now, if you
10   have a laser on here or not.  That's that area in the gold.
11   The prop shaft is in there, and then that turns our propeller.
12           I don't know if anybody even noticed it, Jeff, but if
13   you can maybe step aside just for a sec.  There's two things I
14   want to show.
15           First, if you look in this area here, you can actually
16   see how that reduction is going.  You can see it and watch
17   those gears and see how actually slow that they are now
18   turning.  That's the reduction part.  And I don't know if
19   anyone noticed, but this propeller is actually spinning right
20   now.
21           So if you see how fast the engine is moving and look
22   at this propeller, they are all interconnected.  So then that
23   torsion shaft is a direct connect to the reduction gears and to
24   that prop shaft.  So when the engine speeds up, the prop speeds
25   up.  When the prop engine speeds down, the prop speeds down.

1    They are essentially a direct connect through the reduction

2    system.  Okay.  That's an important part to understand.

3         The second thing to understand is that you can see the

4    speed difference.  That engine is rotating at 41,000 RPM.

5    41,000 in normal engine operation.  The reduction gear knocks

6    it down to a little over 1,500 in the propeller to about a 26

7    or so to 1 reduction.  That's the general operation of the

8    engine, how the torsion shaft connects to the propeller.  Let's

9    dive a little closer into the rotating group.

10        Thanks, Jeff.

11        Okay.  So what I'd like to show now is, we've had kind

12   of an overview of the engine.  What I'm wheeling out in front

13   of you on this little doctor's table here is another model of

14   the actual turbine section.  Now, you can see some of the

15   differences just for illustration purposes.

16        This is our -- the torsion shaft is inside here.  And

17   then the torsion shaft itself that exits through a -- it's

18   inside here, it stops about there, and then there's a coupler

19   that goes here, and then that goes to the reduction gears to

20   the prop.  You can see the reduction gears go here and up into

21   the prop.  Just for simplicity, we're connecting in here

22   directly into the rotating group.

23        The point is it is a direct connect between the

24   rotating group, which is what we call this (indicating), and a

25   propeller.  Okay.

1        So let's talk about the torsion shaft itself.  There's

2   actually two shafts that you're going to hear about, that are

3   contained within inside this rotating group.  One is called a

4   main shaft.  The second is called a torsion shaft.  The torsion

5   shaft resides inside the main shaft.  So let me show you.

6   Okay.

7        Here is the main shaft for the engine.  Okay.  So the

8   main shaft of the engine runs this way inside.  You can't see

9   it, but it's in this model as well.  Okay.

10       The torsion shaft resides inside this main shaft.  All

11  right.  So this main shaft is attached to this group of

12  rotating wheels with that spline.  It's a gear.  So when this

13  starts turning, the shaft is turning with it.  All right.  Does

14  that make sense?

15       Now, I want to try to show you the inside of the main

16  shaft, if I can.  What you should see in here is a set of what

17  we call -- I don't know if you can see those are or not

18  (indicating).  That's okay if you can't get it close enough.

19       You can kind of see in there.  You see the groves?

20  There they are.  You see them on the corner?  Those are what

21  they call the splines.  So the torsion shaft itself is going to

22  sit in those splines.  I'm going to install it backwards just

23  to show the effect.

24       So the torsion shaft has these splines on it as well.

25  Okay.  And they fit in there.  That's backwards.  Now I'm going

1    to insert it the proper way and go this way.  So the torsion

2    shaft -- and by the way, these are the bushings that you heard

3    about.  I think counsel referred to them as metallic bushings.

4    They're not metal.  They're actually -- it's almost like a

5    fancy plastic.  You can move it and they're flexible.  They are

6    basically a centering piece.  They are not a structural

7    load-bearing component.  They're used to put in for centering

8    the shaft.

9         Right now you can see I'm turning the torsion shaft.

10   Those splines in the back have not yet been engaged.  Okay.  So

11   what we're going to do is keep putting the torsion shaft in and

12   try to get those things engaged.

13        This is the coupler.  And now they are fully engaged.

14        So those splines as you see, those gears at the end

15   are now attached to the torsion shaft to the main shaft such

16   that they are both rotating in unison.  Does that make sense?

17   So now they are both -- they will always turn together.

18   There's no differential rotation of one around the other.

19        Now, if the torsion shaft were to somehow fail or

20   become disconnected, this is kind of what happens.  I'm just

21   simulating it.  Right.  If it somehow fails, then this can

22   happen, then the main shaft can continue rotating around it

23   because it's broken.  Make sense?

24        So the next thing we are going to do now is talk just

25   a little bit about what the torsion shaft does.

1      So we've talked about one of the things it does, and
2  that's that it turns the propeller.  Right.  So we know that
3  the torsion shaft talks to this gear, to this coupler, goes to
4  these gears, direct to the prop shaft, direct to the propeller.

5      What's the second thing that it does?  Okay.  Torsion
6  shaft -- torsion is a fancy word for twisting.  Okay.  When we
7  say "torsion," we are talking about the twist.  So when I say
8  the word "torsion shaft," torsion shaft is designed to twist.
9  Okay.

10      So what do I mean by that?  So let's go real quick and
11  cover some of the things that we've talking about already.

12      So we've gone through the engine.  What we've learned
13  is that the torsion shaft is connected to the prop through this
14  mechanism.  It goes through the reduction gears and up to the
15  propeller.  We've learned also that the engine core spins at
16  41,000 RPM.  We've learned that through the reduction gear, the
17  prop spins at about 1,500 or so RPM.  Okay.  And what we've
18  also learned is - this clicker is a little slow today -- the
19  torsion shaft turns the prop, the engine speed is 26 times, and
20  the engine and prop speed are proportional because it's a
21  direct connect.  All right.

22      So what is a torsion shaft?  We've talked about the
23  rotating group already.  We are going to go on and talk now
24  about what the torsion shaft twist is.  All right.

25      Why do we need the torsion shaft to twist?  There's a

simple explanation.  We need to give the pilot an indication of
how much power the engine is producing.  So the torsion shaft
is designed to twist.  The maximum amount of twist that's going
to occur when this engine spools up is going to be about
two degrees or two and a half degrees back at this aft bushing.

Now, let me talk about what the aft bushing is.  When
this torsion shaft was found failed, the torsion shaft was
found failed back here.  Okay.  Right after the spline area.
That's where they found it broken.  It was not broken at the
aft bushing area.

So what happens is when the pilot powers the engine
up, the torsion shaft twists.  And it twists about only
two degrees back at that aft bushing.  That's all that it's
going to twist.  And when it twists, it's -- basically you can
barely perceive it.  It turns about two degrees.  And that two
degrees is depicted on that picture that you're seeing in front
of you in the red.  That's all it's going to twist.  And that's
from zero to full throttle.  Okay.

What do we do with that twist?  There is a device in
the engine that's called a torque sensor -- I won't bother
getting into too much detail -- that's mounted right here in
the engine.  It measures that amount of twist in the shaft.  It
takes that amount of twist, converts it to a signal, and goes
up to the pilot's cockpit instrument.

And here it is.  That's in red where the cockpit

1    instrument is, and that's where we record it.

2          What I'm going to do now is show you a videotape that

3    simply demonstrates the operation of the torsion shaft.  And we

4    are going to do it by solely looking at the cockpit.  And

5    you're going to see us inside a real Otter, same model as the

6    one that crashed, you're going to see us take the throttle, and

7    basically go from low power setting up to what you do for

8    takeoff, and you are going to see that torque gauge register a

9    power increase.  Okay.

10          And listen for the engine sound, and you'll hear the

11   engine sound.  It will sound a high-pitched whine kind of

12   (noise.)  I don't know how that's going to come out in the

13   transcript, but it's kind of a high-pitched whine, and then

14   you'll see it slowly come up a little higher (noise), and

15   that's all it's going to do.  That's the whine.

16          Go ahead.

17          (Video played.)

18          MR. MCQUILLEN:  That increase is full throttle right

19   there.  Okay.  Just to show that one more time if I may,

20   Your Honor.

21          THE COURT:  You may.

22          MR. MCQUILLEN:  We're going be looking at this gauge

23   here.  Go ahead and play it again.

24          You can see that this is the torque gauge right here.

25   Now it's at low power, 22.  There's the throttle up, and you

1    see the torque gauge.  Torque is increasing.  You hear that

2    whine in the engine increasing.  Now it's operating at full

3    power at 41,000 RPM.

4         And that reading that you saw on that instrument is

5    caused by that little twist in the shaft, on the torsion shaft.

6         So we've covered a lot of ground, but that's the

7    engine part of the opening statement this morning.  And the

8    takeaways that we have here that we just try to cover

9    everything, what we've gone through is, that the engine speed

10   is 26 times faster than the prop.  The engine speed in the prop

11   are proportional, meaning they move together.  The torsion

12   shaft, it turns the propeller, it twists very slightly and

13   minutely in operation, and that twist is converted into a

14   measurement of torque that's displayed on the pilot's gauge.

15        A lot more of this you will hear from our experts, but

16   that's kind of the high-level operation that you're going to

17   hear today.

18        So the parties also agree in this case, okay -- before

19   we move on to part two, the parties also agree in this case

20   that this engine was certified by the Federal Aviation

21   Administration in 1982.  The torsion shaft was manufactured and

22   put into this engine back in 1998.  The actual -- in 2010

23   there's a third party known as Executive Aircraft Maintenance

24   overhauled the engine and they inspected the torsion shaft and

25   installed it then, in 2010.

1          In July of 2010, a company called Recon Air actually
2    took this engine and installed it in the accident airplane.

3          So I don't know if you remember some of the Otters
4    before.  They operated with an old -- I think it was Pratt &
5    Whitney radial engine.  It had the radial engine with pistons
6    on it.  And the conversion that was done in 2010 is they
7    removed that piston engine airplane and they put in this
8    turbine engine.  Okay.  That was done in 2010.

9          This torsion shaft had accumulated 540 hours of flight
10   time from 1998, when it was made, until the time of the
11   accident.

12         The last thing is, there are no known, at all,
13   complaints, reports, problems, issues, anything, none, with
14   this torsion shaft during the operational history of that
15   entire time period.

16         Here's a quick timeline that you'll see.  And you can
17   see that the torsion shaft is manufactured in the 1998, the
18   accident in July of '13, the overhaul date in April of 2010.

19         540 hours with zero complaints or issues related to
20   the torsion shaft.

21         So let's go to Chapter 2 of today's presentation.
22   We're going to talk about the five things that show that this
23   engine was producing power at impact that you are going to hear
24   during the course of this trial.  Okay.

25         The parties have agreed that the torsion shaft was

found broken due to torsional failures. You've now heard what
I mean by torsion. I mean twisting. When you break
something -- I'm not a metallurgist so we'll just talk about it
in effect -- generally if you break something, it can happen in
several ways. We can pull something, right, which is kind of a
tense little break where you pull it and snap it, you can break
it like a twig, which is a break like this (indicating), or
torsion could have a torsional failure. Torsional failure is
like twisting a washcloth. Okay.

All parties, I think you're going to hear during the
course of this case, are going to agree that this engine failed
from torsional forces, twisting forces.

Now, let's talk about subchapter 1 of why this -- we
believe this engine was working.

Torsional failure was an overload event, a one-time
overload event, which twisted the shaft to failure. Okay.
This is the picture of the actual fracture surface of the metal
of the shaft. Again, looking at it to you and me, it probably
doesn't mean anything. Looking at it to the trained
metallurgists will tell you this is textbook example of what a
twisting failure looks like. There's no dispute between the
metallurgists, believe it or not, one of the few things not in
dispute here, is that this was a twisting failure. Okay.

One of the competing stories about how that happened,
and what you're going to hear from Honeywell, is that this was

1    caused by the rotating energy of the airplane when that prop

2    hit the ground.  That's why the torsion shaft failed.

3           Remember what we talked about.  This unit here, I

4    don't know what it weighs, maybe 50, 60 pounds, an amazing of

5    centrifugal force that's being done in this, you know,

6    50 pounds, 60 pounds, turning at 40-some-thousand RPMs, creates

7    a tremendous amount of centrifugal force.  And this engine was

8    operating when it hit the ground.  And when that propeller

9    hits, the propeller stops and this engine just wants to keep on

10   going and snaps the shaft.

11          What the plaintiffs are going to say in this case, as

12   I think that you've heard already, is that it didn't and that

13   it somehow failed in flight.  I'm not sure what their theory

14   exactly is going be on how the torsion shaft twisted to failure

15   during the flight, but we have a couple of ideas, based on some

16   of the testimony that's happened so far.

17          And we think what they are going to say is something

18   like the pilot thought he had some issue with the torque, and

19   the pilot added some power to the engine and that broke the

20   shaft.  We will have to see what Mr. Sommer says this

21   afternoon, but that's what we think he said in his sworn

22   testimony.

23          So we looked into that theory to see if that's

24   possible; by adding power, can you snap the shaft.  This engine

25   produces about 900 horsepower.  I won't bore you with the

1    details of the number.  The picture is all we're trying to get

2    across, is that at maximum power, the torsional forces or

3    twisting forces on that shaft are in green, and what it takes

4    to rupture the shaft is in the red.  There's a three times

5    safety factor built into this.

6         And our people will tell you it never got close to it.

7    You cannot break it by adding power to the engine during normal

8    operation.  Okay.

9         So part two of why the engine was operating normally

10   at impact.  The wreckage shows it was operating at impact.  And

11   here's probably where's it going to be the biggest difference

12   amongst us during this case.  This is probably where most of

13   the action is going to be.  You'll hear it this afternoon.

14   Right.

15        You heard Mr. Brauchle say -- and he's right.  His guy

16   is going to come up here and say, hey, here's an impeller that

17   looks good, and here's an impeller that's all damaged.  And if

18   it's damaged, that means the engine running; if it ain't

19   damaged, that means the engine is not running.

20        Our people will say that is completely false, and it's

21   contrary to any aircraft accident investigator's textbook.  You

22   have to look at all sorts of things, like the impact angles.

23   And one of the things that was looked at by not only us but by

24   the National Transportation Safety Board who investigated this

25   incident and wrote some factual reports on it, they looked at

1   these propellers and they noted that there was significant
2   rotational scoring and what they call "leading edge damage."
3           And let me talk about just generally what the
4   significance of this is.
5           So, obviously, these blades were shortened for the
6   courtroom.  Okay.  This is what a real blade -- this is what a
7   real blade looks like, just to give you an idea of its size.
8   They are substantial blades.  They are very heavy, and they are
9   very strong.
10          And what you'll see is those blades, or those
11  propeller blades, as you can see, are twisted into pretzels.
12  That doesn't happen with an engine that's not operating.  It
13  doesn't happen with an engine that's windmilling.  That's what
14  our people are going to say.
15          So I think that when we talk about ruptures and
16  failures and everything else in these propellers, that's going
17  to be the big difference.  We say that this is significant
18  rotational energy, and the plaintiffs will say, nah, it's just
19  kind of windmilling.  Okay.
20          There's another -- after the propeller was removed,
21  you can see this propeller assembly was basically twisted like
22  a pretzel.  And our people will tell you, no, this is
23  significant power applied to that propeller at impact.
24          You will see that in some of these, you can see these
25  are what they call "leading edge."  The rotational scoring is

1  that rotation or two when that propeller hits the ground and
2  causes those circumferential scratches that you see on the
3  propellers.  You will also see that there is some leading edge
4  damage which is pointed to there.  And the leading edge damage
5  there shows that basically chunks out of the leading edge of
6  the propeller.

7          So if their propeller is rotating this way
8  (indicating), there's big chunks that are taken out of the
9  leading edge of the blades.  Every single blade had the leading
10 edge, which is turning it to the wind, had those chunks out of
11 the leading edges of those blades.  Substantial chunks taken
12 out.  Some of them were even torn.

13         There was also -- and, again, these would be the
14 chunks, bites out of the blades.  Another blade.  There's other
15 damage here.  These two had their tips ripped off.  The whole
16 tips of the blades were completely ripped off during the
17 sequence.  That's not going to happen, our people will say, if
18 it's a prop that's either not rotating or rotating with no
19 torque behind it.  Okay.

20         All right.  So the National Transportation Safety
21 Board wrote a factual report, and the factual report that the
22 NTSB wrote that contained some factual observations about what
23 they found said:  "The disassembly of propeller revealed the
24 following characteristics consistent with rotation under an
25 amount of torque."  That means power.  "Rotational scoring of

1    the blade tips, leading edge dents and tears, loss of tips on

2    the blades," that you saw, "and similar twist and bend patterns

3    of the four blades."

4           You saw this picture, and I believe you saw this

5    picture.  Let's take these two.  These are, I think, the

6    pictures that Mr. Brauchle told you.  Here's where the action

7    is going to be here in this case.

8           They showed you photos to make it sound like that

9    needs to be all torn up to find evidence that the engine was

10   operating at impact or not.  What you're going to hear from our

11   people, who can explain it much better than me, is it

12   depends -- every accident is different, and it depends how that

13   airplane hits the ground.  That will determine how torn up

14   those are.

15          You can see in here the reason our people will tell

16   you why those rotating components aren't as all damaged as the

17   other one that Mr. Brauchle showed you, we believe that in the

18   other accident -- we'll have to see what Mr. Sommer says -- if

19   you have an airplane -- imagine this.  If we have an airplane

20   with the engine out in front that goes 300 miles an hour

21   straight forward into a wall, you are going to see that whole

22   thing pushed in and scrunched.  Right.  And it's going to start

23   chewing those things up.

24          That's not what happened here.  We had an airplane

25   that reached an aerodynamic stall, rolled over, fell down on

its side.  The first thing that hit was the right wing.  It
broke the wing off to absorb some energy.  The second thing to
hit was the propeller spinning, and then it hit that spinner.
A lot of energy dissipation in terms of the airplane damage
when it hit.

As you can see from the photo, the outer case was not
compressed around those to cause the damage that Mr. Brauchle
was talking about.

So the other people will explain this in better detail
during the course of the case, but that's the concept to be
aware of; that you have to understand the facts of each
accident before you draw any conclusions.  All right.

So the NTSB also noted that a disassembly and
examination of the engine revealed the following significant
characteristics consistent with rotation during impact.  A
sheered torsion shaft, corresponding rotational scoring of the
propeller shaft and sun gear, rotational scoring throughout the
compressor and turbine sections, and metal spray that was
present throughout the turbine components in the airstream
path.

What is metal spray?  You are going to hear
Mr. Studtmann talk about this later in the case.  Metal spray
is the simple phenomenon that if you have an impact like
this -- these are pretty substantial engines.  They're
obviously very strong metal that's in there.  And we know this

1  plane fell down on its right side.  And if the engine were to

2  take a little scuff or something from where this impeller here

3  rubs against the metal here on one side, the side it hits down

4  on, it might take a little divot out of that side.  This is

5  titanium, the wheel is, and the housing here is basically like

6  aluminum or a felt metal that's around it.

7          So if the titanium impeller hits that side of the --

8  takes a little divot out of the side, it's going take that

9  aluminum, send it -- remember the gas path here, send it

10  through this compressor, this compressor, send it through here,

11  send it through this turbine section.  They found metal spray,

12  which is that little metal scraped off up here, back here and

13  impaled on the blades in the back of the turbine section.  It

14  got all the way through the gas path, back into the turbine

15  section, and melted and adhered itself to the blade.  That's an

16  indication that the engine is running and turning at impact.

17          Let's talk about -- those are the pictures of the

18  blades with the metal spray on them.  There's like little

19  flecks of melted aluminum that you find impaled on the blades.

20  Okay.

21          Let's talk about another part of the accident.  Let's

22  talk about -- metal spray, we finished that.  Let's move on

23  to -- I apologize.  It's a little quicker here.

24          Let's talk about dirt and debris and that why isn't

25  there a lot of debris.  Our side of that is, you're probably

1    already thinking about this.  Remember how this one fell down.
2    You're going to get debris in here.  Imagine if a plane goes
3    down and hits the ground and skims across the grass and hits
4    rocks and stones and is bouncing down a thousand feet through
5    grass or river rock, sucking things up, that's when you get a
6    lot of debris.  We don't have that here.  This plane went up,
7    fell over, and fell down on its side.

8         There was no digging, but there was a little bit of
9    things kicked up, and they actually found some dirt in the back
10   of this turbine section back here which means it went through
11   that gas path.  It's not a lot, but it's there.  And it's not a
12   lot because it wasn't scooping a lot up.  That wasn't the
13   dynamics of this accident.  Okay.

14        There was a lot of talk about these bushings, and I
15   think from what I heard from Mr. Brauchle, I won't spend much
16   time on this because it does get complicated.  But what I would
17   like you to understand is that I think, I'm going to predict,
18   and I could be wrong, that really this -- these marks are not
19   indicative that the shaft failed in flight per se.  Remember,
20   the only reasons these marks are caused is when the one shaft
21   is rotating around the other after the shaft breaks.

22        Those marks that you can see are going 360 degrees all
23   the way around that shaft, that cannot happen in normal
24   operation.  Why?  Because those shafts are splined together.
25   There's no opportunity for anything to rub and cause those.

1    It's only after that shaft breaks that you get that main shaft

2    rotating around to cause the damage.

3            And what we're going to show you in this case is that

4    that did not happen in flight, that it happened at ground

5    impact.  We will have a dispute with Mr. Brauchle.  He told you

6    the engine was not running and you cannot hear engine noises.

7    That's what he told you.  That's what he thinks he will

8    present, and that's his right to try to do that.

9            We will present you contrary evidence.  We hired an

10   acoustical person to listen to the noise of that engine, and

11   you'll hear that engine winding down.  When that engine hit --

12   when the engine hit and that prop stopped, it made a little

13   slight bend in that shaft at impact, and that was enough with

14   the continued rotation of the engine to chew that thing up and

15   make those marks.

16           This does not indicate that this engine failed in

17   flight.  And we'll play that stuff for you, and you'll see that

18   from our acoustical person later.  Those marks were all

19   captured from the iPhone.

20           So let's talk a little bit about the iPhone itself.

21   All right.  Mr. Brauchle played that iPhone for you.  I'll go

22   ahead and say, the third subchapter into why this engine was

23   operating at impact, and that's a sound spectral analysis.  You

24   all heard that whine of the engine, so we hired somebody to

25   listen to that.  And it's amazing, as you will find, that the

1  iPhone 5 picks up the sounds of the engine.

2         It picks it up how?  It picks it up through noise

3  frequencies.  Those whines that you heard, that high pitch?

4  That can be recorded on a spectrograph.  So we will present to

5  you an acoustical person who will show you what we mean by how

6  those acoustical signatures can be shown.

7         The acoustical signatures can be picked up in several

8  ways, and what I'm going to play for you here, if I can -- I

9  don't know if I -- there is going to be a point where I'm going

10  to play it and stop it.  I am not going to play the whole

11  video.  It's tragic.  I don't mean to emphasize that.  I do

12  want to play the first few seconds, just so you can hear the

13  pilot apply the power to the engine.

14         You are going to hear that high-pitched whine right at

15  first, and then if I ask you to stop, Chris, if you can, that

16  would be great.  Okay, go ahead.

17         (Video played.)

18         MR. MCQUILLEN:  You hear the whine of the engine.

19  They are taxiing out now toward the runway.  You hear that

20  engine operate.  They're about to turn onto the runway, making

21  a right turn onto the runway to take off.  And right about

22  now -- stop.

23         That's okay.

24         Did you hear it go up?

25         If we can play it one more time.

1           Right around there where the orange cone is.

2           (Video played.)

3           MR. MCQUILLEN:  Right after he passes that orange

4    cone -- that was the advancement of the throttle to full

5    throttle.  Just that little increase in pitch.

6           So why is that important?  So these are the

7    spectrographs.  And how is it done?  So these fan blades as

8    they pass through the air, believe it or not, create a noise

9    frequency and dynamic.  The acoustical people can tell you this

10   better than I can.  But they create a certain dynamic and

11   frequency level.  These blades, as they pass through the air of

12   the compressor, create another decibel level, and the propeller

13   blades -- not a decibel but a sound frequency level -- the

14   propeller blades create yet a third one.  Okay.

15          What I'm going to do to get through this, you are

16   going to hear all this from our expert, a guy named

17   Dr. Gabrielson who's going to go through all this.

18   Dr. Gabrielson studied all this.  And what we are going to

19   focus into is just the last couple seconds of the flight.

20          So the top two graphs are the engine speed.  One is

21   from a turbine section in the back and the other from the

22   compressor section.  And then the one on the bottom is the

23   actual -- for the prop speed.  Okay.  And what we're looking

24   for there is, are they proportional.  Because as you now know

25   how the engine works, the engine speed is going to be

1    proportionate to the propeller speed.

2           So we are going to look to the last two seconds, when

3    this plane has already rolled over.  Okay.

4           Go ahead.

5           The spectrograms will show, our people will say, that

6    the engine was connected to the prop at impact and here's why.

7    If you look to those last two seconds of the flight -- the

8    laster.

9           So if you look to the last two seconds of the flight

10   so if we cycle through these, you'll see this is the right turn

11   and roll to the right that's happening in the last two seconds.

12          We're going to focus in on what the engine's doing

13   during that time, and what you're going to see up here is this

14   is those last two seconds after the plane is rolled over, and

15   you're going to see here that this is the engine.  This is an

16   engine -- go back -- but yeah, that's okay.  This is fine.  You

17   can -- you can leave it up there.  That's fine.

18          So these are showing that in the last two seconds, the

19   engine is starting here at 100 percent.  This one -- this is

20   the last two seconds here.  We are looking inside this red box.

21   The engine is here at a hundred percent power.  The prop is at

22   100 percent power.

23          That cannot happen unless that torsion shaft is in

24   tact.  As the plane's going down, there's a moment -- there's a

25   reduction down to about 96 percent power, 95, 96 percent power,

1   and you see both phases of the engine and the prop all have

2   that same reduction.  That tells us that the engine was

3   attached to the shaft.

4          If the torsion shaft had broken, the engine will keep

5   spinning at had 1,000 RPM.  The prop will immediately slow

6   down.  You would not see a proportionate difference.  That's

7   the sound spectral analysis you're going to hear during the

8   course of the case, ladies and gentlemen.  That will be

9   presented by Mr. Gabrielson.

10         Let me address the noise that Mr. Sommer claimed that

11  he heard.  The noise that claims that he heard at 50.5 seconds

12  was not the shaft breaking.  That's what he says.  Our people

13  will tell it was the trim wheel.  What is the trim wheel?

14         Well, now you're going to be experts on the de

15  Havilland trim system works, so let's go talk about it.  This

16  is the de Havilland airplane.  This is a very similar model to

17  the one that crashed.  It's the one that we used for our flight

18  test.

19         The trim wheel -- remember this is a 1950's version

20  airplane.  The trim wheel basically is connected through a

21  series of cables mechanically, not hydraulically --

22  mechanically through an actuator to the tail, right?  And the

23  tail of that -- that airplane that I'm talking is right back

24  here, and you can see there's a mark up here.

25         And what we're going to do is move that trim wheel.

Can you turn the volume up a little bit?

When he turns that wheel, here's the tail. Do you see it moving? That's the stationary mark with tape. This is the tail that is moving. As he turns that wheel, there's a scrapping noise as he's moving that. That's a way for the pilot to turn the trim wheel to try to force the elevator up or down.

Okay? It's kind of a fine tuning device to using the actual yolk of the airplane, okay? That's what a trim wheel is, all right?

Our people looked at that, the same acoustical engineer that listened to the things, and we went up and actually did a test flight where we recorded the sound of that trim wheel, and we matched it against the noise that's heard on the iPhone that's was recorded.

This shows that -- they will explain this better. It's the fingerprint that's important it's the fingerprint of the two and the frequencies of them both that show it's an identical match.

So the sound that we hear in the iPhone isn't any shaft breaking. It's a sound that goes on for a second and a half of the trim wheel that's moving. After the accident, the investigators looked into that trim position, and what they noticed was that -- and there's a normal takeoff position as you can see here. This is a trim indicator. There's a normal

1    takeoff position.

2          How do they determine this?  The investigators found
3    the actuator that is moving that tail that you just saw.  When
4    they pulled the actuator out, they measured the difference that
5    it was extended.  They went to an exemplar airplane, and they
6    installed it, and they tried to determine the trim position,
7    and this is what they found is that the trim position was
8    forward of the takeoff position, which would be consistent with
9    an attempt to move the nose of the plane down.

10          So fourth subchapter, part two as why the engine is
11   operating.  This needs a little set up, but I think it's
12   probably one of the simpler concepts.  Pitch, when I use the
13   word "pitch," I'm referring to the pitch of that airplane.
14   Where's my little toy?  Oh, here we go.

15          Pitch of the airplane is just what it sounds like,
16   pitched up or down.  Okay?  Altitude, feet above the ground.
17   These are the words that you're going to see.  Climb rate, what
18   is climb rate?  How fast is it going up?  It's going up at a
19   hundred feet an minute, 200 feet a minute, a thousand feet a
20   minute.  Okay?

21          Speed is -- typically we're using air speed when you
22   see calculations here.  We're talking about air speed as
23   opposed to ground speed, okay?  And what's a stall?  Stall that
24   you're going to hear, again not stall of the engine.  Stall is
25   when -- planes as you know, the old Bernoulli's principle for a

1    lift, that air passes over a curved surface, creates a negative

2    pressure area, and the plane rises and creates lift, okay?

3              There's a point at which if the plane is pitched up

4    too much, that lift is destroyed, and the wing no longer

5    flows -- the air no longer flows nicely over the wing.  It

6    starts to ripple, and you lose lift.  That's what are people we

7    will say happened here because the nose was pitched up too

8    high.

9              So let's take a look at what some of the performance

10   data shows.  The NTSB looked into the issue of the airplane

11   performance and did a lot of work on this, and both experts on

12   both sides, Mr. Sommer, who you'll hear from, and our experts

13   all looked at that data, have all done their own things with

14   that data, and here's basically what it shows.  Okay?

15             That's the principle of stall.  Just to simply show

16   that as the plane pitches up -- if you get too high, you get

17   burbles behind the wing.  You lose the lift, and the wing stops

18   flying.  That's what we mean by stall.

19             And here's -- hopefully this might be simple.  What we

20   are looking at are three parameters, three factual parameters

21   that were done during the course of the investigation, and what

22   we're looking at here is one is pitch.  That's the nose of the

23   airplane, and then pitch is this black line, and the pitch on

24   the black line is defined by this scale on the left.

25             The pitch -- this is roughly where the plane left the

 1   ground.  You can see the blue line is altitude here.  Altitude

 2   begins to change right around the 45 or 46-second mark.

 3   Altitude goes up, and then this is our climb rate, okay?

 4        The plane up here then, it gets up to about -- over

 5   here is altitude also.  That's 120 feet, and this is a climb

 6   rate on this side.  So, again, pitch in degrees, it -- the

 7   last -- the recorded pitch that people determined was about

 8   30 degrees nose up.

 9        This is the pitch at a climb rate.  You can see up

10   here about to over 1,100 -- about 1,100 feet per minute, and

11   this is the altitude of the airplane going from takeoff, just a

12   constant increase up to 120 feet.

13        Where does the plaintiffs say that the engine failed?

14   We'll have to see.  I think what Mr. Sommer is going to tell

15   you is that the engine failed at 38 feet.  Where's -- where is

16   that from what we cite?

17        This was roughly where the plaintiffs say that engine

18   failed, and you can look at this, and what you'll have to

19   decide is, if the engine to the left over here has only gained

20   this much altitude, and this is your climb rate of 500 feet per

21   minute at the time the shaft breaks, this plane keeps on

22   climbing, increases its altitude after he says it breaks, and

23   it increases its rate of climb, doubles its rate of climb after

24   they say it failed.  That's evidence that you will have to

25   consider during the course of the trial.

1           And last subchapter before we get into the pilot error

2  phase, and that's the notion of the flight tests that Honeywell

3  did.  Mr. Brauchle is right, we did do flight tests.  We'll

4  have to see what flight tests the plaintiffs did.  I'm not

5  aware of any, but maybe there are some that you might see.

6           First, the plane rolled to the right when it stalled.

7  Our people will tell you that that's an indication that power

8  was on the prop, and when I say power is on the prop, I mean

9  that the torsion shaft is still connected to the prop.  What do

10  I mean by this?

11           So you've seen repeatedly now that this plane does a

12  right turn when it stalls, okay?  All right.  Here's what is

13  important to know that you'll hear about, and the pilots are

14  going to be able to tell you, you know, better than we can.

15           We know this plane rolls to the right.  You've seen

16  this several times already.  Okay.  So what is important as I

17  mentioned to you that the group called Recon is the group that

18  put this engine on the airplane, and when they put this engine

19  on the airplane, they were required to do a series of what they

20  call stall tests.  Okay.

21           And here's the only two things I want to bring to your

22  attention, we will try to get through this pretty quick.  So

23  you have to -- when you do this conversion, you take that

24  piston engine off and you put the turbine engine on, you have

25  to show the FAA how it's going to affect performance.  This is

not Honeywell.  This is this group called Texas Turbines and
Recon, okay.  This is their test data, not the plaintiffs', not
Honeywell's.  It's a company called Texas Turbines.

So you are going see two sets of data.  One is a power
off stall.  One is a power on stall.  Let's just talk those
through.  They're not as complicated as they sound.  So if
you're going to go do a test with power off, what you do is you
set the airplane up to fly basically kind of straight and
level, and then you slowly pull back on the controls and have
the engine -- and then you reduce your throttle.

As you reduced the throttle, you start bringing the
controls back and get the plane to pitch up and up, and you're
trying to get it to stall.  That's the point of the test, and
you get the plane to stall, and then you see what happens to
it.

These reports show that when you have power off,
meaning you've reduced it to idle, that this plane will
basically settle back down.  The nose goes down, and you can
see up here, the roll angle is about 2 degrees, insignificant.
It's basically the wings come down.

Let's go to the power on tests.  The power on tests is
a different story.  Power on is what it sounds like.  You don't
reduce the throttle.  You increase the throttle.  You pull back
on the controls, and when you pull back on the controls, you're
still going to keep pulling back until the plane stalls with

1    the power running.

2           That's what a power on stall is.  It takes a little

3    longer because you got some engine power, but eventually when

4    you get that wing pitched up enough, it's going stall, power on

5    or power off, and when this stalled with the power on, look

6    what happens.  It rolls to the right 30 degrees.  And the nose

7    goes down 10 degrees pretty rapidly, exactly what happened in

8    this flight.

9           And our people will tell you that's an indication that

10   power was on when it stalled at 120 feet in the air.  And when

11   it stalled at a 120 feet in the air with the power on that

12   means your torsion shaft was absolutely intact.

13          Let's talk about the test.  I won't show you the test.

14   You'll see that with Mr. Studtmann.  He was with our pilot to

15   do these.  We'll play these during the course of our case to

16   show you what that stall is, both power on and power off.

17          We also did some flight test to simulate the failure

18   that Mr. Sommer says happened at 38 feet, and we did that by

19   taking a plane up and simply reducing the power to see what

20   happens and to see if you reduce the power, will the plane do

21   what those other graphs that we showed you said.

22          I won't play the time, but I'll get through this, but

23   you'll see this during our case in chief.  There's videos, and

24   that net effect or the results of our test show from our data

25   that was recorded on that flight -- shows that if you match

1  that to where plaintiff say it breaks, which is overlaid on

2  some of the NTSB studies and what some of the experts have

3  done, we've interpreted the data.  The plaintiffs have

4  interpreted the data.

5        Our flight test show that that's what happened.  If

6  you pull that power back, this plane isn't going to go up and

7  climb at a thousand feet per minute.  It's going down right

8  away, okay?  It's going to stay level.  It's not going to roll

9  to the right.  You pull the power back, very docile, it will

10 just settle down, and what you see is incline and pitch is what

11 happened.  It does not match what they say happened on the

12 flight.

13       All right.  So that's the summary, ladies and

14 gentlemen, of our product defense in this case.  You can see if

15 it's fairly complex, but at the end of the day, it's fairly

16 simply.  It's a difference in what these signatures of the

17 wreckage mean.  That's going to be biggest dispute I think in

18 the case.

19       But the shaft failed from a one-time twisting overload

20 is what our people will say.  The physical damage to the engine

21 props support that and show the engine was running.  The sound

22 study shows the engine was running right up the time of impact,

23 and you'll be able to hear -- when we play that video again,

24 you will be able to hear that whine going all the way down to

25 the time of impact, that that engine is operating.

1          The performance studies so that the airplane continued
2   climbing at a rapid rate after the failure and our test flight
3   show that it doesn't match what the performance study is that
4   plaintiffs claim will happen when the engine fails.

5          I'm sure they'll have a different story, but you'll
6   hear it our side when it gets to ours.

7          Let me go to the last phase of our presentation today,
8   and that's the pilot error presentation, and hopefully I will
9   be able to get through this here in the next 10, 15, minutes or
10  so.

11         So as I mentioned at the beginning, the plane crashed
12  because the pilot improperly load the airplane and used the
13  wrong flap setting, so now we're coming back to where we
14  started this discussion.  All right.

15         So the whole issue with respect to part three here is
16  pretty simply.  There's a -- there's a couple of things.  We
17  talked about the weight and what do we mean by all that, to try
18  to explain this drastic and abnormal --

19         THE COURT:  Mr. McQuillen, again, I apologize.

20         MR. MCQUILLEN:  Too fast?

21         THE COURT:  Madam court reporter is going to throw
22  something at me soon.  I just need to you slow down a little
23  bit.

24         MR. MCQUILLEN:  Sorry, Stacy.  Sorry.

25         All right.  So let's talk about balance, and speaking

```
1   of maintaining your verbal pace, stability.  All right.  That's
2   what we're going to talk about here, the balance and stability
3   of an airplane.  All right.
4         So now that you're all experts on turbine engines and
5   sound stuff, now we are going be to talk about stability for
6   airplanes.  All right.  So what are we really trying to get
7   through there?
8         So balance is the location of a center of gravity in
9   an airplane.  Okay.  That's what balance is.  Go ahead.
10         The center of gravity is the point -- and you're going
11   to hear all sorts about the center of gravity.  The center of
12   gravity is the point that an airplane would balance if it was
13   suspended at that point.  All right.
14         And so I'm basically holding here -- I mean, I'm not
15   telling you that this is an exact, you know, weight thing, but
16   just to form a point.  There's a point in here in which the
17   airplane will balance on my fingers, and you can let go of it,
18   and it's going to -- it's kind of like a teeter-tooter is the
19   best way to say it.
20         It will balance at a certain point on your fingers.
21   You can put a little bit of a weight over here and won't knock
22   it off the fingers.  You can put some more weight up here, it
23   won't knock it off the fingers, but you will get to some point
24   where it will, and it's going to fall off the teeter-tooter if
25   you'll.  That's a the whole point of weight and balance.
```

1          So as a pilot, you need to make sure you know where

2     you are distributing the weight, so there's two elements there.

3     One is, how much weight do you have, and the second is, where

4     you are putting that weight inside the airplane.  Okay.

5          So to demonstrate the concept of weight and balance,

6     if we just kind of shoot through this here real quick, so

7     there's our center of gravity.  Go ahead.

8          If I put a hundred pounds on the nose, then that takes

9     the teeter-totter down if that's the only weight we have.  This

10    is just for example to demonstrate a point.  Go ahead.

11         If we put the hundred pounds and balance it, we see

12    the airplane stays nice and balanced.  Okay.  We can also put

13    50 pounds farther back in the airplane and still have no

14    effect.  It's all where you place it.  You can put 200 pounds,

15    which is more than the hundred you have in front, but it's

16    moved a little more forward closer to our center point and

17    still keep that airplane balanced.  That's generally what we

18    mean by the topic of weight and balance.  Go ahead.

19         If you put 200 pounds in the back, with nothing up in

20    front, the teeter-totter is going to come the other way.

21    That's weight and balance in a nutshell.

22         So how does a pilot do this?  The significance of the

23    FCG by the way is that if you load it in a tail-heavy

24    condition, it will have a serious effect on longitudinal

25    stability.  What's that?  Well, it's pitching up or pitching

1    down too much.  You're out of control.  That's what an aft

2    center of gravity does if you move it too far aft.

3         As the center of gravity moves aft or further aft, a

4    less stable condition of the airplane occurs.  It decreases the

5    ability of the aircraft to right itself.  So if it's too

6    tail-heavy, the pilot will have a great deal of difficulty

7    trying to get the nose down.  That's what an aft center of

8    gravity does.

9         Now, pilots are supposed to ensure that the planes are

10   in proper balance.  There's a regulation that applies to pilots

11   in a Part 135 or operation like Rediske Air that requires them

12   to comply with the manufacturer's takeoff weight limitations in

13   the approved -- in the approved flight manual.  That's a

14   requirement for the pilot in this case.

15        You will also note -- another requirement these

16   operating specs are specifications that are issued by the FAA

17   to Rediske Air.  The certificate holder who was Rediske Air, is

18   authorized to use only actual weights when determining aircraft

19   weight and balance, actual weights.  Go ahead.

20        Where do the weights come from?  Well, the passenger

21   advises the lodge that the weights of the passengers was

22   1,345 pounds.  The passengers estimated that their baggage

23   weight to be at 80 pounds.  Rediske Air, we think after the

24   accident, not before the accident, calculated a post-accident

25   estimate of cargo, the stuff loaded in the back of the

1  airplane, to be 300 pounds.  That's what we think.

2         However, the lodge owner who was there with

3  Mr. Rediske to put the cargo in the back of the airplane said,

4  We didn't weigh it.  We say that's a violation of the operation

5  specs to weigh it.  The cargo was not weighed prior to loading

6  it on the airplane, on this passenger, you know, fare-paying

7  flight.

8         Go ahead.  Go back to the other one.  Thank you.

9         This is a receipt that was found during the course of

10  the investigation of some of the cargo that was put on the

11  airplane.  The NTSB went back.  They looked at the receipt.

12  They went to the store.  They weighed the things, and they came

13  up with about 360 pounds, okay?  And you say, Well, 60 pounds,

14  300 pounds.

15         However, in the wreckage they found tons of other

16  things, pot roasts, huge bags of fluids, chickens, all sorts of

17  extra food that were not documented on the receipt as well, and

18  they weighed those items.  Go ahead.

19         The net effect of what was reported and what the NTSB

20  determined was 1,400 for the passengers, 187 for the luggage,

21  not the 80, and 719 pounds of cargo, not 300.  So the weight

22  was actually almost 600 pounds more than what the pilot had

23  thought, if he even did any weight and balance calculation, and

24  I'm here to say I think our evidence is going to be that he did

25  not do one, and there is no evidence that he did.

1          Next one.  So now that we know the weights, we move on
2     to what they call the loading part of the plane.  Now, where do
3     you -- you saw in our illustration.  Where do you distribute
4     the weights, okay?
5          So this is the approved loading envelope, and this
6     gets a little bit complex, but I'm going to try to make it real
7     simple.  So if you remember this center of gravity area with
8     the two fingers that I have on this airplane, just with --
9     that's kind of where you can keep this plane balanced, okay,
10    without it falling off either end of the teeter-totter.
11         That little two finger thing, if you will, is right
12    here.  This is what they call the approved loading area, and
13    that this part of the plane basically under that first row of
14    passenger seats.  That would be that center point or where the
15    plane would suspend itself if you held it up in the air.
16         And as long as you keep a calculated center of gravity
17    somewhere between 132 and 152 inches in here, that's about
18    whatever that is, a foot and a half, 20 inches -- as long as
19    you keep that center of gravity in that range, plane's going to
20    be okay, and it's legal to take off. If you are out of that
21    limit, you are not legal to depart the ground, period.
22         That's a violation.  It's black or white.  You cannot
23    do it.  There is no fudge factor that a pilot's allowed to do.
24    Okay.  So how does a pilot do that?  Well, every manufacturer
25    that builds an airplane has a table.  You take a table to where

1    you put the weights.  This is going back to 1958, this is

2    evidence that we believe you'll see.  I won't get into this.

3    It gets complicated.  The experts will sort this out, but it's

4    not -- it's not that complicated.

5            You take the various weights, and you attach a moment

6    arm to them, another fancy word for you to remember, just a

7    fancy word of where -- how far from that center the weight's

8    being placed.  A short moment arm means that that plane from

9    the center of gravity might be to here.  A longer moment arm

10   might be that the weight is put back here.

11           The farther back you put the weight, the greater the

12   that moment arm is, and you have to multiply the weight by the

13   moment arm.  The moment arms -- I know this sounds fancy.  It's

14   all found right in the manual.  It's all spelled out in this

15   1950s manual.

16           It says you take the weight, and there's moment arm

17   for that row, weight -- gets a little bit moment, 290 something

18   here, you multiply there.  Weight in the fourth row gets

19   multiplied by that one.  Weight in the fifth row gets

20   multiplied there, weight in the sixth row there.

21           And when you get back to the cargo, it has an even

22   higher number.  That multiplier increases as you go back.  Why?

23   Because you're placing it farther back on the teeter-totter.

24   Okay?

25           So what does a pilot do then?  Then you take that

1   total number, and you do some more math with it, and you will

2   get where that center of gravity is located in inches.  And

3   that inches is from that center of gravity point where the two

4   fingers are.  That's where you're -- what you're trying to

5   learn.

6           So let's just walk through this real quick.  Go ahead.

7   So here what we have is warning that manual of the 1950s that

8   says the CG position of a loaded aircraft must be checked and

9   verified prior to take off.  That's a requirement.  It's a

10  warning in the pilot's manual.  The CG position on the loaded

11  aircraft must be checked and verified prior to take off.  We

12  believe that was never done in this case.

13          It's been reconstructed by our people with the data

14  from the NTSB, and here's where we are going to start.  And

15  you're going to see right here, this is all in -- in the white

16  is good.  Red is bad.

17          Right here, when the plane is loaded with the pilot

18  and fuel in the tanks down here, this airplane -- the weight

19  which is on this side and that center of gravity with that

20  moment arm were all good, no problem.  You're within that

21  center of gravity.

22          Next one.  Let's fill up the person next to it.  What

23  you're going to see here, the center of gravity didn't move

24  back much.  Why?  Well, because that pilot -- this second pilot

25  ends up here.  As we start filling these rows, you are going to

1    slowly start seeing this number move back.

2            Here's the first -- wait one second.  Here's the first

3    row of two passengers.  These were the weights determined by

4    the NTSB.  You'll see how we are still good to go.  There's bag

5    that the NTSB noted was there.

6            The third row passengers were still good to go here,

7    okay?  Let's go to the fourth row, which is the third row of

8    passengers, 132, 113 pounds and 22 pounds of carry on.  Those

9    are the weights of the passengers there.  Still good to go.

10           Row 4, 195 pounds and a 10-pound carry-on bag.  Notice

11   how it's moving back?  That center of gravity is moving back

12   because we're loading more in the tail of that airplane.

13           Go to the next row.  The pilot in this place decided

14   to put one of the heaviest of all the passengers in this row,

15   235 pounds.  Hold right there for a second.  Now, we have

16   luggage and passengers on board.  We're still okay, still

17   within limits, still good to go.

18           Now we're going to go ahead and add that 719 pounds of

19   cargo, kaboom.  It's in the red zone, and our people will tell

20   you that that's the danger zone.

21           Now, when I say that's what our people are going to

22   tell you're going to hear I believe during the course of this

23   case that that's what the NTSB determined, and the plaintiffs

24   actually determined a center of gravity that's even greater

25   than that.

1          So this was off the charts.  It was in violation of

2     the manual.  It clearly shows that the pilot our people say

3     could not have done because no pilot would have taken off with

4     an airplane that out of balance.

5          Those are the numbers.  The legal limit was 152, and

6     you might say, Well, five inches -- okay, well five inches out

7     on a big long airplane, that's not significant.  It's extremely

8     significant because remember, that area is only about 20 inches

9     wide.  You've taken and you've added another five inches off

10    that teeter-totter.  That's enough to tip the balance and

11    bottom it out.

12         Okay.  So the significance of the aft CG, ladies and

13    gentlemen, is the plane was loaded in violation of the regs for

14    not complying with the manufacturer's weight limitations.

15         Number 2, the plane was loaded in violation of the FAA

16    operational specs.

17         3, it was loaded in violation of the airplane flight

18    manual, and also the extreme aft loading caused this plane to

19    be tail-heavy and pitch up, and you will hear from the

20    experts -- the plaintiffs' own experts that that pitch

21    continually linearly.  It just kept rising and rising and

22    rising and rising, and it didn't vary.  It just kept constant

23    the whole time until it stalled and over it went, and that was

24    the result right there.

25         Secondly, the pilot used an improper flap setting

1  which kept him from being able to maintain control of the

2  plane.  Next slide.  Here's the flaps.  We go ahead and see

3  these.  The flaps are at the back edge of the airplane right

4  here.  You can see.  Go ahead.

5         The pilot is what they call moving the flaps down.

6  All he's doing is just -- these are kind of -- it's kind of a

7  hydraulic little pump and it just pumps these flaps down, okay?

8  That's how the flaps work, pretty rudimentary, pretty simple.

9         These are the available flap settings.  You can set

10  them at zero.  You can set them at 10, 20, 30.  There's a

11  difference between takeoff flaps and landing flaps.  I don't

12  mean to sound facetious.  Takeoff means this is what they want

13  you to use for takeoff.  Landing is a different story.

14        It's a different flap setting for landing.  It's

15  30 degrees.  Go ahead.  This is what the manual says you use

16  for takeoff this a pre flight airplane check.  Okay.  All doors

17  properly closed, tail trim, takeoff setting -- we talked about

18  that trim -- wing flap takeoff position.  That's the position

19  that you're supposed to put the flaps in.

20        This is a photo from the iPhone.  I think there will

21  be no disagreement from any of the parties here that these

22  flaps were found in the full down position, not the takeoff

23  position in violation of the manufacturer's recommended takeoff

24  flap setting.

25        Why does that make a difference?  I will leave that

1   for the aerodynamicist to explain or at least the experts that
2   we're going to have here in our case.

3          If you have a greater deflection in the wing flaps
4   between takeoff flaps here and then a bigger deflection down to
5   30 degrees, it takes the air both over the top of the wing and
6   the bottom of the wing, and a lot of the wing just to be
7   simple, air over the bottom is disturbed now.

8          You're not getting as much as airflow over the tail,
9   and the air that is going off the tops of the wings is now
10  pushing down -- it's called downwash.  It's now pushing down on
11  the top of that tail, which makes the pitch up caused by the
12  aft CG worse because the plane's pitching up from the load, and
13  the downwash from the full flaps is pushing even further down.

14         The net effect, our people will show you, is that it
15  renders the airplane uncontrollable.  So if a pilot wants to
16  push the elevator forward, there's not enough elevator
17  authority left in that plane to get the nose down.  And this
18  nose never pitched down until the plane stalled.

19         And our pilot will tell you that any pilot that sees
20  this plane in a 30-degree pitch-up will be doing everything
21  they can to get that nose down because it's so abnormally high,
22  and they know that they would stall, they would push forward,
23  and there's no evidence that that ever happened in this flight.

24         So, ladies and gentlemen, that's the sum and substance
25  of our pilot error case right here.  He didn't use the actual

1    weights.  We think he did not use any weight and balance.  The

2    plane was loaded after the allowable limit.  The flaps were set

3    to the wrong setting and that caused the airplane to pitch up.

4    And that's the pilot error case that we're going to present to

5    you during the course of our case, ladies and gentlemen.  And

6    that led to stall.

7            Go ahead.

8            So I would say, ladies and gentlemen, as I conclude

9    the opening statement here today, tragic accident, no question.

10   Honeywell believes, however, that this accident had nothing to

11   do with the cause of its accident.  We think the evidence will

12   show that during the course of the case.

13           I thank you for your patience here this morning.  I

14   would ask one thing in addition to exercising your patience and

15   give us a fair shot until we get to our case.

16           I heard one day and one time that someone once told

17   me, that the mind is like a parachute and that it works best

18   when it's open.  So might be a -- we just ask that you simply

19   take your time, be patient with us, and wait until the evidence

20   comes in, and I'll talk to you again at closing argument.

21           Thank you very much.

22           THE COURT:  Thank you, Mr. McQuillen.

23           So, ladies and gentlemen, this worked out, from a time

24   perspective, perfectly.  So we are going to break for our

25   lunch.  We will bring you back in here about a quarter after

1    1:00 and we begin taking testimony.

2            Thank you again for your patience and your attention.

3    Thank you.

4            Madam Clerk.

5        (Out of the presence and hearing of the jury panel.)

6            THE COURT:  Please be seated.

7            Any issues we need to address before we come back at

8    lunch or at lunch?

9            MR. BRAUCHLE:  I have an issue, Your Honor.  And a

10   statement.

11           Again, I didn't -- as you said it, I didn't want to

12   object, but there was a couple of slides there at the end in

13   reference to the NTSB determinations, which is exactly what I

14   was, for the last several pretrial hearings, afraid -- I was

15   afraid of.

16           THE COURT:  No, and I noted those as well.  I don't

17   know that I wanted to call attention to it during opening

18   statements.  I, unfortunately, have sort of an emergency

19   hearing I have to do here in about ten minutes on a different

20   matter.  But let's -- is there anybody who will be testifying

21   this afternoon that will be at all related or been providing

22   testimony that touches on the NTSB determination studies,

23   things of that nature?

24           MR. BRAUCHLE:  I think Colin Sommer may a little bit.

25           THE COURT:  Let me see how long this 12:15 hearing

1    lasts, and then perhaps before we bring the jury back in at

2    1:15, we can address this issue as far as -- I mean, it's

3    difficult.  We've had several conversations at that point as to

4    where that line is.  That did feel at least -- I want to go

5    back and read Judge Holland's order one more time, but facts as

6    it relates to the weight of the cargo, where that cargo was

7    found seems to be proper fodder under 703 for an expert witness

8    to testify to, but effectively determining -- and I'll go back

9    and look at the transcript, but at least it felt implicit, if

10   not explicit, but that in Mr. McQuillen's opening statement he

11   indicated NTSB determined.  That is sort of a more

12   conclusionary statement as to the cause of the accident as

13   opposed to simply providing that data as to weight and location

14   in the aircraft.

15          But I need to look back at the transcript and make

16   sure my recollection of what was said matches that transcript.

17   I have to conduct this other hearing, but let's plan on being

18   back in here at 1:00 and we can have that discussion.

19   Mr. McQuillen, I will give you an opportunity to be heard on

20   this point as well.

21          But I apologize.  I just don't have enough time to get

22   into it at the moment.

23          MR. MCQUILLEN:  I will just say that I show the slide

24   being properly supplied to Mr. Brauchle, and you said okay.

25          THE COURT:  Well, we will pull up the slide and we'll

1  talk about it.  I noted it as well.  You know --

2          MR. MCQUILLEN:  I specifically showed that slide to

3  Mr. Brauchle.

4          THE COURT:  And I'm not suggesting anyone has done

5  anything wrong, but I want to at least have the discussion, if

6  for no other reason than it prepares us better as we move

7  forward in this trial --

8          MR. MCQUILLEN:  Understood.

9          THE COURT:  -- as to what is acceptable and what is

10 unacceptable.

11         But we are going to take our lunch break.  I will be

12 back on the bench at 1:00.

13         DEPUTY CLERK:  All rise.  This matter stands in recess

14 until 1:00 p.m.

15     (Proceedings in recess from 12:05 p.m. until 1:01 p.m.)

16      (Out of the presence and hearing of the jury panel.)

17         DEPUTY CLERK:  All rise.  His Honor, the Court, the

18 United States District Court is again in session.

19         THE COURT:  I apologize for my tardiness.

20         The NTSB issue, I didn't have ample time to go through

21 the entirety of the transcript, and it does seem to me that at

22 least early on in the opening statement references to the NTSB

23 did comport with Judge Holland's ruling; that the references

24 made were always wed to "our experts will testify to," so on

25 and so forth.

1          And I imagine plaintiffs' argument relates more

2   towards the end of the opening statement when Mr. McQuillen was

3   talking about weight and balance; is that correct?

4          MR. BRAUCHLE:  That's correct, Your Honor.

5          THE COURT:  And there it becomes a little bit, at

6   least from the transcript, a little bit murkier.

7          What I didn't have available to me was the slide deck,

8   so I can't say with certainty what the slide deck said

9   versus -- and how well that comported with the actual

10  statements made.

11         But I was left with the impression that although it

12  wasn't explicit, it was implicit, this idea, that the NTSB

13  determined, when it came to weight and balance, that that was

14  somewhat the causation of the accident.  That's how I

15  interpreted the statements.

16         I don't know, again, given the short duration between

17  now and when we bring the jury in that we can fully flesh this

18  out.  Nor am I saying at this moment, Mr. McQuillen, that I'm

19  finding a violation of the order, as much as I think it's close

20  enough that it's worthy of discussion.  But it also begs the

21  question, how we would remedy that reference.

22         Now, part of it is I'm going to instruct the jury

23  several times that what the lawyers say is not evidence.  But

24  that's also a bell that is difficult to unring in certain

25  settings.  So I would imagine that if I were to determine that

those statements went too far, for lack of a better term, I
would be open to what does the limiting instruction look like.
You know, whether or not this can be remedied through a direct
or cross-examination.  And anyhow, it's all on the table.

I don't think even if I were to determine a violation
that it's so severe that there is no way in which we can remedy
it.  But I don't like the idea that the jury's been left with,
the NTSB has already determined the cause of this accident.
And I think a juror or multiple jurors or the entire jury could
have been left with that impression, based on the opening
statement.

Again, this is after reviewing the transcript for
about 90 seconds before I came back in.  And that's my fault
for scheduling a hearing that was pretty pointless as it was.

But nevertheless, so that's where we are at.  I don't
know that it should complicate the testimony of the first
witness.  I don't know for once plaintiffs start calling expert
witnesses if there are ways in which they want, I guess, more
breadth in their direct examination to highlight these points.
I definitely think I would be open to that, if for no other
reason than to make it clear to the jury that NTSB studies are
mere data and not conclusionary nor should they be
conclusionary.  And I think there's a way we can thread that
needle, but I'm just going to need a little more time to review
the transcript more fully.

1          But I did say, Mr. McQuillen, that I would give you

2     time to respond, and so this is your time to do that.

3          MR. MCQUILLEN:  Thank you, Your Honor.

4          A couple of things that I would say first of all.

5     Number one, I did take the Court's advice to heart.

6     Mr. Brauchle and I exchanged these exhibits.  I specifically

7     showed that slide and he agreed with it.  And he was here when

8     it was John, one of his partners, as well.  And they both

9     agreed to that slide.  I went through the entire dep.

10          Number two, here's the issue.  And I remember when we

11     first met, Your Honor, a couple of weeks ago.  I said there's

12     three buckets of reports here.  This determination -- and I

13     think I probably did use the word "determination."  I would

14     doubt very seriously I said "cause," but I probably did say

15     "determination," just like they determined the speed, just like

16     they determined the pitch, just like they determined all the

17     things that Judge Holland said were fair game.

18          The weight and the CG are similar facts and data.  And

19     so I don't think it's a violation at all.  And, in fact, when

20     we talk about -- here's the difference -- when we say it gets

21     upper -- or approaches or gets close to the probable cause,

22     remember what the probable cause is.  It reached an aerodynamic

23     stall.  That's in the probable cause.  That's verboten.  But

24     everybody's agreed to that.

25          Also, I did not say at any point, that I recall, that

the NTSB determined that an aft CG caused the accident. That would be a violation. And I would have to check the transcript, too, Your Honor. I didn't do it over lunch. But that would be a violation.

And the other thing that is probably more important, Your Honor, is that that data of the 157-inch CG comes directly from the NTSB factual report.

We've already discussed that plaintiffs agreed to the admission of the factual reports. Some of that data appears in the studies that Judge Holland talked about, but the 157-inch CG is in the factual report, which statutorily there is no prohibition to and which the plaintiffs had no objection.

Also, let me point to Docket 492, the plaintiffs' response to our motion in limine -- or the reply in support of the motion in limine to bar studies.

For clarification, plaintiffs do not object to the admission of the NTSB factual reports.

So I don't know how this can remotely be a violation or even close to a violation of the order by repeating a determination of a fact of what the CG was anymore than it is the weights, the speed, the stall, or anything else. These were all done by some type of analysis or calculation.

So I don't know that you can parse out that probable cause and say, well, we can all talk about pitch and speed and stalls and everything else, and we can talk about weights, but

 1    you can't talk about what the CG made a determination of.  It

 2    doesn't seem to make sense.

 3          I would close simply by saying as far as the prejudice

 4    is concerned, the plaintiffs have it farther back than the NTSB

 5    does.  So this notion that, you know, he comes up with an even

 6    more -- if there is such a word like after, it's more aft than

 7    what the board concluded.

 8          So, you know, I totally understand the Court's

 9    concern.  We have all been struggling with what Judge Holland

10    meant by getting close to or approach to.  But I will check the

11    transcript.  I'm quite sure I didn't say the NTSB determined

12    that that aft CG caused it.  I doubt that I said that.

13          THE COURT:  You did not.  You did not say that, from

14    my review of the transcript and my recollection.  That is not

15    what you said.

16          I think the trick here, and this is something that we

17    discussed ad nauseam in I think all of our pretrial

18    conferences, is this -- this is difficult, because I do think,

19    you're correct, Mr. McQuillen, NTSB's determinations as to what

20    they found the weight to be, you know, these factual data, more

21    data centric determinations, are permissible, understand

22    Judge Holland's rulings, under the Rules of Evidence.

23          I think the difficulty, and maybe this won't bear out

24    in expert testimony because it will be more linear, it will be

25    more structured, but I think when I look through the

1    transcript, you're right, you never said, NTSB indicated this

2    was the cause.  But there's a -- there's a tethering between

3    when you would indicate NTSB made the following determinations

4    about weight, so on and so forth.  And then would conclude and

5    this is what caused the accident.

6           Now I appreciate that you're trying to display a

7    fidelity to this somewhat opaque line that has been created by

8    Judge Holland's order, but the problem is I don't know if I'm a

9    juror and I'm listening to that that they are appreciating the

10   distinction between the initial NTSB determinations and your

11   sort of more conclusory statement.  And it could be that

12   there's not a violation, but it was something that as I heard

13   it, I definitely cocked my head and thought, this might be

14   problematic.

15          Again, I am not making a ruling here that you did

16   violate the Court's ruling.  I appreciate the fact that there

17   was nothing on your slides that I thought did.  It's just this

18   idea that, can the jury appreciate that distinction between

19   what NTSB determinations are as to data versus conclusions that

20   could have been made by the NTSB.

21          And so it might be that a limiting instruction is just

22   ultimately necessary because this line is so hard to walk.  And

23   that's what I would like the parties to think about as we move

24   forward in this trial.  Is there something they would like the

25   Court to instruct the jury on as it relates to NTSB data?  Is

1  it something they both would like an opportunity to make that

2  point during their examination of their witnesses, this

3  difference between, you know, data and conclusions?

4        But I do think it will be important that at some point

5  in time the jury appreciates and understands that the opinions

6  they hear are from the experts themselves and not simply them

7  parroting the conclusions and the determinations of NTSB as far

8  as causation is concerned.

9        And that's -- I mean, I think that's the difficulty,

10  and perhaps I was naive to think that there was a way to

11  separate these two things in a clear manner for the jury's

12  benefit.  So perhaps we just have to be explicit with it.  I

13  don't know.

14        But I am growing more and more concerned that we -- no

15  matter the best efforts of counsel, that we may not be able to

16  draw this line without doing it for the jury.

17        But, again, I'd like to go through the transcript more

18  fully.

19        I do appreciate Mr. McQuillen's correct.  He didn't

20  say anything explicitly that was in violation of

21  Judge Holland's ruling.  I just don't know -- I worry that

22  there is just some inability for the jury to appreciate the

23  distinction that was being made.

24        But that being said, it is the approximate time to

25  bring them in.

1    Mr. Brauchle, do you have anything you would like to

2    add?

3    MR. BRAUCHLE:  Just briefly, if there is something in

4    that factual report that has those numbers and said that they

5    determined, I don't remember that.  I don't see it.  So I would

6    just counter that it's not in the factual report.  It's in the

7    studies which specifically said the NTSB -- we cannot determine

8    the actually weight and balance.

9    So to say the NTSB determined this, they didn't

10    determine anything when they explicitly said they couldn't do

11    it.  It's not in the fact -- maybe there's a different report,

12    and I'm wrong, and if I am, I apologize to the Court for

13    wasting your time, but I don't just see it in the factual

14    report.

15    THE COURT:  Nothing's a waste of time.  I get paid

16    either way.  But I do think -- and this is another issue we

17    addressed -- is that some of this will be fodder for

18    cross-examination.  If you drive home the point in

19    cross-examination or even in direct examination of your own

20    witnesses that these NTSB -- NTSB themselves concluded that

21    they couldn't make these determinations, well then that's -- I

22    think that's a powerful tool for the plaintiffs to use.

23    Again, this is more just a broader question of as this

24    trial proceeds, if this is an issue that keeps rising, how do

25    we walk that line and whether or not the Court needs to be, I

1  guess, more aggressive in instructing the jury so they can
2  appreciate this distinction.
3        But I'm also fairly confident that as the experts
4  testify it will become more clear what is a determination -- or
5  what facts are solid and which facts are more speculative.
6        MR. MCQUILLEN:  We have a witness that's in the
7  courtroom, Your Honor, so Mr. Sommer.
8        THE COURT:  Mr. Sommer?  And he is -- he has been
9  noticed as an expert witness?
10        MR. BRAUCHLE:  Yes.
11        MR. MCQUILLEN:  Yes.
12        THE COURT:  Very well.
13        MR. MCQUILLEN:  I mean, we're going talk about him
14  real quick.  So should he be in the courtroom for this?  Is
15  that allowable?
16        THE COURT:  Well, let's have -- how long do we think
17  the first witness will take, Mr. Schneider?
18        MR. SCHNEIDER:  I think significantly less than an
19  hour.
20        THE COURT:  Okay.  Well, let's go ahead and do this
21  now before we bring the jury in.  We will ask Mr. Sommer to
22  briefly step out of the courtroom, and we can address whatever
23  issues we need to address.  All right.
24        MR. MCQUILLEN:  I would just state two things:  I
25  don't know if the Court's practice is under Rule 615 to exclude

1  any witnesses from the courtroom.  We've got a -- he was
2  sitting in here waiting for the next fact witness to testify,
3  number 1.
4          Number 2, you know, I do think that this -- I'm
5  encroaching on your jury time now.
6          THE COURT:  No, no.
7          MR. MCQUILLEN:  But the issue before the house is,
8  Your Honor, that the -- this is going to come up with
9  Mr. Sommer, because of his reliance on data that was taken
10  right from the very studies they are trying to protect.
11         So, I mean, we're going to hit this thing head on here
12  pretty soon.  Nobody wants to be in violation of any orders
13  here, but, you know, this stuff -- these experts looked at the
14  various studies the plaintiffs are now trying to keep out.  And
15  by the way, that -- CG does appear in the factual report, so...
16         But anyway, maybe after this witness is done, we can
17  address Mr. Sommer and what we expect him to say, just so we
18  have guidance and we don't have to take breaks all the time.
19  And, Judge, now I want to say, I want to ask him about this now
20  and --
21         THE COURT:  Well, look, I think counsel wants an
22  answer that I cannot provide --
23         MR. MCQUILLEN:  Okay.  Understood.
24         THE COURT:  -- as far as -- I have cautioned counsel
25  to tread carefully.  I do think at the end of the day,

1    Judge Holland was as clear as I think he could be, given the
2    fact that he hadn't heard any testimony.  He wasn't going to be
3    presiding over this trial.  Parroting is impermissible of the
4    NTSB reports.

5          As far as the accidents, I mean, I think it's going to
6    have to be done in real time and hopefully we can limit
7    sidebars.  I think I have a better understanding after hearing
8    both opening statements as to the relevance of other accidents
9    and any studies and analysis of other accidents.

10         My biggest concern has always been not necessarily the
11   relevance under 401, but the prejudice under 403.  So to the
12   extent that it's clear that when we're referencing other
13   accidents, that these do not involve Honeywell engines or at
14   least avoiding the implication that they do, that dramatically
15   decreases the concern that this Court has under 403.

16         And I'm assuming now at this point in time that both
17   parties are exercising or invoking 615, so we are going to have
18   witness exclusion; is that correct?

19         MR. MCQUILLEN:  Yeah.

20         THE COURT:  All right.  Very well.  Any other issues?

21         MR. BRAUCHLE:  None from the plaintiff, Your Honor,
22   other than I think the Court earlier said you wanted me to read
23   the uncontested facts before the first witness.

24         THE COURT:  I think that was Judge Holland's -- in his
25   trial order, I believe that is what he had indicated should be

1    the first evidence in.

2         So if you want to do that, that would be perfect and

3    then call your first witness.

4         MR. BRAUCHLE:  Okay.

5         THE COURT:  All right.

6         Madam Clerk, if we could bring the jury in.

7    (In the presence and hearing of the jury panel.)

8         THE COURT:  Thank you, Madam Clerk.  Everyone may be

9    seated.  Mr. Brauchle, you may proceed.

10        MR. BRAUCHLE:  Thank you, Your Honor.  May it please

11   the Court?

12        The parties have agreed to a set of facts, and they

13   are not disputed.  So I'm going read those to you now.

14        Plaintiff and defendant, Honeywell International,

15   pursuant to the Court's order in pretrial proceedings and final

16   pretrial conference submit this joint statement of uncontested

17   facts.

18        One, the case arises out an airplane accident in

19   Soldotna, Alaska on July 7, 2013.

20        The airplane was a de Havilland DHC-3 Otter that was

21   manufactured in 1956.

22        The pilot and nine passengers died in the accident.

23        The charter flight was being operated by Rediske Air,

24   and the pilot was Walter Rediske.

25        The airplane was not equipped with a flight data

1    recorder or cockpit voice recorder, but one of the passengers

2    recorded the flight with an iPhone.

3         So they have take off from the Soldotna Airport.  The

4    airplane pitched up, climbed until the plane had reached an

5    aerodynamic stall, then rolled to the right, and impacted the

6    ground.

7         The airplane was equipped with a Honeywell TPE331

8    turbine engine.  The subject model of the TPE331 engine was

9    certified by the Federal Aviation Administration, FAA, in 1982.

10   The engine torsion shaft was manufactured in 1998 and installed

11   in the airplane engine on September 14, 1998.

12        In 2010, the engine was overhauled by a third party,

13   Executive Aircraft Maintenance, EAM.  At that time EAM

14   inspected the torsion shaft again pursuant to the Honeywell

15   inspection repair manual.

16        On July 7th, 2010, the engine was installed on the

17   accident airplane by a company called Recon Air Corporation.

18   This was done pursuant to a supplemental type certificate

19   issued by the FAA and held by Texas Turbine Conversions,

20   Incorporated.

21        The subject torsion shaft had accumulated

22   approximately 540.6 hours flight time from the time it was

23   installed in 1998 until the time of the accident.

24        There are no known reports, records or other forms of

25   complaints indicating there were any issue with the subject

1  torsion shaft during its operational history.

2          After the accident, the torsion shaft was found due

3  to broken due to torsional or twisting forces.

4          Thank you.

5          THE COURT:  Thank you, Mr. Brauchle.  Plaintiffs may

6  call their first witness.

7          MR. SCHNEIDER:  May it please the Court?  Plaintiffs

8  would call Matthew Isham.  I need to get him outside,

9  Your Honor.

10          THE COURT:  Very well.

11          (Oath administered to the witness.)

12          DEPUTY CLERK:  Thank you.  Please have a seat.  Speak

13  into the microphone at all times.  Please state and spell your

14  first name and last name.

15          THE WITNESS:  Matthew Isham, I-s-h-a-m.

16          DEPUTY CLERK:  Thank you.

17          THE COURT:  Mr. Schneider, you may proceed.

18          MR. SCHNEIDER:  Thank you, Your Honor.

19              MATTHEW ISHAM, PLAINTIFF WITNESS, SWORN

20                       DIRECT EXAMINATION

21  BY MR. SCHNEIDER:

22  Q   Mr. Isham, why are you here today?

23  A   For this accident that happened at Soldotna Airport.

24  Q   Did we serve you with subpoena to leave your work and be

25  here with us?

```
 1   A    Yes.
 2   Q    And at the time -- shortly after, within minutes of you
 3   being served, where were you served?
 4   A    At the Anchorage Airport.
 5   Q    And within minutes of being served, did you and I visit a
 6   bit about the possibility of you testifying in this case?
 7   A    Yes.
 8   Q    Did I give you a copy of the NTSB summary of its contact
 9   with you?
10   A    Yes.
11   Q    And did we look at probably not the aerial image we are
12   going to see today, but an aerial image of the Soldotna
13   Airport?
14   A    Correct.
15   Q    Where were you born, sir?
16   A    I was born in Vancouver, Washington.
17   Q    And when did you leave Vancouver, Washington, if ever?
18   A    It was 1990.  I moved to Alaska with my family.
19   Q    And where in Alaska did you move to?
20   A    Soldotna.
21   Q    That was with your family?
22   A    Yes.
23   Q    You were how old?
24   A    Ten.
25   Q    Where you did you live on July 7, 2013?
```

1  A    33080 Colsen Street in Soldotna.

2  Q    And as of that date, July 7, 2013, roughly how many years

3  had you lived at this Colsen Street address?

4  A    20-some years.

5  Q    You're still there?

6  A    Correct.

7  Q    Okay.  Are you married?

8  A    Yes.

9  Q    And who's your wife?

10 A    Iris Isham.

11 Q    You have a couple of sons?

12 A    Correct.

13 Q    Could you give us quickly their names and ages?

14 A    Kyle who is 23, and Carston is 19.

15 Q    And how long have you and Iris been married?

16 A    Six years.

17 Q    Okay.  Did you attend high school in Soldotna?

18 A    Yes, I went to the Soldotna High School.

19 Q    And what year did you stop attending?

20 A    1998.

21 Q    Did you graduate with a high school diploma?

22 A    No, I didn't.

23 Q    And what did you do educationally after you left high

24 school, if anything?

25 A    I got a GED.

```
 1   Q   And how soon after that spring of '98 did you get your GED?
 2   A   That was the summer of '99, '98.
 3           THE COURT:  I'm sorry to interrupt.  If you could
 4   bring that microphone just a little bit closer.
 5           THE WITNESS:  Sorry.
 6   BY MR. SCHNEIDER:
 7   Q   Did you go to work after high school?
 8   A   Yeah, I did.
 9   Q   Who was your first employer?
10   A   I worked at the Chevy dealership in Soldotna.
11   Q   What were you doing at the Chevy dealership in Soldotna?
12   A   Just oil changes and tires and engine work, and I was on a
13   learning program, so...
14   Q   Okay.  And after the Chevy dealership -- well, did you work
15   on both gasoline and diesel engines in that first year?
16   A   Yes.
17   Q   Okay.  And who did you work for after that?
18   A   I went to work for ASRC.
19   Q   That's Arctic Slope Regional Corporation?
20   A   Arctic Slope Regional.
21   Q   And where was ASRC's facility located at?
22   A   It was located on Rig Tenders Road in Nikiski.
23   Q   And did you work at that location solely, or did ASRC send
24   you to different places?  How did that --
25   A   Yeah, I went everywhere from Valdez to Trust, Cook Inlet,
```

 1   Slope.

 2   Q   And what sort of work were you doing for ASRC?

 3   A   I was doing a lot of pipe work and --

 4           (Whereupon, the Court Reporter

 5            interrupted for clarification.)

 6           THE WITNESS:  On piping and working on gas turbine --

 7   or not turbines, but gas compressors and diesel engines.

 8   BY MR. SCHNEIDER:

 9   Q   After ASRC, who did you work for?

10   A   I went to work for Atigun, Incorporated.

11   Q   Where is Atigun, Incorporated located?

12   A   They're in Nikiski.

13   Q   And what kind of work were you doing for Atigun?

14   A   Engine repair.  They are an equipment rental company, so I

15   was doing all the maintenance on equipment.

16   Q   Did Atigun send you off to a variety of locations as much

17   as ASRC did?

18   A   Yeah, yeah.

19   Q   And did both of these companies in -- in making part of

20   this work, were you asked to travel in light aircraft from time

21   to time to get from place to place?

22   A   Yes.

23   Q   Now, eventually, who are you working for now?

24   A   I work to for Lynden, Inc.

25   Q   Where?

1  A    On the Slope.

2  Q    Okay.  And tell us how you went from Atigun to Lynden.

3  A    Atigun got bought out by Lynden.

4  Q    When, do you recall?

5  A    It was 2018.

6  Q    Okay.  And what have -- what have you been doing since 2018

7  for Lynden?

8  A    Working on heavy equipment and diesel trucks and diesel

9  equipment.

10 Q    Were you -- so at the time of this -- if I got the

11 chronologically right, and this is your chance to say, No, you

12 don't.  But if I got the chronologically right, you would have

13 been working for Arctic Slope Regional Corporation when this

14 crash took place July 7th, 2013.

15 A    Correct.

16 Q    Did you know Walter Rediske before July 7th of 2013?

17 A    Just flying with him.

18 Q    Okay.  And that's how you came to meet Mr. Rediske as

19 opposed to met him socially or through some other aspect of

20 your work?

21 A    Yeah.  Yeah.  I had no idea who he was until I flew with

22 him.

23 Q    Okay.  Tell us -- and what was the name of his air service?

24 A    Rediske Air.

25 Q    And can you tell us a little bit about the first flight you

1  took with Mr. Rediske.

2  A    It was a normal flight.

3  Q    From where to where?

4  A    I went from his -- Rediske Air in Nikiski there to Granite

5  Point Tank Farm, in a -- I was in a Cessna with him.

6  Q    And how about the first flight -- have you flown in the

7  Otter that's the subject of this lawsuit?

8  A    Yes.

9  Q    Tell us about the first flight in the Otter.

10 A    He flew it the first time across the inlet to Granite Point

11 Tank Farm.

12 Q    And that's where you were?

13 A    That's where I was at, yeah, working.

14 Q    Okay.  And what did he do when you got there?

15 A    He had groceries onboard, so he offloaded all the

16 groceries.

17 Q    Okay.

18 A    And he was tending to the plane while we offloaded the

19 groceries, and then I got on the plane and flew back with him

20 to Nikiski.

21 Q    And do you know if he ever had passengers on that plane

22 before?

23 A    Not at that time.  I was the first one on it.

24 Q    And why is that in your opinion?

25 A    That's what he told me.

1  Q    Okay.  How many times in these various employments that you

2  had where you've been asked to use light aircraft to where you

3  got to go --

4  A    I was --

5  Q    -- do you think you've flown in this Otter with

6  Mr. Rediske?

7  A    How many times in the Otter?

8  Q    Yeah.

9  A    Twice maybe.

10 Q    Okay.  And can you remember the Otter flight specifically?

11 I think you told us about one of them from Granite Point --

12 A    Yes.

13 Q    -- to -- and was it to Kenai or to Soldotna?

14 A    To Nikiski.

15 Q    To Nikiski?

16 A    Correct, that's where his base was.

17 Q    And can you remember any other flights in the Otter?

18 A    I flew to Beluga, which is just on the -- just a little

19 further north of Granite Point.  He took -- there was seven or

20 eight of us that flew over for work with all our gear and

21 stuff, so...

22 Q    And when Mr. Rediske loaded the aircraft with all you, did

23 he do anything to determine your weight or the weight of the

24 related gear that he was taking?

25 A    Yeah.  He had a scale there that we all got on, weighed us

1    individually and all our gear.

2    Q    Okay.  Do you think you've ever seen Mr. Rediske operate

3    this Otter except as we are about to visit with in a moment on

4    the day of the crash; in other words, you're not in the plane,

5    but you see him flying the plane?

6    A    Yeah.  When he left Beluga, I remember seeing him.

7    Q    Was there anything unusual about the way he departed the

8    Beluga strip?

9    A    No, it looked like a normal takeoff and flight.

10   Q    There was no exaggerated pitch attitude or anything like

11   that?

12   A    No.

13   Q    Did the aircraft, the Otter in question that eventually

14   crashed that brings us here today, did that airplane have an

15   exhaust pipe?

16   A    Yes.

17   Q    Which side of the airplane?

18   A    It would be the right side of the plane.

19   Q    Okay.  And to be painfully precise, right side as if you're

20   sitting in the airplane, looking out the front of the airplane,

21   the right side?

22   A    It would be the right side, yeah.

23   Q    Okay.  Where were you sitting in these couple of flights

24   that you took in this airplane before the date of the incident?

25   A    In the back seat.

```
 1   Q    Okay.
 2   A    Like right behind, the right side behind the copilot, I
 3   guess, it would be.
 4   Q    See if I'm with you.  The next -- behind the copilot which
 5   would be the right side far front --
 6   A    Correct.
 7   Q    -- up in the cockpit seat, you would be in the next seat
 8   back?
 9   A    Correct.
10   Q    Why did you choose to sit there?
11   A    It's my favorite spot.  I like watching.
12   Q    See what's going on, talk to the pilot?
13   A    Yeah.
14        MR. SCHNEIDER:  Can we have a picture of the plane,
15   please.
16   BY MR. SCHNEIDER:
17   Q    Is that the plane that you flew in?  Do you see it on your
18   screen?
19   A    No.
20        THE COURT:  One moment, Mr. Schneider.
21        DEPUTY CLERK:  Is this an exhibit, Your Honor?
22        THE COURT:  Has it been identified as an exhibit,
23   Mr. Schneider?
24        MR. SCHNEIDER:  You know, I didn't think it has, and I
25   didn't intend to introduce it, Your Honor.
```

         1          THE COURT:  Very well.  It is currently up on his

         2   screen, yes.

         3          MR. SCHNEIDER:  Okay.

         4   BY MR. SCHNEIDER:

         5   Q   Does that look like the Otter that you flew in?

         6   A   That's it.

         7   Q   Okay.  And are you able --

         8          THE COURT:  I apologize for interrupting,

         9   Mr. Schneider, but I do need you to identify it as an exhibit

        10   just for the record's sake.

        11          MR. SCHNEIDER:  Can we pull that up?

        12          THE COURT:  Did nobody move to publish this yet?  So

        13   the jury's not going to be able to see it.  Just from a

        14   logistical standpoint, I need -- is this Demonstrative

        15   Exhibit 1?

        16          MR. SCHNEIDER:  We can call it Demonstrative

        17   Exhibit 1, Your Honor.

        18          THE COURT:  103.  Let's label this as Demonstrative

        19   Exhibit 103.  And would you move to publish at the time?

        20          MR. SCHNEIDER:  I would.

        21          MR. MCQUILLEN:  No objection.

        22          THE COURT:  You may publish.

        23          MR. SCHNEIDER:  And should I approach with this,

        24   Your Honor?

        25          THE COURT:  He has it on his screen.

1          MR. SCHNEIDER:  Okay.  Very good.

2     BY MR. SCHNEIDER:

3     Q    That's the airplane you were in, sir?

4     A    That's correct.

5     Q    And is the exhaust obvious in that photograph to you?

6     A    Yeah.

7     Q    Can you use the little laser device I gave you and point

8     the out to the jury?

9     A    Right there.

10    Q    Okay.  Thank you.

11         Did you ever see Mr. Rediske manipulate the trim control

12    when you flew with him in the Otter?

13    A    Yeah.

14    Q    And where was the trim located just generally speaking?

15    Describe it as where from the pilot's seat.

16    A    It would be on his right hand, right in the center of the

17    console.

18    Q    And how did you know it was the trim control?

19    A    He -- he told me.

20    Q    Okay.  Did you see him manipulate the trim?

21    A    Yes.

22    Q    Did you ever hear the trim being manipulated?

23    A    I don't recall hearing anything.

24    Q    In the times that you were around this Otter before the

25    date of the crash, did you ever see smoke being emitted from

1   the exhaust of that aircraft?

2   A    No.

3   Q    Okay.

4           MR. SCHNEIDER:  We are going to go to the date of the

5   incident now, July 7th, 2013.  If we could pull up the next

6   Demonstrative.

7           THE COURT:  I assume it's not been previously marked

8   so we will label this 104.  A request to be published?

9           MR. SCHNEIDER:  Please.

10          MR. KELLY:  No objection.

11          THE COURT:  At this time demonstrative Exhibit 104,

12  maybe published.

13  BY MR. SCHNEIDER:

14  Q    What are we looking at here, Mr. Isham?

15  A    That's the Soldotna Airport.

16  Q    And the folks at Kenai Burrough conveniently labeled Funny

17  River Road for us, would you agree with that label?

18  A    Yeah, that's correct.

19  Q    Okay.  The body of water at the top of the photo is what?

20  A    That's the Kenai River.

21  Q    And the photo is oriented such that west is on which side?

22  A    West would be on the left side.

23  Q    And east would be therefore on the right?

24  A    On the right.

25  Q    All right.  If -- and by the way, is the -- why don't you

```
 1    show us if you would starting with the most eastern -- forgive
 2    me, the most western area on this aerial, and show the jury the
 3    path that you were -- that the vehicle you were in took that
 4    day and follow that path until it disappears off the image, if
 5    you can?
 6    A    Okay.  Funny River Road runs along here, and it comes up,
 7    and it goes around and then down and then off into the --
 8    Q    Okay.  And Funny River Road -- Funny River Road is laid out
 9    a little differently today, correct?
10    A    Yeah.
11    Q    The black line pretty much tracks where it is?
12    A    That's today, yeah.
13    Q    Okay.  But -- so let's -- on the date of the incident, were
14    you a driver or passenger on the vehicle?
15    A    A passenger.
16    Q    In what kind of rig?
17    A    A Chevy pickup.
18    Q    Who were you with, if you remember?
19    A    With my buddy Jerry.
20    Q    And what were you guys up to that morning?
21    A    Heading out to help a friend move a trailer.
22    Q    What time of a day was it, if you remember?
23    A    It was around 11:00.
24    Q    And I think you have showed -- you depicted the path around
25    the airport, the path you followed.  Is that the path that your
```

```
 1  vehicle followed that morning?
 2  A    Yes.
 3  Q    Now, there's -- did you see the Rediske Otter that morning?
 4  A    Yes, I did.
 5  Q    Tell us what you saw.  And in doing that, if you would use
 6  your pointer, show the jury approximately where you believe the
 7  vehicle you were in was located when you noticed the aircraft?
 8  A    I was right about here when we were driving, and I seen it.
 9  Q    Okay.
10  A    Right in here.
11  Q    And for reference, you're to the left of the Funny River
12  Road label --
13  A    Yes.
14  Q    -- a bit.  Okay.  And maybe just a little bit to the left
15  of the "F," huh?
16  A    Yeah, it was right -- probably right in here, because none
17  of these buildings were there at the time --
18  Q    Okay.
19  A    -- those hangars.
20  Q    And what did you see?
21  A    I was looking out the window stargazing and seen a plane
22  coming down the runway, and it was off the runway probably a
23  hundred foot, and then I seen a -- black smoke coming out of
24  it, out of the side of it.
25  Q    Let me ask a couple of questions.  The black smoke you saw,
```

was it your impression that it came from any particular place

on the right side of the airplane?

A    It was coming out the exhaust.

Q    All right.  And can you describe the smoke?  Was it a

single puff of smoke?  Was it a series of little puffs?  What

did you see?

A    It was a stream probably 30, 40 feet long maybe, judging by

the distance.  It was like a diesel truck taking off from a

stoplight.  It was black.

Q    And how long did you get to observe this?

A    Eight, nine seconds, maybe ten seconds.

Q    And then why couldn't you see it any longer?

A    We got behind one of the hangars that's right in here.

Q    And you had never seen smoke coming out of the airplane

about?

A    No, I never seen smoke like that come from a plane.

Q    Did you notice anything about the takeoff, the pitch angle

of the aircraft that morning?

A    It was like a normal takeoff, like any other plane.

Q    In the time you saw it, it had not pitched up steeply in

your opinion?

A    No.

Q    Now, at some point you got around to the east side of Funny

River Road, if I'm understanding you.

A    Yeah.

```
 1  Q    What could you see, if anything, when you looked back
 2  toward the airport?
 3  A    I just seen a bunch of smoke blowing.
 4  Q    Did you -- I mean, at that moment did you know what the
 5  source of that smoke was?
 6  A    I didn't.
 7  Q    And did you at some point develop the opinion that that
 8  smoke was from this crash?
 9  A    Yeah, I had heard that there was an airplane crash on the
10  radio at the airport.
11  Q    All right.  And how long after -- how long after seeing
12  that smoke did you hear that there had been an airplane crash
13  and concluded it was Rediske?
14  A    That night, probably.
15  Q    Now were you eventually interviewed by the NTSB?
16  A    Yes, I was.
17  Q    How long after the crash?
18  A    Three days.
19  Q    And were you at some point interviewed later on by
20  Mr. Klamser?
21  A    Yeah, like four years later.
22  Q    Okay.  And who -- did you know who Mr. Klamser was?
23  A    No idea.  He said he was an investigator.
24  Q    Did you know he was an investigator?
25  A    He said he was an investigator.
```

```
1   Q    Was he working for me?

2   A    I have no idea.

3   Q    Okay.  Did you try to give both the NTSB and Mr. Klamser

4   your honest impressions about what you had observed on the date

5   of the crash?

6   A    Yeah, everything I could recall.

7   Q    In your work on mechanical devices, have you ever worked on

8   anything pertaining to Honeywell turbine engines?

9   A    Yeah, I worked on a generator set that had "Honeywell" on

10  it.

11  Q    Okay.  Good generators?

12  A    Yeah, they're great.

13  Q    Did they make any smoke?

14  A    No.

15  Q    Did the NTSB seem terribly interested in what you had

16  observed that day?

17            MR. KELLY:  Objection.

18            THE COURT:  Sustained.

19            MR. SCHNEIDER:  Those are my questions.

20            THE COURT:  Thank you, Mr. Schneider.

21                      CROSS-EXAMINATION

22  BY MR. KELLY:

23  Q    Good afternoon, Mr. Isham.  I just have a couple of

24  questions for you.

25       You said you were passenger in a car?
```

```
 1   A    Yes.

 2   Q    A truck, a pickup?  Is that what you said?

 3   A    Yes.

 4   Q    Do you have any estimate at how fast you were going?

 5   A    45 is my guess because that's a 45-mile-an-hour stretch

 6   through here.

 7   Q    And then when you saw the airplane, do you have an estimate

 8   as to how far you were from the airplane while you were sitting

 9   in the pickup truck?

10   A    If I had to guess, maybe 500 feet.

11   Q    We saw your depiction there on Plaintiffs' Exhibit 104 for

12   demonstrative purposes.  But I think you pointed out where it

13   was as opposed to where the airplane was?  Do we have an idea

14   of where that?

15   A    Where the airplane was?

16   Q    Yeah.  We saw where the car was.  What I'd like to do -

17        MR. KELLY:  If we could publish Exhibit 104 for

18   demonstrative purposes.

19        THE COURT:  Could we bring up 104 again?

20   BY MR. KELLY:

21   Q    Sir, I think you told us where the car was.  And it was

22   left of the F on Funny River Road, correct?

23   A    Yeah.

24   Q    Now, can you kind of point with your laser pointer where

25   the airplane was when you saw it?
```

```
 1   A    It was right about here (indicating).
 2   Q    Okay.  And for the record, if you drew a straight line
 3   essentially, about between the R and the I and you went
 4   straight down to the runway, that's where it would be.
 5   A    Yeah, if you went straight.  Yeah.
 6   Q    All the way down to the runway there, which is the bottom
 7   horizontal line.
 8   A    Okay.
 9   Q    Okay.  And it's your testimony that that was about
10   500 feet?
11   A    I'm -- yeah, if I had to guess.
12   Q    Okay.  Do you recall what the weather was like on the day
13   when you saw the airplane?
14   A    It was a nice, clear day, if I remember right.
15   Q    Okay.  And you had testified today I think, that the smoke
16   that you saw was continuous.  Is that what you had told
17   Mr. Schneider?
18   A    When I seen it, it was about 20, 30 feet long, however.
19   Q    Do you recall giving a -- your statement to the NTSB?
20   A    Yeah.
21   Q    And that was done on July 10, 2013, correct?
22   A    Correct.
23   Q    And that was, like you said, three days after the accident?
24   A    Yeah.
25   Q    And the events that you depict, where you saw this
```

1    airplane, would have been much fresher then, three days after

2    the accident, than they are here today.  Fair statement?

3    A    Yeah.

4    Q    And you wanted to make sure that you told the NTSB

5    investigators accurate information for their investigation,

6    true?

7    A    Yeah.

8    Q    And do you recall telling the investigator that it was a

9    puff of smoke?

10   A    Yeah.

11   Q    You didn't mention anything about it being a continuous

12   stream that was 30 to 40 feet long, true?

13   A    Correct.

14   Q    Now, you testified earlier about it being a normal takeoff.

15   Am I correct?

16   A    Yeah.

17   Q    And it had -- I think you said in response to

18   Mr. Schneider's questioning, it had not pitched up steeply,

19   true?

20   A    Correct.

21   Q    Now, sir, you're not a pilot, correct?

22   A    No, I'm not.

23   Q    Obviously you've never flown an Otter airplane like the one

24   that we're talking about here, correct?

25   A    I flew in it.

```
1    Q    You flew in it.  But you never operated it.

2    A    No, I never operated it.

3    Q    Is it fair to say that you don't know what the normal

4    takeoff attitude is for this model Otter airplane?

5    A    I can't say, no.

6    Q    No.

7         So it could be 5 degrees it could be 15 degrees, it could

8    be 30 degrees.  You don't know, true?

9    A    I don't know.

10   Q    The other thing you testified about was the other times

11   that you flew in this Otter airplane.

12        Do you recall that?

13   A    Yeah.

14   Q    And one of the times that you said you had, it was you and

15   some other coworkers, true?

16   A    Correct.

17   Q    And you told us about that.

18        My question to you, sir, is, you talked about loading that

19   airplane with you and the baggage.

20   A    Yeah.

21   Q    Fair to say that you don't know how Mr. Rediske loaded the

22   airplane before taking off for this accident flight?

23   A    No, I don't.

24             MR. KELLY:  I have nothing further.

25             THE COURT:  Mr. Schneider, any redirect?
```

                    RE-DIRECT EXAMINATION

1  BY MR. SCHNEIDER:

2  Q    In the NTSB-documented conversation with you that I showed

3  you, that wasn't verbatim of your discussion with the NTSB, was

4  it, that day?

5  A    No.

6  Q    But it was close?

7  A    It was close.

8  Q    And didn't you say, "I saw a big puff of black smoke come

9  from the exhaust on the lower right side area of the airplane"?

10 A    Yeah.

11            MR. SCHNEIDER:  Thank you.

12            THE COURT:  Thank you, Mr. Schneider.

13            Sir, you are excused.  Thank you.

14            Plaintiffs may call their next witness.

15            MR. BRAUCHLE:  Your Honor, plaintiffs will call Colin

16 Sommer.

17            (Oath administered to the witness.)

18            DEPUTY CLERK:  Thank you.  Please have a seat.

19            Speak into the microphones at all times.  Please state

20 and spell your first and last name.

21            THE WITNESS:  Colin Anthony Sommer.  S-o-m-m-e-r.

22 First name is C-o-l-i-n.

23            DEPUTY CLERK:  Thank you.

24            THE COURT:  Ladies and gentlemen, you're about to hear

1    testimony from Colin Sommer who will testify to opinions and

2    the reasons for his opinions.  This opinion testimony is

3    allowed because of the education or the experience of this

4    witness.  Such opinion testimony should be judged like any

5    other testimony.  You may accept it or reject it and give it as

6    much as weight as you think it deserves considering the

7    witness' education and experience, the reasons given for the

8    opinion, and all the other evidence in the case.

9              Mr. Brauchle, you may proceed.

10              COLIN SOMMER, PLAINTIFF WITNESS, SWORN

11                    DIRECT EXAMINATION

12   BY MR. BRAUCHLE:

13   Q   Mr. Sommer, what do you do for a living?

14   A   I investigate primarily airplane and helicopter crashes.

15   Q   And how many years have you been doing that?

16   A   Oh, about 20 years.

17   Q   Do you have any formal degrees, bachelors degrees?

18   A   Yes, I do.

19   Q   Okay.  And what is your bachelor's degree?

20   A   I have a bachelor of science from the University of

21   Michigan in Ann Arbor in civil and environmental engineering

22   with an emphasis in structural design.

23   Q   Okay.  And what year did you graduate?

24   A   In 1997.

25   Q   Okay.  And when did you first get involved in airplane

1  accident investigation?

2  A   Oh, about the end of 2002.

3  Q   All right.  So how does one become an aircraft accident

4  investigator?

5  A   Oh, I'm not sure there's really a strict and defined path.

6  It depends a lot on your background, your education.  It

7  depends on your interest level, where you want to go in your

8  life, and the pursuits that you make as far as those interests

9  are concerned.

10 Q   Okay.  Well, since you're here, why don't you tell us about

11 your path to becoming an aircraft accident investigator.

12 A   Oh, I got involved in aviation way back before I could even

13 remember.  I think my first airplane ride was in a car seat

14 sitting next to my father.  He was a pilot and a mechanical

15 engineer and an accident investigator, and I've been around

16 airplanes and around aviation my whole life.

17     I grew up learning about airplanes, working on airplanes,

18 learning about airplane crashes from my father, and I have been

19 exposed to the aviation business and the piloting world since,

20 as I mentioned, way back before I can even remember.  And I

21 eventually discovered that I really enjoyed it and really

22 wanted to pursue aircraft safety and aircraft accident

23 investigation.

24 Q   Okay.  Great.

25     Have you done any type of formal classes or education in

1  regards to aircraft accident investigation?

2  A    Yes.  I have.

3  Q    Okay.  And can you just give us a brief summary of the

4  schools that -- or courses you've attended?

5  A    I attended the National Transportation Safety Board

6  Accident Investigation School in Washington, D.C.  that is the

7  same school that the National Transportation Safety Board sends

8  all of its accident investigators through.  So I received the

9  same training that each of the -- as it's abbreviated, NTSB,

10  investigators received and had all the experience that they

11  would experience during instruction in D.C. for that purpose.

12      I also attend the Southern California Safety Institute

13  school for accident investigation reconstruction.  That one is

14  a little different in that it is put on former Air Force

15  investigators.  So one of them is a little more of the -- of a

16  civil government approach, whereas the other one was more of a

17  military approach.

18      And those are the two primary schools where I got my basic

19  education on top of my informal or on-the-job training for the

20  past 20 years.

21  Q    And in these schools and the training that you did, did you

22  ever receive any training in regard to failure analysis of

23  airframes and engines?

24  A    Yes, significant.

25  Q    Okay.  How about propeller analysis?

1    A    Yes.  There's a specific propeller analysis portion of the

2    NTSB school that is actually taught, or was taught to me, by a

3    long-time investigator from Hartzell Propeller named Roger

4    Stallcamp, and the Hartzell Propeller is the same model

5    propeller that's on the subject airplane.

6    Q    Okay.  And you said you were trained by Mr. Stallcamp?

7    A    I was trained by him in my NTSB class, and then I also have

8    worked with Mr. Stallcamp on numerous accidents over the years.

9    Q    Okay.  And the accident that we're here about involved a

10   turbine engine.  Any of the classes and the courses that you

11   have taken, did any of that involve turbine engine failure

12   analysis?

13   A    Yes, they did.

14   Q    Are you a pilot?

15   A    Yes, sir.

16   Q    Okay.  And how long have you been a pilot?

17   A    I think I got my private pilot rating back in 2006.

18   Q    And prior to this case, had you ever investigated any other

19   accidents that involved -- that were involved in Alaska?

20   A    Yes.  Numerous.

21   Q    Okay.  And outside of your investigations, have you ever

22   flown in Alaska?

23   A    Yes.

24   Q    Can you kind of just give us a brief summary of those

25   experiences?

A    I've had a lot of different accidents in Alaska.
Unfortunately, there are quite a bit of mishaps that happen
here.  A lot of times it's due to the weather conditions and
the, you know, low ceilings that exist.

But I have done float planes, ski planes.  I have done
piston engines, turbine engines.  I have done mid-air
collisions.  Controlled flight into terrain where the airplane
ran into the side of a mountain.  Engine failures.  Control
system failures.  I've kind of seen the vast world of aviation
accidents in Alaska.

Q    All right.  And how about, have you ever flown in Alaska
other than, say, coming in on Delta or Alaska Airlines?

A    Yes, I have flown in small aircraft.  Most of the flying
that I have done here has been more personal.  When I've come
up here to go on a fishing trip or a hunting trip, I have flown
on smaller, you know, bush-type aircraft, where we've flown
into tiny strips on tundra tires or landed on floats on a lake,
that kind of thing.

I haven't done a lot of flying here for purposes other than
that.

Q    In any of the private flying that you did, have you ever
been -- ever flown in or out of the Soldotna Airport?

A    Yes.

Q    Okay.  Do you have a rough estimate about how many times?

A    Oh, probably two or three, maybe four times.  It's usually

1    been, again, for fishing and hunting expeditions that I've

2    done.  And I've spent a lot of time up in the Soldotna area on

3    the Kenai and have taken some side trips from Soldotna.

4    Q    Okay.  Thanks.

5         So I want to shift focus just about being an aircraft

6    accident investigator.  When you're first contacted to be

7    involved -- to investigate an accident, what -- I guess,

8    essentially, what is the first step you have to do as an

9    investigator?

10   A    Well, it kind of depends on what stage the accident

11   investigation is, but, you know, my primary goal is to collect

12   and address as much as information as possible.  I have to

13   start with a blank slate, you know.  Regardless of what

14   portions of the government investigation may or may not be

15   completed, I have to take into consideration all of the

16   information that is relevant to an aircraft accident, and then

17   I have to analyze each different portion of that.

18        So as soon as I am engaged, I'm kind of a sponge of trying

19   to collect as much information as I can about every single

20   aspect.  Some are relevant in causal and some are not.

21   Q    All right.  And how did you get involved in this case?

22   A    I believe I was contacted by you or by your firm.

23   Q    Okay.  And just for the sake of all candor here, have we

24   ever worked together outside of this accident?

25   A    Yes.

1  Q   Okay.  And in the cases that we have worked together, in
2  all of them -- or in accidents that I've consulted with you, do
3  all of them go to -- into litigation?
4  A   No, they don't.
5  Q   Okay.  So did you -- in doing your research or starting
6  your investigation, did you investigate the pilot of this
7  aircraft?
8  A   Yes.
9  Q   Okay.  And what did your investigation -- or what were you
10 able to receive or encounter or determine about the pilot?
11 A   He's a pretty experienced guy.  He had in the neighborhood
12 of somewhere around over 7,800 hours, most of which he was
13 flying in Alaska.  He was flying pretty much everything out
14 there.  He had a single-engine rating, a multi-engine rating,
15 an instrument rating, all of which I also have.  He had a
16 commercial rating.  He was checked out in turbine engine
17 airplanes, piston engine airplanes.
18     As far as Alaska flying goes, this guy's a pretty
19 high-time, experienced guy.
20 Q   Okay.  In your research of him, did you find anything
21 derogatory, past accidents, violations, anything of that
22 nature?
23 A   No.  A little bit to the contrary.  I think the only term
24 that maybe was negative that I heard about him was that he was
25 a little too strict on all of his people and on his operation;

1  that if you did anything wrong, it was a good way to get fired.

2  Q   All right.  Mr. Sommer, I want to show you what has been

3  premarked as Plaintiffs' Exhibit 9.

4      Do you recognize what that is?

5  A   I do.

6  Q   Okay.  And what is that?

7  A   That is the subject 1958 de Havilland DHC-3 Otter aircraft,

8  the actual subject aircraft involved in this accident.

9  Q   Okay.

10          MR. SCHNEIDER:  And, Your Honor, at this time

11  plaintiff would move to admit Plaintiffs' Exhibit 9.

12          THE COURT:  And no objection from the defense.

13          Would you also like to publish that?

14          MR. SCHNEIDER:  I would, Your Honor.

15          THE COURT:  At this time Exhibit Number 9 is admitted

16  and you may publish.

17          (Plaintiffs' Exhibit 9 received into evidence.)

18  BY MR. SCHNEIDER:

19  Q   All right.  And how many seats are -- well, let me ask you

20  this.

21      You talked about the de Havilland.  This is -- rather than

22  using the whole name, if I refer to it as the Otter, is that --

23  A   That's what everybody calls them.

24  Q   All right.  And what type of -- what type of engine is on

25  this aircraft?

1    A    Originally it was equipped with a different engine, a

2    radial engine, capable of about 600 shaft horsepower.  But this

3    aircraft had been modified to install a turbine, or a turboprop

4    jet engine, which is the Honeywell TPE331-10 Romeo model.

5    Q    Okay.  And this aircraft, looking at this photo, what type

6    of propeller is on this aircraft?

7    A    It has a four-bladed, what they call, constant speed

8    Hartzell Propeller.  And, in essence, that means that the

9    propeller spins the same RPM all the time.  So low power, high

10   power, that propeller is spinning 1,591 revolutions per minute,

11   and that does not change whether it's at full power or whether

12   it's in flight.

13   Q    Okay.  And what is the -- what is the, if you know, the

14   maximum gross weight of this aircraft?

15   A    8,000 pounds.

16   Q    Okay.  Is this an aircraft -- I noticed this aircraft here

17   has some very large tires, which seemed abnormal to me being

18   from, I guess, the Lower 48.

19        Can you kind of describe what I'm looking at?

20   A    This aircraft was originally manufactured -- well,

21   manufactured by an operation from Canada.  And the conditions

22   often lend themselves to the necessity to land in off-airport

23   situations where you might put tundra tires on the aircraft, or

24   skies or floats.  It's a utility category aircraft that was

25   kind of designed for inclement weather in Canada and in Alaska.

1    It's a very typical bush plane, if you will.

2    Q   Okay.  And can that -- does it always have wheels, or can

3    it be modified in any way?

4    A   It can have the regular tires, it can have tundra tires,

5    large tires, big, puffed-up tires.  It can have skies installed

6    on it, floats.  It can even have floats that have the

7    capability to put wheels on the bottom of them.  So it's quite

8    versatile.

9    Q   Okay.  And I'm looking at what I see protruding out of the

10   right side of the aircraft, kind of underneath there, it looks

11   like a big silver, I guess what I would say, I want to say -- I

12   want to say smoke stack or some type of pipe.

13       Can you identify what that is?

14   A   As you called it, that's the exhaust pipe.  So the turbine

15   engine, obviously, generates exhaust, just like any other

16   engine does, and has to be routed out of the engine

17   compartment.  And there is one location on this aircraft where

18   that occurs, and that is that big, silver metal tube that you

19   see sticking out forward of the right-hand side landing gear.

20   Q   Okay.  All right.

21       And I know you had talked a little bit earlier about this

22   aircraft was initially made out of a big radial engine.  The

23   aircraft that was involved in this accident, were there any

24   other modifications that -- say, from its original design?

25   A   Yes.  So this aircraft was equipped with multiple, what are

1    called, supplemental-type certificates.  And they are basically

2    major modifications that are added to the aircraft typically to

3    improve performance, or at least in this aircraft that was the

4    case.

5        One of those was the modification of the engine.  So the

6    change-out from the original radial to the Honeywell TPE331,

7    which increased the horsepower from 600 to 900 horsepower.  So

8    increase by about 50 percent and you can imagine that has a

9    fairly large effect on aircraft performance.

10            Another one, which you can see in this picture,

11   although without a comparison it's a little tough to tell, but

12   the wingtips have a little bit of a droop on them, and the

13   leading edge has a little bit of a droop towards the front, the

14   nose, of the aircraft.  And that is a short takeoff and landing

15   modifications which improves the handling characteristics of

16   the aircraft and allows it to more easily fly into some of the

17   shorter strips, some of the locations where it wouldn't

18   normally be able to get into if it didn't have, what's called,

19   a STOL, short takeoff landing kit, installed, and it basically

20   reduces the stall, speed of the aircraft, and also improves

21   handling characteristics at low speeds.

22            MR. SCHNEIDER:  Your Honor, I would ask that I can

23   just approach the witness to give him a laser pointer?

24            THE COURT:  You may.

25            (Mr. Brauchle approached the witness.)

1          THE WITNESS:  The leading edges of the wings here have

2     been modified in accordance with the STOL kit, short takeoff

3     and landing, and then the wingtips have been drooped which

4     improves the aerodynamic capability of the aircraft to improve

5     the short takeoff and landing capabilities.

6          The last modification of somewhat significance is that

7     this aircraft was equipped with additional fuel cells installed

8     in the belly of the aircraft.  You can't see them in this

9     picture, but it had additional extended range tanks which is

10    somewhat common when you put on a turbine engine, because the

11    turbine engine consuming considerably more fuel than the radial

12    engine does.  So it's pretty common to put on extended tanks.

13    BY MR. BRAUCHLE:

14    Q   Okay.  And we keep talking about a turbine engine, and

15    we've seen it, we've seen diagrams of one, we have seen mockups

16    of one today.

17        But how would you describe the turbine engine that's on

18    this aircraft?

19    A   Without getting too far into the weeds on it, essentially

20    this engine has a couple of impellers in the compressor

21    section.  The compressor section sucks the air in, then the

22    impellers route that air through the combustor where it burns

23    it.  So --

24    Q   Hold on.

25          DEPUTY CLERK:  Was that admitted as an exhibit?

```
 1          MR. BRAUCHLE:  It was not.  This would be a

 2   demonstrative, 104?

 3          THE COURT:  104 I believe -- Demonstrative Exhibit 104

 4   was the airfield from Soldotna; is that correct?

 5          DEPUTY CLERK:  Yes.

 6          THE COURT:  So it'd be 105.

 7          And you would like to show that to the witness, sir?

 8          MR. BRAUCHLE:  I would.  If I could publish to the

 9   jury.

10          MR. MCQUILLEN:  No objection.

11          THE COURT:  Very well.

12   BY MR. BRAUCHLE:

13   Q   Just kind of maybe give us a summary of how this works.

14   That would be great.

15   A   Sure.

16       As I was discussing, this is the front of the engine.  This

17   is where the propeller attaches.  You can see the holes where

18   the propeller is bolted on.  And the primary operating portion

19   of the engine is here, and this big scoop here is called the

20   intake.  That's where all the air comes in.

21       The air comes in to these two impellers, and they are

22   called the compressor and they do exactly that.  They just

23   compress the air down.  Squeeze it, basically, so that it can

24   then be distributed into this section which is called the

25   combustor or the burner can.  And in the combustor, the fuel is
```

1  mixed in with the compressed air, and then they light it on

2  fire.

3  So once it ignites, it then goes through what's called the

4  turbine section.  And the turbine section operates due to the

5  airflow of the burning gases.  So you light it on fire, the

6  fire then goes through each of these wheels, and these wheels

7  turn, and they're connected by an internal shaft called the

8  torsion shaft, which goes right through the middle of the shaft

9  that all of these wheels sit on.  You can't see it.  And it

10  sticks out into the gearbox here, and then it turns and causes

11  the entire planetary gear system to turn which then turns the

12  propellers.

13  So you suck the air in, squeeze it down, light it on fire,

14  it blows through the turbine section, turns the turbines, which

15  run the propeller, and then all the exhaust goes out the back.

16  Q   Would this be considered a -- I heard you talk about

17  turbine engines, jet engines.  Are those synonymous or --

18  A   Technically, yes.  This is a jet engine that has a power

19  shaft coming out of it, called a turboprop.  But it is a type

20  of jet engine.

21  Q   Okay.  All right.  And in -- let's do this.

22  MR. BRAUCHLE:  Can you pull up --

23  THE COURT:  Mr. Brauchle, this might be a good time to

24  take our afternoon recess.

25  MR. BRAUCHLE:  That would be perfect.

 1          THE COURT:  Ladies and gentlemen, we are going to take
 2    our afternoon recess.  We will try to get you back in here
 3    closer to a quarter till 3:00, and then we will go to the end
 4    of the day.  Thank you.
 5          Madam Clerk.
 6       (Out of the presence and hearing of the jury panel.)
 7          THE COURT:  Please be seated.  Before I step off the
 8    bench, ma'am, if you could move that monitor, I'm a little bit
 9    concerned because I think juror number 1 is looking at your
10    monitor.
11          MS. SCHIAVO:  Here?  Oh, okay.
12          THE COURT:  If you kind of just tilt it, that would be
13    perfect.  Yeah, just as long as --
14          MS. SCHIAVO:  Okay.
15          THE COURT:  Okay.  Anything we need to take up during
16    our break?
17          MR. BRAUCHLE:  Two things.  One, I think Mr. Moore
18    wants to bring something about the economist report.  Oh, I
19    guess not.
20          But the second was they had requested now that we're
21    going to sequester the witnesses.  I know that Mr. Studtmann is
22    here, and I understand his role as the corporate
23    representative, but he's also testifying as an expert witness
24    in this case.
25          THE COURT:  I think 615 speaks to this.  The rule does

```
 1    not authorize -- this is in subsection (b) in 615, "an officer
 2    or an employee of a party that is not a natural person, after
 3    being designated as the party's representative by its
 4    attorney," and I believe that's what occurred here, correct me
 5    if I'm wrong.
 6              MR. MCQUILLEN:  I'm sorry, without reading the rule,
 7    Your Honor, I apologize.
 8              THE COURT:  Oh, sorry.  Under 615(b) this rule does
 9    not authorize "excluding an officer on employer of a party that
10    is not an actual person, after being designated as the party's
11    representative by its attorney."
12              MR. MCQUILLEN:  That's correct.
13              THE COURT:  And that's what we have here.
14              MR. MCQUILLEN:  Yes, sir.
15              THE COURT:  I don't think 615 would be a part of this.
16              MR. BRAUCHLE:  Fair enough.
17              THE COURT:  Anything we need to take up?
18              MR. MCQUILLEN:  I'm just advising, Your Honor.  I'm
19    not suggesting anything wrong.  We keep momentarily getting
20    pictures of families showing up on our screens.
21              THE COURT:  We do too, and that is not something that
22    is being displayed to the jury, but I think that is something,
23    Madam Clerk, that is controlled from that station.
24              And so if we're not using any photographs from the IT
25    station, if we could just have that screen blank, but to lower
```

```
 1    your fears, the jury is not seeing that at all.
 2             MR. MCQUILLEN:  That's all I wanted to know.
 3             THE COURT:  Very well.  I will back on the bench at
 4    2:45.  Thank you.
 5             DEPUTY CLERK:  All rise.  Court stands in recess until
 6    2:45.
 7        (Proceedings in recess from 2:28 p.m. until to 2:43 p.m.)
 8          (Out of the presence and hearing of the jury panel.)
 9             DEPUTY CLERK:  All rise.  His Honor, the Court, this
10    United States District Court is again in session.  Please be
11    seated.
12             THE COURT:  All right.  Are we ready to proceed?
13             MR. KELLY:  Yes, Your Honor.
14             THE COURT:  Very well.  Madam Clerk, if you could
15    please grab the jury.
16          (In the presence and hearing of the jury panel.)
17             THE COURT:  Mr. Brauchle, you may proceed when you're
18    ready.
19    BY MR. BRAUCHLE:
20    Q   All right.  Mr. Sommer, before we took a break, we talked a
21    little bit about your qualifications.  We talked about the
22    start of your investigation in this -- in this case.
23        Real briefly back on your qualifications, I remember you
24    said that you graduated with an engineering degree.
25    A   That's correct.
```

1  Q    Do you have any professional license or anything in regards

2  to engineering?

3  A    Yes.  My professional license is in mechanical engineering.

4  Q    So you're a professional engineer?

5  A    Correct.

6  Q    All right.  You've talked about in your investigation, you

7  investigated the pilot, the aircraft.

8       Let me ask you about the pilot.  In reviewing the pilot's

9  records, did you ever find any type of records, reports,

10 anything that would show that this aircraft and/or Mr. Rediske

11 had a previous experience encounter with an aft center of

12 gravity?

13 A    I looked through the maintenance records in the aircraft,

14 the witness statements of people that worked at Rediske Air.  I

15 tried to find any evidence that -- over the three years that

16 the aircraft was being operated by Rediske Air, and the

17 300 hours that were put on the aircraft, if there was any

18 history of any problem due to the modifications of the

19 supplemental-type certificates to the handling characteristics

20 or the center of gravity, and I was unable to find any

21 indication of that.

22 Q    Okay.  In regard -- so let's talk a little bit about weight

23 and balance.  Can you just kind of briefly summarize what that

24 even means, weight and balance?

25 A    It means the amount of payload that the aircraft can take,

1 and that includes people, bags, fuel, primarily, anything that
2 you put on the airplane that isn't attached more or less, and
3 then where you put it.
4     If you put two folks up in the cockpit, then you're loading
5 it in the forward portion of the airplane.  If you put a bunch
6 of baggage in the baggage area that's in the aft of the cabin,
7 then you are loading it aft.
8     And then the center of gravity limits or the CG, which is
9 probably going to be used quite a bit in the next few days, is
10 where you want the center of basically all that weight to be
11 distributed in a range such that it isn't too far back, and it
12 isn't too far forward in regard to the handling characteristics
13 of the aircraft primarily at STOL speed.  At higher speeds,
14 it's generally not an issue, but when you get to low air
15 speeds, then the center of gravity or the balance is what
16 they're referring to, is -- can be an issue.
17 Q   Okay.  And if I remember your testimony earlier, you said
18 the maximum allowable weight for this aircraft was
19 8,000 pounds.
20 A   Correct.  That is including all people, all baggage, and
21 fuel.
22 Q   Okay.  And just so we're clear, the 8,000 pounds also
23 includes the actual airplane itself?
24 A   Correct.
25 Q   Okay.  And did you -- were you able in your investigation

1  to make a determination whether this aircraft was over its
2  allowable weight at 8,000 pounds?
3  A    I did a weight and a balance calculation, the best that I
4  could.  The information is somewhat limited in and estimated in
5  many different situations, because the aircraft was so badly
6  damaged and burned, so the contents that were in the airplane
7  couldn't really accurately be weighed.  Even -- even the people
8  can't really be accurately weighed once they are involved in a
9  heavy fire.
10     So I did the best that I could do with the information that
11 I had, and I determined that the aircraft was slightly under
12 gross weight.
13 Q    Okay.  And how about, were you able -- with the limited
14 factual data that you had, were you able to calculate a center
15 of gravity?
16 A    Yes.
17 Q    Okay.  And what did you determine?
18 A    I determined that the aircraft was likely -- had a slightly
19 aft center of gravity from the published rear limit.
20 Q    And in and of that self, in that -- your opinion and your
21 determination that there was an aft center of gravity, do you
22 have any opinion as to what role at all that aft center of
23 gravity -- it played in this accident, if any?
24 A    My opinion is that as long as the engine is running and you
25 have the propeller producing thrust, the position of the center

1    of gravity where it was calculated should not be an issue at

2    all.

3        This aircraft can be flown in that configuration with a

4    fully operating engine without any issue and had been flown for

5    three years and 300 hours with no reported issues of that kind.

6        If you lose your engine and your air speed gets low, then

7    it becomes an issue.

8            MR. BRAUCHLE:  All right.  Your Honor, this is

9    Demonstrative 106.  I was going to have the witness try to

10   demonstrate his opinion on what he just described.  I will not

11   be admitting it into evidence.

12           THE COURT:  So you're looking to publish, sir?

13           MR. BRAUCHLE:  Yes, sir.

14           THE COURT:  Any objection?

15       At this time you may publish what's identified as

16   Demonstrative Exhibit 106.

17           MR. BRAUCHLE:  Okay.

18   BY MR. BRAUCHLE:

19   Q   Mr. Sommer, this photograph, what are these different

20   arrows, and what do they all mean?

21   A   So this is literally aerodynamics 101.  If you take any

22   piloting courses or aerodynamics courses, this is basically the

23   first page in the book.  And what they're showing you is the

24   four main forces that are on an airplane in flight.

25       You have the thrust being generated by the propeller,

1  obviously pulling the aircraft forward.

2      You have the drag, which is as the airflow, the wind hits

3  the airplane, it is wanting to slow the airplane down.  So as

4  the wind hits the wheel fans here, as the wind hits the

5  windshield, as the wind hits the tail, all of that is wanting

6  to slow the airplane draft down which is called drag.

7      In the vertical axis, you have the weight of the aircraft,

8  and that is just the aircraft plus whatever is on it, so in

9  this case, pretty much close to 8,000 pounds.

10      And then have you the lift that is generated by the air

11  coils.  And that's primarily in an upward direction on the

12  wings.  There actually is lift generated by the tail as well,

13  but the force specter that you're primarily concerned with is

14  the lift -- the center of the lift, and the most of that lift

15  comes from the wings operating -- acting in an upward

16  direction.

17  Q    Okay.  And using this diagram, are you able to describe how

18  the center of gravity and/or these different forces would have

19  on the center of gravity?

20  A    Sure.

21  Q    Would you do that, please.

22  A    So if you think of this aircraft as balancing on say the

23  tip of a pencil, and that pencil is basically represented by

24  the weight arrow here and is acting on the belly of the

25  aircraft.  If you were to load the aircraft to where you had

all of these forces acting on it, and you have a center of
gravity that is forward, i.e., the center of the location where
if you calculated all the weights of the aircraft and the
people and everything else as one, and you had it forward of
where that pencil is, then the aircraft is going to pitch nose
down, if you take away the thrust.

If you have that same setup and you have that center of
gravity, i.e., the collection of all the weights for the
aircraft, and for the people and for the gear and everything
else, and it is aft of that pencil tip, and you take away that
thrust specter, then the aircraft is going to pitch nose up.

So your center of gravity is not so critical as long as you
have all of these forces and equilibrium, thrust, drag, lift,
and weight.  You can move the center of gravity around a little
bit, and it's not really going to make a difference whether
it's forward or aft of that center of lift or that pivot point
or neutral point.

And it only really becomes an issue if you take one of
these, i.e., the thrust specter out of the equation, in which
case if have you an aft center of gravity, then the aircraft
was wanting to pitch up instead of down.

Q   And how, if anything, that you just described, aft center
of gravity, loss of thrust, pitch up, is that -- how does that
relate to this accident?

A   So this airplane is departing the runway.  Everything is

1    normal.  The aircraft rotates which means the aircraft starts

2    to pitch up and departs the actual runway surface.  Everything

3    seems fine, and then all of a sudden the aircraft starts to

4    pitch up dramatically and roll to the right.

5        And it's at that point -- that I was most concerned with

6    when I was looking at the video from the accident and when I'm

7    looking at, What did this aircraft do and why and why did it do

8    it at the point where in the video there is an event.

9    Q    Okay.

10   A    And so I had to form my investigations around answering

11   some of those questions, because it appeared as though the

12   center of gravity didn't have too much of an effect until

13   something happened, and that applies to not only the three

14   years and 300 hours that the aircraft had been flown but also

15   the accident flight.

16   Q    And you mentioned the video.  Is that video -- are you

17   talking about the video that was shot by Olivia Antonakos from

18   inside the aircraft?

19   A    Yes, sir.

20   Q    Okay.

21           MR. BRAUCHLE:  Can you pull up Plaintiffs' Exhibit 3,

22   please.

23   BY MR. BRAUCHLE:

24   Q    Okay.  With you looking at the screen here, without me

25   playing it, can you identify whether this is the video of the

1  accident?

2  A    I'm fairly certain that it is.

3            MR. BRAUCHLE:  Okay.  Your Honor, at this time

4  plaintiff would like to move into evidence Plaintiffs'

5  Exhibit 3, the iPhone video that we both used this morning in

6  our opening.

7            THE COURT:  At this time Plaintiffs' Exhibit -- sorry.

8            MR. MCQUILLEN:  No objection.

9            THE COURT:  At this time Plaintiffs' Exhibit 3 is

10  admitted.  And you intend to publish now?

11            MR. BRAUCHLE:  I do, Your Honor.

12            THE COURT:  And it may be published.

13        (Plaintiffs' Exhibit 3 received into evidence.)

14  BY MR. BRAUCHLE:

15  Q    A couple things.  You just said from the analysis, there

16  was something before -- you got off the video before the

17  aircraft kind of rolled off.  So I'm not going to go all the

18  way to the impact site.

19            MR. BRAUCHLE:  But is the witness able to stop and

20  start the video, or is that something that I will have to do?

21            THE COURT:  That's something you will have to do.

22  BY MR. BRAUCHLE:

23  Q    Okay.  If we could just -- we'll play the video, and if you

24  want to stop it at a point just say, Stop.  And I'll -- Heather

25  will try to stop it, the best -- the best that she can.

```
 1      But basically I want to play the video, and you can tell me
 2   what you're observing or anything that formed any of your
 3   opinions are in this case.  Okay.
 4   A    Sure.
 5   Q    All right.
 6           (Video played.)
 7   BY MR. BRAUCHLE:
 8   Q    What are we witnessing here?  What are we seeing on the
 9   video here?
10   A    This is the aircraft at the Soldotna Airport.  It's
11   basically on a taxiway, and then it's turning from the taxiway
12   to runway 25, which means that it goes in 250 degrees magnetic
13   heading, so it's turning onto the runway in order to do the
14   departure or takeoff.
15   Q    And based on part of the video that we just saw, were you
16   able to come to any conclusions that there was something wrong
17   with the aircraft or there was any type of issues at this
18   point?
19   A    Not that I saw.
20   Q    Great.
21           (Video played.)
22           THE WITNESS:  Right there.  And I can kind of explain.
23   BY MR. BRAUCHLE:
24   Q    Yeah.  Please explain why you stopped the video at that
25   spot.
```

1    A    On the video, and I have listened to this video 50 times

2    probably and watched it an equal number of times, to assess

3    what happened during this crash.

4        At that point in time, there's what's been identified by me

5    and by numerous other people as a metallic sound that is

6    abnormal to -- to me and not something that I'm familiar with

7    as far as normal engine sound or a normal aircraft sound.

8        It is a kind of a screeching noise that you can hear on the

9    video, and immediately following that screeching noise, which

10   is about where this video is stopped, is that -- that is when

11   the adverse events in the flight occur.

12   Q    Start it again?

13   A    Sure.

14           (Video played.)

15   BY MR. BRAUCHLE:

16   Q    All right.  So you had an opportunity to see the video.

17   You identified this metallic sound, and then I believe your

18   testimony is that's when --  well, let me not say what your

19   testimony.

20       You tell me what the plane does after you hear that

21   metallic sound.

22   A    Right at the time of the metallic sound, the aircraft

23   starts to slow down, and there would be no reason for the pilot

24   to do that.  The pilot is trying to take off.  They want to fly

25   to their destinations.  There would be no reason that the pilot

1    would ever normally reduce power at what I estimated to be 38
2    or 39 feet above the runway.
3        So there is -- there is no reason that the aircraft should
4    be slowing down, if everything is working right.  And what, in
5    fact, happens is we hear this screeching metallic noise, and at
6    that exact moment, the aircraft starts to decelerate or slow
7    down, and then it also, as you can see, starts to roll to the
8    right.
9        Now, the roll to the right can be explained by the fact
10   that the deceleration or the slowdown of the aircraft, results
11   in an aerodynamic stall, and I could explain what an
12   aerodynamic stall is if that would be beneficial.
13   Q   It would, but I think Mr. McQuillen described it earlier
14   this morning.  So if you could just do it briefly, that would
15   be great.
16   A   It is -- it is the point where the wing stops flying.  If
17   you have ever been to an air show and you watched an airplane
18   that flies up and up and up, and then finally it noses over and
19   comes down, that's not because of the engine.  That's because
20   of the airflow over the wing, and it no longer is capable of
21   keeping the wing in the air.
22       It's technically the exceedance of the critical angle of
23   attack.  Basically as you increase the angle of the wing, the
24   airflow becomes such to a point where it no longer is adhering
25   to the wing, and it starts to separate, and that destroys the

1  lift, which means that the wing can't fly anymore.

2  Q   Okay.  And did you do any type of calculations or any type

3  of estimations as to the flight path of this aircraft or how

4  high that it got?

5  A   Yes, I plotted the flight path both horizontally and

6  vertically so that I could understand where it was in regard to

7  the runway and the altitudes associated with the identified

8  points along the runway.

9  Q   Okay.

10         MR. BRAUCHLE:  Could you pull up Exhibit 15, please.

11  BY MR. BRAUCHLE:

12  Q   Is this the -- do you recognize -- is this the document

13  that you were just referencing?

14  A   Yes.

15         MR. BRAUCHLE:  At this time, Your Honor, the

16  plaintiffs would move into evidence Exhibit 15.

17         THE COURT:  Defense?

18         MR. MCQUILLEN:  No objection.

19         THE COURT:  At this time Exhibit 15 is admitted.

20  Request to publish?

21         MR. BRAUCHLE:  Yes, Your Honor.

22         THE COURT:  And it may be published.

23         (Plaintiffs' Exhibit 15 received into evidence.)

24  BY MR. BRAUCHLE:

25  Q   And again, can you just kind of just give an overview

1  description of what we're looking at here?

2  A   So this is the Soldotna Airport.  It even says Soldotna up

3  in the left-hand corner.  This is runway designation 25, which

4  means that it's a 250-degree magnetic heading, and this is the

5  taxiway and the apron area where the aircraft was turning in

6  order to access runway 25 and then take off to the west.

7      And then each of these dots represents an identified

8  latitude and longitude for the subject aircraft at a certain

9  point in time.  And you can't really see it on this, but each

10  is labeled with the altitude.

11      So on your screens you might be able to see 00000, and then

12  you'll see a 2, and then a 7 and then a 15, and then a 25, and

13  then a 33, a 44, and then a 58, and in between the 33 and the

14  44, you see an arrow that says "metallic sound and slow down"

15  which occurred at around 38 or 39 feet, at about 50.5 seconds

16  in the video.

17      And then immediately following that noise, as is pointed

18  out here with the second arrow, you can see it says "engine

19  variations," and that is labeled with the second red arrow, and

20  it says at approximately 52.3 seconds in the video.

21  Q   What did you base was the -- estimate that the highest

22  altitude that this aircraft got to?

23  A   It was about 120 to 125 feet.

24  Q   Okay.  And -- well let me ask you this:  Do you have an

25  opinion as to whether this engine experienced any type of

1  failure?

2  A    Yes.

3  Q    Okay.  And what is that opinion?

4  A    I believe that the metallic sound that you hear at

5  50.5 seconds in that video is the failure of the torsion shaft

6  or the center shaft in the engine that basically connects the

7  propeller portion of the engine to the compressor and turbine

8  portion of the engine.

9      And that screeching noise is the interference between the

10  outer shaft that all those parts are stacked up on and the

11  inner shaft that goes through it to provide the power to the

12  propeller.

13  Q    Okay.  And I think -- so based on your chart here that

14  we're looking at, if the engine failed at -- am I correct in

15  saying roughly 40 feet at altitude?

16  A    Yes.

17  Q    Okay.  And it's your opinion or estimation that this

18  aircraft climbed to 120 feet.  Are you able to explain how an

19  aircraft with a failed engine could climb an additional

20  80 feet?

21  A    Yes.

22  Q    Okay.  Could you explain that, please?

23  A    Basically it was slowing down and pitching up.  And if an

24  aircraft is traveling along at in this case say around 60 miles

25  per hour and you pitch the aircraft up without engine power,

1   it's going to climb, but it's going to slow down.  It's called

2   trading altitude for air speed.

3       It's kind of similar if you are driving your car and you

4   put into neutral and you are going 60 miles per hour down the

5   road and you hit a hill.  You're going to go up the hill to a

6   point until you run out of kinetic energy, and the amount of

7   grade that you increase on the hill is increasing your

8   potential energy or your altitude, and you're using your speed

9   to get there.

10      The same thing happens with an airplane.  As the airplane

11  pitches up and slows down, it's able to climb even without

12  engine power, and then when it gets to point where it is below

13  stall speed, it rolls off to the left, and the nose falls, and

14  then it crashes off the right-hand side of the runway as we see

15  represented by the final portion of the flight path and impact

16  point here.

17  Q   So in your investigation you said that you looked at the

18  history of the pilot.  You looked at the history of the

19  aircraft, the engine, the weight and balance, a video analysis.

20      How about weather?  Did you look -- or how -- did weather

21  play a factor in this accident is probably the best question?

22  A   In short, no.  It was a nice day.  It was clear skies,

23  54 degrees Fahrenheit.  You had a little bit of wind coming out

24  of the south, about six knots.  So the net net was weather did

25  not have any reason that it would have affected this aircraft's

1    ability to climb and to increase air speed.

2    Q    And did you in your investigation review any witness

3    statements at all?

4    A    Yes.

5    Q    Okay.  And in your review of the witness statements, did

6    you rely on any of those in forming your opinions?

7    A    I would say I didn't rely upon them, but I always have to

8    review and consider them.  And I did review and consider and

9    take into account each of the witness statements and then also,

10   you know, paid attention to specific witness statements that

11   had what I would call key information contained within them.

12   Q    Okay.  And were there any particular statements that you

13   relied on or that you took key information from?

14   A    Probably the most significant -- and when you're doing

15   aircraft accident investigation, you want to look at the

16   witness statements and kind of pick out what is helpful for a

17   reconstruction perspective and what isn't.

18        When Mr. Isham described a big puff in his witness

19   statement of black smoke, that's a pretty major concern for an

20   accident investigator to hear and something that I had to

21   address to determine whether or not that was consistent with

22   the evidence that I found inside the engine, the evidence of

23   the flight path, the evidence of the history of the aircraft,

24   the evidence of the history of the pilot.

25        Did that witness statement match up to the video, to the

physical evidence, to the aircraft information, the piloting

information, the weather information?  Did it all match?

Q   Okay.  And I know you said you have been doing this for

about 20 years, but approximately how many aircraft accident

investigations have you been involved in in your career?

A   I haven't counted in a little bit, but somewhere between

750 to 800.

Q   Okay.  And in these 700 maybe investigations that you've

had, have any of those investigations involved an aircraft

equipped with a Honeywell TPE331?

A   Yes, many.

Q   And this description about black smoke, have you ever --

let me ask you this:  The black smoke out of the TPE331

exhaust, is that something that's normal or abnormal?

A   That should never happen.

Q   And why is that?

A   Because the black smoke is an indication of excessive fuel.

And unless the fuel that is being delivered to the engine is

inappropriate, the 331 should be burning very clean.  It should

be almost a translucent, invisible exhaust.  You really

shouldn't see anything.

    You might see the air show a little bit of striations from

heat, but you shouldn't see any black smoke whatsoever if that

engine is running normal.

Q   All right.  And in your investigation, did you -- were

1  there any inspections of the actual aircraft or the wreckage?

2  A    Many.

3  Q    Okay.  And did you attend any of these wreckage

4  inspections?

5  A    Yes.

6  Q    Okay.  And what was the first wreckage inspection that you

7  attended?

8  A    The first inspection was at the Soldotna Airport.  The

9  airplane was in hangar.  It was back in the February of '16

10 where we looked at the airframe, the propeller, all of the

11 different components of all the flight controls.  Pretty much

12 everything with the exception of the engine, which we looked at

13 two days later in Anchorage.

14 Q    Okay.  And based on your investigation and exam- -- up

15 until that point, plus the examination, physical examination in

16 Soldotna and Anchorage of the engine, did you believe that

17 there needed to be further investigation?

18 A    Yes.  I looked at all the flight controls.  I looked at the

19 elevator controls, you know, the control surface on the back of

20 the airplane that moves up and down.  I didn't find anything

21 wrong.  I looked at the trim system, and I didn't find anything

22 wrong.  I looked at the rudder, which is the vertical fin on

23 the back, or the control surface on the back.  I didn't find

24 anything wrong.  I looked at the flaps; everything looked good.

25 I look at the aileron arms, which is out on the wings;

1    everything looked good.

2        Basically assessed, was there anything wrong with the

3    airframe that I could figure out that made this airplane do

4    this, and I couldn't find anything.

5        So that kind of led us to, we needed to look a little

6    further, which was one of the reasons why we took the engine to

7    Anchorage to take it apart.

8    Q    Okay.  And following taking the engine apart in Anchorage,

9    based on that -- based on that inspection, were any further

10   inspections scheduled?

11   A    Yes.

12   Q    Okay.  And what was the next inspection after you took the

13   engine apart in Anchorage?

14   A    Later that year, in November of '16, we went to TAE, which

15   is a fuel control and governor overhaul facility in

16   Kansas City, to disassemble the accessories on the engine that

17   are primarily responsible for controlling the propeller and for

18   controlling the fuel going into the engine.

19   Q    Okay.  And what were -- what were the results of that

20   inspection?

21   A    We didn't find anything wrong.  We took the entire fuel

22   control down, which had not been taken apart previously, by the

23   NTSB or by Honeywell or any other entity, so we took it apart,

24   and we didn't find anything that was of -- a discrepancy that

25   we would have associated with any kind of a problem.

We took apart the governor; same thing.  We didn't locate
any pieces inside either of those components, which, again,
neither one of those was investigated previously to rule them
out, that they could have been having a problem.  So we took
that step, and there wasn't any indication that there was
anything wrong.

Q   Okay.  If you're investigating or trying to determine
whether an engine was making power or not acting abnormally, do
you have to take apart the fuel control and the governor?

A   In my opinion, yes.  Because in accordance with appropriate
aircraft accident approach, "methodologies" is the term that's
always used, it's just as important to rule something in, as it
could be causal, as it is to rule it out.  So you can say, I
looked.  If you don't turn the rock over, how do you know
what's under it and how do you know that it didn't have an
issue.

So in my opinion if there is an engine failure, then you
need to look at the fuel control and look at the governor.

Q   And after the fuel control and governor inspection, was
there another inspection?

A   Yes.

Q   Okay.  And when was -- where was that?

A   That was at National Flight Services where we looked at the
fuel pump.  And the fuel pump is driven off of the engine, and
it's pumping fuel, whereas the fuel control is metering the

1  fuel or determining how much fuel goes in.  So the pump
2  provides the pressure and the fuel control provides the amount.
3      So we took the fuel pump, the torsion shaft, we took the
4  fuel shutoff valve, we took the feathering valve, and each of
5  these kind of does its own individual jobs on the engine.  We
6  didn't necessarily have indication of a problem, but we wanted
7  to rule it out.  So we took them all to National Flight
8  Services, and we examined them and took them apart and didn't
9  find anything wrong.
10 Q   Okay.  So there was nothing wrong with the fuel pump?
11 A   Correct.  The fuel pump did not show any anomalies that
12 would have explained why the torsion shaft would break or that
13 would explain why the engine would lose power and the aircraft
14 would slow down.
15 Q   Okay.  And following the National Flight Service's
16 inspection, were was there any more inspections?
17 A   Yes.  So typically the way these investigations work, it's
18 kind of a drill-down approach.  So you start off with a broad
19 scope, what are all the different things that could have caused
20 this, and you start ruling them out one by one.  Well, it
21 wasn't the fuel pump, it wasn't the fuel control, it wasn't the
22 shutoff valve, it wasn't the feather valve, it wasn't the
23 flight controls, nothing wrong with the pilot.
24     And then you successively go after each individual
25 possibility.  And sometimes that's a particular component,

1   sometimes that could be weather, sometimes that could be pilot

2   error, sometimes that could be something to do with the

3   training, it could be engine-related, it could be

4   airframe-related, but you are whittling it down to where you

5   have the most likely possibilities based on what you've ruled

6   out.  And often you then take those components to a laboratory

7   if it's a metallurgical examination that is required.

8       In this case we had a broken torsion shaft, so we wanted to

9   go look at the torsion shaft to understand the nature of the

10  failure, of the fracture surface.  We wanted to look at the

11  main shaft, we wanted to look at the impeller wheels, you know,

12  the spinning impellers that we saw, we want to look at the

13  turbine wheels, we want to look at the rings that those sit in,

14  but we want to do it under a microscope.  And all the other

15  places we had been were not that kind of place so we took it to

16  ATS Laboratories in Atlanta, Georgia.

17  Q   Okay.  And was that the last inspection?

18  A   Well, we went to ATS twice.  We did it once in 2016 and

19  again in 2017 because we wanted to make sure that, again, we

20  turned over every stone; that we looked everywhere that we

21  could look and made every determination that we could make

22  based on the physical evidence that we had, and so we ended up

23  going back to ATS a second time.

24  Q   Okay.  Now in these wreckage inspections, primarily the

25  first one in Soldotna, did you have an opportunity to inspect

1  the propellers from this aircraft?

2  A    Yes, sir.

3  Q    Okay.  And what are -- well, what can you tell us about

4  propeller investigations?  Is there anything unique about it,

5  or...

6  A    Yes.  Roger Stallcamp, who I mentioned earlier, who worked

7  for Hartzell for 40 years or something like that, it's a little

8  bit of a -- of an art and a science.  Propellers can operate at

9  high speed or low speed.  They can operate at coarse pitch,

10  meaning relative to the wind they are biting a lot of air.

11  They can operate at fine pitch, meaning relative to the wind

12  that they are not biting very much air.  They can operate at

13  high-power settings, and they can operate at low-power settings

14  or no power.

15      And it's a little tough to tell exactly, was this a

16  high-power, low RPM versus a low-power high RPM versus a

17  high-power RPM.  And part of the investigative school teaches

18  you that, but there can be some signatures that overlap.  If

19  you have a propeller that is rotating very fast, it might look

20  like it has a lot of power on it, but if it doesn't have some

21  of the typical power signatures, that may not be the case.

22      So it's a little bit of an art and a little bit of a

23  science.

24  Q    And you mentioned signatures of the power.  What are some

25  of the typical signatures of power that you would expect to see

1  in a propeller?

2  A    The textbook teachings in all of the accident investigation

3  manuals that I have ever read, that the NTSB teaches, Southern

4  California Safety Institute teaches, is you look for, oh, four

5  or five different things.  S-bending, is the prop shaped like

6  an S.  That's usually a sign of power.  It could also be a sign

7  of higher RPM.

8      You look at the leading edges.  Are they all torn up, big

9  gauges and nicks and damage, in addition to the trailing edges?

10  Do they have a bunch of teeth marks in them, like they've been

11  all chewed up because they have been digging through concrete

12  or rocks or dirt or asphalt, whatever it might be?

13      You look for chord-wide scratching.  This is the blade of

14  the propeller and it's moving this way, and when it hits stuff,

15  you often will expect that stuff to leave scratch marks along

16  the camber or the face of the blade, and you can also find it

17  on the back side as well.  So chord-wide scratching is another

18  thing that you look for.

19      And at low air speeds, you also look for forward bending.

20  And the reason why that happens is if an airplane crashes into

21  the ground and you've got a propeller that's sitting there

22  spinning, when it hits the ground, the aircraft stops and the

23  propeller wants to keep going.  And the propeller acts like a

24  big corkscrew, and it tries to screw itself into the ground.

25  When it does that, it bends the blades over in a forward

1   direction because the airplane can't go into the ground, so the
2   propeller tries to screw itself into the ground, and when it
3   does that, it often will bend the blades forward.  So if you
4   have low air speed at high power, you often will see forward
5   bending.
6        So those are the main things that they tell you to look for
7   in accident school and how to tell if a prop is putting out
8   high power.
9   Q   Mr. Sommer, do you recognize this photograph?
10  A   Yes.
11  Q   Okay.
12          MR. BRAUCHLE:  And at this time, I would move to admit
13  Plaintiffs' Exhibit 17A, which is the Sommer photo DSC0173.
14          MR. MCQUILLEN:  No objection.
15          THE COURT:  At this time Plaintiffs' Exhibit 17A is
16  admitted.
17        (Plaintiffs' Exhibit 17A received into evidence.)
18          THE COURT:  Would you like to publish that?
19          MR. BRAUCHLE:  I would, Your Honor.
20          THE COURT:  You may publish.
21  BY MR. BRAUCHLE:
22  Q   And, Mr. Sommer, can you describe and tell us what we're
23  looking at here.
24  A   So these are the four propeller blades.  They have been
25  arbitrarily numbered 1, 2, 3, and 4.  There really isn't an

1    official designation of that.  That's just how we could tell

2    them apart, 1, 2, 3, and 4.

3       This is the root of the blade which has been cut off.

4    These surfaces are very shiny, and they were not a product of

5    the impact.  Sometime during the accident investigation, not

6    that we were part of, but the government investigation, they

7    cut all the blades off.  Usually that's so they can fit it on a

8    truck or, you know, put it in a flatbed or something because

9    the blades are large and cumbersome.  So a lot of times, they

10   cut them off.

11      And then the black side, which you're looking at, so this

12   blade root attaches to here, this blade root attaches to here,

13   and so on and so on.  As you can see, this one was cut a little

14   further down.  The black side is the back side, and then the

15   silver side or the gray side is the front side.

16      So this is the four blades as removed from the hub where

17   they attach with each one having been cut.

18   Q   Okay.  And in looking at these blades, is there anything

19   that you could deduce or that factor into your thoughts whether

20   these blades were producing power?

21   A   So I did what they always tell me to do, and what I've

22   always done in my investigations, is, okay, does it have

23   S-bending?  One of these, when it wasn't cut, showed a little

24   bit of evidence of that, but the other three do not.  So I did

25   not see S-bending which is typical of power.

1    Does it have forward bending?  None of these are bent

2  forward.  So I didn't see any evidence of that being indicative

3  of power.

4    Does it have significant leading edge or trailing edge

5  gouging?  Now, there's some damage, but not what I would

6  typically see and not what is described in the manuals that

7  I've consulted as high power.

8    Now, we do have some damage to the tips, and each of these

9  tips is deformed a little bit and broken off.  In my opinion,

10  that's more indicative of an RPM, a high RPM setting, but these

11  blades didn't have what I would call typical, or what the books

12  in the schooling that I've gone to calls typical signatures of

13  high power, that things that I mentioned to you.

14    It didn't have S-bending, it didn't have the forward

15  bending, the leading edge and trailing edge gouging.

16    Now the chord-wide scratching, there's nothing on the backs

17  as you can see in this picture.  There was some of that, and

18  I'm not sure if we have a picture of that or not, but some of

19  that chord-wide scratching is actually on top of the fire

20  damage.

21        (Whereupon, the Court Reporter

22         interrupted for clarification.)

23        MR. BRAUCHLE:  And, Heather, if you could pull up

24  DSC0132.

25        DEPUTY CLERK:  I'm sorry, what exhibit number is that,

1  Mr. Brauchle?

2          MR. BRAUCHLE:  It's going to be 17B.

3          DEPUTY CLERK:  Thank you.

4  BY MR. BRAUCHLE:

5  Q   Mr. Sommer, do you recognize the photograph?

6  A   Yes.

7  Q   Are these the prop blades from the accident aircraft?

8  A   Yes.

9          MR. BRAUCHLE:  All right.  At this time I would move

10 into evidence as 17B Sommer photo DSC0132.

11         THE COURT:  Hearing no objection from the defense at

12 this time, Plaintiffs' Exhibit 17B, as in boy, is admitted.

13         (Plaintiffs' Exhibit 17B received into evidence.)

14         MR. BRAUCHLE:  Also, may we publish, Your Honor?

15         THE COURT:  You may publish.

16 BY MR. BRAUCHLE:

17 Q   Can you tell us what, if anything, in this photograph is

18 relevant to your investigation?

19 A   In this photograph we laid out the blades so that you get a

20 little better idea of what they looked like when they were on

21 the aircraft.

22     So the center portion here is called the hub, and each of

23 these blades goes onto each respective shaft inside the hub.

24 And then each of these blades is laid out in the four corners

25 of the photograph at 90 degrees from each other with the roots

1   of the blades somewhat matched up so you can see kind of how

2   they fit in with the rest of the blades.

3       As I mentioned, there's a little bit of S-bending here on

4   this one blade.  So there's a little bit of an indication of

5   possible power there from the S-bending perspective.  But there

6   isn't any forward bending.  This is bent aft, this is bent aft.

7   It's hard to see, but this one is just basically twisted and

8   bent aft.  We don't have any of the forward bending.

9       We do have a little bit of chord-wide scratching.  Not real

10  sufficient, and I'm not sure if you can see on your screens any

11  better than I can see on the big screen, but a lot of these

12  scratches are on top of black soot so --

13  Q   Let me see if I can help you out.  I may have a better

14  photograph.

15  A   Sure.

16  Q   Let her take it down first.

17      Do you recognize this photo?

18  A   Yes, sir.

19  Q   Is this from the propeller of a Jackson aircraft?

20  A   That's correct.

21          MR. BRAUCHLE:  At this time I would move in as

22  Exhibit 17C, DSC0055.

23          MR. MCQUILLEN:  No objection.

24          THE COURT:  At this time Plaintiffs' Exhibit 17C,

25  Charlie, is admitted.

1          (Plaintiffs' Exhibit 17C received into evidence.)

2              THE COURT:  Permission to publish?

3              MR. BRAUCHLE:  Yes, Your Honor.

4              THE COURT:  You may publish.

5     BY MR. BRAUCHLE:

6     Q    You were talking about blade number two.  I will let you

7     continue what you were about to say.

8     A    As you can see in this photograph, this is what is called

9     chord-wide scratching.  The chord of the blade is basically the

10    width of it.  And when you see scratching along in a chord-wise

11    direction, that is one of the things that you look for when

12    you're looking for power.

13         But you also see a big burn mark here.  This blade is

14    normally this color (indicating).  This is the deice boot.

15    This is the leading edge of the blade.  This is the trailing

16    edge of the blade.  And we see a little bit of impact damage

17    here, where a pretty good chunk has been taken out.  But we see

18    a whole bunch of scratches on the black discoloration.

19    Obviously, the propeller wasn't subject to any fire before the

20    accident, so the accident fire had to have made this

21    discoloration and then we see all of this chord-wide scratching

22    on top of that.

23         So I had to take that into consideration because if you

24    move the propeller blades around, if you pile them on top of a

25    flatbed truck, you drag them across the hangar floor, you move

them with a forklift, you can scratch up these components

pretty good when you're dragging a wreckage around.  And in

this case, it's very obvious that that had to have occurred

because we had no fire before the accident, and we had a very

significant fire after the accident, and we have marks on top

of the fire damage.

So, yes, there are some chord-wide scratches, and I am not

of the opinion that all of those scratches are on top of the

fire, but there are a significant number that are.

Q   Okay.  And based on your investigation and your analysis of

the propellers, does that support or detract from your opinion

that this airplane -- this aircraft suffered an in-flight

engine failure?

A   Based on the condition of the propellers, in addition to my

investigation of the engine components, I believe that the

propellers are not consistent with a high-power, high-RPM

impact, which I think there would be tremendously more damage

to them.  I do believe they were at high RPM, I don't believe

that they were at high power.

So the RPM should be maintained by the propeller governor

during the event, and I would expect the propeller to still be

at high RPM, but I don't think that there are signatures here

that support high power and high RPM.

Q   Now, there was a -- you talked earlier about the trim

system in the aircraft.  Again, briefly, what is the trim

1 system in the Otter?

2 A    So the trim system is a little like cruise control in the

3 vertical axis.  When you're flying an airplane, you push

4 forward on the yoke, the elevator lifts up, nose goes down; you

5 pull back on the yoke, elevator goes up, nose goes up, and

6 that's your control for your vertical.

7          When you get to, say, the altitude that you are happy

8 with, or the pitch attitude that you're happy with, you want to

9 reduce the amount of force on that yoke.  So if you have, say,

10 a neutral elevator and then you pull back, then you're going to

11 have to hold it there, and it can be heavy.  This is a big

12 elevator.  It's a big airplane and a big tail.  So in order to

13 alleviate that, there's a little tab that sits off the back of

14 the elevator.  So the elevator goes up and down like this

15 (indicating), elevator up, nose up; elevator down, nose down.

16 The tab allows you to alleviate those control forces.

17          So all it's really doing is making it easier for you

18 to hold the yoke.  That's what the trim system is.  So you can

19 trim it for a little bit of nose up, so it's not so heavy, you

20 can trim it for an altitude so that it stays nice and neutral

21 and level, you can trim it for a little bit of nose down, and

22 it's a handle that is on the side of the pilot's chair down to

23 the right-hand side of where the pilot sits.  It's a wheel.

24 You spin the wheel forward, nose down trim; spin the wheel

25 back, nose up trim.

1  Q   Mr. Sommer, I'm going to show you a picture here and see if
2  that is what you were just describing.
3      Is that a picture of what you were just describing?
4  A   Not exactly, but it is related to the trim system.
5  Q   Okay.
6  A   That is the trim position indicator.  So if you do what I
7  was describing, roll the wheel forward, this -- I'm sorry.
8  That is the trim position indicator.
9  Q   Okay.  Fair enough.
10     And is this -- what -- is this the trim position indicator
11 from an Otter?
12 A   Yes.  It is not the accident one as it was very badly
13 burned.
14 Q   Okay.
15         MR. BRAUCHLE:  And, Your Honor, I would label this as
16 Demonstrative 107 and request to publish.
17         MR. MCQUILLEN:  No objection, Your Honor.
18         THE COURT:  At this time you may publish Plaintiffs'
19 Demonstrative 107.
20 BY MR. BRAUCHLE:
21 Q   Okay.  And can you just describe to the jury what we're
22 looking at.
23 A   This red line is the indicator of the trim position.  So as
24 I indicated, you roll the trim wheel forward, that's nose down
25 trim, the red line moves this way; you roll the wheel

backwards, and that's nose up trim and the red line moves this way.

Now, there's some labels on here that tell you the same thing. If the trim indicator is moving this way, it's nose down. If it's moving this way, it's nose up.

This zero, basically, is neutral trim. So if you were to have, all things being equal to where you're just flying level, you are in, say, cruise flight, with cruise power, you probably would be about here (indicating) because you don't really want any nose up trim and you don't really want any nose down trim.

Each of these little notches is relatively arbitrary, so they have a 1 and 2 in the down direction, and then a 1, 2, 3, 4, 5 in the up direction. And then they have a little arrow that tells you where they recommend that you put the arrow -- or the indicator for takeoff.

Q   Okay. And the red line as we see here, it looks like it's -- I guess for clarity, .5 or a half. Is that -- I guess what I'm trying to do is I'm trying to determine where that red line is actually on that scale.

A   So the red line is at about .5 nose up. This being 1 nose up, this being 2 nose up, this being neutral. So it's in a nose-up configuration at about .5 units, which isn't really defined as to what a unit is.

Q   Okay. And what is that -- so if it's .5 there, then, and at takeoff is 2, then, am I correct that it is a 1.5 nose down

1  from the takeoff position?

2  A    That's correct.  This is what they recommend, which would

3  be just a general recommendation, and if you were to

4  count 1.5 units, then this is indicative that it's about 1.5

5  below the normal recommended takeoff, still slightly nose up.

6  Q    Okay.  And was this what investigators determined was the

7  setting on the accident aircraft that they found in the

8  wreckage?

9  A    Yes.  They looked at the component in the rear of the

10  aircraft which is called actuator, or the spool, and then they

11  equated that on an exemplar that wasn't burned up and

12  destroyed, and determined that the position of the trim spool

13  in the accident airplane was found at about .5 units nose up.

14  Q    Okay.  And you said that it's recommended that during

15  takeoff that it be set to the takeoff setting.  When you say

16  "they" or it's recommended -- where is that?

17  A    So one place is on the indicator, as you can see, which is

18  right here (indicated).  The other place is in the aircraft

19  flight manual.  And it has a checklist for takeoff, and it

20  tells you that it recommends that you set the trim to the

21  takeoff position for a normal takeoff.

22  Q    Does it say anything else about trim setting for takeoff,

23  other than it's recommending that it be in the takeoff

24  position?

25  A    Well, sure.  The trim setting is a hundred percent

1  dependent upon your loading.  So how many people you have

2  onboard, how much stuff do you have.  The more aft that you're

3  loading is, or your center of gravity is, then the more nose-up

4  trim you're going to -- or the more nose-down trim you're going

5  to need and vice versa.

6      So if you are in an empty plane, you probably don't need

7  quite as much nose-up trim, or you need a little more nose-up

8  trim if you are in a full plane and vice versa.  So the flight

9  manual actually tells you to adjust the trim for your center of

10 gravity.

11 Q   Okay.  And does the airplane, the flight manual, does that

12 allow me, as a pilot, to have that discretion to put it up or

13 down?

14 A   Sure.  Pilot discretion.  Wherever is appropriate for your

15 conditions, your altitude, your power settings, your loading,

16 baggage, of course, fuel, you're going to set that to what is

17 appropriate for the configuration of your airplane.

18 Q   And I think earlier we talked about the different

19 investigations, and you talked about you did an engine

20 investigation.

21     Can you give us a brief summary of your findings from the

22 engine investigation examination?

23 A   Sure.  When we went to Anchorage, after our initial

24 inspection of the airframe wreckage in 2016, the engine was

25 loosely put back together, which is a little strange.  I've

never seen that before.  I don't have the opinion that that
necessarily had anything to do with the accident.  It was just
unusual.  But we had to take it apart again.

     So we went to a facility that had the appropriate tools and
such, and then we took the engine back apart, even though it
had already been apart before during the government
investigation where Honeywell was involved, and we looked at
all the different rotating components.  We discussed earlier
the impellers, and the impellers ride in what's called a
shroud.

     So I looked at the impellers, I looked at the impeller
shrouds, I looked at the turbine, wheels, the three of those, I
looked at the rings that the turbine wheels ride in and
assessed the entire rotating system for damage.  Does it look
like this engine was burning and turning when it hit the
ground, or not?

Q   Mr. Sommer, I'm showing you what's been premarked as
Plaintiffs' Exhibit 64.  Can you identify what that is?

A   That is, I believe, the first stage impeller from the
accident engine.

          MR. BRAUCHLE:  At this time I would move to admit into
evidence Plaintiffs' Exhibit 64.

          MR. MCQUILLEN:  No objection, Your Honor.

          THE COURT:  At this time Plaintiffs' Exhibit 64 is
admitted.

1          (Plaintiffs' Exhibit 64 received into evidence.)

2          MR. BRAUCHLE:  May I publish, Your Honor?

3          THE COURT:  You may publish.

4   BY MR. BRAUCHLE:

5   Q    I believe you just said this was the first stage impeller.

6   What is significant about this impeller?

7   A    So the best place to look in an engine, turbine engine, as

8   to whether it's running or not is in the compression at the

9   impeller.  This is the best place, so this is the number 1.

10  This is the first place at the beginning of the engine where

11  the air goes in.

12       And this is the best sign that you're going to get in my

13  opinion, and in the investigation manuals this is what they

14  teach you the best play to look.  You can find signatures other

15  places, but this is the most indicative portion of the engine

16  as to were you underpower or not.

17       One is because all the airflow through the engines goes

18  through these blades, and this is the first portion of the

19  engine that experiences anything that enters the engine.

20       When these airplanes crash, when the turbine engines

21  contact terrain, it's a gigantic vacuum cleaner acting at the

22  front of the engine which sucks in all kinds of debris when it

23  hits the ground.

24       So when you look in here, you can kind of tell, Do I have a

25  bunch of blades that are bent back?  Does it look like this

1    thing was eating rocks?  Does it look like it sucked in a whole

2    bunch of dirt?  Does it look like this thing was subject too

3    high operation, high vacuum, high suction, and did it exhibit

4    evidence that it had ingested a whole mouthful of junk that it

5    experienced when it hit the ground?

6        And we don't see that.  We don't see the blades bent back,

7    we don't see nicks and gouges in the leading edges of the

8    blades.  We don't see scoring.  We don't really see hardly any

9    damage to this at all.  There's a little bit of deformation but

10   on like one blade, and more or less, this thing's pretty

11   pristine.

12       The other thing that we look for is on the edges of these

13   blades.  When the engine's putting out a lot of power -- and

14   this particular component spins at almost 42,000 RPM, so when

15   it's spinning that fast and it's under a lot of power, there's

16   a shroud that goes around the outside of this, which I think we

17   have a photo of, and the clearances between that shroud are a

18   few thousands of an inch, very, very small.

19       When the engine hits the ground, they grind into each

20   other.  So the shroud of the first stage impeller and the

21   impeller itself is the best place to look for an engine to see

22   if it's running and putting out power, and we didn't really see

23   any.

24   Q   And you just mentioned shroud.  Is this what you were

25   talking about?

1  A   Yes, sir.

2  Q   Okay.

3          MR. BRAUCHLE:  At this point I would move into -- like

4  to move into evidence Plaintiffs' Exhibit 65 and publish it to

5  the jury.

6          MR. MCQUILLEN:  No objection.

7          THE COURT:  At this time Plaintiffs' Exhibit 65 is

8  admitted, and you may publish.

9          (Plaintiffs' Exhibit 65 received into evidence.)

10 BY MR. BRAUCHLE:

11 Q   And if you could describe what we're looking at?

12 A   So this shroud, this curved surface, if you were to flip

13 this over, it basically provides the air seal for these blades.

14 So the impeller turns.  The impeller sucks air in this way, and

15 then it spits it out this way, and in order to do that, it has

16 to have some type of air seal so that it can create a suction,

17 and this shroud is what does that.

18      So these curved surfaces ride up against these curved

19 surfaces.  When the engine is running at high power, at

20 42,000 RPM and it hits the ground hard, this thing digs into

21 this shroud, and it will score it and scratch it, and it will

22 leave a whole bunch of heavy duty marks.  And often it will --

23 it will dig into it so hard that it actually can even basically

24 burn a hole in it.

25      So this is a great place to look.  There's a little bit of

 1  rotational scoring on this, but no where near what I would

 2  expect if this engine was putting out high power.

 3      We actually see a couple of little static marks here and

 4  here, but those are not indicative of high power, and the

 5  limited amount of scoring that's on here is not representative

 6  in my experience as an accident investigator in what I've seen

 7  in other engines as well as in the turbine engine investigation

 8  schools that I've been to -- there isn't an indication of high

 9  power.

10          MR. BRAUCHLE:  Can I take a moment?

11  BY MR. BRAUCHLE:

12  Q   Is this what you were -- what you had just described about

13  burning a hole in the shroud?

14  A   Yes.

15          MR. BRAUCHLE:  At this time I would move to -- this

16  exhibit, Exhibit 108, move it into, evidence, Your Honor.

17          MR. MCQUILLEN:  Can we hear a little bit more about

18  the foundation for this one, Your Honor?  We can chat.

19          THE COURT:  Approach.

20          (Bench conference held.)

21          THE COURT:  That was my initial thought too was that

22  it could benefit from additional foundation, but my concern is

23  whether that foundation will lead to testimony about whether or

24  not it's a Honeywell engine.  I don't know if that is.

25          MR. BRAUCHLE:  It's not.

```
 1          THE COURT:  Okay.  Then I would just sustain the
 2   objections as far as providing the foundation of what it is
 3   we're looking at, and it's -- I guess it's relevance in that
 4   regard.  I'm assuming that was your objection.
 5          MR. MCQUILLEN:  Yeah.  Thank you.
 6          (Bench conference ended.)
 7          THE COURT:  The objection is sustained.  I will ask
 8   Mr. Brauchle to lay a little more foundation.
 9          MR. BRAUCHLE:  Sure.
10   BY MR. BRAUCHLE:
11   Q   So, Mr. Sommer, the picture that you just saw, that shroud,
12   it -- well, tell me what is that shroud?
13   A   That shroud came off of a Turbomeka I believe an REL engine
14   that was installed on a Eurocopter EC135 that crashed in
15   Wisconsin.
16   Q   Okay.  And is that engine -- that Turbomeka, is that a
17   turbine engine?
18   A   Yes.
19   Q   And that the picture that you just had, is that the shroud
20   of the turbine engine?
21   A   That is the impeller shroud.
22   Q   The impeller shroud, okay.  Thank you.
23        And what is the significant to that shroud -- because it's
24   not a Honeywell product, what is the significance of that
25   photograph of what we're looking at to this case?
```

1    A    The impeller in the Turbomeka engine functions very similar

2    to the impeller in the Honeywell engine.  It's an axial

3    centrifugal impeller, and it is contained by a very similar

4    shroud.

5        In my opinion, that's a very good example of an engine that

6    is under high power, high RPM at impact.

7    Q    And were you involved in that investigation?

8    A    Yes, I took that picture.

9    Q    Okay.  And was that engine at the time of impact with the

10   ground -- was it running at full power?

11   A    Most definitely.

12   Q    Okay.

13           MR. BRAUCHLE:  At this time Your Honor, I move in

14   Exhibit 108.

15           MR. MCQUILLEN:  No objection.

16           THE COURT:  At this time Plaintiffs' Exhibit 108 is

17   admitted.

18           (Plaintiffs' Exhibit 108 received into evidence.)

19           THE COURT:  Request to publish?

20           MR. BRAUCHLE:  Yes, Your Honor.

21   BY MR. BRAUCHLE:

22   Q    Okay.  So the photograph that we're looking at is an

23   impeller shroud from a turbine engine?

24   A    Correct.

25   Q    And can you describe what we're looking at?

A    My screen is dark, but this is the ceiling surface, so this
is the curved surface that we saw similar to the other
photograph.  The induction portion of the axial centrifugal
impeller is here, and then the air comes in here and then
travels along this surface and then exits centrifugally.

The way that the impeller works is basically the air comes
in the top, and then it shoots out the sides.  This is the
mating surface between the veins of the impeller, and when the
impeller is putting out full power at full RPM and comes to a
screeching halt because of impact, the impeller impacts this
shroud and scrapes it.

Now, in the photo, there's a bunch of evidence of scoring
inside the duct here of the shroud due to contact with the
impeller, but here the contact was so significant that the
rotational energy of the impeller actually dug a hole into the
shroud, which is what we see here.  Normally the entire surface
would look kind of like the accident surface which is like
this.

In this one, we can see evidence of high power due to the
contact of the impeller with the shroud that actually smeared a
whole bunch of the shroud material and actually dug a hole into
the side of it.

Q    And how does that compare to the impeller on this aircraft,
impeller shroud?

A    Our shroud doesn't hardly show any damage in -- compared to

1  this one which has a giant gaping hole in it.

2  Q    Thank you.

3      So we talked about the impeller section.  Do you also

4  investigate or look for signs in the turbine section as well?

5              (Whereupon, the Court Reporter

6              interrupted for clarification?)

7              THE WITNESS:  Yes, sir.

8              MR. BRAUCHLE:  Okay.  Can you pull up Exhibit 68.

9  BY MR. BRAUCHLE:

10 Q    Is this a photograph of the blades from the turbine section

11 of our aircraft?

12 A    Yes.

13             MR. BRAUCHLE:  At this time, Your Honor, I move into

14 evidence Plaintiffs' Exhibit 68.

15             MR. MCQUILLEN:  No objection.

16             THE COURT:  At this time Plaintiffs' Exhibit 68 is

17 admitted.

18         (Plaintiffs' Exhibit 68 received into evidence.)

19             THE COURT:  And you may publish.

20 BY MR. BRAUCHLE:

21 Q    And, Mr. Sommer, can you tell us what we're looking at

22 here?

23 A    So this is the first stage turbine wheel, and there's three

24 of them.  There are the two impellers in the front and then the

25 three turbine wheels in the back.  This is the first one of

1  those three.

2      And the wheel itself basically has a whole bunch of blades

3  on it, and these blades are what -- when you burn the fuel and

4  air and you blow it through the turbine section, it causes

5  these blades to turn.

6      So the blowing of the fuel air mixture affects these little

7  air foils, makes this whole wheel turn in addition to the other

8  two turbine wheels, and they spin at the same speed of the

9  compressor which is 41,700 RPM, so they are spinning very, very

10  fast.

11      Now each of these blades is installed in this wheel, and

12  they call these little fir trees, and basically each of these

13  blades slides in, and they call them fir trees because they

14  look like little Christmas trees.  When you slide the blade in

15  there, that's how it's held in place.  So this wheel doesn't

16  really have any damage on it at all.  It's not all scrapped up.

17  It doesn't have any -- even blending of the blades.

18      It doesn't have any real scoring on the tips of the blades

19  because they ride inside of a ring, and that ring has extremely

20  close tolerances to when this engine is putting out a lot of

21  RPM and power, it will cause the blade ends to impact the ring.

22      And then you'll see that it gets all scored up to the point

23  where -- I've seen them where you knock every single one of

24  these blades off, and all that's left is the little Christmas

25  tree portion.  So you can see good evidence of engine power on

the turbine section as well, and we don't see any evidence of that.

The other thing you look for is called metal spray, and you'll probably hear a lot about that from various folks, but what it is is when the marks that I showed you where the impeller digs into the shroud, because of the aluminum content of the shroud components, what happens is the impeller takes a big chunk of that metal, and then it shoves it through the engine.

But when it does that, that metallic liquifies when it goes into the burner can, and then it gets sprayed out the other end like paint.  So if you have a pretty good impact under high power, then you will see little paint specks all over the turbine wheels because you dug into the shroud on the impeller side, and then you sent it through the burner can and it melted it all, and then it's -- was spit out through the turbine wheels, and you'll see a whole bunch of little -- what looks like silver spray paint.

And we don't really see any significant evidence of that. There's a little bit of flecks here and there, but not what I would call indication of high power.

THE COURT:  Mr. Brauchle, I would like to end just about 15 minutes early today.  I'm not certain if that's okay with you.

MR. BRAUCHLE:  This would be a good stopping point.

1          THE COURT:  That's what we will do.  Ladies and

2     gentlemen, I'm going to end just a little bit early today.

3          As I indicated before this trial started, you as

4     jurors will decide this case based solely on the evidence

5     presented in this courtroom.

6          This means that after you leave here tonight, you must

7     not conduct any independent research about this case, the

8     matters in the case, the legal issues in this case, or the

9     individuals or other entities involved in the case.

10          This is important for the same reasons that jurors

11     have long been instructed to limit their exposure to

12     traditional forms of media information such as television and

13     newspapers.  You also must not communicate with anyone in any

14     way about this case, and you must ignore any information about

15     the case that you might see while browsing the internet or

16     social media feeds.

17          Thank you very much for your attention today.

18          Madam clerk?  I will see you tomorrow at 9:30.

19        (Out of the presence and hearing of the jury panel.)

20          THE COURT:  Please be seated.

21          So just a few issues I want to address before we

22     adjourn for the day.

23          I guess first we had sort of -- I don't know how to

24     best characterize it, but it was an objection or at least a

25     concern voiced about the opening statement of the defense

1   earlier today.

2          I have heard argument.  I went back and looked at the

3   transcript.  I think to the extent that I guess the objection

4   or the concerns implicate both the orders at 537 and 538, I

5   want to take this in two parts.

6          First, there was this idea that I sort of felt in real

7   time that Mr. McQuillen had implicated the NTSB conclusions

8   themselves as to causation.

9          When I went back and looked at the entirety of the

10  opening statement, what you see time and again in

11  Mr. McQuillen's opening, for lack of a better expression is

12  sort of a call and response.  He refers to data.  He refers to

13  information, and then concludes with, Our witnesses, our

14  experts will testify as to X, as to Y, and he does that

15  throughout.

16         There is a portion particularly as it relates to

17  weight and balance where the call in response isn't quite as

18  clear, but I think when I look at the totality of the opening

19  statement, I don't see that Mr. McQuillen's opening is -- does

20  in any way violate the Court's rulings at dockets 537 and 538.

21         There is -- when you look at, I think it's the order

22  at docket 538 where Judge Holland indicated while the data from

23  the studies could be referenced during expert testimony, you

24  could not parrot those findings.

25         I guess the argument could be made that the slides

```
 1    themselves serve as parroting those studies, but again as both
 2    the parties indicated prior to opening statements, there were
 3    no objections to the slides themselves, so I don't find here
 4    that at this point in time, there are any means to remedy any
 5    violations of Judge Holland's rulings.
 6         The Court will reiterate:  I do see this as something
 7    that we will probably have to address several more times
 8    throughout the course of this trial.  So I would ask the
 9    parties to at least consider intellectually, conceptually, the
10    idea of what an appropriate limiting instruction might look
11    like if the need arises to provide one.
12         I'm not giving up the ghost that we can get through
13    this trial without it, but it is something that obviously is a
14    risk.
15         As far as the economist's reports, what I would like
16    to do is start a little bit early tomorrow.  Mr. Moore, I don't
17    know how much time we may need.  If we had a half an hour in
18    the morning --
19         MS. DIOMEDI:  I think we have some good news.
20         THE COURT:  Oh, good news.  Let me have it.
21         MR. MOORE:  We have worked that out.
22         THE COURT:  So no more economist issues.
23         MS. DIOMEDI:  That's my understanding, he's going to
24    revert back to how they dealt with fringe benefits before, so
25    we should be --
```

1    THE COURT:  Well, that is -- that's good news.

2    We can start again -- I will be on the bench at 9:15.

3    Any other issues we need to address before we adjourn

4    for the day?

5    MR. BRAUCHLE:  Just -- I know what Mr. McQuillen said

6    about the video.

7    THE COURT:  Oh, yes.

8    MR. BRAUCHLE:  There was the previous -- there was

9    Judge Holland's order where we need to cut off the last minute.

10   We will make sure that that's done.  We're certainly not going

11   to -- since it's been admitted.  We will clean that up.

12   MR. MCQUILLEN:  We got these videos, and sometimes we

13   forget to edit them according to the order, and I just wanted

14   to make sure that one had been so edited.

15   THE COURT:  Very well.  So it has been admitted, and I

16   think that was Plaintiffs' Exhibit 3.  I will understand that

17   it was admitted with the caveat that it is expected to comply

18   with Judge Holland's ruling, both to the extent that it is

19   played again throughout the course of this trial, but obviously

20   before it goes back with the jury for deliberations.

21   All right.  Any other issues, Mr. Brauchle?

22   MR. MCQUILLEN:  Order for trial?  Are we going to

23   finish with him and then do --

24   (Counsel conferred off the record.)

25   MR. MCQUILLEN:  Nothing further, Your Honor.  Thank

1    you.

2            THE COURT:  Well, thank you very much for our first

3    long day.  I'll see everyone at 9:15 tomorrow morning.  Thank

4    you very -- oh, I forgot something.

5            So when it comes to -- and again this is more a court

6    preference when it comes to admitting exhibits.  What is

7    beneficial for me, and when I say me, I mean madam court

8    reporter, is if we can try to identify the exhibit early on,

9    reference it before it's pulled up on the screen.

10           It allows madam clerk to both find it in her own

11   exhibit list and be in a position to ensure it's not improperly

12   being published to the jury.

13           So, you know, just basically saying, I'm about to pull

14   up or show you what's previously been marked as Exhibit 73.  It

15   gives us a head start in ensuring that the progression and the

16   procedures are a little smoother.

17           Madam Clerk, does that --

18           DEPUTY CLERK:  That's fine, yes, Your Honor.

19           THE COURT:  Or ask Madam Clerk how she would like it

20   done, because she knows more than I do.

21           But again, thank you all very much.  I'll see you

22   tomorrow morning.

23           DEPUTY CLERK:  All rise.  Court stands in recess until

24   9:15 tomorrow.

25               (Whereupon, the Court adjourned at 4:20 p.m.)

1                              --o0o--

2                            CERTIFICATE

3        I, Stacy M. Baldwin, Federal Official Court Reporter in and
    for the United States District Court of the District of Alaska,
4    do hereby certify that the foregoing transcript is a true and
    accurate transcript from the original stenographic record in
5    the above-entitled matter and that the transcript page format
    is in conformance with the regulations of the Judicial
6    Conference of the United States.

7        Dated January 31, 2023.

8

9                              /s/ Stacy M. Baldwin
                             STACY M. BALDWIN, RCR, RMR
10                            FEDERAL OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25