1          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF ALASKA
2

3   In re Crash of Aircraft N93PC    )
                                     )  No. 3:15-cv-0112-JMK
4                                    )  (Consolidated with
    on July 7, 2013, at Soldotna,    )  No. 3:15-cv-0113-JMK and
5   Alaska                           )  No. 3:15-cv-0115-JMK)
                                     )
6   _____

7
            TRANSCRIPT OF TRIAL BY JURY - TRIAL DAY 3
8      **BEFORE THE HONORABLE JOSHUA M. KINDRED, DISTRICT JUDGE**
               Wednesday - February 1, 2023
9                  9:15 a.m. - 4:22 p.m.
                    Anchorage, Alaska
10

    **FOR THE PLAINTIFF:**
11
         Law Offices of Michael J. Schneider, P.C.
12       BY:  MICHAEL J. SCHNEIDER
         800 N Street, Suite 202
13       Anchorage, Alaska 99501
         907-274-8201
14
         Motley Rice, LLC
15       BY:  JAMES RICHARD BRAUCHLE
         BY:  MARY SCHIAVO
16       28 Bridgeside Blvd.
         Mount Pleasant, South Carolina 29464
17       843-513-7626

18       Thomason & Pracht, LLP
         BY:  JOHN CHRISTOPHER PRACHT
19       P.O. Box 4025
         Anderson, South Carolina 29622
20       864-226-7222

21  Clerk in attendance: Suzannette David-Waters

22  _____

23                    **STACY M. BALDWIN**
                 **Realtime Certified Reporter**
24              **Federal Official Court Reporter**
                  222 West 7th Avenue, #4
25                 Anchorage, Alaska 99513
           Transcript Produced from the Stenographic Record

**FOR THE DEFENDANT:**

Adler Murphy & McQuillen LLP
BY:  MICHAEL G. McQUILLEN
BY:  GINA MARIE DIOMEDI
BY:  JOHN A. KELLY
20 South Clark Street, Suite 2500
Chicago, Illinois 60603
312-345-0700

Perkins Coie, LLP
BY:  JAMES N. LEIK
1029 W. 3rd Avenue, Suite 300
Anchorage, Alaska 99501
907-279-8561

1                        **I N D E X**

2    WITNESSES CALLED BY THE PLAINTIFFS:              PAGE

3    **COLIN SOMMER**
     DIRECT EXAMINATION (Continued) BY MR. BRAUCHLE        8
4    CROSS-EXAMINATION BY MR. MCQUILLEN                    50
     RE-DIRECT EXAMINATION BY MR. BRAUCHLE               133
5    **DONALD FRANKENFELD**
     DIRECT EXAMINATION BY MR. MOORE                     138
6    **MARK HOOD**
     DIRECT EXAMINATION BY MR. BRAUCHLE                  173
7
     FURTHER PROCEEDINGS:
8
     CERTIFICATE                                         193
9

10                          EXHIBITS

11   **PLAINTIFFS**
     Exhibit 22A                                          15
12   Exhibit 22B                                          19
     Exhibit 22D                                          22
13   Exhibit 22E                                          24
     Exhibit 57                                           37
14   Exhibit 58                                           40

15

     **DEFENDANTS**
16   Exhibit 125.4                                        61

17

18

19

20

21

22

23

24

25

1                    (Call to Order of the Court at 9:15 a.m.)

2                    (Out of the presence and hearing of the jury.)

3              DEPUTY CLERK:  All rise.  His Honor, the Court, the

4    United States District Court for the District of Alaska is now

5    in session, the Honorable Joshua M. Kindred presiding.  Please

6    be seated.

7              THE COURT:  Good morning, everyone.  Thank you,

8    Madam Clerk.

9              I think I'll have the jury available in about

10   15 minutes.  This is me just checking in this morning to see if

11   there are any issues that we need to address, not just related

12   to the immediate witness, but anything you anticipate later on

13   today.  This would be a good time.

14             I'll start with Mr. Brauchle?

15             MR. BRAUCHLE:  Nothing at all, Your Honor.

16             THE COURT:  Mr. McQuillen?

17             MS. DIOMEDI:  Good morning, Your Honor.  We just

18   wanted to move forward with withdrawing the designation of our

19   economist, Eric Knowles.

20             THE COURT:  Very well.

21             MR. MCQUILLEN:  On the heels of that, Your Honor, just

22   giving you an update on schedule.  Jim -- Mr. Brauchle, I think

23   has advised that he will -- I think -- I'm not holding you to

24   anything, but I think what we loosely talked about was we would

25   probably get done with Mr. Sommer by hopefully noon today,

1    including cross.

2           And then it's the economist this afternoon, and then

3    they want us to at least get started with their next expert.

4    And they are going to only have one more witness after that, so

5    they envision -- I'm not telling --

6           MR. BRAUCHLE:  I think whether either Mark --

7    Mark Hood.  After our economist, we have two witnesses.  They

8    will be much shorter than Mr. Sommer, so I am very confident,

9    absent an extensive cross-examination, we will definitely get

10   our case in tomorrow at some point.

11          THE COURT:  Okay.

12          MR. MCQUILLEN:  So the question is, if we are trying

13   to shave down with the economist, et cetera, I'm just trying to

14   get a feel for the Court's perspective.  We chatted about it.

15   Let's say he finishes it at noon -- I don't know when it will

16   be, but whenever he finishes on Thursday, is it the Court's

17   preference that we start, or kick the defense off fresh on

18   Monday?

19          I don't anticipate us -- even if we started Monday,

20   that we are going to go any longer than Thursday.

21          THE COURT:  Okay.  So if I understand correctly, what

22   we're anticipating here, understanding that none of this could

23   be predicted with absolute certainty, is that plaintiffs are

24   likely to rest sometime on Thursday.

25          But I also imagine it's unlikely to be tomorrow

1     morning.  It's more likely to be the afternoon.

2           MR. BRAUCHLE:  What I was envisioning is -- I guess I

3     have a question, we were it kind of talking to ourselves, is

4     what if I get done at 2:00?  Then there are two and a half

5     hours left in the court day.

6           THE COURT:  I mean, I get the sense that it appears

7     that this trial may not be long --  last as long as we all had

8     anticipated.  Given that, I'm happy to tell the jury that we

9     are moving with greater efficiency.

10           And thus if you rest tomorrow at two, my inclination

11     would be to send them home for the weekend unless you wanted to

12     begin your case.

13           MR. MCQUILLEN:  I don't really care either way.

14           THE COURT:  Okay.  I'll defer to the parties, but if

15     the request or desire was to just start fresh on Monday with

16     the defense case, I don't have any reservations about sending

17     them home a couple hours earlier, but also I appreciate if you

18     would like to get your testimony before the weekend, the Court

19     is here until 4:30.

20           I'm not going to have heartburn given the pace with

21     which we are going, particularly because I will be able to give

22     them at least some sense that things are progressing quicker

23     that we had anticipated, so they shouldn't have any concerns if

24     we leave early tomorrow.  Does that make sense?

25           MR. BRAUCHLE:  Yeah.

1          THE COURT:  But I'll leave it to you, Mr. McQuillen.

2          MR. MCQUILLEN:  Yeah.  Maybe we can see if today goes

3   as planned, maybe we -- it's up to you obviously, but tell them

4   at the end of the day or tomorrow morning or whatever.  I don't

5   know.

6          THE COURT:  Well, the courtroom is yours from 9:15 to

7   4:30, but just as far as logistics and having witnesses ready,

8   that may or may not go on an afternoon.  To the extent that it

9   eases the burden on you and you would like to simply start on

10  Monday, what I'm suggesting is that I will be okay with that.

11         MR. MCQUILLEN:  Thank you.  Appreciate it.

12         THE COURT:  Anything else?

13         MR. BRAUCHLE:  If the jury is coming in at 9:30, is it

14  okay if I run to the restroom?

15         THE COURT:  Of course.  Of course, yes.

16         (Pause in proceedings.)

17        (In the presence and hearing of the jury panel.)

18         THE COURT:  Good morning, ladies and gentlemen.  As I

19  reminded yesterday and continue to emphasize to you today:  It

20  is important that you decide this case based solely on the

21  evidence and the law presented here.  You must not learn any

22  additional information about the case from sources outside the

23  courtroom.

24         As I will ask you every morning in this trial:  In

25  order to ensure fairness in all the parties in this trial, have

```
 1    any of you learned anything about or shared anything about this
 2    case outside of this courtroom?  Seeing no hands.
 3              Mr. Brauchle, you may continue.
 4              MR. BRAUCHLE:  Thank you, Your Honor.
 5                    DIRECT EXAMINATION (Continued)
 6    BY MR. BRAUCHLE:
 7    Q    Good morning, Mr. Sommer.
 8    A    Good morning.
 9    Q    We talked a lot about a lot of different topics yesterday,
10    and we will probably at the end of your testimony just do an
11    executive summary, but one of the things you discussed
12    yesterday was the gross weight of the aircraft.
13        Am I correct that that includes not only cargo passengers
14    but also the actual airplane itself?
15    A    That's correct.
16    Q    And if -- when we say gross weight, the aircraft has a
17    limit; is that correct?
18    A    Yes, the gross weight is the maximum limit.
19    Q    Okay.  And hypothetically if this aircraft, this DC --
20    DHC-3 Otter, turbine Otter was, let's say, 20 pounds over gross
21    weight, would you expect that to cause a crash?
22    A    Definitely not.
23    Q    How about 40 pounds over gross weight?
24    A    For sure would not.
25    Q    60 pounds?
```

1  A    Actually, 60 would not have an effect on the gross weight,

2  and there's even a special federal aviation regulation specific

3  to Alaska in regard to maximum gross weight.

4  Q    Okay.  And can you just kind of -- what is your

5  understanding of that regulations?

6  A    14 Code of Federal Regulations Part 91.323 is entitled

7  "Increased maximum certificated weights for certain airplanes

8  operated in Alaska."

9      It is the only regulation for any state in the entire

10  United States that allows for an increase in gross weight, up

11  to 15 percent of the maximum gross weight of the airplane.

12      What that means in this case for an 8,000-pound airplane,

13  the FAA would allow the operator to operate the aircraft up to

14  1,200 pounds over gross.  So 20 pounds or 40 pounds or

15  60 pounds --

16          THE COURT:  Hold on a second.  I didn't hear you,

17  Mr. McQuillen.  Please approach.

18          (Bench conference held.)

19          MR. MCQUILLEN:  This is all new.  This isn't part --

20          THE COURT:  This isn't part of the expert report.

21          MR. MCQUILLEN:  He's never talked about this reg,

22  never relied on it.

23          As a matter of fact, at Docket 520, he was excluded

24  from saying anything about that it's common for Alaska pilots

25  or Otter pilots to overload the aircraft.

1          He's now raising that inference it's okay.  That was

2     specifically excluded under 520 in our motion in limine

3     number 11.

4          MR. BRAUCHLE:  I think the motion in limine was

5     talking about like bush pilots and what bush pilots do.

6          THE COURT:  Let me look at the order really quickly if

7     you could stay here.

8          It does appear in the order at Docket 520 that

9     Judge Holland excluded testimony that would suggest that bush

10    pilots commonly I guess deviate from what is expected, and that

11    related to both I think weight, overloading vehicles or the

12    planes, but also to the flap position on takeoff.

13         So it does seem that this issue has been litigated,

14    and Judge Holland issued his ruling.

15         So based on the answer that Mr. Sommer has given so

16    far, it would seem that this would be impermissible given

17    Judge Holland's order, so I'm inclined to sustain the objection

18    and strike this portion of testimony.

19         MR. MCQUILLEN:  It's not responsive, but --

20         MR. BRAUCHLE:  He's not saying that it's okay to do it

21    or it isn't.  He's just saying that's the regulations which

22    allows for them to do it.  I don't know if that's really going

23    into the habit or saying that they do it all the time, or, Hey,

24    this is how Alaska pilots operate.  It's the -- I mean, that's

25    the law, whether they do it or not.

1          THE COURT:  But, I don't -- I mean, if the argument is

2    that this should come in under 406, I don't think that a

3    regulation would suffice to establish the requisite foundation

4    to establish hybrid testimony.

5          And the fact that it's Alaska specific, I think it

6    calls into question -- obviously we're not talking about the

7    airline pilots.  Any Alaska pilot, whether taking off from

8    Merrill Field or from Utqiagvik is commonly referred to as a

9    bush pilot in Alaska.

10         So the distinction I don't know matters here.

11         MR. BRAUCHLE:  But I think what -- but I think -- our

12   case is this, and I think what he's testified to is -- and I

13   think that's consistent, that the over weight and even using

14   the studies or the best number, then it doesn't effect.

15         And I think that's the question, it doesn't.  And what

16   I'm eliciting in the testimony is:  Being overweight doesn't

17   affect the performance of a crash, doesn't cause a crash.

18         And -- and in this case, even in the worst case

19   scenario, I believe that even the NTSB, it's like 37 pounds,

20   and so I asked him, Hey, look 40 pounds, 60 pounds, and he said

21   no, it doesn't affect the performance of the aircraft, and you

22   can legally load this plane up to an additional 2,500 pounds.

23         THE COURT:  Well, if I understand Mr. McQuillen's

24   objection, it wasn't as to the portion where Mr. Sommer

25   indicated that it was his opinion that an additional 30 pounds

1  or 60 pounds would not have been -- I apologize for the term --

2  fatal as far as this flight was concerned.

3       I think Mr. McQuillen's objection relates to the

4  testimony indicating that this is, for lack of a better

5  expression, common in Alaska for bush pilots or small plane

6  pilots.  Am I correct?

7       MR. MCQUILLEN:  You are 100 percent correct, plus it's

8  never been disclosed.  He never relied on this as a basis for

9  his testimony.  And moreover, even the stuff about it's safe to

10 fly 20, 40, 60, but where's the foundation for that?  Has he

11 done testing?  How does he know it's safe to fly over the

12 limits?

13      There is no foundation for any of this stuff.

14      THE COURT:  Well, but is this effectively a Rule 26 so

15 objection to that portion of the testimony separate from the

16 order at Docket 520?

17      MR. MCQUILLEN:  It is, yeah.

18      THE COURT:  I'm going to sustain the objection.  I'm

19 going to strike this portion of the testimony.  I'm going

20 permit you to go into this, but I'm going to require you to at

21 least go into a little bit foundation for is this just part and

22 parcel to this general knowledge as far as weight is concerned.

23      Obviously this will be fodder for cross-examination,

24 and I would to the extent that this wasn't contained in the

25 expert reports or the discovery, be caution in the breadth with

which you go down this line of questioning because I would
entertain a motion to strike it, if it wasn't part of the
expert disclosures.

I'll strike this portion.  I'm not going to allow you
to go back down the path of asking about regulations or
anything that explicitly or implicitly that goes down the path
that Alaska pilots typically overload their flights.

MR. MCQUILLEN:  Thank you.

(Bench conference end.)

THE COURT:  Ladies and gentlemen, I am going to --
excuse me -- sustain McQuillen's objection.  I'm also going to
strike that portion of the witness' testimony.

What that means is you have to disregard what you just
heard.  It is not part of the evidence that you will ultimately
consider during your deliberations.

Mr. Brauchle, you may proceed.

MR. BRAUCHLE:  Thank you, Your Honor.

BY MR. BRAUCHLE:

Q   Mr. Sommer, in your investigation, based on your
examination of the wreckage and the in flight path, did you
come up with a general determination as to the attitude of the
aircraft, as to how it hit the ground?

A   Yes.

Q   Okay.  And I want to show you some photographs from
Plaintiffs' Exhibit 22.  The last four numbers of the

1    Bates number is 1196.

2         While we're waiting for some of the photographs, what

3    was your -- based on your review of the evidence, can you just

4    kind of describe, and we'll get the photographs up here once we

5    get this computer issue worked out, but to try to keep this

6    moving along:  What -- what -- can you summarize for the jury

7    your opinion as to the angle at which the aircraft hit the

8    ground?

9    A    The aircraft rolled off to the right, and then it started

10   to descend, and as it descended, the right wing dropped, and

11   the nose dropped slightly, so when the aircraft impacted the

12   ground, it impacted on the right wing and the right side of the

13   horizontal stabilizer, which is on the tail, and it impacted

14   slightly nose low, so propeller side.

15   Q    Okay.  And can you see on the screen there Exhibit 22, last

16   number 1196?

17   A    Yes.

18   Q    And is that a photograph from the accident scene?

19   A    Yes, it is.

20   Q    Okay.

21        MR. BRAUCHLE:  At this time I would like to move into

22   evidence Plaintiffs' Exhibit 22, we'll call it 22A, and publish

23   to the jury.

24        MR. MCQUILLEN:  No objection.

25        THE COURT:  At this time Plaintiffs' Exhibit 22 Alpha

1    is admitted, and you may publish.

2              (Exhibit 22A received in evidence.)

3              MR. BRAUCHLE:  Okay.  And I just had one question for

4    Madam Clerk.  Is there a stylus where he could do a stylus and

5    write on the screen?

6              DEPUTY CLERK:  We have a laser pointer.

7              MR. BRAUCHLE:  Okay.  Was there anything where he does

8    it on the screen or do we have --

9              DEPUTY CLERK:  I would have to show him really quick.

10             THE COURT:  The question is whether or not the witness

11   can manipulate the photographs with the highlights and things

12   of that nature.

13             MR. BRAUCHLE:  Yeah, we noticed yesterday with the

14   laser pointer --

15             THE COURT:  I think given the amount of time it might

16   take to -- to walk through the witness through this technology,

17   my preference would be just to use a laser pointer to the

18   extent that that's satisfactory, and if's not, we can revisit

19   the issue.

20             MR. BRAUCHLE:  Do you have it?

21   BY MR. BRAUCHLE:

22   Q   And, Mr. Sommer, I want to have you, if you could, when you

23   describe what you're seeing in this photograph or what this

24   photograph tells you in your investigation, if you could use

25   your laser pointer to point out what you're looking at, so the

1  jurors could see it as well.  Thank you.

2  A    Sure.  So the aircraft is lying on its right-hand side.

3  The photograph is taken with photographer what looks like

4  leaning over to their left, so the grassy surface is the

5  terrain or the ground.  You can see the sky up here.

6       So in this photograph where the laser pointer is pointing

7  would be up, and then obviously this side would be down.

8       This is the propeller.  We can see one of the blades here,

9  one of them sting sticking up this way, and it is possible to

10 zoom in a little on the photograph?

11       What this is showing is that there's a grassy and dirt

12 debris that has been scooped up by the impact with the

13 aircraft.  Some of it actually is lying in the lip of the

14 engine intake, which is this gap right here is where the

15 airflow enters the cowling to go to the engine.

16       And we can see that there's a clump of dirt and grass

17 that has actually been scooped up into the engine inlet which

18 is indicative with my opinion that the aircraft impacted

19 slightly nose down.

20 BY MR. BRAUCHLE:

21 Q    Okay.  And what is the -- can you identify the part that

22 appears to be underneath the cowling, the -- the better

23 shaped -- it kind of looks like an L or maybe the cutoff?

24 That's it.

25 A    This portion here is a piece of cowling.  The cowling is

1    made up of linimentum in this area, and it wraps around the
2    bottom of the engine and the cell, and it has been torn off and
3    kind of peeled back a little bit because of the impact angle
4    with the ground.

5    Q    Okay.  And what about that -- that piece or that part of
6    the cowling gives you evidence of what the impact was, or the
7    impact angle?

8    A    If the aircraft had actually impacted flat on its side,
9    there wouldn't be any way for all this dirt to get in there.
10   So the aircraft inlet, as the air goes into the front of the
11   airplane, the airplane is impacting the terrain such that that
12   inlet is allowing for soil and grass to be brought in, and that
13   is, of course, the direct conduit to the engine inlet.

14        If the aircraft had just fallen over on its side with no
15   forward energy, then that wouldn't be possible.

16   Q    Okay.  Thank you.  Is there anything else about this
17   photograph that affected your opinions as the impact angle?

18   A    Yes.  If we zoom in a little more on this area right here
19   (indicating.)

20   Q    I think that is the extent of our capabilities.

21   A    But what this shows me is in this photograph, you can see
22   the first stage of the impeller engine.  There are a couple of
23   veins that are visible right here, and that is the engine, and
24   that is the first stage impeller that we talked about being the
25   best indication of power on the engine if the engine is

1  running.

2      Well, if there's all this dirt and debris that had been

3  scooped up by the engine inlet, this giant vacuum cleaner or

4  suction that is created by the engine would ingest all that if

5  it was running.  If it was providing power and suction, then

6  this debris and grass and dirt should be sucked into that

7  engine inlet.

8      And we should see damage to that impeller.  We should see

9  damage from the debris traveling through the impeller.  We

10  should see the impeller veins bent backwards, and we don't see

11  any of that.

12  Q   All right.  Anything else on this photograph or should I

13  move through to the next one?

14  A   I think we've covered it.

15  Q   Thank you very much.  Okay.  We can take this down.

16      And then next I would -- I'll have you take a look at

17  Plaintiffs' Exhibit 22, with the last four digits 1212.  And

18  are you able to see that photograph?

19  A   Yes.

20  Q   Okay.  At this time -- is that also a photograph of the

21  wreckage taken at the scene of the accident?

22  A   Yes, it is.

23          MR. BRAUCHLE:  Okay.  At this time plaintiff would

24  move into evidence Exhibit 22B and request to publish.

25          MR. MCQUILLEN:  No objection.

1          THE COURT:  At this time Plaintiffs' 22B is admitted

2    and you may publish.

3          (Exhibit 22B received in evidence.)

4    BY MR. BRAUCHLE:

5    Q   Can you identify what is in this photograph?

6    A   This is the front of the engine here.  This is what's

7    called the spinner, which covers the prop hub, and this is the

8    number 2 blade that we talked about yesterday.

9    Q   Okay.  And what about this photograph -- or what does what

10   you see in this photograph tell you about this accident?

11   A   Number 1, I think this is a very good example of what the

12   prop blades looked like on the engine.  So instead of being

13   bent forward as we would expect at a low speed impact under

14   high RPM, it's bent straight backwards, and that's just from

15   the energy of the aircraft impacting the terrain.

16      It's bending the propeller blades backwards.  They're made

17   out of aluminum.  They're strong, but they are malleable, and

18   they do bend significantly in crashes, and that's what we see

19   here is it's just bent back because the aircraft impacted the

20   ground in a nose low attitude.

21          What we also see is some evidence here that the

22   propeller likely struck some portion of the nose of the

23   aircraft, causing this gouge that we saw yesterday in the

24   photographs.  As we can see it's relatively adjacent to the

25   aircraft structure, to the engine mount, so it looks like there

1  was some damage to that propeller likely from contact with the
2  airframe as opposed to necessarily contact with the ground,
3  which as we talked about, the leading edge gouging being an
4  indication of power.
5       If the propeller blade hits the aircraft structure,
6  then that could explain why we do have that one gouge in that
7  one blade, and we really don't see that in the other blades.
8       The final thing that I would note is in this
9  photograph, we do have some burn damage, and we do have some
10 scoring that looks like it's on top of the burn damage.
11      So we talked about yesterday the possibility of some
12 of that scoring on top of the burning being from moving the
13 blades around after the accident, which could happen, but at
14 least in this case, there's some evidence that there was some
15 superficial scratches on the -- on the face of the propeller,
16 and then they are just in the paint.
17      So I think what we're seeing here is the fire is
18 burning the paint, and then the superficial scratches that just
19 took a little bit of the paint off are showing the aluminum
20 underneath as opposed to scratches on top of the burn.
21      So just for a little clarification, I think that's
22 what we're seeing in this photo.
23 BY MR. BRAUCHLE:
24 Q   Okay.  Is there anything else about this photo that you
25 need to discuss in regards to your investigation or

1   conclusions, or should I move onto the next?

2   A    No, sir.

3   Q    Okay.  I'm going to show you another exhibit, Plaintiffs'

4   Exhibit 22, last four numbers are 1234.

5       And I just want to -- this photograph, is that anything

6   that you relied or had anything as far as your investigation?

7   If not, I can move on to the next.  It's just what I had on my

8   list.

9   A    I think we already covered STOL kit --

10  Q    Okay.

11  A    -- which that shows the end of the wing, but I think we

12  already covered it.

13  Q    Thank you.

14      I will then move on to Plaintiffs' Exhibit 22, last four

15  numbers 1237.  Do you see that photograph on your screen?

16  A    Yes.

17  Q    And again is that a photograph of the accident aircraft at

18  the accident scene?

19  A    Yes.

20          MR. BRAUCHLE:  At this time I would like to move in as

21  Plaintiffs' Exhibit 22 C, photograph, last four digits 1237,

22  and also permission to publish to the jury.

23          THE COURT:  Mr. Brauchle, just for the record's sake,

24  the last image that you showed the witness, we are going to

25  refer to as 22 Charlie.  I would like to refer to this as

1  22 Delta.

2           MR. BRAUCHLE:  Fair enough.

3           THE COURT:  So at this time, Mr. McQuillen, any

4  objections to 22D?

5           MR. MCQUILLEN:  No, Your Honor.

6           THE COURT:  At this time Plaintiffs' Exhibit 22D is

7  admitted, and you may publish.

8           (Exhibit 22D received in evidence.)

9  BY MR. BRAUCHLE:

10 Q   Mr. Sommer, can you describe what we're all looking at

11 here?

12 A   This is the propeller attached to the engine flange that we

13 talked about yesterday.  We have the four blades:  One, two,

14 three, and four, and then they all connect to the hub, which is

15 here in the middle, and the spinner, the silver cone that goes

16 over the front of this, has been removed at this time.

17      And what we see is significant amounts of grass and dirt

18 all clogged up and stuck into the front of the aircraft.  The

19 engine inlet is down on the bottom, so we are looking at the

20 top of the engine over here.

21      And again from an accident investigation perspective,

22 that's indicative that the aircraft was, in fact, in a nose low

23 attitude at the time that it impacted the terrain.

24 Q   Okay.  Is there -- and so just for a perspective, I think

25 in some of the other photographs, in front of the propeller we

saw that big, I guess for better sake of a word, silver dome.

Is -- has that been removed in this photograph?

A    Yes.

Q    Okay.  And just so I understand it, that -- that's the base of the propeller that's closest to the engine inlet?

A    Correct.

Q    Okay.  Is there anything else about this photograph that you need to discuss or explain as far as your investigation?

A    Yes.  We just looked at the number 2 blade which was here. Here we can see the other blades.  This one is bent aft.  This one is bent aft, very similar to what we see in the number 2 blade, and they'll all pretty consistent.

There was the one blade that had a little bit of S-bending to it, and we talked about that yesterday, and my opinion is that the reason why there's only one blade that is S-bent is because that was the blade that hit first.

And then there just wasn't any inertia in the propeller system to cause that spinning in the other three blades, and they just bent backwards because of the forward motion and the nose down impact of the aircraft with the terrain, inconsistent with engine power.

Q    Okay.  Anything else about this photograph, or can we take it down?

A    No, sir.

Q    Okay.  All right.  I'm going to show you one last

1   photograph, Plaintiffs' Exhibit 22, last four numbers 1247.

2   Okay.  Do you see that photograph?

3   A    Yes.

4   Q    Again, is that -- can you confirm that's a photograph of

5   the accident aircraft after the accident?

6   A    Yes, it is.

7          MR. BRAUCHLE:  At this time I would like to move into

8   evidence Plaintiffs' Exhibit 22 E, as in echo, last four digits

9   1247, and request to publish.

10          MR. MCQUILLEN:  No objection.

11          THE COURT:  At this time Plaintiffs' Exhibit 22E is

12   admitted, and you may publish.

13          (Exhibit 22E received in evidence.)

14   BY MR. BRAUCHLE:

15   Q    Okay.  And, Mr. Sommer, can you tell us what we're all

16   looking at here?

17   A    Sure.  This is the propeller flange, so this is on the end

18   of the shaft that comes out the engine.  The propeller bolts to

19   this flange with numerous bolts that are around the circular

20   portion of the flange, and then the bolts go through the

21   propeller and then through this flange, and then they have a

22   nut on the other side that holds the propeller.

23      What this shows is that this flange is bent, and it's bent

24   backwards on the right-hand side.  And that tells us basically

25   two things.  One, that there was a bending load on the

1   propeller which bent the flange to the right, which is

2   consistent with the right wing low attitude that the aircraft

3   impacted terrain.

4       The other thing that it tells us is that because this is

5   bent backwards that the aircraft impacted nose low.  Because in

6   order for the propeller to bend, you have to hit on the

7   propeller.  If you were just to fall off to the side and hit

8   the right wing, where the propeller just hits the ground in a

9   totally lateral manner, you wouldn't bend the flange back.

10      So the flange is consistent with the debris in the inlet

11  which is consistent with the grass and the dirt that's clogged

12  up in the nose.  They are all indication that the aircraft

13  impacted right wing low and nose low.

14  Q   Okay.  Thank you.

15      Is there anything else about the damage that was to the

16  flange, or are we done with this photograph?

17  A   No, sir.

18  Q   Okay.  Thank you.

19          MR. BRAUCHLE:  And now I would like to pull up -- and

20  I believe that it's Demonstrative 105 which was the diagram of

21  the engine.

22          Did I get the numbers right?  Or is it 104?

23  BY MR. BRAUCHLE:

24  Q   This is -- is this the diagram we showed yesterday of the

25  aircraft engine?

```
 1  A    Yes.

 2           MR. BRAUCHLE:  Okay.  At this time I'd like to just

 3  publish to the jury.

 4           THE COURT:  I believe it is.

 5           MR. BRAUCHLE:  Okay.  It is.  It's on screen.  Sorry,

 6  Your Honor.

 7           THE COURT:  That's okay.

 8           MR. BRAUCHLE:  Slowly, but surely, I will get on

 9  Alaska time, I promise.

10  BY MR. BRAUCHLE:

11  Q    Okay.  I believe that there's going to be some evidence

12  presented in this case that -- I understand your testimony that

13  the aircraft was kind of in a nose-low attitude.  I believe

14  there's going to be some testimony that this aircraft may have

15  landed on its side, and which may be a reason why some would

16  say we don't see a lot of damage inside the aircraft.

17       If this aircraft had landed on its side in less of a

18  nose-low attitude, as an accident investigator that's

19  investigated over, I think you said, 5- or 600 accidents, what

20  would you expect to see as far as damage to a turbine engine?

21  A    If the impact forces are acting in this direction

22  (indicating), as opposed to this direction (indicating), this

23  big heavy shaft with all these rotating components on it, is

24  going to be forced to the side of the case.

25       So just centrifugal force, if you were to take a water
```

bottle and drop it on the ground, then all that water is going
to hit the side of the water bottle as it hits the ground.

Well, the same thing would happen here.  This rotating
section of all of these very heavy parts would impact the side
of the case.  So we would see damage to the edges of the blades
and the impellers, first stage and second stage, and we would
see damages to the edges of the blades of each of the turbine
section if the engine was running.

And if the engine wasn't producing any power then we
wouldn't see much damage because it's not containing any
rotational energy.

So if the engine is running and it impacts in a more
forward direction, then we see damage from the rubbing between
the different components as they are -- as they continue
forward due to the -- due to the forces acted on them during
impact.  But if it happened on the side, you would still see
evidence of it, it would just be in a different location.

So the power signatures would still be there.  You would
just see the power signatures on the blade tips as opposed to
the power signatures, say, on the leading edges of the impeller
blades.

Q   Thank you.

Are you through with this photograph?

A   Yes.

Q   Thank you.

1    In your investigation, were you able to determine the flap

2  setting of this aircraft during the accident sequence?

3  A    Yes.

4  Q    Okay.  And just real quickly, as a primer, what are the

5  flaps?

6  A    The flaps are control surfaces on the back sides of the

7  wings.  And if you've flown on pretty much any airplane,

8  commercial or private, sometimes before takeoff you will see

9  those surfaces extend back and down, if you're looking out the

10  window, and almost always on landing you will see those same

11  surfaces.  So you have the fuselage in the center.  Each of the

12  wings on the back side inboard on those wings is what's called

13  flaps.

14    And those flaps are used to basically increase the amount

15  of lift that the wing generates, but they also increase a lot

16  of drag.  So you don't want to fly with them up at altitude in

17  cruise, but they are very helpful to generate lift at takeoff

18  and at landing.

19  Q    Okay.  And in your investigation of this accident, were you

20  able to make any type of determination or opinion as to what

21  the flap setting was when this aircraft took off?

22  A    It had full flaps when it took off.

23  Q    Okay.  And in and of itself, is that prohibited or -- for

24  flying this aircraft?

25  A    No.

1  Q   Okay.  And what is the basis of your opinion of that?

2  A   The pilot operating handbook or flight manual recommends

3  for normal takeoff the use of what is called "takeoff flaps."

4  So there are three notches of flaps, there's flaps up, which is

5  zero, there's takeoff/approach, and then there's flaps down.

6     It is normal to take off with one notch of flaps, but it is

7  also common practice in these types of airplanes to take off

8  with full flaps.  It depends on what type of terrain --

9           MR. BRAUCHLE:  One moment.

10          THE COURT:  Mr. McQuillen, is there an objection?

11          MR. MCQUILLEN:  Foundation.

12          THE COURT REPORTER:  I didn't get it.

13          THE COURT:  I'm sorry.  The objection is foundation,

14  Madam Court Reporter.

15          I will sustain the objection and ask Mr. Brauchle to

16  label a foundation for the basis of this opinion.

17          MR. BRAUCHLE:  Okay.

18  BY MR. BRAUCHLE:

19  Q   So we are talking about flap settings.  As part of your

20  investigation, I think you said that - did you review the

21  aircraft flight manual for this aircraft?

22  A   Yes.

23  Q   Okay.  And as a part of your investigation, do

24  investigators -- is that critical that you review the flight

25  manual?

```
 1   A    Yes.
 2   Q    Okay.  And in that flight manual, does it discuss the flaps
 3   and flap settings?
 4   A    Yes.
 5   Q    For different portions of flight?
 6   A    Correct.
 7   Q    Okay.  And did you review those flap settings in that
 8   manual?
 9   A    Yes.
10   Q    Okay.  And what is the -- I think you said, is it the
11   recommended flap setting for takeoff?
12   A    Correct.
13   Q    Okay.  And is there any prohibition of taking off with the
14   flap -- in the manual is there any prohibition of taking off in
15   the flaps in any position other than the takeoff position?
16   A    There is not.
17   Q    Okay.
18           MR. BRAUCHLE:  All right.  Let's next put up
19   Plaintiffs' Exhibit 15.
20   BY MR. BRAUCHLE:
21   Q    Okay.  This was the photograph you showed yesterday a
22   little bit of your flight path reconstruction.
23           MR. BRAUCHLE:  Are we able to zoom in on that just a
24   little bit?
25           Okay.  And -- move it to the left a little bit more,
```

1   towards Ann.

2          Perfect.  Thank you.

3   BY MR. BRAUCHLE:

4   Q   You made a couple of annotations on there.  Metallic sound,

5   50.5 seconds, and then it says "slowdown."

6      Can you -- what was that annotation -- why did you make

7   that annotation?

8   A   The metallic sound is heard on the audio from the video as

9   kind of a screeching noise.  So it was important to me to

10  understand exactly where that occurred in the flight sequence

11  so that I could match that up:  Did that make sense with, say,

12  where the puff of black smoke was seen?  Did that make sense

13  with where the aircraft started to slow down and where the

14  aircraft started to pitch up?

15     And if you match up all those parameters where the

16  indication of the black smoke occurred, where the slowdown of

17  air speed starts in the aircraft and also where the pitch-up of

18  the aircraft starts, it all starts at that same point where we

19  hear that screeching noise.

20     Now, the speed was something that I couldn't just look out

21  the window of the video and say, hey, the aircraft is slowing

22  down.  So it was done taking the individual points that were

23  established through the observation of the video and then

24  calculating the time in between those points, based on the

25  video time, and then determining the speed.

1    So yesterday we talked about the aircraft slowing down.  It
2  wasn't my opinion of looking out the window to say, ah, the
3  aircraft is slowing down here, it was actually calculations
4  that were done from a point-to-point basis based upon the time
5  that was recorded by the iPhone video.
6  Q    And then your next annotation says "Engine variations,
7  52.3 seconds."  Is that something you can hear?  So if I
8  understand the timeline, there's a metallic sound at
9  50.5 seconds and the aircraft slows down and then you have
10  engine variations.
11    What -- can you explain what that means?
12  A    The variations that I hear in the video, and I think that
13  they are recognized by others in this investigation as well,
14  indicate that there are fluctuations in the noise that the
15  engine is making.  So the engine noise kind of slows down a
16  little bit and then speeds up right after the fact.
17    Both of those are consistent with my analysis of the
18  evidence showing the torsion shaft being failed and the fact
19  that when the torsion shaft fails, you're basically unloading
20  the engine.  It's kind of like you're putting your car into
21  neutral when you have the accelerator down.  All of a sudden,
22  your engine wants to rev up.
23    That is what I believe is being heard in the video at that
24  point.  You can hear the engine rev up as the torsion shaft
25  shears.  It's the same thing as if were you to press down the

1    accelerator while you're driving and then push your car into

2    neutral, your tachometer goes through the roof because there is

3    no load on the engine.

4        The same thing is happening when the torsion shaft shears.

5    Q   Okay.  And after the impact, I think you previously

6    testified that you heard -- you previously testified that you

7    had heard a component.  Tell us what your -- what you analyzed

8    video after the impact.

9    A   In watching the video, I listened to it in detail numerous

10   times, trying to understand what pieces of the airplane might

11   be making what sort of noises.  And after the impact, the only

12   sound that I heard was an electric boost pump, which is making

13   kind of a clicking noise.  And it's electric so it just runs

14   off the electrical system for the aircraft, and it doesn't have

15   anything to do with the engine operation.

16       So I can hear that in the video, but that is because the

17   electrical system is powering it, the battery.  It doesn't have

18   anything to do with the rotation or operation of the engine.

19   Q   Okay.

20       MR. BRAUCHLE:  The next exhibit I want to show you is

21   actually Defense Number 2.

22       That's not it, unfortunately.  You can take it down.

23   BY MR. BRAUCHLE:

24   Q   All right.  You indicated a few minutes ago that you had

25   read the aircraft flight manual for this aircraft?

```
 1   A    Yes.

 2   Q    Okay.  And in the flight manual, does it discuss trim

 3   settings?

 4   A    It does.  I think that was just up on my screen for a

 5   moment.

 6   Q    All right.

 7            MR. BRAUCHLE:  Well, let's do this.  Can we put that

 8   up again and we'll call it -- since that's not the full

 9   exhibit, we will just call it a demonstrative.

10            DEPUTY CLERK:  I'm sorry, what exhibit is this,

11   Your Honor?

12            THE COURT:  I don't know that it has a number.

13            MR. BRAUCHLE:  I'm looking for the -- I want to make

14   sure I get you the right sequence.

15            I think we are up to 108?

16            DEPUTY CLERK:  Yes.

17            MR. BRAUCHLE:  Your Honor, I want to mark this as an

18   exhibit, Demonstrative 108.

19            DEPUTY CLERK:  109, I'm sorry.

20            MR. BRAUCHLE:  109?  Sorry.

21            And would request --

22   BY MR. BRAUCHLE:

23   Q    Well, let me ask you this, before I do that.  Can you see

24   that on your screen?

25   A    Yes.
```

1  Q   Is that a page out of the aircraft flight manual for this
2  aircraft that was involved in the crash?
3  A   Yes.
4          MR. BRAUCHLE:  At this point, I would like to publish.
5          MR. MCQUILLEN:  No objection.
6          THE COURT:  At this time you may publish Plaintiffs'
7  Demonstrative Exhibit 109.
8  BY MR. BRAUCHLE:
9  Q   Okay.  And we talked a little bit yesterday about trim, do
10 you remember?  And we showed that photograph and it had, like,
11 a takeoff position with the red arrow?
12 A   Yes.
13 Q   Okay.  And does the flight manual indicate -- well, let me
14 ask you this.
15     Yesterday, in that photograph, it showed an indentation or
16 a mark for takeoff, correct?
17 A   Correct.
18 Q   All right.  And in the flight manual, is the pilot allowed
19 to take off in any position other than takeoff?
20 A   Of course.
21 Q   Okay.  And looking at this page from the -- from the flight
22 manual, does this -- does this part of the flight manual
23 explain that?
24 A   Yes.  If we zoom in a little on 5.2.2, it says "Takeoff
25 characteristics."  And it says that "The aircraft should be

1  trimmed appropriate to its CG," or center of gravity,
2  "positions in order to retain moderate stick forces."
3      So this is telling you that you should trim the aircraft
4  appropriate to the CG, and it is also verification that there
5  is no requirement in the manual that you have to set it to the
6  little takeoff arrow on the indicator.
7  Q   And I believe your testimony yesterday was that the trim
8  was set to 1.5 -- I won't say degrees, but units, nose down; is
9  that correct?
10 A   No.  It was set to .5 units nose up, but that is 1.5 units
11 below takeoff.
12 Q   Okay.  And is that something you would expect to see a
13 prudent pilot do with an aft center of gravity?
14 A   Absolutely.
15 Q   Okay.  Thank you.
16      MR. BRAUCHLE:  Could we pull up exhibit -- the next
17 exhibit we're going to look at is Plaintiffs' Exhibit 57.
18 BY MR. BRAUCHLE:
19 Q   And, Mr. Sommer, do you see the photograph in front of you?
20 A   Yes.
21 Q   And do you recognize this as a part from the accident
22 aircraft?
23 A   Yes.  That is the main shaft and the torsion shaft out of
24 the accident engine.
25      MR. BRAUCHLE:  Okay.  At this time plaintiff would

1  move into evidence Plaintiffs' Exhibit 57 and request to
2  publish.
3           MR. MCQUILLEN:  No objection.
4           THE COURT:  At this time Plaintiffs' Exhibit 57 is
5  admitted, and you may publish.
6           (Exhibit 57 received in evidence.)
7  BY MR. BRAUCHLE:
8  Q   Mr. Sommer, can you describe to the jury what we are seeing
9  in this photograph?
10 A   This is what's called the main shaft.  And all of those
11 rotating components, or wheels, the impellers, the turbine
12 wheels, they all stack up on top of this.  So this is basically
13 the axle that all of those parts sit on.
14     This is called the torsion shaft.  And the torsion shaft
15 rides inside of the main shaft, and what it does is it connects
16 the main shaft to the gearbox, or the transmission, which then
17 drives the propeller.
18 Q   Okay.  And what is -- do we see -- in this photograph, does
19 it show where the shaft separated or failed?
20 A   Yes.  And that is right here (indicating).
21 Q   Okay.  And just so for clarification, what I'm calling that
22 separate smaller piece, and I'm just going to describe it as
23 black, just because it's darker than the rest, that would be
24 attached to the end of that -- of the torsion shaft there?
25 A   Correct.

1   Q    Okay.  And the side of the picture that's closest to

2   His Honor, that's the front or the back?

3   A    This is the front of both the main shaft and the torsion

4   shaft, and this is the rear of both the main shaft and the

5   torsion shaft.

6   Q    Okay.  And I've heard people refer to, when they talk about

7   this shaft, is forward and aft.  Is aft and back the same

8   thing?

9   A    Correct.

10  Q    Okay.  And let's look at the torsion shaft for a second.

11  The -- we'll start at the front.  There looks like there's a

12  black -- to me it looks like a piece of, like, black electrical

13  tape -- I know that's not what it is, but I'm just describing

14  it.  What is that?

15  A    This is the forward bushing.  And a bushing is basically a

16  solid piece bearing.  It functions the same way.  It's a

17  support item that allows relative movement between two

18  surfaces.

19      So it functions as a bearing, but it's calling a bushing

20  instead of a bearing as it doesn't actually have any rollers or

21  balls.  It's just a solid piece that goes around the shaft in

22  order to center it inside the main shaft so that it can't

23  wobble around.

24  Q    Okay.

25          MR. BRAUCHLE:  And could you just zoom in a little bit

1  on the torsion shaft?

2       Perfect.

3  BY MR. BRAUCHLE:

4  Q   And the bushing you described, is there a special place on

5  that shaft where they're supposed to be placed, or could I --

6  where would they go?

7  A   So there's normally two of them, and they reside in these

8  little grooves.  They are also called lands, which is a little

9  bit of an alternate name for that.  But these grooves, these

10 little bushings, have a slice in them so that they can open up

11 a little bit and you can slide them over, and then they fit

12 inside these little grooves.

13      There's one here called the aft land, or the aft groove for

14 the bushing, and then there's the forward land or forward

15 groove for the forward bushing.

16 Q   Okay.  And in this photograph we don't -- we only see one

17 bushing, we don't see a second bushing in your investigation.

18 Have you ever seen the aft bushing?

19 A   In this accident?

20 Q   Yes.

21 A   No, I've never seen it.

22 Q   Okay.  And was it ever found?

23 A   According to the Honeywell engine teardown information,

24 they indicated that when they took the engine apart, the

25 bushing was gone.

1    Now, there is evidence that at least at some time some

2 portion of the bushing was there due to the damage, but they

3 indicated that they never found it when they took it apart.

4 Q   Okay.

5        MR. BRAUCHLE:  And can we go to plaintiffs -- we'll

6 take this down.

7        And what we're going to pull up next and look at is

8 Plaintiffs' Exhibit 58.  Okay.

9 BY MR. BRAUCHLE:

10 Q   Do you see Plaintiffs' Exhibit 58?

11 A   Yes.

12 Q   Okay.  And is that a picture of the torsion shaft from

13 our -- from this crash?

14 A   Yes.

15 Q   Okay.

16        MR. BRAUCHLE:  At this point, I'd like to admit

17 Plaintiffs' Exhibit 58 and publish.

18        MR. MCQUILLEN:  No objection, Your Honor.

19        THE COURT:  At this time Plaintiffs' Exhibit 58 is

20 admitted, and you may publish.

21        (Exhibit 58 received in evidence.)

22 BY MR. BRAUCHLE:

23 Q   And I just want to -- I just want to make something clear,

24 and I'm not -- I just want to make sure.  Is it your opinion

25 that during the accident flight that there was -- was or was

1 not a bushing on the aft land?

2 A    I believe that there had to have been some form of bushing

3 there, based upon the extensively rotational scoring and damage

4 that we see to the aft groove or the aft land that is very

5 dissimilar to what we see from the forward polished somewhat

6 smooth surface which is normal for the bushing groove or land.

7 Q    Okay.  And based on your examination of the torsion shaft,

8 and the damage that you just pointed out, did you -- does that

9 form the basis of your opinion -- your ultimate opinion in this

10 case -- that the engine failed in flight?

11 A    It does.

12 Q    Can you explain that to us, please?

13 A    The only way that this damage can happen -- the torsion

14 shaft and the main shaft move together.  They shouldn't ever be

15 spinning independently of each other.  There's a little bit of

16 a twist inside between the two shafts, about 7 or 8 degrees.

17 So when the main shaft turns, the torsion shaft turns.

18     The only way this can happen, and I think this is agreed

19 upon pretty much by everyone, is that it can only happen after

20 the torsion shaft breaks.  It cannot happen while the torsion

21 shaft is still intact because you have to now be spinning the

22 torsion shaft relative to the main shaft.

23     So for that to happen, you've got to break the torsion

24 shaft.  That's the only way it can occur.

25     And my opinion is that this extensive damage is consistent

```
 1   with the engine rotating, i.e., the main shaft rotating, at a
 2   dissimilar rate to the torsion shaft after it breaks while it's
 3   in flight.  Because if the airplane crashes, and the engine is
 4   not running, well, then, it can't turn and make all this
 5   damage.
 6       So my opinion is that the torsion shaft failed in flight
 7   and that this damage is indicative of that failure in flight
 8   because the propeller continues to rotate after the torsion
 9   shaft breaks.
10   Q    Thank you.
11           MR. BRAUCHLE:  And we can take this photo down.
12           And, Your Honor, if counsel and I could approach real
13   briefly.
14           THE COURT:  Sure.
15           (Bench conference held.)
16           MR. BRAUCHLE:  I'm going to wrap it up now and just do
17   his summary of opinions.  But I know that one of the things
18   he's going to talk about is this weight issue.  And based on
19   the Court's ruling, I don't want to run afoul of that.  So I
20   don't know if -- and I know this may be a little early for the
21   morning break, but at least I could caution the witness of the
22   Court's ruling so he doesn't go into it.  I just --
23           THE COURT:  Sure.  Let's go into recess now and you
24   can finish up when we return.
25           MR. BRAUCHLE:  And I'll only be about 15 minutes.
```

1          THE COURT:  Okay.  Thank you.

2          (Bench conference end.)

3          THE COURT:  Ladies and gentlemen, I think this will be

4     a good time for the morning recess.  I will have Madam Clerk

5     take you back, and we will try to meet back in here in about

6     15 minutes.

7          Thank you for your attention, and thank you, Madam

8     Clerk.

9        (Out of the presence and hearing of the jury panel.)

10          THE COURT:  Please be seated.

11          And so, Mr. Brauchle, I know you wanted an opportunity

12    to talk to your witness about how you'll wrap things up.  There

13    were just three quick points I just wanted to make.  These are

14    more housekeeping than anything else.

15          One is sort of in the vain of what had occurred, just

16    so the parties know, I tend to try to take the morning recess

17    between 10:30, 10:40, the afternoon recess around 2:45, and

18    lunch at noon.

19          Just so you are preparing -- I know sometimes I would

20    like to build to crescendo and be frustrated if I got

21    interrupted halfway through.  So just so the parties are aware

22    that's when I tend to look for -- especially with the breaks,

23    they are malleable, but just so the parties are aware.

24          And this hasn't been an issue yet, but it tends to

25    start becoming an issue on cross-examinations, just ensuring

1    that only one person is speaking at a time, so allowing the
2    witness to complete their answer before you begin your next
3    question.  From the court reporter's standpoint and from my
4    standpoint, it's preferable.

5         And then also for objections, I would just ask that
6    you be a little bit more tenacious with them, if for no other
7    reason than it puts the witness on notice that there is an
8    objection, they will refrain from continuing speaking, and I
9    fear that I may miss the objection if I don't hear it.  So
10   don't hesitant to -- even if you want to have a sidebar.

11        You don't need to be angry about it, but I apologize,
12   Mr. McQuillen, I don't think I heard your objections at first.

13        MR. MCQUILLEN:  I get it.

14        THE COURT:  Is anything you need from the Court?

15        MR. BRAUCHLE:  Nothing.

16        THE COURT:  Very well, so I will come back on the
17   bench right around a quarter till.

18        DEPUTY CLERK:  All rise.  The Court stands in recess
19   for 15 minutes.

20      (Proceedings in recess from 10:32 a.m. until 10:46 a.m.)

21        (Out of the presence and hearing of the jury panel.)

22        DEPUTY CLERK:  All rise.  His Honor, the Court, the
23   United States District Court is again in session.

24        THE COURT:  Please be seated.  Are we ready to
25   proceed?

```
 1          MR. BRAUCHLE:  The plaintiffs are ready, Your Honor.
 2          THE COURT:  Then let's go ahead and bring the jury in.
 3          (In the presence and hearing of the jury panel.)
 4          THE COURT:  Please be seated.  Thank you, Madam Clerk.
 5          Mr.  Brauchle, you may continue.
 6          MR. BRAUCHLE:  Thank you, Your Honor.
 7  BY MR. BRAUCHLE:
 8  Q    Mr. Sommer, we have heard a lot of testimony this afternoon
 9  and this morning.  So I would just like you to summarize --
10  have you summarize your opinions that you formed in your case
11  from this investigation that you conducted in regard to this
12  accident.  What is your ultimate opinion as to the cause of
13  this crash?
14  A    The subject accident occurred due to the in-flight failure
15  of the torsion shaft of the TPE331 Honeywell engine, following
16  the departure from the runway, disconnecting the propeller from
17  the engine, resulting in an engine failure.
18  Q    Okay.  And is that opinion to a reasonable degree of
19  certainty?
20  A    Yes, sir.
21  Q    Okay.  And is that opinion based on your education and
22  experience?
23  A    Background, experience, education and training.
24  Q    Okay.  Fair enough.  If you can -- because again there's
25  been a lot of testimony over the last two days, if you can just
```

1  give an executive summary as the basis for your opinion.

2  A    As I mentioned, I had to consider all possible factors in

3  this accident that could be contributory.  I concluded that the

4  weight of the aircraft was not contributory or causal to the

5  accident, that this aircraft could take off 20, 30, 40 or more

6  pounds over gross weight without any issue whatsoever.

7      I concluded that the center of gravity being in an aft

8  location alone wouldn't have caused this crash.  The aircraft

9  flew in the exact same configuration as far as all the

10 modifications were concerned for three years, by the same

11 operator, out of the same places, with the same types of

12 operating parameters and 300 hours.  And my conclusion is that

13 if this accident was due to the center of gravity alone, it

14 would have happened a long time ago.

15     Its CG limits are only an issue when the aircraft gets near

16 stall, which it would never normally be unless there was an

17 engine failure.

18     I concluded that the trim settings did not have any causal

19 factor in this accident.  The flight manual specifically tells

20 you to trim it for the aircraft loading for the center of

21 gravity, and that appears to be what the pilot did.  The

22 aircraft was still in the a nose up trim.

23     It just was 1.5 units below the recommended takeoff

24 setting, which is consistent with what the flight manual tells

25 you to do in the instance that you have an aftly-loaded

1  airplane.

2      I concluded that the flaps did not cause this accident.

3  Every aircraft climbs with full flaps every time you do a go

4  around.  If you are landing on a runway and you see a deer, you

5  apply full power, and every flight manual tells you to climb

6  the airplane first and then bring your flaps up.  Climbing with

7  full flaps should not have caused and in my opinion did not

8  cause this accident.

9      It is my opinion that this accident is caused by the

10  failure of the torsion shaft in the subject engine after

11  departure from the runway.  This is evidenced by the puff of

12  black smoke that is seen by Mr. Isham.  This is evidenced by

13  the metallic screeching sound that we hear on the audio or the

14  video at exactly the same time that the aircraft starts to slow

15  down, at exactly the same time that the aircraft starts to

16  pitch up and in the same location that the puff of black smoke

17  is referenced.

18      It is also evidenced by we don't see any signs of power on

19  the engine.  None of the grass and debris got sucked in.  We

20  don't have damage to the first stage impeller from all that

21  dirt and grass and rocks going through the engine because it

22  didn't, because the engine wasn't producing any power.

23      We don't see evidence on the impellers or evidence on the

24  impeller shrouds, evidence on the turbine wheels and on the

25  rings for the -- for the turbine wheels.  We don't see that

 1   this engine was turning at almost 42,000 RPM and putting out

 2   full power when the airplane hit the ground.

 3       We don't see evidence of metal spray, and I think you'll

 4   hear that even the Honeywell investigators didn't find that,

 5   and I concluded the same thing that they concluded, that there

 6   wasn't foreign object, debris that went in.  There wasn't metal

 7   spray found in any significance in the engine indicative of

 8   power.

 9       We see that the bushing failed and that the aft bushing in

10   the torsion shaft caused dramatic rotational damage and

11   signatures that can only happen after the torsion shaft fails.

12   It can't happen when the torsion shaft is still in one piece,

13   so it has to have time for that to occur.

14       It is my opinion that the engine surging is consistent with

15   the failure of the torsion shaft, which is consistent with all

16   the other items, the black smoke, the metallic sound, the

17   slowdown, the stall, the lack of power, the lack of fire

18   damage, the lack of metal spray, and we ruled everything else

19   out.

20       I looked at the airframe.  I looked at the flight controls.

21   I looked at the weather.  I looked at the different components

22   of the engine, the fuel control, the fuel pump, the governor,

23   the feather valve, took all those apart to make sure that there

24   wasn't some other possible explanation as to why this accident

25   happened.

```
 1        And in my opinion and in summary.  The only possible
 2   conclusion as to why this airplane crashed is the failure of
 3   the engine in flight due to the failure of the torsion shaft
 4   and.
 5   Q    And your opinion as to the cause of the crash, of the
 6   in-flight failure of the torsion shaft, you believe that you
 7   are more likely right than wrong in that opinion?
 8   A    Substantially more.
 9   Q    Okay.  And then let's see.  I think yesterday you testified
10   that you're a pilot, correct?
11   A    Yes.
12   Q    And I think you said that you traveled as a passenger in
13   aircraft?
14   A    Many times.
15   Q    Okay.  And what is -- as a passenger and a pilot, what is
16   your expectation as to engine -- aircraft engine operation on
17   takeoff?
18   A    The engine is supposed to produce rated power and operate
19   normally, and it is not supposed to fail as the aircraft is
20   departing.
21   Q    Thank you, Mr. Sommer.  I appreciate your time.  I'm sure
22   Mr. McQuillen has some questions for you.
23            DEPUTY CLERK:  Thank you, Mr. Brauchle.
24            Mr. McQuillen?
25            MR. MCQUILLEN:  One or two, yep.
```

1          May I have one moment, Your Honor?

2          THE COURT:  Sure.

3                         CROSS-EXAMINATION

4    BY MR. MCQUILLEN:

5    Q    Good morning, Mr. Sommer.

6    A    Good morning, sir.

7    Q    I have a few questions for you today.  The -- let me take

8    you back in time to early yesterday to discuss some of your

9    background.

10        I believe you mentioned that you graduated from the

11   University of Michigan or so, I think you said 1997-ish; is

12   that correct?

13   A    Yes.

14   Q    Okay.  And your degree I believe was in civil and

15   environmental engineering, true?

16   A    Correct, civil, structural and environmental engineering.

17   Q    And that includes construction, buildings, waste water,

18   water and pollution, correct?

19   A     In part that is covered, yes.

20   Q    But you didn't take any courses in propulsion engineering,

21   true?

22   A    Thermodynamics, which is the basis for that, yes, I did not

23   take a class with that name.

24   Q    Okay.  Now, when you graduated from Michigan, out of school

25   I believe you ended up going to work for Deloitte Consulting;

```
1   is that true?
2   A   That was the second job that I had out of college, correct.
3   Q   Okay.  And you also went to work for Pricewaterhouse, true?
4   A   I think it was PricewaterhouseCoopers, but yes.
5   Q   And you worked there for I think five or six years?
6   A   Total between the two was around five years.
7   Q   And it was not in the aviation department, correct?
8   A   I worked in management consulting and software engineering,
9   that is correct.
10  Q   Right.  So eventually I think you said you changed course,
11  and then in 2002 or so, you went to your father's business I
12  think you said, which is called Aeroscope; is that true?
13  A   Correct.
14  Q   And in 2002, I believe you also said that you at some point
15  took the NTSB accident investigation course, correct?
16  A   Yes.
17  Q   Was that approximately in 2002 after you went to work with
18  your father?
19  A   I think it was in 2004.
20  Q   Okay.  The point is that you took that class after you
21  joined with your father -- to take the NTSB course, correct?
22  A   Yes.
23  Q   And that NTSB course is open to anybody, true?
24  A   Not to my knowledge.
25  Q   Okay.  How long is the course?
```

```
 1  A   I believe it's about 14 days.
 2  Q   Okay.  So you took the course, and then you said you
 3  started doing some accident investigations; is that correct?
 4  A   I had been working in accident investigation for about a
 5  year and a half, so I had already been doing that type of work,
 6  but I did continue doing that type of work.
 7  Q   Okay.  And I think you mentioned that you have done several
 8  hundred investigations, and I think you mentioned somewhere in
 9  the area of 5, 6, 7, 800 investigations.  Did I hear that
10  correctly?
11  A   Estimate between 750 and 800.
12  Q   Right.  But you have never worked for the federal agency
13  like the NTSB to investigate accidents, correct?
14  A   I have never been an employer of the NTSB.
15  Q   And you have never been invited by the National
16  Transportation Safety Board to go on scene with them to
17  investigate an accident, true?
18  A   I have been invited by the NTSB to perform investigations
19  alongside with them -- that is not correct.
20  Q   Were you deemed as party member by the NTSB?
21  A   I was asked in certain instances to be named as party
22  member.  I have never signed as party member.
23  Q   So is it fair to say you have never been a party member to
24  an NTSB investigation, true?
25  A   By the definition of NTSB party member, that's true.  I
```

1  have been a member.

2  Q    So of the accidents that you have done, and you said

3  roughly 700 or so are --

4  A    800.

5  Q    -- 800, okay.  Do you agree with me that the vast majority,

6  perhaps 98 or 99 percent, of those are doing work for

7  litigation?

8  A    Normally my work is in conjunction with litigation.  Not

9  always, but that is typical.

10  Q    And what that means is that you are typically hired by

11  plaintiffs' lawyers to give them an opinion on what happened in

12  an accident, correct?

13  A    I have some defense attorneys that hire me as well, but

14  more often, just because of the relationship between plaintiff

15  and defense, I am normally engaged by attorneys on the

16  plaintiffs' side.

17  Q    And when you say more even, would you estimate that as

18  about 98 percent of the time you work with plaintiffs?

19  A    That's probably correct.

20  Q    Yeah.  And when you have been retained by these plaintiffs

21  in the 98 percent of the time -- when you've been so retained,

22  you have not been retained by the National Transportation

23  Safety Board, in those cases you've been retained by the

24  plaintiffs' lawyers, true?

25  A    I'm not familiar with any retainer-type agreement that the

1  NTSB --

2  Q    I'll rephrase it.   In the 98 or so percent of the time of

3  your 700 investigations that you've done for the plaintiffs'

4  lawyers.   Those were done for plaintiffs' lawyers; those

5  weren't done for a governmental agency, true?

6  A    Sometimes both.   I have been asked in some of my

7  investigations to provide my findings to the government

8  agencies.

9  Q    Okay.   By the plaintiffs' lawyers?

10  A    No.   Sometimes I've been asked directly by the government

11  agency themselves.

12  Q    Okay.   And in terms of the ones that you've done for the

13  plaintiffs' lawyers here, that would encompass well over -- or

14  well over 700, probably 770 or 790, if we do the math right for

15  the plaintiffs' side is all I'm trying to establish.   Do you

16  agree?

17  A    Most of my investigations are done as I've been retained by

18  plaintiffs' counsel.

19  Q    Yeah.   And then when you have been so retained, what you're

20  doing be is you've been retained, and ultimately in those

21  several hundred investigations, you've given testimony adverse

22  to manufacturers, true?

23  A    Sometimes, but by no means, even more often than not.

24  Q    You've testified against -- you said in response to

25  Mr. Brauchle's question, you've testified against Honeywell

1  several times, true?

2  A    I have.

3  Q    Pratt & Whitney, you have testified against

4  Pratt & Whitney, true?

5  A    I have.

6  Q    You've testified against Boeing, true?

7  A    Yes.

8  Q    You have testified against Cessna Aircraft Company, true?

9  A    That's true.

10  Q    You've testified against Beech Aircraft Company?

11  A    That's true.

12  Q    Piper Aircraft?

13  A    Yes.

14  Q    Yep.  You've testified against other engine manufacturers

15  such as Continental, true?

16  A    Correct.

17  Q    And other engine manufactures like Boeing, you've testified

18  against them as well?

19  A    Yes, I have.

20  Q    Now, in -- is it also true based on your experience that

21  you can't think of one component used on an aircraft turbine

22  engine in the field that you have designed?

23  A    I'm not really in that business, but I don't believe I've

24  ever designed a turbine engine component that is currently in

25  use in any commercial product.

1  Q    Okay.  Let's shift gears and talk about the pilot in this
2  case.  You mentioned that one of the things you did was
3  investigate the pilot, true?
4  A    Correct.
5  Q    And when you investigated the pilot, you told the jury that
6  he had about 7,000 hours of flight time, correct?
7  A    Correct.
8  Q    But you also looked into how much time -- I don't think we
9  discussed yesterday -- how much time this pilot had in this
10 particular model airplane, correct?
11 A    Correct.
12 Q    And in your report that you wrote back in 2016, I believe
13 you pointed out that you found that based on a particular
14 application that he submitted in April of 2013, that this pilot
15 had about 105 hours of experience in this model airplane; is
16 that accurate?
17 A    In April of '13, that is what he reported.
18 Q    Okay.  And that's about three months before the accident?
19 A    Yes.
20 Q    And you were unable to find records of the actual pilot's
21 logbooks, true?
22 A    That's true.
23 Q    All right.  Let's talk about when you were first called or
24 retained in this case.
25      I think you testified during your time yesterday that you

1  were first retained in February of 2016.  Did I hear that
2  correctly?
3  A    I don't recall.
4  Q    Is that close to accurate?  I'm not going to hold you to a
5  day or a week.  I'm just trying to establish approximately
6  when.
7  A    I'm not sure we covered that date, but it would have been
8  in that time frame.
9  Q    Okay.  And by that time the NTSB, who investigated this
10  accident, had completed their investigation, true?
11  A    I believe that's correct.
12  Q    Okay.  So you didn't go on-site in this case during the
13  course of the NTSB investigation, correct?
14  A    That's correct.  Typically that is not allowed.
15  Q    Right.  So -- and I'm just simply trying to show that when
16  you were shown those photos of the propeller, et cetera, at the
17  investigation site, those were taken by somebody else because
18  you weren't there at that time, true?
19  A    Correct.  Non-party members are not allowed to attend.
20  Q    Correct.  So you didn't see the wreckage when it was on
21  scene, correct?
22  A    Through my own eyeballs?  No, just through photographs.
23  Q    Okay.  So you weren't able -- in talking about the weight
24  of the airplane or the calculations, you were never in a
25  position to do what the NTSB did, such as weights of the bags

1   or weights of the contents inside that airplane, fair?

2   A   I was not part of the NTSB investigation, that's true.

3   Q   That wasn't my question, sir.  You never had a chance to

4   weigh the bags at any time like the NTSB did in this case,

5   true?

6   A   That's true.  I don't even think they were available for

7   inspection for us.

8   Q   All right.  What I'd like to do is talk about some of the

9   things that you mentioned yesterday, and I think you touched

10  upon it again this morning.

11      You talked about yesterday the topic of chord-wise

12  scratching.  Do you remember that, on propeller blades?

13  A   Yes.

14  Q   And I think that you mentioned during your testimony that

15  that's -- that's one of the things that you look for when

16  you're looking for power are the chord-wise scratches, correct?

17  A   Correct.

18  Q   And you did that in this case.  You looked for the chord

19  wide scratches as indication of power, correct?

20  A   Correct.

21  Q   Okay.  Now -- but what you said yesterday is that you

22  believe in this particular case that there's indications that

23  it was high power -- I'm sorry, high RPM.  I don't believe that

24  it was high power.  That's what you said yesterday.

25  A   Yes.

Q   All right.  Now, in one of the things that you mentioned
was that in looking at those chord-wise scratches on the
propeller yesterday -- in fact, I'll tell you what?

        MR. MCQUILLEN:  Can we bring up Plaintiffs' 176?
Before I publish it to the jury, I just want to make sure I got
the right one.

        I'm sorry, 17 -- is it 17C?  And just before I get in
the photograph, just -- to real quick to touch on it --
actually it's up already.

BY MR. MCQUILLEN:

Q   So this was the picture that you showed the jury yesterday,
correct?

A   Correct.

Q   All right.  And one of the things that you told the jury is
that you have to take into consideration when you're looking
for those signs of high power like the chord-wise scratches
that you said yesterday, one of the things that you looked at
were the possibility that this might be from some other event.

    And I think you specifically said yesterday that one of the
things that you looked for was if there was anything else that
incurred or caused damage to these planes after, correct?

A   Correct.

Q   And, in fact, you said yesterday if you move the propeller
blades around, you piled them on top of a flatbed truck, you
drag them across the hangar floor.  You move them from a

1    forklift.  You can scratch up these components pretty good when

2    you're dragging the wreckage around.

3         That's what you testified to, correct?

4    A    That's all correct.

5    Q    And you said in this case it's very obvious that that had

6    to have occurred and that you found a significant number of

7    scratches that were caused by that kind of handling.  Do you

8    recall saying that yesterday?

9    A    Yes, and I think I clarified that today.

10   Q    Yeah.  So that's what I want to talk about.  So yesterday

11   you mentioned -- and when you told the jury about the handling

12   on the forklift truck or being dragged across the floor, I got

13   the impression that you mentioned that it was significantly --

14   did say a significant amount of those scratches were caused by

15   that.

16        This morning you showed another picture.

17             MR. MCQUILLEN:  Let's see if we can bring that one up.

18   This is plaintiffs' -- sorry.

19             DEPUTY CLERK:  I'm sorry, what exhibit was that?  Has

20   it been admitted.

21             MR. MCQUILLEN:  I was going to use their exhibit.

22             MR. BRAUCHLE:  I think it's 22 B as in bravo.

23             MR. MCQUILLEN:  I think it's 22 B as in bravo.  Sorry.

24             DEPUTY CLERK:  Okay.

25

```
 1  BY MR. MCQUILLEN:
 2  Q    Let me show you -- this is the defense --
 3              THE COURT:  So this just for the record --
 4              MR. MCQUILLEN:  This is the time photograph.  It's
 5  just a defense exhibit.
 6              THE COURT:  -- for madam clerk.
 7              So 22 B as in bravo of plaintiffs seems to be
 8  identical as D125.4.  Although this hasn't technically been
 9  admitted yet, I'm assuming no objection from the plaintiffs.
10              MR. BRAUCHLE:  None at all, Your Honor.
11              THE COURT:  Just to clear things up, at this point in
12  time, the Court is admitting D125.4 and publishing it for the
13  jury.
14              (Exhibit 125.4 received in evidence.)
15  BY MR. MCQUILLEN:
16  Q    This was the photo that you showed the jury this morning,
17  correct?
18  A    Correct.
19              MR. MCQUILLEN:  And what I would like to do is see if
20  I can ask Chris to compare them and put both up.  Already.
21  BY MR. MCQUILLEN:
22  Q    So what I would like to do, Mr. Sommer, I don't know, can
23  we -- this is the one you told the jury about yesterday where
24  you suggested that there was significant amount of post crash
25  either dragging on the floor -- dragging across the floor,
```

1    falling off the truck, whatever you said it did.

2        The one on the left is the picture -- that's at the scene

3    of the accident, agreed?

4    A    Agreed.

5    Q    All right.  So let's just take a look here.  Here's where

6    that -- it looks like there's a big cut in the leading edge of

7    the blade.  I'm pointing to the left photo which I think is

8    22B, and we see that kind of blade chunk, and you can see where

9    that is on the photo on the right up here.  Agreed?

10   A    Agreed.  I discussed that earlier.

11   Q    And so if you look below that, you see a strike here,

12   correct?

13   A    Yes.

14   Q    And we see another one on the photo on the right, which is

15   the one you showed the jury yesterday.  And if you move all the

16   way to the right over here, you see scratches that are going

17   from the leading edge of the blade all the way down to the base

18   of the blade, correct?

19   A    Correct.

20   Q    Yep.  And we see that similarly on the photo on the left,

21   correct?

22   A    Yes.

23   Q    We see a -- little hooks at the site of the accident

24   picture coming off the right of that line.  We see the same

25   thing here, true?

1  A   Correct.

2  Q   Okay.  And if we move -- keep moving to the left, we see

3  another line coming down here, and we see that same line over

4  here, true?

5  A   True.

6  Q   Okay.  And if we come to -- keep going all the way over,

7  we're seeing more lines here, and they are also appearing below

8  the blade, correct?  You see this little dot on the right

9  compared to this dot on the left, agreed?

10 A   Yes.

11 Q   All right.  And as we move over here, we see more scratches

12 coming down on the left side of the accident scene blade, and

13 we can see those -- the one on here, correct?

14 A   It's a little tough to see from here, but I believe that's

15 correct.

16 Q   Okay.  And this notion that you told the jury yesterday

17 about that there may have -- that things were piled on a

18 flatbed truck, you weren't there to see that, correct?

19 A   That's true.

20 Q   Okay.  When you told the jury that they may have been

21 dragged on the hangar floor causing more damage after the

22 impact, you didn't see that happen, true?

23 A   I saw them moved around at least our wreckage inspection,

24 and I did see some differences even between the two photos that

25 you have shown here where the signatures are not exactly the

1   same.

2   Q   Yeah.  And you also mentioned that it was moved with a

3   forklift.  You didn't see it moved with a forklift causing any

4   damage to those blades, did you?

5   A   I don't believe that there's any other way that you could

6   move around this wreckage without involving a forklift, which

7   is why I used the analogy.

8   Q   The question is:  You didn't see it, true?

9   A   I was not there, correct.

10  Q   All right.

11          MR. MCQUILLEN:  So let's go on to the -- I believe

12  we'd like to go to Defense Exhibit 2.3.

13  BY MR. MCQUILLEN:

14  Q   During the course of -- during the course of your work,

15  Mr. Sommer, you read the NTSB reports, true?

16  A   Yes.

17  Q   And you relied on those reports in forming some of the

18  opinions that you gave in this case, correct?

19  A   There were portions of the factual sections that I relied

20  upon.  I did not rely upon any conclusions or opinions made by

21  the NTSB.

22  Q   Did you see in the NTSB Powerplant report their

23  observations of the propeller blades when they were on the

24  scene doing their investigation?

25  A   I saw that they had some descriptions, yes.

1    Q    Yeah.  And do you recall what those descriptions were?

2    A    I believe you're showing it to me in my screen here, but I

3    could go back to my own documents also.

4    Q    Okay.

5         MR. MCQUILLEN:  Your Honor, at this time we would move

6    for the admission of NTSB 2.3.

7         MR. BRAUCHLE:  I would like to be heard on it.

8         THE COURT:  Sure.

9         (Bench conference held.)

10        THE COURT:  Mr. Brauchle.

11        MR. BRAUCHLE:  Well, it is contained -- it is a part

12   of the factual report.  It says, "We found the following

13   signatures, consistent with rotational damage."  That's part of

14   the conclusion, and then it goes onto describe what they found.

15   That's factual.  But to say that it's consistent with

16   rotational damage, I believe that's a conclusion or analysis or

17   an opinion.

18        THE COURT:  Let me look at it really quick.

19        The entirety of it -- because it's zoomed up I can't

20   see the entirety of the report.  For the language that is

21   zoomed in, do you have any issues with that as far as it being

22   inconsistent with Judge Holland's orders?

23        MR. BRAUCHLE:  Just the part -- just that one part of

24   the sentence where it says, you know, "The following

25   characteristics that are consistent of rotational damage."  And

```
 1   then he says, "We found the following are inconsistent with
 2   rotational" -- I think that in itself is a conclusion or
 3   analysis.  What it says and describes is, scratching, this and
 4   that, those are factual observations.  But to say what that
 5   is --
 6             THE COURT:  I mean it seems to me, and I'll let you
 7   have further argument if you'd like, but it seems to me base on
 8   the direct examination of Mr. Sommer, he went through the
 9   things that you typically look for that would consistent with
10   that.  So the fact that the NTSB has found these -- or has
11   concluded that these have the scratching marks on and so forth,
12   it doesn't seem like that runs afoul of Judge Holland's order,
13   given that it's the nature indication based on this expert's
14   own previous testimony.
15             So I am going to allow the question but I do want to
16   be careful --
17             MR. MCQUILLEN:  I won't get into that.
18             THE COURT:  Okay.  Very well.
19             MR. BRAUCHLE:  Thank you, Your Honor.
20             MR. MCQUILLEN:  There's another provision that talks
21   about engine marks too.  It's the same concept.  This is the
22   prop marks, and they have a similar paragraph on engine marks.
23   I just want to hit them both.
24             THE COURT:  Okay.  And I'll take a look at that
25   language when it pops up.
```

 1          What I want to be careful of when we are zooming in, I
 2   can't see the rest, but the jury might.  And so if you have an
 3   issue with that, one other way we can logistically work around
 4   it is simply having the witness read the portion without
 5   publishing to the jury.  But we will cross that --
 6          MR. MCQUILLEN:  Whatever you want me to do.
 7          THE COURT:  Yeah.  I think I'd prefer that.
 8          MR. BRAUCHLE:  Do you have that section for the next
 9   one?
10          MR. MCQUILLEN:  Yeah.
11          MR. BRAUCHLE:  Because it may just be the -- and it's
12   the same -- if it's going to be the same objection, the same
13   ruling, I could just say -- just make an objection --
14          MR. MCQUILLEN:  I'll just mention that I showed this
15   in opening statement and I showed Mr. Brauchle, and I want to
16   show this again.  So I don't want to be prohibited from the
17   opportunity to offer it into evidence, so I can show it.
18          THE COURT:  Okay.  Okay.
19          MR. BRAUCHLE:  Well, I believe that it's consistent
20   with what your ruling is here, so I don't know if --
21          THE COURT:  What are your questions?
22          MR. BRAUCHLE:  -- I don't know if I should just put on
23   the record --
24          THE COURT:  Let's put it on the record now, just sort
25   of a standing objection to these snippets from the NTSB report

1   to the extent that an objection would go beyond what we

2   previously discussed, we can have a sidebar.  But, otherwise,

3   your objections are preserved and we'll move forward.

4           MR. BRAUCHLE:  Fair enough, Your Honor.

5           MR. MCQUILLEN:  Thank you, Your Honor.

6           (Bench conference ends.)

7           THE COURT:  Mr. McQuillen, just because we were there

8   for a moment of time, if you could start your question over

9   again so the witness can recall where we were at.

10  BY MR. MCQUILLEN:

11  Q   We were talking about the Powerplant Group report, and I

12  showed you a section of the report that you're seeing that the

13  jury has not yet from that NTSB Powerplant Group report, which

14  is Defense Exhibit 2.3.

15      And do you have that in front of you, sir?

16  A   Yes.

17  Q   Okay.

18          MR. MCQUILLEN:  And as far as that's concerned, may I

19  show that picture, Judge?  Or would you prefer I read it?

20          THE COURT:  That's fine.  Given this Court's ruling,

21  that is permissible.

22          MR. MCQUILLEN:  If we could just show that limited

23  area of the report.

24  BY MR. MCQUILLEN:

25  Q   Showing you from Exhibit 2.13 --

1          THE COURT:  And I'm sorry.  Madam Clerk, we will

2     publish.

3          DEPUTY CLERK:  This was exhibit --

4          THE COURT:  This was exhibit, I think --

5          MR. MCQUILLEN:  2.3.

6          THE COURT:  2.3.

7          DEPUTY CLERK:  So it's admitted.

8          THE COURT:  It's not admitted, but it is published.

9     Or are you looking to admit?

10         MR. MCQUILLEN:  Looking to admit.  But for purposes of

11    this, we can cross that issue later.  But all I'm going to show

12    right now is just this one portion of the page, and that's on

13    page 2 of the report.

14         THE COURT:  So we will publish 2.3, and we will

15    discuss admission of this document further long term.

16         MR. MCQUILLEN:  Thank you, Your Honor.

17    BY MR. MCQUILLEN:

18    Q    Mr. Sommer, you have that in front of you, correct?

19    A    Yes.

20    Q    And you see that that's a portion of the National

21    Transportation Safety Board Powerplant report which documents

22    their findings of the propellers when they looked at them

23    during the course of their investigation before you got

24    involved, true?

25    A    I believe that is what it depicts.

1    Q    Okay.  And it indicates that "The disassembly and

2    examination of the propeller revealed the following

3    characteristics consistent with rotation under an amount of

4    torque."

5         Do you see that, sir?

6    A    I do.

7    Q    It says, "Number 1.  Rotational scoring on the blade tips.

8    Number 2.  Leading edge dents and tears."

9         Did I read that correctly?

10   A    Yes.

11   Q    Okay.  "Number 3.  Loss of tips on two blades."

12        Saw that too yourself, didn't you, sir?

13   A    Yes.

14   Q    Okay.  And, "Number 4.  Similar twist and bend patterns of

15   all four blades."

16        Did I read that correctly?

17   A    That's what that says.

18   Q    All right.

19             MR. MCQUILLEN:  Let me go onto a new topic,

20   Your Honor.

21   BY MR. MCQUILLEN:

22   Q    Now, there is a -- there was some testimony yesterday that

23   you gave, and you spoke about the fact that in your opinion the

24   impeller at impact was under a high RPM.

25        Did I hear that correctly?

1  A    Yes.

2  Q    And one of the things that you said about that propeller

3  operating at high RPM, I believe you said that you do believe

4  that the propellers were at high RPM.  And you said, "The RPM

5  of that propeller should be maintained by the propeller

6  governor during the event, and I would expect the propeller to

7  still be at high RPM, but I don't think the signatures -- are

8  signatures here to support high power and high RPM."

9       Is that what you said yesterday?

10 A    Exactly.

11 Q    All right.  So you mentioned that the prop governor, you

12 said, will maintain the speed of a prop at about 1,560-ish RPM?

13 A    I think it's 1,591.

14 Q    1,591, okay.

15      And is that the speed RPM that you believe that propeller

16 was turning at impact?

17 A    The propeller governor is going attempt to maintain that

18 speed.  I don't think that there is any accurate way to say it

19 was exactly that, but the propeller governor will flatten out

20 the propeller and then the wind flow will continue to turn it

21 as close to 1,591 as possible.

22 Q    So you're saying it's the wind flow that's going to help

23 influence the RPM?

24 A    Of course.

25 Q    Now, do you know what turns the prop governor?

```
1  A    The gearbox.
2            (Whereupon, the Court Reporter
3              interrupted for clarification.)
4  BY MR. MCQUILLEN:
5  Q    Do you know what turns the gearbox?
6  A    The propeller.
7  Q    How about the other end of the gearbox?
8  A    It's not connected.
9  Q    So when you say it's not connected, in normal operation is
10 the torsion shaft turning that propeller?
11 A    The torsion shaft drives the gear train, and the gear train
12 drives the propeller.  The propeller governor is directly
13 connected to the gear train, so as long as the propeller is
14 moving, the governor is operating.
15 Q    I'm going to flip that on you.
16       As long as the torsion shaft is intact and operating,
17 that's going to move the propeller, correct?
18 A    I think it's a bit semantics but they are all connected.
19 Q    Right.  So the torsion shaft is turning the gears that
20 includes the sun gear, and that's turning the -- that's turning
21 the actual prop governor as well.
22 A    When underpower, that's correct.
23 Q    Okay.  Now, you mentioned that it's the flow of wind that's
24 over the prop.  In your review, I didn't see anything in your
25 reports or your deposition opinions that show where that prop
```

1  speed dropped from 1,590 or so RPM, true?

2  A   I don't think I addressed the variations in propeller speed

3  in my deposition or in my report, other than what we just

4  discussed in regard to the governor attempting to maintain

5  rated RPM.

6  Q   Okay.  And just -- and we'll come back to this with

7  Mr. Studtmann.

8      But to maintain RPM, you're saying now based on whatever

9  airflow was going over that propeller, correct?

10  A   Well, you have the inertia of the propeller, which is

11  disconnected, so now the propeller is going to attempt to slow

12  down.  As it slows down, the governor has to flatten out the

13  blades in order to maintain RPM as close to 1,591 as they can.

14      The only other force acting on the propeller after the

15  shearing of the torsion shaft would be the wind.

16  Q   Okay.  And I appreciate that that's your opinion.

17      Let's go onto another topic real quick and talk about the

18  fracture itself of the torsion shaft.

19      So the torsion shaft itself -- I want to see if we can find

20  any common ground here.  I believe you testified to this, but

21  we all agree in this case, I believe, that that torsion shaft

22  was from a shear, correct?

23  A   Yes.

24  Q   All right.  And that shear -- and I know you are not a

25  metallurgist, correct?  You have someone else on your team

```
 1   who's going to give metallurgic testimony in this case?
 2   A    I believe Mr. Hood is going give the metallurgical --
 3   Q    Yep.  Yep.
 4        But you know that during the work in your case, there was
 5   no indication that there was any bad metal in that shaft,
 6   correct?
 7   A    I would probably defer those questions to Mr. Hood.
 8   Q    Okay.  Did you testify at your deposition that you believed
 9   it was not from any bad metal in the shaft?
10   A    I don't specifically recall, but I'm sure Mr. Hood will
11   provide all the metallurgical opinions that you would need.
12   Q    All right.  Well, we will talk to Mr. Hood; I'm interested
13   in what you said, respectfully, Mr. Sommer.
14             MR. MCQUILLEN:  So, Your Honor, may I approach the
15   witness?
16             THE COURT:  You may.
17             (Mr. McQuillen approached the witness.)
18             MR. MCQUILLEN:  And for the record, I'm showing the
19   witness his deposition at page 110.
20             May I approach, Your Honor?
21             THE COURT:  Yes.
22   BY MR. MCQUILLEN:
23   Q    Do you recall testifying at your deposition on page 110 at
24   line 16, "Of the bad metal which Mr. Hood didn't find, I would
25   say that's about it."  Correct?
```

1  A    That looks like my deposition.

2  Q    And that was -- did I accurately read your testimony?

3  A    I'm sorry?

4  Q    Did I accurately read the transcript?

5  A    You read that section.

6  Q    Okay.  You didn't find any bad metal with the shaft,

7  correct?

8  A    That's not really my charge.  That was really Mr. Hood's

9  charge.  I don't believe that he found a defect, but I'm sure

10 you can ask him those questions.

11 Q    Okay.

12      Now, we talked about the NTSB Powerplant Group report, and

13 during the course of the Powerplant Group report, they also

14 talked about some other things that the NTSB found during the

15 course of the accident site that was also sheared in torsion

16 from impact.

17      Do you recall that?  Specifically the starter gear?

18 A    I do recall that.

19 Q    So on this engine there's a starter gear that has a shaft,

20 and you recall -- and you agree that that shaft failed from an

21 impact-related failure, correct?  Meaning, that shaft sheared

22 in torsion the same means that the torsion shaft failed,

23 correct?

24 A    I do not believe that the failure of those two components

25 is related in any way.  No, that's not --

1    Q   Well, that's what I'm simply trying to establish that's

2    your opinion.  I'm simply trying to establish that, in your

3    opinion, that starter gear shaft failed in torsion just like

4    the torsion shaft did in this case, the torsional failure of

5    both, correct?

6    A   Both failed in torsion.  I do not have the opinion that for

7    similar reasons.

8    Q   And you believe, however, that the shaft in the starter

9    actually failed because of the impact and a sudden stoppage at

10   impact, correct?

11   A   I don't think I've ever been asked that question or made

12   that opinion, but the starter is directly connected to the gear

13   train that's connected to the propeller.  So as long as the

14   propeller is turning and the starter has a, you know, a big

15   heavy rotor in it, then yes, I would expect that it would shear

16   the small shaft that connects it when the propeller hits the

17   ground.

18          MR. MCQUILLEN:  Your Honor, we'd -- if I may, the

19   exhibit, I think, is 234.

20   BY MR. MCQUILLEN:

21   Q   You wrote a report in this case, Mr. Sommer?

22   A   Yes.

23   Q   Do you have it with you?

24   A   Yes.

25   Q   Would you turn to page 19 of your report?

1  A    Yes.

2  Q    Do you see where you say in your report that "The high RPM

3  rotation of the propeller and thus the starter generator

4  explains why the sudden stoppage of propeller on impact caused

5  the starter generator shaft to shear"?

6       Is that what your report says?

7  A    That's correct.

8  Q    Let's talk about the NTSB report in terms of the --

9       MR. MCQUILLEN:  I'm going back to 2.3, if I may, on

10 page 8, if we can blow that up.

11      We're going go to page 8 of the report, which is

12 Exhibit 2.3, and then Section D.4.4.2.5.  We will put that up

13 on a similar --

14      DEPUTY CLERK:  Is this the same as -- the one that we

15 had earlier?

16      THE COURT:  It is 2.3.  It's a different page.  So he

17 will have to request to publish this portion separate.

18 BY MR. MCQUILLEN:

19 Q    In the course of your work, you read part of the NTSB

20 Powerplant Group report at page 8.

21      Do you recall reading that, Mr. Sommer?

22 A    Yes.

23      MR. MCQUILLEN:  Permission to publish this one section

24 as well, Your Honor.

25      Let's hone in on that one paragraph.

 1          MR. BRAUCHLE:  No objection, Your Honor.

 2          And just for clarification -- I'm sorry, I was

 3  distracted.  But what document is this from?

 4          MR. MCQUILLEN:  Defense 2.3.

 5          THE COURT:  Given the lack of objection at this time,

 6  page 8 of Defense Exhibit 2.3 may be published.

 7  BY MR. MCQUILLEN:

 8  Q   That indicates in looking at the turbine assembly, the back

 9  of the engine, the NTSB mentioned "The rear turbine bearing

10  housing was undamaged and the rear bearing was oil-wetted and

11  darkened, consistent with normal engine operation."

12      Do you see that, sir?  Did I read that correctly?

13  A   Technically no, but it says "normal operation."

14  Q   Let me read it, again, since you have suggested I didn't

15  read it correctly.  And if I didn't, I apologize.

16      It says, "The rear turbine bearing housing was undamaged

17  and the rear bearing was oil-wetted and darkened consistent

18  with normal operation."  Correct?

19  A   That's correct.

20  Q   "The rear oil scavenge pump was removed from the rear

21  bearing turbine housing and was undamaged."  True?

22  A   That's what it says.

23  Q   And it mentions, with respect to the torsion shaft, "The

24  front internal and aft external splines of the torsion shaft

25  were undamaged."  True?

```
 1   A    That's what it says.
 2   Q    "However, the torsion shaft itself was sheared just forward
 3   of the aft external spline, consistent with a rotating engine
 4   sustaining a sudden propeller stoppage."
 5        Did I read that correctly?
 6   A    You read what the NTSB wrote.
 7   Q    Now, I maybe can save some time.  I was going to ask you
 8   about some of the maintenance records, but you're aware of --
 9   or are you aware that the parties have all agreed here that
10   there were no known complaints or problems with the torsion
11   shaft in the operational history of this engine?
12   A    I would agree with that.
13   Q    All right.
14        Okay.  Let's talk about some of your comments on the engine
15   things that you -- the other day -- had discussed the other
16   day.
17             MR. MCQUILLEN:  Let's go back to Exhibit 2.3, this
18   time at page 2.  So it's the same Defense Exhibit 2.3, at
19   page 2.
20             Exhibit 2.3.  Thank you.
21   BY MR. MCQUILLEN:
22   Q    Now, one of the things that's in that report also talks
23   about the NTSB's examination --
24             MR. MCQUILLEN:  No.  No.  We're still on page 2 of
25   Defense Exhibit 2.3.
```

1           Again, if you could zoom in on that particular

2     section.

3           May I publish, Your Honor?

4           THE COURT:  Any objections, Mr. Brauchle?

5           MR. BRAUCHLE:  No, Your Honor, just subject to the

6     previous.

7           THE COURT:  Your other objection is preserved.

8           At this time page 2 of Exhibit 2.3 -- sorry, Defense

9     Exhibit 2.3 may be published.

10    BY MR. MCQUILLEN:

11    Q   Now you mentioned to the jury your observation that shows,

12    according to your opinions in this case, that there was -- the

13    indications are that the engine was not producing power at

14    impact.

15          Is that how I interpret your testimony?

16    A   Correct.

17    Q   All right.  And it indicates here that when they reviewed

18    the disassembled engine, it says, "Disassembly and examination

19    of the engine revealed the following significant

20    characteristics consistent with rotation during impact."

21          Did I read that correctly?

22    A   You did.

23    Q   And it lists several things.  Number one, a sheared torsion

24    shaft, correct?

25    A   That's what that says.

1  Q   Corresponding rotational scoring of the propeller shaft and

2  the sun gear, and rotational shoring throughout the compressor

3  and turbine sections.

4       Did I read that correctly?

5  A   You did.

6  Q   And it says, "Metal spray was present throughout the

7  turbine components in the air stream path."  Correct?

8  A   That's what that says.

9  Q   And I understand that you disagree with the NTSB in that

10 regard, correct?

11 A   I'm not the only one.  Honeywell disagreed with that, too,

12 but that is correct.

13          MR. MCQUILLEN:  Move to strike, Your Honor.

14          THE COURT:  No, it's responsive.  I won't strike that

15 testimony.

16          You may proceed.

17 BY MR. MCQUILLEN:

18 Q   So let's talk about your other opinion that -- about engine

19 operation.  This is what I want to get to.

20      You mentioned yesterday during the course of all the work

21 that you did in this case, you know, Mr. Sommer, that

22 hypothetically if the torsion shaft were to fail, which you

23 know Honeywell says it did not in flight, if the torsion shaft

24 were to fail in flight, the engine itself is going to keep

25 operating.  That's the design of the engine.  You know that.

1    A    The mechanical design is that it can.  It does not mean
2    that it will.
3    Q    Okay.  Now, you learned, in listening to some of the
4    opinions of Mr. Studtmann, that the fuel control and the fuel
5    pump are driven off the end of the main shaft, the outer shaft,
6    and not the torsion shaft, correct?
7    A    Correct.
8    Q    All right.  And the main shaft didn't break in this case,
9    true?
10   A    That's true.
11   Q    So the main shaft, which did not break, was still capable
12   of turning the fuel pump and the fuel controller, agreed?
13   A    If it was still running, that's true.
14   Q    Okay.  So -- well, you said if it's still running.  Let's
15   talk about what you did.
16       You inspected the aircraft in February of 2016; an airframe
17   and engine inspection in Soldotna, correct?
18   A    Correct.
19   Q    You didn't find any indications at that inspection that
20   there was anything wrong with the internal aspects of the
21   engine related to the fuel system, correct?
22   A    The one in Soldotna, the engine was all loosely assembled.
23   So there's no way for me to assess that at that point.
24   Q    February of 2016, the engine -- there was an engine
25   inspection in Anchorage, true?

1   A    Correct.

2   Q    All right.  In November of 2016, there was a component

3   inspection at a company called TAE, correct?

4   A    Correct.

5   Q    And the fuel control unit and the propeller governor were

6   inspected at that time, correct?

7   A    That's true.

8   Q    And there were no failures noted or anomalies with those

9   components at that inspection, correct?

10  A    Neither the propeller governor nor the fuel control

11  exhibited any indication of a malfunction.

12  Q    Right.

13       And there was a laboratory inspection of some components as

14  well, but the bottom line is that you didn't find any

15  pre-impact anomalies or failures of the fuel control unit for

16  this engine, true?

17  A    Correct.

18  Q    You didn't find any problems or anomalies with the prop

19  governor for this engine, agreed?

20  A    That's correct.

21  Q    You didn't find any problems or anomalies with the fuel

22  pump in this case.

23  A    That's true.

24  Q    No problems with the prop pitch control, correct?

25  A    It was in pretty bad shape, but I didn't see anything

1   glaring.  That's true.

2   Q   No pre-impact anomalies that would have been positive,

3   correct?

4   A   Correct.

5   Q   Okay.  No problem with the fuel pump or the NTSB torque

6   sensing system.  You didn't notice any pre-impact anomalies

7   with those either.

8   A   We investigated those components, it doesn't appear to have

9   done prior, and we did not find anything prong.

10   Q   You didn't find anything wrong with the fuel shutoff valve,

11   either, correct?

12   A   That's correct.

13   Q   Okay.  And no problem with the actual torque sensor to

14   which the torsion shaft is connected, correct?

15   A   Right.

16   Q   So the fuel pump, the propeller pitch control, the NTSB

17   system, the flutter valve, the fuel shutoff valve, the torque

18   sensor were all inspected and there were no pre-impact

19   anomalies; is that true?

20   A   All correct.

21   Q   And you noted when you looked at the gear train and when

22   you looked at the gear train inside the engine, there was

23   nothing found to interfere with that main shaft's ability to

24   keep on turning that fuel pump, agreed?

25   A   Sure.  That's true.

1  Q   All right.  So at least within that understanding of the

2  way the control systems on the engine works, there's nothing

3  that should cause that engine or the power section to stop

4  operating, agreed?

5  A   That is a -- is a matter of the function of the fuel

6  control unit in the rollback to midflow and the level of

7  overspeed and the kick in of the overspeed governor after the

8  shaft breaks.

9      So once you dump that much fuel into the engine and such

10 that have you a giant puff of black smoke that comes out the

11 exhaust, I can't say that that engine is going to keep on

12 running.

13 Q   So the question to you, Mr. Sommer, is:  Did you find at

14 any time during the course of your work in this case, at least

15 with your understanding of this case, so that at least the

16 understanding of the engine, there is nothing that should cause

17 the engine -- the power section to stop operating, correct?

18 A   Other than the broken torsion shaft, that's true.

19 Q   Okay.  So you found -- you found nothing to stop the engine

20 from operating.  The next question is as far as we're concerned

21 is:  We contrast the engine operation of which you found no

22 reason to find how it ended up not operating as you claim

23 happened here?  Actually that's a pretty crummy question.  Let

24 me start again.

25      You found -- didn't find anything wrong with any of the

1  internal components of the engine other than the torsion shaft.

2  The failure of the torsion shaft won't stop the engine from

3  operating, and you didn't find anything wrong with any of the

4  fuel systems to keep the engine from operating, correct?

5  A   I cannot agree with your opinion that the failure of the

6  torsion shaft won't stop the engine from operating.

7  Q   Okay.  I know you don't want to agree with it, but there's

8  nothing in the mechanical explanations or drawings that you

9  have in your file that explain why the engine won't keep

10 operating?

11 A   I think there is.

12 Q   Okay.  So in that case, you saw in this case that Honeywell

13 had a sounder and an acoustical expert, correct?

14 A   I have seen that, yes.

15 Q   And you were given the opportunity to file rebuttal

16 opinions to the opinions given by the Honeywell acoustical

17 sound expert, correct?

18 A   I don't really recall.  I read through the report.

19 Q   Okay.  All right.  Let's talk for a minute, Mr. Sommer,

20 about the bushings for a minute.

21     On the bushings themselves, you mentioned this morning you

22 had marks of the -- those circular marks that are going on the

23 torsion shaft.

24     MR. MCQUILLEN:  We can pop up I believe that was

25 Plaintiffs' Exhibit that showed your torsion shaft scoring.

1          MR. BRAUCHLE:  I believe the closeup was 22 echo.

2          MR. MCQUILLEN:  22 echo.  Is that it?

3          MR. BRAUCHLE:  I believe that's fair.

4          MR. MCQUILLEN:  22 E, please.

5    BY MR. MCQUILLEN:

6    Q    And maybe we can save some questions on this.  I think by

7    your closing comments, we may actually have common ground on

8    this.

9         Your opinion is that this type of damage that we see cannot

10   happen when that torsion shaft is intact.  Are we in agreement

11   there?

12   A    We are.

13   Q    Okay.  And to maybe kind of put this to bed for now, the

14   way that gets damaged in your opinion is only after the shaft

15   fails?

16   A    Correct.

17   Q    There's nothing about that picture itself which tells us

18   why the torsion shaft failed, correct, because you can't get

19   these in normal operation?

20   A    The only thing about that picture itself that may be

21   telling us the story of how the torsion shaft failed is the

22   fact that the bushing is gone, that it's completely destroyed,

23   that it was never recovered and that no pieces of it were ever

24   recovered.

25   Q    Right.  But I think you told the jury that you believe it

1   was there, correct?

2   A   Some portion of the bushing had to have been there.  It

3   doesn't mean that it's working correctly, but it had to have

4   been there because of all the damage we see on the groove or

5   the land.

6   Q   Right.  But back to the point, Mr. Sommer:  I think we

7   agree that you cannot get that damage until after the shaft

8   fails.  Are we in agreement?

9   A   To that extent, I agree.

10  Q   Well, when you say "to that extent," the torsion shaft

11  doesn't -- there's no means to cause 360-degree marks at all in

12  normal engine operation because the torsion shaft doesn't twist

13  that much, agreed?

14  A   Technically, no.  The torsion shaft covers 360 degrees of

15  surface, so if you had binding between the bushing and the

16  shaft --

17  Q   Well, there's no evidence of binding here.

18  A   Can I just finish?

19          MR. BRAUCHLE:  Your Honor, let the witness --

20          THE COURT:  Mr. Sommer, please finish your answers.

21          THE WITNESS:  Thank you, Your Honor.

22          Because the bushing covers 360 degrees of the

23  circumference of the shaft if you had binding, you could see

24  markings 360 degrees around, even though the twist is only

25  8 degrees.

 1              But to answer your question, damage to this extent I

 2    do believe would be considerable relative motion between the

 3    main shaft and the torsion shaft after the torsion shaft

 4    breaks.

 5    BY MR. MCQUILLEN:

 6    Q    Okay.  And in this particular case as far as that

 7    rotational damage is concerned, the issue then is, When did

 8    that rotational damage occur.  I believe we are on common

 9    ground that it's after the shaft breaks.  The difference

10    between us is when that shaft broke; is that fair?

11    A    That's correct.

12    Q    Okay.  Okay.  Let's talk about your screeching sounds.

13    There's two things to go into that I want to talk about, the

14    screeching sounds make --

15              MR. MCQUILLEN:  This may take a while.

16              THE COURT:  I'm fine if you are about to start a new

17    chapter of this examination, breaking for lunch a few minutes

18    early.

19              MR. MCQUILLEN:  Okay.

20              THE COURT:  So, ladies and gentlemen, so we are going

21    to take a lunch break.  We will be back at 1:15 and start our

22    afternoon session.  Thank you very much.

23              Madam Clerk?

24         (Out of the presence and hearing of the jury panel.)

25              THE COURT:  Please be seated.  So just -- just so I

1    can make sure that I understand I think where we're at, the way

2    I've read Judge Holland's rulings are -- I know we talked about

3    these buckets before, but obviously the causation or the

4    conclusions of the NTSB are not admissible.  The factual

5    reports are admissible based on those rulings.

6          I think what might assist the Court at least is it's

7    not always clear to me if we are referencing an NTSB fact or a

8    page.  Is it a factual report or is it a study?

9          It may make things cleaner given that as I go through

10   the materials, it seems like there is no dispute or

11   Judge Holland has ruled on the dispute as to the factual

12   reports, and thus the factual reports are I think at this point

13   in time per se admissible.  The studies are what's going to

14   require this Court to make a case-by-case determination.

15         So to the extent that either party relies on the

16   factual reports, if you can just make that clear, and maybe you

17   did, and I just missed it, it may make my analysis a little bit

18   easier as we move forward.

19              MR. MCQUILLEN:  Okay.

20              THE COURT:  And again just to clarify as Ms. Kelly is

21   fiercely typing, I think I got that wrong, the studies are

22   inadmissible, but there can be reference to the studies through

23   the expert's testimony is what I meant.

24              MR. MCQUILLEN:  Okay.

25              THE COURT:  Okay.  Any other issues that we need to

```
 1   address before we take our lunch recess?
 2              MR. KELLY:  Nothing, Your Honor.
 3              MR. MCQUILLEN:  No.
 4              MR. BRAUCHLE:  Nope.
 5              THE COURT:  Very well.  I will be back on the bench at
 6   1:15.
 7              DEPUTY CLERK:  All rise.  Court stands in recess until
 8   1:15.
 9          (Proceedings in recess from 11:58 a.m. until 1:14 p.m.)
10           (Out of the presence and hearing of the jury panel.)
11              DEPUTY CLERK:  All rise.  His Honor, the Court, the
12   United States District Court is again in session.
13              THE COURT:  All right.  I saw the jury walking down
14   the hall.  Anything we need to take up before we bring the jury
15   back in?
16              MR. BRAUCHLE:  No, Your Honor.  Just other than -- and
17   I think Mr. McQuillen will agree with me -- our agreement.  We
18   haven't done, like, formal proffers, I think, because the rest
19   of the testimony is all expert testimony.  I think we stipulate
20   that our people are experts, but we also stipulate that if they
21   go outside the lane of their expertise, we reserve the right to
22   bring up that issue at that time.
23              THE COURT:  Of course.
24              Any issues from the defense?
25              MR. MCQUILLEN:  None, Your Honor.
```

1      THE COURT:  I guess bring in the jury back, Madam

2  Clerk.

3          (In the presence and hearing of the jury panel.)

4      THE COURT:  Please be seated.  Thank you, Madam Clerk,

5  and welcome back, ladies and gentlemen.

6      Mr. McQuillen, you may continue your

7  cross-examination.

8      MR. MCQUILLEN:  Thank you, Your Honor.

9  BY MR. MCQUILLEN:

10 Q   I'd like to look at Exhibit 2.3.

11     Mr. Sommer, there was some testimony earlier about your

12 opinion on how the aircraft hit, et cetera.

13     Do you recall your testimony in that regard this morning,

14 sir?

15 A   Yes.

16 Q   Okay.  And did you -- again, we've talked about the NTSB

17 Powerplant Group report that we talked about on a couple of

18 occasions.  I just want to draw your attention to one section.

19     MR. MCQUILLEN:  And I may publish this limited

20 paragraph, Your Honor?

21     THE COURT:  Any objection, Mr. Brauchle?

22     MR. MCQUILLEN:  For the record, it's on page 9.

23     MR. BRAUCHLE:  No objection.

24     THE COURT:  At this time you may publish page 9 of

25 what has been marked as Defense Exhibit 2.3.

BY MR. MCQUILLEN:

Q   In showing you Exhibit 2.3, page 9, a segment that states

reports in the Powerplant Group report prepared by the NTSB,

Mr. Sommer, that "The second stage impeller was intact, as well

as its fore and aft curvic couplings.  The second stage

impeller shroud was rotationally scored near the inducer side

between 1:00 and 6:00, consistent with an impact from the right

side."

     Did I read that correctly?

A   You did.

Q   When we broke this morning, we -- I want to shift gears and

go back to the screeching sound that you discussed this

morning.

     When we discussed that screeching sound, there's just a

couple of things that I would like to try to make sure that I

understand.

     The metallic sound or the screeching sound that you say you

heard, I heard a couple altitudes and I just want to make sure

I understand you.

     It's my understanding that you say that the metallic sound

you heard occurred at about 50.5 seconds on that videotape,

true?

A   I believe that's correct.

Q   Okay.  And the altitude of the aircraft at that time, I

believe you've given the opinion that it was at 38 feet,

1  approximately, correct?

2  A    38 to 39 feet above ground level.

3  Q    Okay.  So I just want to write down -- and just to make

4  sure that I've got you right.

5       So first, would you say 38 to 39 feet.  And if I write down

6  "AGL," would you understand that to mean above ground level?

7  A    I would.

8  Q    I will just write AGL.

9       All right.  And the second thing there, I believe, is that

10 that's at 50.5 seconds on the video, correct?

11 A    Yes.

12 Q    All right.  Okay.

13      And I think it's your opinion, from you what you told the

14 jury this morning, that that noise represents the destruction

15 of that land that resulted in those marks that we talked about

16 before the lunch break, true?

17 A    That is my opinion.

18 Q    And so what would be a fair way to capture that?  Land --

19 how would you characterize that, land marks -- probably not the

20 right word, but scoring?

21 A    Bushing failure.

22 Q    Bushing marks on land, maybe?  Yes, no?  What would you

23 say?

24 A    That is the time when the bushing was destroyed.

25 Q    Okay.  And that's where you say the shaft -- that's due to

1  the shaft failing, correct?

2  A    I'm sorry?

3  Q    Due to the shaft failing?

4  A    That's correct.

5  Q    Okay.  All right.  Very good.

6      Now I take it that during the course of the work that you

7  did in this case, I believe you testified previously that at

8  the time you formed your opinions and gave your deposition in

9  this case that you had never taken out an Otter and tried to

10  create that noise and then compare it to the sounds you hear on

11  the tape, correct?

12  A    I believe I testified that it would be impossible to try to

13  recreate that sound because you would have to break a torsion

14  shaft inside of an engine.

15  Q    Okay.  But maybe my question wasn't clear.  So let me try

16  it again.

17      I'm referring to your screeching sound.  Okay.  The

18  screeching sound that you mentioned, that destruction of the

19  land, all I'm trying to say is that you never went in and tried

20  to reproduce that noise itself; like, never took a torsion

21  shaft and tried to reproduce it in a lab to create that sound.

22  That's all I'm asking.

23  A    And I believe you mentioned my deposition testimony, in

24  which I did answer that question, that no one, including

25  Honeywell, has ever done that because it would be financially

1  and logistically, basically, impossible to do without

2  destroying an engine.

3  Q    But you have another teammate, a guy named Frank Graham.

4  Do you know who Mr. Graham is?

5  A    I do.

6  Q    Right.  And you are aware that Mr. Graham was given a copy

7  of that audiotape, correct?

8  A    I believe he had copies.

9  Q    Yeah.  And you know that he was listening to that tape on

10 his sophisticated equipment to look for certain noises on that

11 video.

12      Do you recall that?

13 A    I don't really know what Mr. Graham did.

14 Q    So did you read his deposition in this case?

15 A    I don't think I did.

16 Q    So Mr. Graham was one of the other experts hired on the

17 plaintiffs' side, and he listened to the tape, and you're

18 telling us you have not talked to him about the tape and you

19 have not read his deposition?  Is that correct?

20 A    So those are two different questions.

21 Q    Okay.  Let's take them one at a time.

22      Did you read his deposition?

23 A    I don't believe I did.

24 Q    Okay.  Would it be significant to you if he testified that

25 in listening on his equipment to the audiotape that he did not

1   draw any conclusions or make any estimation of what was making

2   that high-frequency vibration metallic sound that began at

3   50.4 seconds?

4   A   No.

5   Q   It wouldn't make any difference to you.

6   A   It wouldn't.  Mr. Graham is not a mechanical engineer.

7   Q   Okay.  Okay.

8       Let's talk for a minute about the NTSB devices report.  Did

9   you look at the NTSB devices report?

10  A   Yes.

11  Q   Okay.

12          MR. MCQUILLEN:  And if we could mark and show

13  Exhibit 2.27, which is the NTSB's devices report.

14          If I can go to the bottom of page 2, Your Honor, and

15  pull up that page, or that segment.

16          We would request to publish that to the jury, Your

17  Honor.

18          MR. BRAUCHLE:  It's the same objection, Your Honor, as

19  previous.

20          THE COURT:  And, Mr. McQuillen, is this in one of the

21  factual reports?

22          MR. MCQUILLEN:  It is.

23          THE COURT:  So the objection is noted and preserved.

24  I will overrule.

25          MR. MCQUILLEN:  It's called -- it's called the

1   devices.  It's called the -- it's called the Nonvolatile Memory

2   Devices Specialists Factual Report.

3            THE COURT:  Very well.  The objection is preserved but

4   overruled.

5            At this point in time, you are permitted to publish

6   page 2 of Defense Exhibit 2.27?  Is that correct?

7            MR. MCQUILLEN:  Yes, Your Honor.

8            THE COURT:  Very well.

9   BY MR. MCQUILLEN:

10  Q   And does that NTSB report on that page 2, the Nonvolatile

11  Memory Devices report, indicated that the audio was recorded

12  during all three videos, and in that report they -- you know

13  they are referring to the iPhones, correct?

14  A   Yes.

15  Q   It states, "The audio recorded with the videos indicated

16  normal operation of the aircraft and no anomalous engine sounds

17  were recorded."

18       Did I read that correctly, sir?

19  A   That's what that says.

20  Q   All right.  Let's go and switch gears and talk about the

21  trim position.

22            MR. MCQUILLEN:  And if we could bring up -- I believe

23  it's Plaintiffs' Exhibit 107, if we could do that.

24  BY MR. MCQUILLEN:

25  Q   And, actually, while we're waiting for Plaintiffs'

1    Exhibit 107, Mr. Sommer, let me just ask you a little bit about

2    your experience.

3        I believe at the time your deposition was taken, at that

4    time you told us that you had never flown the DHC Otter as

5    pilot in command, the one with the radial engine, true?

6    A    I think that's true.

7    Q    Yeah.  And I think you also told us that as pilot in

8    command, you have never flown any aircraft powered by the

9    Honeywell TPE331 engine, true?

10   A    I have never flown as pilot in command, that is true.

11   Q    Okay.

12           MR. MCQUILLEN:  All right.  So if we can go to

13   Plaintiffs' 107.

14   BY MR. MCQUILLEN:

15   Q    Now, you mentioned, when you were telling the jury about

16   the trim system in the Otter, all I wanted to establish -- I

17   just want to make sure we are -- hopefully we can maybe try to

18   make this clear.

19       Talking hypothetically, we can see on this exhibit there's

20   an arrow that points to takeoff setting, correct?

21   A    Correct.

22   Q    And that arrow looks like it's somewhere between a notch

23   there called 1 and 3.  Would you agree with me?

24   A    I think it would almost be exactly at 2.

25   Q    Okay.  And all I'm trying to establish by this picture,

Mr. Sommer, is simply state that the -- after the actuator was

measured by the safety board and put in another exemplar to see

what the effect was, the actuator position had -- is in a

position 1.5 -- what do you call these, units, notches?  What

word do you use?

A    Units has been used.

Q    Okay.  Let's use units.

     And by "units," we are talking about these tick marks,

agreed?

A    Yes.

Q    Okay.  So all we are trying to establish is that when they

put the actuator position in the exemplar plane, they found

that the trim position was 1.5 units toward the nose down

direction from where the arrow is pointing at number 2.

     Would you agree with that?

A    All those statements are correct.  It is still nose up

trim, but it is correct that it is 1.5 units down from the

recommended takeoff position.

Q    And when we say "down," you mean moving toward the nose

down position?

A    Correct.

Q    Okay.  All right.  Let's move on to the aircraft

performance and just a couple of quick facts I'd like to

discuss here real quickly.

     And on the aircraft performance, the -- maybe we can put

1    that here.  So just a couple real quick things on the

2    performance.  I think you've already covered one of the things

3    we want to talk about, and that's the height where you believe

4    the engine failed at 38 and 39 feet.

5        I think you testified earlier, and very early in your

6    testimony, that you were also working with a Mr. Graham and you

7    used his data.  Do you recall that, or using some other data?

8        And just to help you, I thought I heard you say that you

9    made some calculations based on speed, et cetera, and I just

10   want to find out where that came from.  Did it come from the

11   NTSB reports?  Did it come from Mr. Graham?  Where did it come

12   from?

13   A    The information that I discussed in my direct examination

14   was based upon data that was derived from the NTSB study.

15   Q    Okay.  So those were data that you took from the NTSB study

16   and from there, you made, you know, certain statements about

17   you -- what you believe was the height of the engine failure

18   and also how high the airplane got during the flight, correct?

19   A    Yes.

20   Q    Because you showed us your fed 3D kind of image that you

21   did, and I believe you testified that the airplane during the

22   flight got up to an altitude of about 125 feet above the

23   ground, correct?

24   A    Correct.  I believe I said 120 to 125.

25   Q    Okay.  I want to make sure.

1    So altitude on the -- your performance calculations were

2  about 120 to 125 feet?  Did I hear that correctly?

3  A    Yes.

4  Q    And that's AGL again.  If I write that, we will be on the

5  same page that that's above ground level, true?

6  A    That's true.

7  Q    Okay.  Now, you also work with a gentleman named -- you

8  mentioned that you got some of this work from the NTSB study.

9  Did you also see in that study that there were some data

10  related to the climb rate of the airplane?

11  A    Yes.

12  Q    And did you see that the NTSB in those studies, there was

13  a -- did you see a reference in there that there was a climb

14  rate just before the stall of about a 1,090 feet per minute?

15  A    I don't recall what the NTSB's conclusions or opinions were

16  in that regard.

17  Q    Okay.  Did you work with a person named Mr. Cochran,

18  Dr. Cochran?

19  A    I did have some conversations with Dr. Cochran.

20  Q    And did you see that he also tried to determine the rate of

21  climb of the aircraft just prior to the stall?

22    Did you see that?

23  A    It's been some time since I've discussed anything with

24  Dr. Cochran.  I don't really recall.

25  Q    If I told you that his report stated that it was a 1,092

1   feet per minute just before the stall, does that ring a bell?

2   A   To be honest, it doesn't, but I haven't reviewed his

3   information in quite some time.

4   Q   Any reason to doubt it?

5   A   I don't believe that you would be making up information in

6   the courtroom.

7   Q   Okay.  Well, I want to make sure that we're -- so as you

8   sit here today, are you saying that you don't recall the NTSB

9   study comment about the rate of climb, nor do you recall your

10  other teammate, Dr. Cochran's, determination about the rate of

11  climb just before the stall?

12  A   As I testified previous, I did not incorporate any of the

13  NTSB conclusions or opinions into my testimony or my opinions.

14  So their conclusion and opinion of the climb rate I did not

15  focus on.

16      So we can go back and look at it, if you like, but that was

17  not the basis for my conclusions and as part of my

18  investigation the development of my opinions.

19  Q   Understood.

20          (Whereupon, the Court Reporter

21           interrupted for clarification.)

22          MR. MCQUILLEN:  Your Honor, may I approach the witness

23  with a copy of that report?

24          THE COURT:  You may.

25          MR. BRAUCHLE:  Your Honor, I think I need to see...

                    MR. MCQUILLEN:  Sure.  This is the NTSB, the video

study, and it's only being shown for the purpose of

recollection.

                    THE COURT:  Mr. Brauchle, what is the objection?

                    MR. BRAUCHLE:  I think he said he didn't rely on it.

                    THE COURT:  And that is what I heard as well.  So at

this point in time, I'm going to 403.  It wouldn't be

permissible to show the witness.  He said he didn't rely on

that report, so I will sustain the objection.

                    MR. MCQUILLEN:  Fair enough.

BY MR. MCQUILLEN:

Q    And you were looking for something there, Mr. Sommer.  Did

you find what I was referring to?

A    No.

Q    Okay.  Very good.  So let's move on and we will talk about

the stall itself.

     You agree with me, and I think it's apparent from your

reconstruction, that the plane made a right turn or it stalled

and rolled to the right before it hit the ground.

     Will you agree with that?

A    The stalling and rolling off to the right, I would agree

with.  I probably would not say right turn.

Q    I would agree with you on that.

     It stalled -- it was turning on its own.  Basically it

rolled to the right on its own?

1   A    It rolled to the right.

2   Q    Okay.  And at the time of your deposition, as I understand

3   it in this case, when you gave all your opinions, you had never

4   gotten into an Otter to do any type of flight tests to

5   determine how the airplane performs when there's a power on or

6   a power off stall, correct?

7   A    At the time of my deposition, I believe I discussed that in

8   my deposition and that there was some debate on doing so.  And

9   then the determination was made, after we received the results

10  of the defense flight testing, that it wasn't necessary for us

11  to do it as we already had those results.

12  Q    Right.  So my question was, you didn't do any flight

13  testing, true?

14  A    I did not go fly an Otter as I had the answers that I

15  needed from the defense.

16  Q    Okay.  Okay.  Let's talk about some of the weight and

17  balance issues associated with the airplane.  And I know the

18  jury's heard a lot about this, so we'll try to get through it.

19      So back on -- as far as this accident is concerned, you're

20  familiar with the facts and circumstances related to how this

21  airplane was loaded, correct?  And by "loaded," I mean how the

22  weight was distributed inside the airplane with respect to

23  passengers and bags and cargo, correct?

24  A    I am familiar with the assumptions and the estimations that

25  were made in regard to the calculations that were performed to

1  make the determinations on weight and balance.

2  Q   Right.  And you're aware that when you do a weight and

3  balance --

4      You're aware that when a pilot does a weight and balance,

5  they have to go inside the airplane flight manual and they have

6  to figure out where they are going to put their weight in the

7  plane, they do a calculation based on what the manual says to

8  determine what effect that weight will have in a certain

9  position inside that airplane.

10     Do you agree with me?

11 A   That's kind of a non-pilot way to put it, but yes, that's

12 correct.

13 Q   Okay.  And so what the pilot does, or is supposed to do, is

14 to make sure when you put someone in a certain row, for

15 example, the manual is going to tell the pilot what the number

16 is that's associated with weight in that location.  Sometimes

17 people call it a moment arm or something like that, correct?

18 A   The arm is the distance.

19 Q   Yeah.

20 A   And the moment is the weight times that distance.

21 Q   And so there's tables in the manual that tell the pilot to

22 take that weight, multiply it by a certain moment, and add it

23 up, correct?

24 A   Technically, you multiply it by the arm, and then you get

25 the moment, and then you can add up the moments.

```
 1  Q   Right.  And that can be done for any location along the
 2  plane as you move back towards the cargo area, correct?
 3  A   Usually it's designated to a seat.  So I don't know that
 4  any location is really accurate.  But, typically, they will
 5  have defined arm for the pilot's row, defined arm for the
 6  second row, defined arm for the third row, and they just give
 7  you those numbers when you are trying to find the calculation.
 8              MR. MCQUILLEN:  I would like to use Exhibit 64,
 9  please.
10              DEPUTY CLERK:  Defense Exhibit 64?
11              MR. MCQUILLEN:  Defense Exhibit 64.
12              DEPUTY CLERK:  Or plaintiff --
13              MR. MCQUILLEN:  Defense exhibit, I'm sorry.
14  Defense 64, page 397.  I just want to show this one page.
15              MR. BRAUCHLE:  Without objection, Your Honor.
16              MR. MCQUILLEN:  May I publish, Your Honor?
17              THE COURT:  You -- this exhibit isn't labeled, but you
18  said it was 64?
19              MR. MCQUILLEN:  64.
20              THE COURT:  At this point in time, you may publish.
21              MR. MCQUILLEN:  Thank you, Your Honor.
22  BY MR. MCQUILLEN:
23  Q   And all I want to do is point out -- have you seen this --
24  I'm showing page -- it's actually page 6-4 of the de Havilland
25  Otter manual in the weight and balance section, Mr. Sommer.
```

1       Have you seen that before?

2    A    Yes.

3    Q    All right.  And, again, I just want to go through that what

4    the pilots do is they take a certain position in the airplane,

5    whether it's seats, and they multiply it by these numbers here.

6            MR. MCQUILLEN:  Can we make this bigger?

7    BY MR. MCQUILLEN:

8    Q    And they multiply it by these numbers.  Here we have moment

9    divided by a hundred, 235, 285 --

10            (Whereupon, the Court Reporter

11             interrupted for clarification.)

12   BY MR. MCQUILLEN:

13   Q    If we go into Row 1 of where the passenger area is, okay.

14   You agree with me that the manual provides what they call a

15   moment divided by a hundred which is a number associated with

16   that location.

17       Would you agree with that?

18   A    No.  What they provide is an arm.

19   Q    Okay.  But that's for the pilot's use in determining the

20   center of gravity, agreed?

21   A    You take weight of what's in that seat and then you

22   multiply it by the arm that is published on that page, and then

23   you get the moment.

24   Q    Right.  That's what I'm asking.

25       So he takes the weight and he multiplies it by that 235,

1  correct?

2  A    No.

3  Q    Okay.  What does he do?

4  A    You take the weight and you multiply it by the 137.

5  Q    Okay.  And then?

6  A    And that gives you the moment that you then put into what

7  here is an example, which is 235, but that is going to change

8  with every single flight.

9  Q    Right.  What you just said is what I'm trying to establish;

10  that there is a formula to conduct the effect of the weight in

11  a particular area, and as we go aft --

12            MR. MCQUILLEN:  If we can zoom back in here, please.

13  BY MR. MCQUILLEN:

14  Q    As we go aft in the airplane, all I'm trying to establish

15  is that those numbers increase as we go aft, agreed?

16  A    The arm?

17  Q    Whatever you see in the table that's in the manual right

18  here, you can call it the moment times a hundred or you can

19  call it the mean arm.  They are all increasing as we go aft,

20  agreed?

21  A    So the moment divided by a hundred is an example.  That's

22  not a published piece of information.  Pilots don't use that.

23  That is not something that the pilot incorporate into their

24  calculations.  That is not -- it's just an example for the

25  pilot to follow.

1        The arm is what is published, and I would agree with you

2   that the arm increases as you go aft.

3   Q    Okay.  Fair enough.  That's all I'm trying to establish.

4        That for a given location, this arm up here, called mean

5   arm is the one you choose to use, I'm not arguing with you, as

6   we go aft, that number increases.  So if you use 50 pounds in

7   Row 1, and multiply that by the mean to 137, all I'm trying to

8   show is that you're going to get a higher number of the same

9   weight in the last row.

10       Would you agree with me?

11  A    Absolutely.

12  Q    Okay.  All right.  And so the pilot takes those numbers --

13  and by the way, I know this all sounds complicated, but you

14  fly, you know there's programs that are out there that can

15  could this in a heartbeat, in seconds, right?

16  A    They are aircraft-specific so you have to set them up, but

17  once they are set up, you can enter in the weights and all the

18  locations, and you can make them calculate what your overall

19  balance and weight is.

20  Q    Right.

21       Okay.  And in terms of the Rediske operation, you are aware

22  that the Rediske part 135 carrying operation had a set of what

23  they call operational specifications from the FAA, correct?

24  A    Yes.

25  Q    And you are familiar with the fact that those operational

```
 1   specifications required Rediske to use only actual weights in
 2   determining weight and balance, correct?
 3   A    They are supposed to use actual weights, correct.
 4   Q    Right.  And you read, during the course of materials that
 5   you did in the NTSB report, that when they were loading the
 6   airplane and putting things in the cargo section, the lodge
 7   owner was there, and the lodge owner indicated they didn't
 8   weigh anything that went in the cargo area.
 9        You're aware of that?
10   A    I think he said he didn't see that occur.  There was a
11   scale sitting outside the building, but I don't think he had
12   taken part in any way.
13   Q    Right.  Did you hear the operator say that -- or did you
14   look at what the NTSB report said about that, you mentioned
15   that you read it.  Did you look at the NTSB factual report
16   about what they said about what the lodge owner reported?
17   A    I read the statement regarding the lodge owner.
18   Q    Is it your understanding that the NTSB factual report noted
19   that the lodge operator was present during the loading of the
20   plane and said the cargo was not weighed before it was loaded?
21   A    I don't remember the exact wording, but I don't remember
22   him having any information regarding it being weighed.
23   Q    All right.  Okay.  And you're familiar that the NTSB also
24   afterwards obtained copies of certain receipts that they
25   obtained after the accident of things that were bought from the
```

1  store, and the NTSB weighed those materials and came up with a

2  certain weight assigned to them.  Do you recall that?

3  A   Yes.

4  Q   And they also weighed the material that was in the back of

5  the airplane, correct, as recovered at the accident site?

6  A   They did.  They indicated that they weighed it after it had

7  been subject to the fire and the post firefighting activities,

8  meaning that a lot of it was quite wet.

9  Q   Right.  And that's all discussed for and accounted for in

10  the materials that you read in the NTSB studies, correct?

11  A   It is discussed in the study.

12  Q   Right.  Now, as far as the weight and balance is concerned,

13  may I refer, please, to Defense Exhibit 61.

14     And you said that you had read the airplane flight manual

15  supplement I believe you were asked that by counsel, and you

16  saw in there that -- in the section related to the weight and

17  balance in the de Havilland manual, there's a warning in the

18  manual.

19     Do you recall seeing that, Mr. Sommer?

20  A   Yes.

21  Q   And that warning states that "The CG position of a loaded

22  aircraft must be checked and verified prior to takeoff, and

23  appropriate trim settings should be used.  Otherwise abnormal

24  stick forces and position may result."

25     Correct?

1   A   Correct.

2   Q   Now, the appropriate CG range here, according to that

3   manual was what, sir?  Was it something like a 132 to

4   152 inches?

5   A   The aft limit I believe was 152.2 inches.

6   Q   Okay.  Did I write that correctly, sir, 152.2 inches?  I

7   know my writing is pretty horrible, but...

8   A   I believe so.

9   Q   Okay.  And then as far as that particular number is

10  concerned, to your knowledge, Pilot Rediske did not prepare a

11  weight and balance for this flight?

12  A   I don't know what he did, but nothing has been produced.

13  Q   Okay.  So to your knowledge, Pilot Rediske did not prepare

14  a weight and balance report for this flight, correct?

15  A   Again, I have no idea what he did on his phone or what he

16  did on a scratch pad.  I -- I don't know.  All I know is what

17  Rediske Air produced, and they have not produced an official

18  weight and balance document for that flight.

19  Q   So in all the work that you've done in this case and all

20  the NTSB materials that you have read and all the investigation

21  that did you, you found no evidence to date that Mr. Rediske

22  prepared a weight and balance report before this flight took

23  off; is that true?

24  A   I think I've answered that question, but I have never seen

25  any document from Rediske Air formalizing the weight and

1  balance for this flight.

2  Q   Well, you used the word "formalizing."  Do you not -- you

3  have not found anything anywhere in anything that you've seen,

4  all the NTSB reports that were done, all the work that you've

5  done in this case for the last many, many years, Mr. Sommer --

6  the question is:  To your knowledge, based on all that,

7  Mr. Rediske did not prepare a weight and balance for this

8  flight?

9  A   And I'll give I think the same answer for the fourth time.

10  I don't know what he did because he's deceased.  All I know is

11  nothing was ever produced.

12  Q   So to your knowledge, Mr. Rediske did not prepare a weight

13  and balance for this flight?

14          THE COURT:  Sustained.  Let's move on, Mr. McQuillen.

15          THE WITNESS:  Rediske Air --

16          THE COURT:  Sir, you don't have to answer the

17  question.

18          THE WITNESS:  Sorry.

19  BY MR. MCQUILLEN:

20  Q   You prepared a weight and balance though, didn't you?

21  A   Yes.

22  Q   And the weight and balance that you prepared based on the

23  materials that you read show that the aft center of gravity

24  that you determined was 157.94, correct?

25  A   Correct.

1   Q   And 157.94 would be 5, almost 6 inches aft of what the

2   manual says is the max allowable center of gravity, correct?

3   A   Correct.

4   Q   I'm going to call this Sommer CG 157.94, correct?

5   A   Yes.

6   Q   And you concluded that the aircraft was aft of its

7   CG limit, correct?

8   A   Correct.

9   Q   All right. Are you familiar with the federal regulations

10   on complying with the weight limits in the airplane flight

11   manual?

12   A   Yes.

13   Q   Okay. Are you also familiar with the duties of the pilot

14   in command?

15   A   Yes.

16   Q   And you're aware that the regulations place the burden on

17   the pilot in command to be directly responsible for and has the

18   final authority for the operation of the airplane?

19   A   There is a regulation that says that, yes.

20   Q   And that includes assuring that the weight and balance is

21   within the proper manufacturer's airplane flight limitation,

22   correct?

23   A   It is ultimately the pilot's responsibility.

24   Q   All right. Now, you said over the last couple days that --

25   you characterize the center of gravity has slightly aft. I

1  think that's what I heard you say yesterday, correct?

2  A   Correct.

3  Q   All right.  And I think that I heard you say yesterday that

4  as long as the engine is running and you have the propeller

5  producing thrust, the position of the gravity, where it is

6  located should not be an issue at all.

7      Did I say that correctly?  Is that your testimony

8  yesterday?

9  A   As long as the engine is running, that calculated center of

10 gravity should not be an issue.

11 Q   And by "that calculated center of gravity," you're

12 referring to your 157.94, right?

13 A   Correct.

14 Q   You say, "The aircraft can be flown in that configuration

15 with a fully operating engine without any issue and had been

16 flown for three years and 300 with no reported issues."

17     That's what you told us yesterday, and you told us that

18 again today, correct?

19 A   Correct.

20 Q   I want to talk about those three years and understand what

21 you're saying.  Are you saying that Pilot Rediske flew around

22 for three years with the center of gravity back were you

23 calculated to almost 158 inches, that that's what he was doing

24 in those three years?

25 A   What I'm saying is that the setup of the aircraft was the

same. The extended fuel tanks were still installed. The turbine engine was installed. The short takeoff and landing kit was installed, so nothing about the airplane changed.

And I don't know what -- all of the flights that he took and whether they had baggage such -- and occupants such that it would have created 152 -- sorry, 157.9 center of gravity, but it's pretty likely.

Q   Well, you have no clue what happened on those other flights for three years. You weren't there, were you?

A   I only know directly about one.

Q   Right. So for the three years and the 300 hours of operation in this aircraft, which you have led us to believe was operating in the 157.94 off the charts range for the center of gravity, you have no direct personal knowledge that any of those flights in those three years or 300 hours were operated at that range of 157.94; true statement?

A   No. I have direct knowledge from Mr. Isham that that exact aircraft was flown with seven workers, all male, who were going out into the Alaska wilderness to work manual labor for two to three weeks with all of their tools and all of their personal items and clothing, to do this work for two to three weeks, plus the pilot, and they didn't have any issues whatsoever. There was no problem with controllability. There was nothing noted.

The subject flight was half adolescents that weighed no

1  where what a normal, you know, working male adult going out to
2  work in the field in Alaska would weigh, and they were going
3  for one night.
4      So I do I have at least one flight that was opined upon or
5  testified to by Mr. Isham, and there wasn't any issue, and they
6  have been doing this for three years.  So it is my opinion that
7  it's more likely than not that the center of gravity issue was
8  not causal in the accident without the engine failure.
9  Q   The Mr. Isham flight -- okay.  The Mr. Isham flight you
10 heard of this from Mr. Isham from his testimony yesterday?
11 A   I am aware of what he said in his testimony.
12 Q   Yesterday?
13 A   Yes.  And I spoke to him.
14 Q   When?
15 A   A couple of days ago.
16 Q   Okay.  So before a couple days ago, you had no idea
17 anything how this airplane was operated by Mr. Rediske until
18 you talked to Mr. Isham two days ago; is that your opinion?
19 A   No.
20 Q   Is that -- let me back it up.
21 A   I knew everything that I stated and everything that is
22 correct in regard to the configuration of the airplane, in
23 regard to the three years that it was operating and in regard
24 to how it was being used, that it was being used to transport
25 people and cargo to various places around Alaska in a charter

1    135 operation.

2         I'm aware that they indicated it was an expensive airplane

3    to operate.  So you don't want to send it out on a trip that

4    you could take a smaller airplane to do.  You need to have a

5    lot of stuff and a lot of weight and a lot of gear and a lot of

6    people in order to justify its use.

7         I knew all of those things.

8    Q    Mr. Sommer?

9    A    -- when I made all of my opinions, and that was what I

10   based my opinions on.  Mr. Isham's testimony was just in

11   addition to what I already knew about the operation of the

12   aircraft.

13   Q    So let's take those two departments now.  Let's leave

14   Mr. Isham aside, something you heard for the first time

15   yesterday or a couple days of ago.

16        For every other flight that Mr. Rediske took for three

17   years in that airplane, you have no records of who was on it,

18   correct?

19   A    No, but I don't have good records of all the trips that he

20   took.

21   Q    Do you have any?

22   A    There's indication from --

23   Q    Please, Mr. Sommer.

24             THE COURT:  Mr. McQuillen, let the witness answer the

25   questions.  To the extent you're dissatisfied with it, you can

1    follow up.

2         MR. MCQUILLEN:  Very well.

3         THE WITNESS:  There's indication from the people that

4    worked at Rediske Air as to the purpose of the flight, the

5    airplane and how it was being used.

6    BY MR. MCQUILLEN:

7    Q    Okay.  My question isn't the purpose of flight or how it

8    was being used.  My question is how much weight, how many

9    passengers, how much cargo was on all the flights that were

10   being taken by the Rediske operation in those 300 hours.

11        You have no information on that in your file, correct?

12   A    I have the witness statements that indicate they were

13   running a couple of 206s.  They had an Islander.  They had the

14   Otter, and they had a couple of other airplanes.  They needed

15   to have sufficient weight and justification to run the Otter

16   because it was expensive to run.

17        So they're not running it around with two people onboard.

18   They would use the Cessna 206s.  That is in the witness

19   statement, so I have some information, not to your question.

20   It's not that I have nothing.

21   Q    But my question -- and I appreciate your answer, but my

22   question is:  For any of those flights you just discussed, you

23   have nothing like, for example, a weight and balance report,

24   which would tell you who was on it and how much everything

25   weighed, Mr. Sommer?  That's all I'm trying to find out.  Do

1  you have one?

2  A   So that question's a little different.  I don't have weight

3  and balance sheets for any of those flights.

4  Q   And you never spoke to any of the people who were on any of

5  those flights for those three years; true statement?

6  A   I don't know how I would do that, but that's true.

7  Q   Okay.  All right.  Now, you mentioned in this case that you

8  didn't think that the aft CG had a causal role in the aircraft,

9  correct?

10 A   No.  That is not my opinion.

11 Q   I mean, your opinion is that the aft CG did contribute to

12 this accident, correct?

13 A   I believe that this accident would not have occurred if the

14 engine had not failed, but I do believe that the aft CG played

15 a role.

16 Q   It is your opinion that the in-flight engine failure and

17 the aft CG caused a loss of control?

18 A   Yes.

19 Q   Okay.  Let's talk for a minute about the flaps.  You

20 mentioned --

21        MR. MCQUILLEN:  If we can show Exhibit 64, please.  I

22 think it's the same page we had up before, which is Exhibit 64.

23 It's in Section 4, page 386.

24        May I publish this, Your Honor?  This is page 4-7 of

25 the airplane flight manual of Exhibit 64.

1          MR. BRAUCHLE:  No objection.

2          THE COURT:  You may publish.

3          MR. MCQUILLEN:  If you could blow up that top half,

4    please.

5    BY MR. MCQUILLEN:

6    Q    So this is the -- Texas Turbine was the entity who

7    developed this takeoff checkoff list for this airplane, right,

8    Mr. Sommer?

9    A    Correct.

10   Q    All right.  And you can see that -- and this would be

11   applicable to the airplane that crashed.  Would you agree?

12   A    Yes.

13   Q    Okay.  And this is their recommended normal procedures,

14   right?  This is for takeoff -- wing flaps in the takeoff

15   position, agreed?

16   A    That's correct.  It's the normal procedures, not the

17   operating limitations, but the normal procedures.

18   Q    Well -- and it's their recommended procedure.  That's

19   what's in their checklist, true?

20   A    That is exactly correct.

21   Q    Okay.  And I think you testified that you agree that the

22   actual wing flaps were in the full nose down position, correct?

23   A    Full down, not nose down.

24   Q    Yeah.  And the -- I think you testified at the close of

25   your testimony before Mr. Brauchle that the flaps in the fold

1  down position where not a cause of the accident, correct?

2  A   Correct.

3  Q   But do you recall testifying in this case that you have no

4  opinion at all of what the effect of the full down flaps would

5  be on the effectiveness of the elevator?  Did you give that

6  opinion in your deposition in this case?

7  A   That's true.  My deposition was completed before I had the

8  flight testing from the defense.

9  Q   Okay.  And in fact the -- you also worked with a

10  Mr. Cochran, correct?

11  A   Yes.

12  Q   All right.  And you -- did you read -- now, Mr. Cochran, as

13  I understand it, he was one of the people that you spoke to who

14  was also retained by the plaintiffs to look into this too,

15  correct?

16  A   Correct.

17  Q   You understand him to be a teacher at Auburn University in

18  the Department of Aerospace Engineering?

19  A   Yes.

20  Q   And he taught things like stability and control of

21  aircraft, correct?

22  A   I don't recall his CV that well, but he's a Ph.D. and

23  professor in aerodynamics.

24  Q   Do you recall reading his deposition in this case?

25  A   It's been some time ago, but, yes, I did read it.

1  Q   Do you recall where Mr. Cochran testified that the use of

2  full flaps negatively affected the pilot's ability to control

3  the airplane?

4  A   I don't really recall.

5  Q   Do you recall reading in his deposition that if the flaps

6  are set in the takeoff position -- I'm sorry, the landing

7  position, it does affect the downwash on the tail?

8  A   Again it's been a while since I read his dep.

9  Q   Do you recall him saying that if the pilot is pushing and

10 pushing to get the nose down of the elevator, the elevator is

11 not as effective because of that downwash?

12 A   I don't specifically recall.

13 Q   Okay.  Do you recall his saying that the use of flaps in

14 the landing position negatively affected the pilot's ability to

15 control the plane?

16 A   Again, I have not read his deposition in a long time.

17 Q   Now, you mentioned I think at your deposition -- you talked

18 about your deposition that you --

19         MR. MCQUILLEN:  If I could have just a moment,

20 Your Honor, I may be finished.

21         THE COURT:  Actually on that note, ladies and

22 gentlemen, this is far earlier than we normally take our

23 afternoon recess, but I do have an issue that I want to discuss

24 with the parties.  It's entirely my fault.  To the extent that

25 you're frustrated, please aim it at me.

 1          However, when we come back as we go through the

 2    afternoon, if you do need a break given this oddity, always

 3    feel free to catch Madam Clerk's eye or my eye, just do this,

 4    and we'll make sure we give you a break.

 5          We are going to do this a little bit early, so that

 6    counsel and I don't have to speak at sidebar.  Thank you.

 7          Madam Clerk?

 8       (Out of the presence and hearing of the jury panel.)

 9          THE COURT:  Please be seated.  So I know when I first

10    looked over this case, I indicated that the parties -- that the

11    law of the case would be as Judge Holland determined it to be.

12          And I feel somewhat reluctant disagreeing with such a

13    giant, but I find myself at a point where it's impossible for

14    me to think that the orders at 537 and 538, while academically,

15    are not pragmatically problematic.  I'm not quite certain what

16    to do.

17          And let me give you some frame of reference for what

18    my I guess primary issue is.  There are some other issues on

19    the periphery.

20          I recognize that what Judge Holland anticipated were

21    that factual reports would be referenced as part of an expert's

22    testimony on the stand, to the extent that expert might have

23    relied upon them.

24          Well, what is effectively happening here during the

25    course of this trial is that NTSB is being used as an expert

1  witness. They are not subject to any 702 determinations, and

2  the fact that they're not only subject -- they're not only not

3  subject to the 702 determinations, but they're treated almost

4  as they are infallible.

5       And that is -- and I don't think that's just my

6  impression. That is the way in which the testimony and the

7  questions are being framed, and this issue is exacerbated by

8  the fact that this is Alaska. We called 40 people in for jury

9  service. Two of them had actually read the NTSB report in this

10 case.

11      And so I do worry very much that there are probably

12 multiple jurors in that jury box who are very familiar with

13 what NTSB reports are, and so to the extent that they are

14 consistently being referenced, one, it begs the question that

15 they're going assume that there was a conclusion from the NTSB,

16 and why are they not being provide with that.

17      But the more immediate issue is how to resolve the

18 fact that I think we've gone beyond what Judge Holland had ever

19 contemplated occurring during the course of this trial, and the

20 fact that I am uncomfortable now with the fact that, for

21 example, Mr. Sommer is now being compared to an NTSB study, and

22 the implication with every question is that he can't possibly

23 be right if the NTSB came to a different conclusion.

24      That shouldn't be how this is framed, particularly

25 given the fact that the plaintiffs or the defense theoretically

 1    are not at liability to ever question the methodology, the

 2    approach, the practice, the tenacity, the professionalism of

 3    anybody at NTSB who produced these reports, and that is -- the

 4    absence of that ability is untenable from an evidentiary

 5    standpoint.

 6          Now, ultimately -- and I have highlighted this fact

 7    before as an idea, as a concept.  It's no longer an idea or a

 8    concept.  This Court will be giving a limiting instruction

 9    during the final jury instructions that discusses NTSB and what

10    they can or cannot use it for.  I haven't figured out the

11    language yet.  It's something Ms. Kelly and I will work on, but

12    I also encourage the party to meet and confer and try to figure

13    out how best to articulate the role that NTSB -- references to

14    these should play in their deliberations; namely, how little a

15    role it might play in the deliberations.

16          But the reason I wanted to do this before you

17    concluded your cross, Mr. McQuillen, is that I'm going to give

18    plaintiffs broad latitude on redirect or with any of their

19    other witnesses, on cross-examination with defense witnesses,

20    to attack NTSB studies, the methodology, the fact that none of

21    this is open to debate in this courtroom, which is not

22    necessarily what was articulated again in Judge Holland's

23    orders at Docket 537 and 538.

24          Nevertheless, I can't -- I can't sit here and act as

25    though those orders, once confronted with the realities of

1  trial, still makes sense.

2          So the extent that, Mr. McQuillen, you want to

3  highlight any of the those issues before you conclude your

4  cross, I didn't want you to be prejudiced by me making this

5  ruling and allowing Mr. Brauchle that latitude and not you that

6  latitude.  But I can't think of any other way to remedy that

7  issue.

8          But I do think -- just under the umbrella of 702, it's

9  a real problem that there's nobody from NTSB who is going to be

10 held accountable for their approach, their methodology and what

11 may have failed.  And so to the extent that expert witnesses

12 can be critical of NTSB, I'm not going to prohibit that.

13         To the extent that experts could provide testimony

14 that articulates that they have no idea what methodologies or

15 approaches NTSB used, I'm going allow that in a way and manner

16 that maybe would be broader than I typically would in a trial

17 setting.

18         I'm happy to hear from the parties on this.  I

19 realized I'm sort doing this sua sponte, but as I sit here, I

20 just realized that something -- something must be done.

21 Otherwise I fear the jury is going to be left with the

22 impression that the experts who are actually testifying are

23 secondary to what the NTSB has concluded.  Whether those

24 conclusions are minor or large, it's a problem that has to

25 rectified.

1      So I'll start with you, Mr. Brauchle, and your

2  thoughts.

3      MR. BRAUCHLE:  Yeah, I agree with the Court.  It's

4  kind of been our fear when we wrote the motions back to

5  Judge Holland several years ago.  That's -- and I think that's

6  the intent of the statute, that you don't want to put the

7  impetus of the NTSB in there -- into the trial, and they play a

8  completely different role, and you can kind of see how that's

9  playing out here.

10      So I appreciate the Court allowing me the latitude.

11  How much I use, I don't know.  I'm trying to not mention the

12  NTSB at all, but I do appreciate the Court's --

13      THE COURT:  And at this point in time, the genie is

14  somewhat out of the bottle.  So I do think -- and I have been

15  sitting up here struggling with ways in which to rectify this,

16  and I don't know that this is perfect, but I also know that I

17  did assure the parties that I wasn't going to modify

18  Judge Holland's rulings, but this just feels necessary at this

19  point in time.

20      Mr. McQuillen, your thoughts?  I recognize that again

21  I made you a promise, and I've broken that promise, but

22  nevertheless.

23      MR. MCQUILLEN:  Yeah.  I mean, that's all I would

24  reiterate is that we've been trying to play within the

25  framework of rules here.  I mean, I've been keeping a limited

```
 1    role, and I haven't gotten into the studies at all.  They were
 2    prohibited.
 3            I popped up the PowerPoint things -- I'm sorry, the
 4    Powerplant Group reports.  I showed those to counsel before.
 5    They have written in their briefs that they have no objection
 6    to the use of those reports during the trial.  We discussed
 7    this at sidebar.
 8            I thought I was completely and still believe we were
 9    operating completely within the Court's --
10            THE COURT:  You are.  And, Mr. McQuillen, let me be
11    clear:  This is not an indictment of your cross-examination.
12    You have complied exactly with Judge Holland's ruling.
13            What I'm doing now is suggesting that perhaps
14    Judge Holland's rulings, I don't want to say were incorrect, it
15    feels disrespectful to -- to speak of the man that way, but as
16    I'm seeing this trial play out, I think probably -- it's
17    possible that he did not contemplate the manner -- the gravity
18    with which these NTSB reports would I guess be utilized.
19            But, no, Mr. McQuillen, I want to assure you.  This
20    isn't me taking issue with your cross-examination or your
21    fidelity to the orders.  I don't have problems with either.
22            I think my problems are really with the initial orders
23    themselves, seeing them play out in the course of trial.  And
24    this is me sort of in -- midstream trying to figure out a way
25    in which we can address this issue.
```

1    I don't want the jury left with this idea that NTSB is
2    sacrosanct or infallible.  I don't want them to think that to
3    the extent an expert witness disagrees with NTSB, then clearly
4    the expert witness is flawed.  And again, that's sort of the
5    implication, and it's unavoidable.
6            And I had to this, and I reiterate, the fact that this
7    is an Alaska jury, you two would know before better than I do
8    how common it is in other jurisdiction, but I have to imagine
9    it's pretty rare to have two people who have read the NTSB
10   report from the accident in question in the jury pool, or the
11   fact that everybody and their brother here either flies or
12   knows somebody who flies.
13           So that -- that is my chief concern.  I don't know
14   that this completely satisfies those concerns, but I'm left
15   without a lot of other options at this point in time.  But this
16   coupled with a jury instruction at the close of trial I think
17   may be enough to at least mollify my concerns, even if
18   Mr. Brauchle remains concerned.
19           But that's -- that's where I am at with this.  So I
20   will permit you -- I'm going to -- we'll step off.  Give you
21   time to think about whether or not you want to address this
22   change of angle, so to speak, in your cross before you
23   conclude.
24           And then, Mr. Brauchle, we can go to redirect, but
25   I'll step off the bench, and I will come back on at 2:30.

1  Thank you.

2          Madam Clerk.

3          DEPUTY CLERK:  All rise.  This Court stands in recess

4  until 2:30.

5      (Proceedings in recess from 2:19 p.m. until 2:30 p.m.)

6       (Out of the presence and hearing of the jury panel.)

7          DEPUTY CLERK:  All rise.  His Honor, the Court, the

8  United States District Court is again in session.  Please be

9  seated.

10          THE COURT:  Are the parties ready to proceed?

11  Mr. McQuillen, are you ready to proceed?

12          MR. MCQUILLEN:  I am, Your Honor.

13          THE COURT:  All right.  Thank you, Madam Clerk.

14       (In the presence and hearing of the jury panel.)

15          THE COURT:  Thank you, Madam Clerk.

16          Mr. McQuillen, you may proceed.

17          MR. MCQUILLEN:  Thank you, Your Honor.

18  BY MR. MCQUILLEN:

19  Q   Mr. Sommer, the aft CG that you determined the accident

20  claimed to be in the 157.94, fair comment that you never

21  piloted an Otter in that configuration?

22  A   I have not.  That's correct.

23  Q   Okay.  And as far as you know -- I asked you whether you

24  did some flight tests about the effect of the roll.  I'm going

25  to ask you now about flight tests with this CG.

 1      Did you or any members of your team do any flight tests in
 2  an Otter at 157.94 CG?
 3  A    To my knowledge, no one has ever done that from any team,
 4  including my own.
 5  Q    Okay.  And, in fact, you actually talked to your team about
 6  whether to do those test, correct?
 7  A    I'm sure we talked about that.
 8  Q    And do you recall testifying that you did talk to your team
 9  about it, and everyone was very concerned about safety to
10  actually load the aircraft at 158 inches aft CG at
11  8,000 pounds, give or take, even though you think the plane
12  will fly just fine, we didn't have the people lined up to take
13  on that task.
14  A    I think all of those things are true.
15  Q    Thank you.
16          MR. MCQUILLEN:  No further questions, Your Honor.
17          THE COURT:  Thank you, Mr. McQuillen.
18          Redirect.
19          MR. BRAUCHLE:  Thank you, Your Honor.
20          THE COURT:  And would you like -- we can move that.
21                      RE-DIRECT EXAMINATION
22  BY MR. BRAUCHLE:
23  Q    And why weren't people lined up to do that test?
24  A    One is that if you lose your engine, you're probably going
25  to die.

1  Q    Mr. McQuillen asked you a series of questions about being a

2  party representative to the NTSB.  In all your 20 years'

3  experience being involved in accident investigation, who is

4  typically invited to NTSB investigations as a party

5  participant?

6  A    The airframe manufacturer, the engine manufacturer.  At

7  times possibly a maintenance entity, if there is one involved,

8  and possibly a component manufacturer such as like a propeller

9  manufacturer.

10  Q    Okay.  And do you know what the reason is behind that?

11  A    The NTSB investigator in charge is typically -- does not

12  have the depth of knowledge in order to assess the intricacies

13  of complicated aircraft systems, varying from aircraft to

14  aircraft and engine to engine.  So they will call the people

15  that they believe have more knowledge and experience than they

16  do, which are the people that made the products.

17  Q    And in your 20-plus years of investigating accidents, do

18  you know of any case in which the family, or the family's

19  representatives, of people who are killed in plane crashes are

20  invited to be party representatives of the NTSB?

21  A    That is strictly prohibited.

22  Q    Mr. McQuillen also asked you a question about your report

23  in regard to a starter gear that failed in torsion.

24      Do you remember that testimony from earlier on page 19 of

25  your report?

A   Yes.

Q   Okay.  And he had you read the following sentence:  "The high RPM rotation of the propeller and, thus, starter generator explains why the sudden stoppage of a propeller on impact caused the starter generator shaft to shear."

     Let me ask you a question.  He didn't ask you to read the sentence prior to that, did he?

A   No, sir.

Q   Can you read that?  Do you have your report in front of you on page 19?

A   I do have my report.  And I believe that that sentence prior to that says, "The starter generator is driven off of the gear set directly connected to the propeller, which would have been windmilling at the time of impact."

Q   Okay.  And what, again -- you said yesterday, but just for a refresher, what is a windmilling propeller?

A   Just means that the airflow through the propeller is causing it to turn as opposed to the engine.

Q   Okay.  And also you were asked if you had read the -- a recording or summary of an interview with the lodge owner, and I believe Mr. McQuillen referenced that statement; that the lodge owner did not recall any of the stuff being weighed that was put in the airplane.

     Do you remember that?

A   Yes.

Q   Okay.  All right.  And do you recall also that within that summary of the statement that the lodge owner said that he "handed it to Willie who loaded it onto the airplane."  He stated that "The cargo area was not even close to being full."

Do you remember reading that in the report?

A   Yes.

Q   Okay.  And did that have any impact?  Did you take that into consideration in forming your opinions in this case?

A   It's consistent with my understanding that the pilot did not perceive on this flight, or any other flight that he had flown over the three years and 300 hours, that this aircraft was going to have a weight and balance issue with the way that it was loaded.

Q   Okay.  And, Mr. Sommer, based on your review of all the materials, your investigation, and your testing of the different component parts -- well, let me ask you this, before I sit down.

Mr. McQuillen went through a number of different components that you looked at in regards to this aircraft, aircraft engine components.  A bunch of them.  And I think you testified -- did you testify that you didn't find any issues or any anomalies that would have been significant or causal to an in-flight engine failure?

A   Other than the torsion shaft, that's correct.

Q   Okay.  Fair enough.

```
 1      And is it your opinion that this crash was caused by an
 2  in-flight engine failure due to the failure of the torsion
 3  shaft?
 4  A    Yes.
 5  Q    Okay.
 6          MR. BRAUCHLE:  Thank you, Mr. Sommer.
 7          THE COURT:  Thank you, Mr. Brauchle.
 8          Mr. Sommer, you are excused.  Thank you very much.
 9          THE WITNESS:  Thank you, Your Honor.
10          THE COURT:  Plaintiffs may call their next witness.
11          MR. BRAUCHLE:  And, Your Honor, it will be
12  Don Frankenfeld.  Mr. Moore will be conducting the examination.
13          THE COURT:  Thank you, Mr. Brauchle.
14          MR. BRAUCHLE:  And with the Court's permission, if I
15  could just step out.
16          THE COURT:  You may.  And if we could have someone
17  from the defense team remove the --
18          MR. MCQUILLEN:  Easel?
19          THE COURT:  Yes, that's the word I was looking for.
20          MR. MCQUILLEN:  I can do it, Judge.
21          (Oath administered to the witness.)
22          DEPUTY CLERK:  Thank you.  Please have a seat.
23          Sir, if you'd please speak into the microphone at all
24  times.
25          State and spell your first and last name.
```

1          THE WITNESS:  First name Donald, D-o-n-a-l-d, last

2    name Frankenfeld, F-r-a-n-k-e-n-f-e-l-d.

3          DEPUTY CLERK:  Thank you.

4          THE COURT:  Ladies and gentlemen, you are about to

5    hear testimony from Donald Frankenfeld who will testify to

6    opinion and the reasons for his opinions.  This opinion

7    testimony is allowed because of the education or experience of

8    this witness.  Such opinion testimony should be judged like any

9    other testimony.  You may accept it or reject it and give it as

10   much as weight as you think it deserves considering the

11   witness' education and experience, the reasons given for the

12   opinion, and all the other evidence in the case.

13          You may proceed.

14          MR. MOORE:  Thank you, Your Honor.  May it please the

15   Court.

16          DONALD FRANKENFELD, PLAINTIFFS' WITNESS, SWORN,

17                      DIRECT EXAMINATION

18   BY MR. MOORE:

19   Q   Mr. Frankenfeld, can you give us your address, where you

20   live, sir.

21   A   I live in Rapid City, South Dakota.  1307 38th Street.

22   Q   Very good.  And would you mind telling the jury about your

23   educational and occupational background, please.

24   A   Sure.  I've lived in Rapid City almost all of my life.

25   Attended a country school through 8th grade.  Finished second

1    in my class of 13 students.  Went on to high school, but a

2    large high school, and while I was there, I received a National

3    Merit Scholarship -- excuse me, I'm a little parched here.

4    National Merit Scholarship and Presidential Scholarship.  That

5    was so long ago that the president was named Lyndon Johnson.

6        Using those scholarships, I attended Yale University,

7    graduating in 1970 with a liberal arts degree.

8        And then I spent some time working for a bank, an

9    investment company, in Connecticut as an investment analyst and

10   an associate economist.  So that was really my first experience

11   as an actual economist.

12       And then moved to Los Angeles because my boss in

13   Connecticut has recruited me, and I did kind of the same thing

14   for a New York Stock Exchange member firm located in

15   Los Angeles.

16       After that experience, I went back to the school, went to

17   Harvard Business School and got my MBA.

18       I'm taxing my memory.

19       And went home to Rapid City, worked as an accountant for a

20   television broadcasting station for a while and as a

21   stockbroker for a firm -- probably isn't around any longer,

22   Piper Jaffray & Hopwood -- and I started an office for another

23   firm that isn't around any more -- I hope that has nothing to

24   do with me -- that is E.F. Hutton in 1986.

25       I received a Bush Foundation Fellowship.  It's fellowships

1    they give -- it's a leadership fellowship, they call it, for
2    people who live in the Ninth Federal Reserve District, of all
3    places.  But it's Minnesota, South Dakota, and parts of
4    Wisconsin, I think.

5        And I used that fellowship to study again at Harvard at the
6    John F. Kennedy School of Government where I received a
7    master's in public administration.

8        I've talked a little bit about my work as an accountant and
9    financial analyst and an economist.  After I graduated from the
10   Kennedy school, I started a small venture capital company that
11   was almost a sidelight.  Not a big operation at all.  And I
12   spent most of my time from that point on as a forensic
13   economist.

14       I should probably define that.

15   Q   Why don't you tell the jury, generally, what is forensic
16   economist?

17   A   A forensic -- it's not as glamorous as it sounds.  A
18   forensic economist is somebody who appears, as I'm appearing
19   today, before a jury, or in other litigation situations,
20   hopefully to provide some guidance to the jury about what
21   damages might be appropriate to award if a jury decides that
22   liability attaches.  So I don't have anything to do with the
23   liability question, but if you decide that an award is
24   appropriate, my role is to provide some information that
25   hopefully will allow you to confidently give the appropriate

1    award.

2        Forensic economists sometimes appear in other situations as

3    well, but litigation is the most common.

4    Q    And that being the case, this is not the first time you've

5    given testimony in court; is that true?

6    A    That's true.

7    Q    Can you tell the jury just a little bit about your

8    experience in litigation matters?

9    A    Yes.  I've been doing -- testifying as an expert witness

10   since 1976, although initially I just would do it on the side

11   while I was working for an investment firm doing other things.

12   Gradually, that business grew and became my predominant way of

13   making a living.  And I've been doing that really since,

14   full-time, since I guess -- well, certainly since the time I

15   graduated from the Kennedy school, which would have been in

16   1988.

17       I should mention, although it's not always thought of as a

18   credential, that I'm a recovering politician, and I was in the

19   state legislature for about eight years, beginning in 1976.

20   And I made the mistake of running for Congress in 1990 as the

21   Republican candidate in South Dakota, and I got creamed by the

22   incumbent, Tim Johnson, who went on to become U.S. senator.

23       That was enough for me to think my political career, such

24   as it was, was over, and I continued doing the forensic

25   economics.

1     I have had a number of cases.  I suppose I have testified

2  in front of a jury probably a hundred times.  Had maybe 300

3  appearances in depositions and discovery and that sort of

4  thing.  So it's familiar territory.  The cases differ, of

5  course, one from another, and every single plaintiff is unique.

6  But many of the cases have been personal jury, wrongful death,

7  sometimes business litigation, and I would say a substantial

8  number of aviation cases that I've had, borne partly of my

9  experience with the 9/11, September 11th Victim Compensation

10 Fund.

11    I don't know whether to talk about that or not.

12 Q   Sure.  But before you do that, you mentioned plaintiffs,

13 but in your work as a forensic economist, I mean, are you

14 typically called upon by not only claimants but also people

15 defending litigation?

16 A   Yes.  I would say about a third of my work, measured in

17 terms of billable hours, is for the defense side of the

18 equation.  So about two-thirds of it is plaintiffs, which is, I

19 would say, kind of nature since the plaintiff has the burden of

20 proof; that it's more likely that a plaintiff will need an

21 economist than the defense.

22 Q   Now, you referenced some of your experience in aviation

23 cases, and the 9/11 Victim Compensation, I'm sure we are all

24 familiar with that.  But can you tell us a little bit more

25 about what your role was in working with the fund?

1   A    Yeah.  That was an amazing experience.  The Victim

2   Compensation Fund was headed by a fellow named Kenneth

3   Feinberg, who you may have seen.  In fact, I think was involved

4   as a mediator in the Exxon Valdez case.  But he was appointed

5   to be the master of the September 11th, 9/11 fund, which was

6   created by the federal government as a mechanism compensating

7   victims or survivors of victims without the necessity of those

8   victims having to go to court.

9        They would waive -- if they choose to.  They could waive

10  their right to go to court, not everyone did that, but having

11  waived their right, they would then be subject to a hearing

12  where they make a presentation -- they or their lawyers or

13  somebody would make a presentation on their behalf.  And

14  Mr. Feinberg would, in due course, make an award for the people

15  who had -- who had filed claims in that way.

16       In total, I think he awarded about $7 billion, if I

17  remember.  So it was -- it was a pretty big deal.

18       And I had created a computer program that I thought was

19  going to bring me fame and fortune that would allow an attorney

20  using my program to do an economic loss analysis without

21  necessarily having contact with an expensive forensic

22  economist.  I had intended for this to be a commercial product,

23  but when 9/11 happened, I realized, after a while, that it was

24  something that could be repurposed, which was not an easy thing

25  to do, actually.  So it was focused on the 9/11 fund.

1    And that meant that a victim or a victim's lawyer could use
2    their computer -- the internet was not what it is today, but it
3    was still there -- and they could -- they could put in the
4    pertinent information about themselves or their loved one who
5    they lost, and it would provide a report that was consistent
6    with the special standards that Mr. Feinberg had created.
7        Mr. Feinberg sort of created his own jurisdiction, like a
8    state.  I mean, he had his own rules, and they were similar to
9    the rules that would apply here, or in other forums, but they
10   were not the same.  So it took quite a while to make this
11   program work.  And, ultimately, about a thousand victims or
12   claimants of the 3,000 total used that service.
13       And some cases were too complicated to be easily subject to
14   this computer program.  And in that case, sometimes it meant
15   that an individual forensic economist would have to appear
16   before Mr. Feinberg, and I did that.  I appeared in about a
17   hundred cases in front of him, or other hearing examiners,
18   which that was more than any other expert or attorney.  So I
19   got to know Mr. Feinberg fairly well.
20       And it was a remarkable experience and, I think, useful to
21   my career.  That isn't why one enters into that kind of
22   process, but it gave me some experience that could be put to
23   work in other aviation cases, or broadly -- broadly
24   characterizing a case as an aviation case.
25   Q    And, Mr. Frankenfeld, outside of the work that you did with

1  the fund, have you also worked as a forensic economist in other

2  aviation-related cases?

3  A    Yes.

4  Q    And were the, I guess, those experiences, both in the fund

5  and in those other aviation cases, did those inform the work

6  that we asked you to do in this case?

7           (Whereupon, the Court Reporter

8            interrupted for clarification.)

9  BY MR. MOORE:

10  Q    And the lessons that you learned in those other cases, did

11  you employ a similar methodology in this case?

12  A    I did.

13  Q    Okay.  And just -- and, obviously, it's your understanding

14  in this case that we've asked you to come up with some economic

15  value for the estates of the nine deceased, right?

16  A    Yes.

17  Q    How does a forensic economist like you, Mr. Frankenfeld,

18  what is your methodology to go about doing that?

19  A    Well, it's not rocket science exactly, but it's a

20  complicated and complex process.  You start by gathering

21  information.  So if you have an individual, here we have nine,

22  but they need to be treated separately as individuals.  If you

23  have an individual, you look at -- you find out as much as you

24  can about that individual that might pertain to economics.  So

25  if they had a career, what did they do for a living, and what

did they earn.  That's a pretty important question, and you get
that from tax returns, often.  How old were they, what was
their gender, because that has an effect on -- may have an
effect on things like work life expectancy.

You want to know about their education, their experiences,
and their plans, to the extent you can learn about their plans,
because all that has some bearing on how a person would be
living his or her life had the tragedy not occurred.

So you assemble all of that personal information, and then
you use statistics to try to create kind of a model for that
person.

So you look -- you get work life expectancy.  That's
something that is available in statistical manuals created by
the government.  You look at life expectancy, although in this
case that doesn't play a major role.  And you look at interest
rates as they are existing because it's necessary after --
well, I don't want to put the cart before the horse -- but
let's say for a minute, once I get the information and once I
look at the statistical information that's available, I create
a spreadsheet that shows, as nearly as I can, year by year what
that person was capable of earning had the tragedy not
occurred.  And you include earnings, of course.  You sometimes
include other elements of loss, like fringe benefits, and you
project them usually subject to some measure of inflation.

When you're done, you have a long column on a spreadsheet,

series of columns that have the year-by-year numbers of the
person's loss.

And the last process that's necessary is, which I was
saving, is to reduce those losses to present value. You do
that because money does have a time value. And if you just
took all the losses from now until the end of a person's work
life and added them up, you would result in an amount that is
too large. That's because paying somebody a hundred dollars
today has a cost or a value of a hundred dollars. Paying
somebody a hundred dollars in, let's say, ten years doesn't
cost a hundred dollars. Because I can put aside some amount of
money, it depends on what interest rates are doing, but I can
put aside, let's say, $75 -- I don't know what it is, I just
made that up -- but you put that money into an investment, it
would grow gradually over the years, and in ten years, it would
be worth a hundred dollars.

So you need to do that kind of mechanical interest rate
bearing process year by year to make a determination of the
present value of losses. You add all of that up, and you've
got the present value of future losses.

In a case like this, where the accident occurred almost ten
years ago, past losses are also an issue. And the process is
similar but not identical. You don't discount to present value
for past losses. But, otherwise, you basically are doing the
same kind of work to determine what past losses would be.

1  Q   And given that understanding, that there are some

2  differences because we've got minor estates involved in this

3  case and a number of estates that show no earnings, but,

4  generally, is that methodology pretty much the same as you

5  apply that across the United States in this case?

6  A   It is.  I need to be careful as I answer that because every

7  state has its own jurisdictional requirements, and my report,

8  of course, needs to conform to those requirements, as least to

9  the extent that I understand them.  And so I'm using a

10 methodology that's a uniform methodology.  I have applied the

11 same methodology for years and years and every -- I haven't

12 been in every state, but in many states.

13     So the methodology is consistent.  The results, of course,

14 will differ by individuals and differ sometimes to the extent

15 that you're applying statutory requirements of the state where

16 you happened to be.

17 Q   And you referenced you having done a report in this case

18 and your spreadsheet.  Typically, when you're doing an economic

19 analysis on an estate like this, do you create charts or graphs

20 that are helpful to you in explaining the methodology for a

21 given estate?

22 A   I do.

23 Q   And did you do that in this case for the nine estates at

24 issue?

25 A   I did.

```
 1   Q   And would it be helpful for you in explaining your
 2   methodology, as applied to the nine individual estates today,
 3   would that be helpful for you to go over those?
 4   A   I hope so.  I think so.
 5           MR. MOORE:  At this time, Your Honor, I would like to
 6   mark as Demonstrative 110, I believe.
 7           THE COURT:  I'm sorry.  What was that number, sir?
 8           MR. MOORE:  I think we are on 110.
 9           THE COURT:  Oh, 110.  I believe that is correct.  But
10   Madam Clerk will let me know when I'm wrong.
11           DEPUTY CLERK:  Yes, 110.
12           THE COURT:  110.
13           Any objection?
14           MS. DIOMEDI:  No objection.
15           THE COURT:  At this time you may publish what has been
16   marked as Plaintiffs' Demonstrative Exhibit 110.
17   BY MR. MOORE:
18   Q   And what we see on this first slide for Dr. Chris McManus,
19   Mr. Frankenfeld, tell us just generally what this is -- this
20   chart that you created is?
21   A   Well, this fairly intimidating table consists of facts and
22   assumptions that are pertinent to this particular case.  So I
23   told you how I try to get all the relevant information, and
24   this is where it all appears on my -- on my spreadsheet.
25           So we've got the report date.  I won't go through every
```

single one.

Q   Well, let me ask you about that real quick.  So we can all
see, obviously, that the report date is -- your calculation is,
I guess, calculated for February of this year, right?

A   It is for February, although it turns out to be
February 2nd, which is what I thought was the date I would be
appearing to testify.

Q   All right.  And given that you are testifying in the
afternoon the day before, though, does that change your
numbers?

A   It won't change the numbers, no.

Q   So you see in here some of those various data points that
you referenced earlier.  One of those you talked about was life
expectancy?

A   Yes.

Q   And just, typically, where do forensic economists, such as
yourself, derive a given life expectancy for a decedent?

A   There's an organization, a government organization, called
the Bureau of Vital Statistics, and they publish -- they do
extensive studies about the question of life expectancy, and
they publish those studies in the forms of multiple long
tables.  And so my job is just to use one of those tables which
is based upon age, gender -- I'm trying to think whether
education is -- oh, no, just age and gender.  And from that I
can determine what the statistical life expectancy is.  It's a

number that will work out to the third decimal point and one

not ought to be too religious about observing that kind of

accuracy because it's -- that kind of precision because it's a

false accuracy.

What the government does is they will look at a large

universe of Americans, in this case, maybe a hundred thousand

or more, and they will measure when they lived and when they

died, and they will create a life expectancy that is the medium

of the ages of those people.  And so what it represents is half

the people in that huge population would have lived a shorter

life span and half the people would have lived a longer life

span.

So it's a good defendable number, but one ought not to

consider that it's the only number or that it foretells the

future.  I'm 74, I'm near the end of my life expectancy, but I

am bent on beating that table.

Q    So it's an average, right?

A    Say it again, please?

Q    It's an average, right?

A    Yes, it's a kind of statistical average.  Yes.

Q    And the table that you use from the Bureau of Vital

Statics, is that same source that you apply to derive your life

expectancy number for all of the decedents in this case?

A    Yes.

Q    And I meant to ask this earlier, but outside of things like

gender, age, what, if any, impact on your report does what a

person did for a living outside of the various -- just their

economic aptitude have on assumptions you make about a persons

earning capacity?

A   It could be an important attribute of determining earning

capacity.  Age, of course, is a factor, but also work

experience.  Sort of what a person's resume looks like, even if

you don't actually have a literal resume.  But so you want to

know age, education, you want to know where they live, because

that makes a difference too.  All those things factor into the

determination of earning capacity.

Q   You also have on your chart below life expectancy the work

life expectancy.  Where do you derive that -- that figure?

A   That's from another table.  The government provides

statistics that economists massage a little bit in order to

make a determination on work life expectancy, and what that

represents is at least the equivalent of if a person worked

continuously from now until the end of their work life

expectancy.

     In reality, that always -- that doesn't always happen.

People are in and out of the work force sometimes, and that's

why the work life expectancy is less than you might expect it

to be from Social Security or other documents.

Q   And the source at the table you referenced at which you

derived your work life expectancy, did you utilize that same

1    source for determining the work life expectancy for all of the

2    nine decedents?

3    A    I did.

4    Q    You got below that minimum zero rate put in terms of a

5    percentage.  Can you explain to the jury what that represents?

6    A    Yes.  I've talked briefly about the need to discount losses

7    to present value, and you need -- in order to do that, you need

8    to know at what rate one can invest, and in court you are

9    usually talking about investing in the best and safest

10   investments.

11       So most economists will use Treasury securities as a

12   measure, and I do that too.  I use Laggard securities.  I'm

13   sorry that I have to be more complicated, but the losses occur

14   year by year over a potentially lengthy period of time.  And

15   interest rates for the short period usually are comparatively

16   low, and if you are investing for a longer period, the rates

17   tend to be higher -- or higher rather.

18       And so I'm using different interest rates for different

19   years, so that we can appropriately match the investment to the

20   loss.

21   Q    Moving to the second column or the right-hand column at the

22   top, you've got an earning capacity figure.  Is that an annual

23   earning capacity figure for Dr. McManus?

24   A    It is, and that's probably the most important number on

25   this particular table.

1 Q   And you don't pick that number arbitrarily.  Can you

2 explain to the jury where you derive his -- his earning

3 capacity figure?

4 A   Yes.  If -- if you have an earnings history, income tax or

5 similar records, that is usually, not always, the best source

6 for determining earnings capacity.  The question is not

7 necessarily what a person earns but what a person is capable of

8 earning.

9     A physician, an interventional radiologist like

10 Dr. McManus, had a well-established earning history, so I was

11 able to look at his tax returns for I think five years prior,

12 and I used an average.  This is based upon I think the last

13 three years of his -- of his earnings, $656,000.

14     He had in prior years earned somewhat less than that, and

15 he had also earned more than that.  But that average measure

16 seemed to me to be a good measure of his earning capacity.

17 Q   I will get to it, but with respect to calculating his past

18 earnings, there is a deduction for income taxes.

19     Is that the purpose for which you have this income tax rate

20 in this chart?

21 A   Yes.

22 Q   And is that the maximum rate under the IRS regulations?

23 A   Well, so far, yes.  35 percent is the top of the schedule

24 at the moment.

25 Q   You mentioned it a little bit earlier, fringes, and I want

1    you to do two things for me.  Number 1, just define that in

2    terms of your analysis for these nine decedents, and then also

3    tell me where -- from where you get that 7.5 percent number?

4    A    Okay.  Well, fringe benefits are something of value that a

5    person receives that aren't monetary at the time they're

6    received.  Typically a person has -- with their employer might

7    have health care, would have a retirement account, 401(k) or a

8    pension, would have vacation, might have an educational benefit

9    that is available.

10        So there are a number of things that are generally

11   available as fringe benefits, and typically at least those are

12   added together.  It always involves an estimate, so you can't

13   be perfect in choosing what the amount of fringe benefits is.

14        And in this case, as a matter of judgment really, I

15   excluded my estimate of the value of health care because that's

16   not something that would be of value to somebody who has died

17   and who has lost all of his or her survivors.

18        So my normal allocation of fringe benefits would be in the

19   range of 20 percent.  Here it's 7 and a half percent and that's

20   because we took health care out.

21   Q    Just moving down, you've also got a percentage under --

22   well, it says "PERS CONS."  Am I right in assuming that that is

23   a shorthand for personal consumption?

24   A    You got it, that's what it is.

25   Q    Explain to the jurors just generally:  What is personal

1  consumption?  Why does that matter to somebody that doesn't

2  need it?

3  A    Well, it can matter a great deal because if somebody is

4  living, they're consuming.  They are feeding themselves.  They

5  have lodging.  They might have a car.  There are lots of things

6  for which they might use the money.

7       That's called personal consumption, and that needs to be

8  deducted from the losses that we would otherwise arrive at

9  because it's not available to anyone after the individual dies.

10 So it's -- it's an important factor, and it's a factor that

11 reduces losses, all other things being equal.

12 Q    Okay.  And what is the source for the percentage that

13 you've applied in Dr. McManus' case?

14 A    There are lots of studies and tables available on that

15 question, and there's quite a variation on what people decide

16 to use as their personal consumption figure.

17      I use a table that was created by the accounting firm of

18 PricewaterhouseCoopers for the 9/11 fund, and it gives

19 consumption figures a rate on this table by age, by family

20 size, and by income level.  So you can look at age, family

21 size, income level and make a determination -- a rough

22 determination of what the personal consumption allowance ought

23 to be.

24 Q    And given what we know about Dr. McManus, just explain for

25 us briefly why you employed the single personal consumption

1  rate?

2  A  Well, I've employed that because I was told to.  It's a

3  tough question I think when there are no survivors in an

4  accident of this kind.  What is a person's marital status at

5  the time he or she dies?  Well, you -- you can say in the case

6  of Dr. McManus he was married and had children and that would

7  lead to one thing on the consumption table, but instantly -- in

8  the same instant that he died, he lost his wife and family so

9  can be regarded as a single person.

10      A single person has a much higher personal consumption

11  rate; that is, to say the deduction from losses.  It is much

12  higher than would be the case for someone who is married with

13  children.  So I use the highest rate in the chart, in the case

14  of Dr. McManus, is 48.04 percent.

15  Q  The dollar, I guess, figures in the right-hand column below

16  that, do those represent, I guess, figures that you employee

17  doing your future loss analysis?

18  A  Yes.

19  Q  And so obviously there's a difference between the earnings

20  that someone like Dr. McManus might have before we are here

21  today and then those that he would have in the future up to his

22  life expectancy or work life expectancy?

23  A  Yes.

24  Q  Okay.  When you work up -- just speaking only about that

25  future loss, you will typically create a chart like this in

1  order to kind of highlight how you calculate someone's future

2  loss?

3  A    That's right.

4  Q    All right.  And this is obviously what you've done in this

5  case for Dr. McManus?

6  A    Yes.

7  Q    Would you mind just kind of walking the jury through what

8  all this means?

9  A    I will, and I'll try to be as brief as -- as an economist

10  can be because I know there are a lot of numbers here.  I think

11  if we just look at a couple of numbers, it will be clear how

12  this table works.

13     So you see a rate in this spreadsheet a number of different

14  factors, year, that's how many years the analysis goes; age;

15  zero coupon rate, that's what a Treasury bill is paying;

16  discount factor, which is kind of a complicated thing that I

17  will explain in a minute, and loss.

18     In the first year, $375,674.  That is a function of his

19  income less personal consumption with some other adjustments,

20  and then the present value of the loss which is $358,000.

21     There are some other numbers to the right of that that just

22  show you the components of the analysis.  And the important

23  thing I wanted to show you is that if you look in the first

24  year, he's 56.9 at the end of that.  One can invest in

25  government securities that pay 4.77 percent, which is an

1    extraordinarily high rate, but that's what's available right

2    now.

3        Now, you've got the discount factor, which is a little mind

4    numbing I suppose, it's .9545, and all it really is something

5    that takes into account both the rate, 4.77 percent, and the

6    time, in this case one year.  And the 9545 means if I were to

7    invest $95.45 today in a government security paying

8    4.77 percent, then in one year, that $95 would be worth a

9    hundred.  And if you look at the discount factor, year by year,

10   you can see that it gets lower and lower for each year.

11       So if we go, let's say to the fifth year.  At that point

12   he's almost 61 years old.  The interest rate is 3.67 percent.

13   The discount factor now is not 9545.  It's 8351.  And so the

14   loss is the -- excuse me.  The loss is based on earnings and

15   personal consumption.  The present value of the loss is less.

16       It represents multiplying $414,000 by .8351.  Sorry to use

17   so many numbers.  And the net result is a present value of

18   $346,000.

19       So the important -- most important column is the one that

20   says "present value zero coupon," and it shows you the present

21   value for each year that we're dealing with.  And you need to

22   add all of those up to get a final number, in this case

23   $2,700,724.

24       This is the heart of my analysis.  It's necessarily

25   cumbersome, and I used a similar spreadsheet for each of the

1    individuals that we're talking about here in this case.

2    Q    Now, this slide, this is -- fair to say -- characterize

3    this as a summary of both of workup that we saw on that other

4    page, the future column, as well as your calculations for

5    Dr. McManus' past losses from the date of his death until

6    today?

7    A    Yes.

8    Q    And so I guess if we wanted to just look and see what is

9    the total economic loss for the past and the future of

10   Dr. McManus' estate, it's the number that we see in the bottom

11   right-hand corner of this chart.

12   A    That's correct.

13   Q    Now, we notice and we've referenced a little bit early that

14   in the past column, you make a deduction for income tax?

15   A    Yes.

16   Q    All right.  And just so the jury understands, there's a

17   zero in the future column for income tax.  Why is that?

18   A    It's my understanding that Alaska law applies income taxes

19   or thinks income taxes are a factor in the calculation for

20   prior losses but not for future losses.

21   Q    Now, this methodology that we see in this chart that we see

22   here for Dr. McManus' estate's loss, this is something you have

23   done for the other eight deceased in this case?

24   A    Yes.

25   Q    Now, understanding that they may not be apples and oranges

1 comparisons --

2          MR. MOORE:  Can we go to the next item, please?

3 BY MR. MOORE:

4 Q   -- Stacy McManus, Dr. McManus' wife.  Tell the jury if you

5 will, about how her analysis was a little different than

6 Dr. McManus'?

7 A   Stacey's analysis was different because I needed to infer

8 her earning capacity.  I needed to calculate her earning

9 capacity.  She was at home, as a homemaker and a mother at the

10 time of her death, but she was a trained professional.  She had

11 a college degree, as I recall a master's as well, and had

12 substantial earning power, which at the moment she was not

13 putting to use, but that doesn't mean that she lacked earning

14 capacity.

15     It does mean -- and for me to calculate earning capacity, I

16 need to look at statistical sources that shows what a person is

17 capable of earning, and that's what I did, and I attributed

18 earnings to her and earning capacity to her so that we could do

19 this kind of calculation.

20 Q   And what was the earning capacity that you attributed to,

21 and what was the source for that figure?

22 A   I better check to be sure that I got my numbers right.  I

23 attributed earning capacity of $35,000 a year, and she was

24 trained to practice as a psychologist, and I think it's

25 possible that this number is a little more conservative than --

1 than it perhaps ought to be, but $35,000 a year is what I

2 attributed to her.

3 Q    Understanding your comment about conservative, but that is

4 based on the fact that at the time of her death, she did not

5 have historical earnings as the -- in the years leading up to

6 her death?

7 A    Right.  We don't have income tax returns that would show us

8 what she had earned as a homemaker and mother.  So we need to

9 measure that by a less precise and less accurate method, and

10 it's probably appropriate given the uncertainty to resolve

11 doubts in a conservative way.

12    I try to resist saying conservative or aggressive because

13 I'm trying to come up with the number I think is the right

14 number.  But in this case, it -- as I look at it now, it seems

15 a little low to me, $35,000 a year.

16 Q    In doing the analysis on Stacey's estate, you also used a

17 statistical life expectancy for her; is that true?

18 A    I do.

19 Q    Do you recall what that was?

20 A    My notes say 82.5.

21 Q    Again that was from that same vital statistics table?

22 A    Yes.

23 Q    The analysis as it relates to Stacey's estate, was that the

24 same methodology you employed for the estate of Mrs. Antonakos?

25 A    Yes.

Q   And before I get to that -- so obviously we have the
children as well.  Tell the jury how your economic analysis and
assumptions you may make in employing your methodology changes
due to the fact that five of these deceased were children?
A   That complicates things a little because as with the two
spouses, there's not an income record when you're dealing with
a child.  And it's also true that if a child is 14 years old,
there will be -- no presumably be no earnings until age 18 or
age 20.

So you have a string of zeros in your report, and then the
question is:  What would that person have earned once entering
the work force and starting a career?  And again, we look at
statistics, and we need to recognize when we look at those that
it's not as good as looking at a tax return.  But because we
don't know, we need to make realistic judgments about the
future of these kids.

In the case of both families, the families were high
earners, well-educated.  The kids were active.  One was the
president of her class, and another was on his way to becoming
an Eagle Scout.  These kids had lots of potential, and the
question is:  How far would they have taken their education?

I concluded that they would take their education through a
college degree.  I think that's very reasonable given the
family circumstances and given their own individual records.
And so I attributed to them ultimately after a string of

zeros -- I assumed they would pay for college. We had to deduct that, and then enter the work force, enter what the median would be for somebody -- a college graduate.

We don't know whether this college graduate would be -- would be getting a degree in statistics, which would pay a lot, or a degree in sociology, which wouldn't pay a lot, so we're making -- we're making an average judgment here.

Q    And before I ask to go to the next slide, just so the jury understands each of these graphs as we're going through it, essentially that bottom line is what your total calculation is for past, future, and then that aggregated total loss for these estates; is that correct?

A    That's correct.

        MR. MOORE:  Would you go to the next one, please, Heather.

BY MR. MOORE:

Q    All right.  So you reference -- you had referenced talking about the college cost reduction coming out of the children's, and using Meghan's as an example, is that what we're seeing in the past column?

A    Yes, and you can see the past column, when all is said and done, is only $21,000, and that's because she's 17 years old. And there's not much income that can be attributed to her at that age.

        So that's a comparatively small number.  The future losses

1   are $586,000 that -- $585,000 I think.

2   Q   And the figure that you use for Meghan's earning capacity,

3   is that something you also derive from a statistical table or

4   study?

5   A   It is.

6   Q   Is it something that is typical done in your field?

7   A   Yes.

8   Q   And again, just like you described for the adults, it's

9   something that is done based on their age, gender, things of

10  that nature?

11  A   Yes.

12  Q   Did you use the same source in this case for each of the

13  five children?

14  A   I did.

15  Q   And you used the same table with respect to the life

16  expectancy for Meghan as well?

17  A   I did.

18  Q   Do you recall what her average life expectancy was?

19  A   Again I'm referring to my notes, and I think 81.6 is the

20  answer.

21  Q   Now, the methodology that you had explained to us with

22  regard to Meghan and the other children, was it essentially the

23  same for Connor?

24  A   Yes.

25  Q   The assumptions you that made in terms of -- I think you

```
 1   said that your reasonable assumption that he would have -- or
 2   gone to college?
 3   A   Yes.
 4   Q   And again his earnings were based on this statistical table
 5   or source that you used for all of the children?
 6   A   They were.
 7   Q   And again the bottom line is -- the one that shows after
 8   earnings minus the various deductions you've discussed in your
 9   methodology, that's the total loss of past, future --
10   A   Correct, yes.
11   Q   I'm going to be redundant here.  For life expectancy, what
12   was his life expectancy?
13   A   76.6.
14           MR. MOORE:  Go to the next slide, please.
15   BY MR. MOORE:
16   Q   Now, you had an earnings history for Melet Antonakos?
17   A   Yes.
18   Q   Much like you had one for Dr. McManus?
19   A   Correct.
20   Q   So the methodology that you employed for Melet is
21   essentially the same as what you did for Dr. McManus, which you
22   explained at length earlier?
23   A   That's right.
24   Q   And based on the Bureau of Vital Statics tables, what was
25   Melet's life expectancy?
```

```
1   A    When you get old, your writing is illegible.  76.4.
2   Q    And the total loss including the past and future after, the
3   necessary deductions you've applied which you discussed, is
4   that 1.6 -- $1,674,233?
5   A    Yes.
6   Q    You told me earlier that the methodology that was
7   applicable to Stacey McManus' estate was the same that you used
8   for Kim Antonakos.  Do you recall that?
9   A    I do.
10  Q    Now, was there a different earnings number that you used
11  for Mrs. Antonakos?
12  A    I think I used a somewhat different number.  I did use a
13  different number, whereas for Stacey McManus it was $35,000 a
14  year.  For Kimberley, it's $30,522 a year.
15  Q    And why the difference?  What was that difference based on?
16  A    Because I'm looking at tables and trying to determine on
17  the one hand what a junior-level starting psychologist might
18  earn and compare that with a junior-level starting CPA, which
19  is -- Kim was a CPA.
20  Q    And again, it's just a statistic that you're getting from
21  the table that's based on an average, correct?
22  A    Correct.
23  Q    Because she had different training and occupation than
24  Mrs. McManus, her number was slightly different?
25  A    That's correct.
```

```
 1   Q    And again we talked about the number being low.  That's
 2   based primarily because at the time of her death, she did not
 3   have a history of earnings in the years preceding her death?
 4   A    Right.
 5   Q    What was Mrs. Antonakos' life expectancy based on the
 6   table?
 7   A    82.8.
 8               MR. MOORE:  Next slide, please.
 9   BY MR. MOORE:
10   Q    Same methodology employed for Olivia as what you had
11   employed for the two McManus children you discussed earlier?
12   A    Yes, sir.
13   Q    And what was Olivia's life expectancy?
14   A    78.7.
15   Q    And her total loss is calculated as $577,897?
16   A    That's correct.
17               MR. MOORE:  Next slide, please.
18   BY MR. MOORE:
19   Q    Same assumptions and same methodology for Mills Antonakos?
20   A    Yes.
21   Q    And what do the tables have as Mills' life expectancy?
22   A    76.2.
23   Q    And the last slide please.  Same methodology and
24   assumptions for Ana Antonakos?
25   A    Yes.
```

```
 1   Q   And what do the tables have as Ana's life expectancy?

 2   A   81.2.

 3   Q   All right.  Please answer any questions the defense might

 4   have.  Thank you.

 5           THE COURT:  Thank you, Mr. Moore.

 6           MS. DIOMEDI:  No questions for him, Your Honor.

 7           THE COURT:  Very well.

 8           MR. MOORE:  Pardon me, Your Honor?

 9           Your Honor, may I ask him a few more questions?  I

10   apologize.

11           THE COURT:  You may assuming there's no 611 objection

12   here.  Would he be permitted to reopen direct?

13           MS. DIOMEDI:  No objection.

14           THE COURT:  Very well.  You may proceed.

15           MR. MOORE:  Would you mind putting the demonstrative

16   back up, please.  Go to the third slide.

17   BY MR. MOORE:

18   Q   Just to summarize, Dr. McManus' total past loss was

19   2,366,582?

20   A   That's correct.

21   Q   And his future was $2,700,724, for a total of $5,067,307?

22   A   Yes.

23           MR. MOORE:  Next slide, please.

24   BY MR. MOORE:

25   Q   Mrs. McManus' past loss was $78,013?
```

```
 1   A    Yes.

 2   Q    And her future loss was $84,514?

 3   A    Yes, it was.

 4   Q    For a total of $162,527?

 5   A    Yes.

 6            MR. MOORE:  Next slide, please.

 7   BY MR. MOORE:

 8   Q    Meghan's past loss was $21,136; is that true?

 9   A    It is.

10   Q    And you calculated her future loss at $586,492?

11   A    That's correct.

12   Q    For a total of $607,627?

13   A    Yes.

14            MR. MOORE:  Next slide, please.

15   BY MR. MOORE:

16   Q    Connor's past loss was $21,136?

17   A    Yes.

18   Q    And according to your calculations, his future loss was

19   $608,958?

20   A    Yes.

21   Q    For a total of $630,094?

22   A    Yes.

23   Q    Melet Antonakos' past loss was $1,330,450?

24   A    Correct.

25   Q    With his future losses being $343,783?
```

```
 1   A    It was.

 2   Q    For a total of $1,674,233?

 3   A    Yes.

 4   Q    Kim Antonakos' past loss was calculated by you as $64,924?

 5   A    Correct.

 6   Q    Her future loss was $65,157?

 7   A    Yes.

 8   Q    For a total $130,082?

 9   A    Correct.

10   Q    What did you calculate Olivia's past total loss?

11   A    Past loss $21,136.

12   Q    And her future?

13   A    Future 550- -- $556,761.

14   Q    For a total of?

15   A    Total of $577,897.

16   Q    Would you give the figures that you derived for

17   Mills Antonakos?

18   A    Yes, past loss of $21,136.  Future, $609,250.  Total

19   $630,385.

20   Q    And for Ana.

21   A    Ana's past losses are $21,136.  Future, $588,874.  Total

22   $610,010.

23   Q    Thank you, Mr. Frankenfeld.  Thank you.

24             THE COURT:  Thank you, Mr. Moore.

25             MS. DIOMEDI:  No questions Your Honor.
```

1    THE COURT:  Sir, you are excused.

2    THE WITNESS:  Thank you.

3    THE COURT:  How is everybody doing on the jury?  You

4  okay?

5    MR. BRAUCHLE:  Your Honor, our next witness is

6  Mark Hood.  He's a metallurgist.

7    I don't think by the Court's time we will get done

8  with his testimony today.  But I would like to start, at least

9  get his qualifications and what he did in this case before we

10  get into his opinions.

11    THE COURT:  Sure.  That works.

12    MR. BRAUCHLE:  So plaintiff would call Mark Hood.

13    (Oath administered to the witness.)

14    DEPUTY CLERK:  Thank you.  Please have a seat.  Speak

15  into the microphone at all times.

16    If you would please state and spell your first and

17  last name.

18    THE WITNESS:  Mark Hood, H-o-o-d.

19    DEPUTY CLERK:  Spelling of your first name?

20    THE WITNESS:  M-a-r-k.

21    DEPUTY CLERK:  Thank you.

22    THE COURT:  Ladies and gentlemen, you are about to

23  hear testimony from Mark Hood who will testify to opinions and

24  the reason for his opinions.  The opinion testimony is allowed

25  because of the education or experience of this witness.  Such

1  opinion testimony should be judged like any other testimony.

2  You may accept it or reject it, and give it as much weight as

3  you think it deserves considering the witness' education and

4  experience, the reasons given for the opinion, and all the

5  other evidence in the case.

6          Mr. Brauchle, you may proceed.

7              MARK HOOD, PLAINTIFFS' WITNESS, SWORN

8                  DIRECT EXAMINATION

9  BY MR. BRAUCHLE:

10 Q   Mr. Hood, I would just like to go through your background a

11 little bit.

12 A   Okay.

13 Q   And then discuss -- we are going to do an overview of the

14 work that you performed in this case.  And then I believe we'll

15 probably break for the day and go over your opinions tomorrow.

16     But we've got some extra time, we have some time here

17 today, so we want to keep moving along.  Okay?

18 A   Okay.

19 Q   Great.  Could you just give the jury the benefit of your

20 academic background?

21 A   Sure.  I have a bachelor of materials engineering degree

22 from Auburn University in Auburn, Alabama.  I currently live in

23 Pensacola -- well, Cantoma, Florida, which is part of

24 Pensacola, Florida.

25 Q   Okay.  And did you become employed after college?

1  A   Yes, I did.  I graduated from college in 198- -- December

2  of 1984.  I started working for the Navy as a DOD civilian at

3  that time doing only failure analysis and accident

4  investigation in January of 1985.

5  Q   Okay.  And just for our sake, what is failure analysis?

6  A   Failure analysis is -- because I'm a metallurgist, my

7  primary background is in metals.  I do other materials, some

8  plastics and ceramics, but primarily it's metallurgical

9  related.  I use my education in understanding materials in the

10 failure analysis practice.

11     So failure analysis is basically if a component either

12 fractures or break, analyzing those surfaces and the fractures

13 to determine why it broke, what can be done to prevent it from

14 breaking again.

15     It could also involve a system that has failed to perform

16 its intended function.  So the failure analysis doesn't have to

17 have -- doesn't actually have to have something to break to do

18 that analysis.

19 Q   Okay.  And in your work -- and just so we're clear, you

20 weren't in the Navy, you were a civilian that worked for the

21 Department of the Navy?

22 A   Yes, that's correct.  Pensacola was one of the helicopter

23 fixed-wing aviation repair depots.  So aircraft would come in,

24 we would take them apart.  If things were found failed or

25 broken either during the overall of the aircraft or things

1  would come in from the fleet if they had broken, we would do a

2  failure analysis on the component or the system to try and

3  basically prevent it from occurring on other aircraft if there

4  was a design change that could be made; otherwise, we may go

5  out to the fleet or in the depot.  We would develop a procedure

6  to actually find if the same problem was occurring in other

7  aircraft.

8  Q    Okay.  And did any of your work with the Navy at any time

9  involve accident investigation?

10  A    Yes.  If there was an accident that involved one of the

11  aircraft that the depo was responsible for, then the Naval

12  Safety Center would do the actual investigation, but then they

13  would utilize the engineers and the different airplane groups,

14  or if there was a material analysis issues, they would use a

15  materials engineering material lab to do that part of the

16  investigation.  And I had, on occasion, assisted with that

17  investigation, through the Naval Safety Center.

18  Q    Okay.  And at some point did it become that you stopped

19  working for the Department of the Navy?

20  A    Yes.  After -- I started working for Navy in 1985.  I

21  progressed through the different -- the failure analysis group,

22  nondestructive testing group.  Was eventually the supervisor of

23  the full metallic materials engineering lab.  And then in 1993,

24  one of the base closure actions had started to close the depot

25  portion at Pensacola, and I left the Navy -- or the Government

1    at that point.

2    Q    Okay.  And let me just ask you one question.  You mentioned

3    the nondestructive testing group.  How would that be -- how

4    would nondestructive testing differ than, say, failure

5    analysis, or maybe it's the same?

6    A    No.  The failure analysis process basically identifies the

7    type of failure that -- or the type of crack that may be

8    occurring, how long it takes it to propagate.

9        And then nondestructive testing would be a methodology to

10   go either with field teams from the depot, we would look at it

11   within the depot itself, and then occasionally send proceedings

12   out to the fleet, or we would send our field teams out to the

13   fleet to see if we had the same type of cracking using

14   different methods.

15       Fluorescent penetrate, which is a method of basically

16   putting a fluorescent dye on the surface of the part and then

17   you wipe off the excess and let it come out.

18       There's also a similar process for magnetic -- or

19   ferromagnetic parts where you do magnetic particle inspection,

20   and there were ultrasonic inspections, eddy current

21   inspections, and radiography.

22            (Whereupon, the Court Reporter

23            interrupted for clarification.)

24            THE WITNESS:  Okay.  There's also eddy current

25   inspection, ultrasonic inspection, and radiographic inspection.

BY MR. BRAUCHLE:

Q   And that's all nondestructive?

A   Yes.  After we would analysis the parts or the parts would be analyzed, if there were no cracks they could continue in service.  And that's what makes it a nondestructive technique.

Q   Okay.  And I remember that you -- just so I know you said that you had a bachelor's degree in engineering from Auburn University.  Do you hold any type of a professional licensing, a registration?

A   Yes.  I have a professional engineering license from the state of Florida, which I obtained through testing, and then I reciprocated that with -- in the state of Alabama, which is right next to where Pensacola is.

Q   Okay.  And just so I -- so I understand the process, you said "testing."  But if I was engineer by trade or had that -- what's the process to become a professional license -- licensed professional engineer?

A   After -- a lot of people do it while they are in college.  You can take what used to be referred to as an engineering training test, which is an EIT, which basically encompasses all of the general math, science, physics, the things you would take in college.  And then after you have four to five -- I believe it's five years' experience now working under -- or with professional engineers, you can actually take this specific exam based on the type of engineering which you

1   perform.  There was not a materials exam, there was a

2   metallurgical exam, and that is what I took in 1998.

3   Q    Okay.  And if I understand correctly, you are a registered

4   professional metallurgical engineer?

5   A    Yes.  That's -- I took the test in Florida in '98 and then

6   reciprocated -- basically applied to Alabama.  They got my

7   transcripts and tests -- I guess they got the test scores --

8   and then they issued it.  I also have a professional

9   engineering license from the state of Alabama, too.

10  Q    Okay.  Great.

11       And so I think where we were in your career, you had just

12  left working for the Department of the Navy.  Where did you go

13  from there?

14  A    From -- after I left the Navy, I went to work for a

15  research and development group in Lynchburg, Virginia.  It was

16  a foundry company.  We had five foundries around the United

17  States, one in Europe.  And I basically -- I did metallurgical

18  evaluations on some of the materials, as well helped provide or

19  establish the nondestructive testing procedures to make sure

20  that the castings, which we were making at that time, met the

21  requirements.

22       We were primarily making automotive components, automative

23  steering components, things like that, and they to meet the

24  ductile iron, which most of our castings, had to meet a certain

25  mechanical property requirement.

1  Q   Okay.  And where did you go from there?

2  A   I worked there for -- from '93 until '95.  At '95, I

3  returned to Pensacola, Florida, and began working at

4  McSwain Engineering.  Dr. McSwain, who owned

5  McSwain Engineering, had hired me when I got out of a college

6  to work for the Navy, and he had his own consulting business at

7  that time and I went to work with him in 1995.

8  Q   Okay.  And just for the benefit, what was

9  McSwain Engineering, what did they do, what kind of work?  Can

10  you describe?

11  A   Primarily -- it was a metallurgical engineering company,

12  and it still is.  At this point most of the work I would say is

13  related to litigation-type work analysis, although there was,

14  when I was there -- I left in 2015, but there was, you know,

15  some service work as long as -- we would do things for anybody

16  that needed work done.

17  Q   Okay.  And when you say "needed work done," what kind of

18  work would people hire McSwain to do?

19  A   Well, there was nondestructive testing work.  There was a

20  machine shop.  There were metallurgical issues as far as

21  somebody needed hardness testing.  If there were an insurance

22  company that had an issue that they wanted them to look into,

23  they could do that.  I -- those are the type of things which

24  were done in addition to the litigation support.

25  Q   Okay.  And did any of your work at McSwain Engineering

1  involve analysis or investigation regarding airplane crashes?

2  A    Yes.  Because my background had primarily been in doing

3  failure analysis related to aviation components and aviation

4  investigations when I worked for the Navy, Dr. McSwain had done

5  that also, so the majority of our work at McSwain Engineering

6  was aviation-related, although we did have a number of

7  automotive-related investigations.  And just medical devices,

8  other things that didn't fall into either one of those two

9  broad categories.

10 Q    Okay.

11 A    It was primary failure analysis and engineering

12 investigation would be a good way to characterize most of the

13 work that was done.

14 Q    Okay.  And I think you mentioned that you left there in

15 2015?

16 A    That's correct.  In 2015, I had been working there for

17 almost 20 years and was at a point in my career that if I -- I

18 knew that if I wanted to branch out and work -- be on my own

19 that it was the time for me to do it, and I left in 2015.

20 Q    Okay.  And let me ask you this.  In the 20 years that you

21 worked at McSwain Engineering, and without getting into

22 specifics if you had, did you ever have an opportunity to do

23 any work or analysis or investigation regarding a Honeywell

24 TPE-331 engine?

25 A    I mean, I recall looking and those engines being involved

1  or in aircraft that were involved in investigations that were

2  ongoing at McSwain Engineering.

3  Q  Okay.  And -- well, how about -- I'll even go more general.

4  How about turbine engines?  Did you have an opportunity, either

5  in the Navy, at McSwain Engineering, or on your own, have you

6  had occasions or experiences in dealing with investigations

7  involving turbine engines on aircraft?

8  A  Yes, there were, in addition to the TPE331, there were

9  other turbine engines involved in investigations which were

10  performed at McSwain Engineering.  And then all of the aircraft

11  that were in the Navy Marine Corp inventory at the time when I

12  was there were all turbine engines.  We did not do all of the

13  turbine engine work, but there were issues that came up with

14  the engines that we took care of at Pensacola.

15  Q  All right.  And you are a -- you're a retained expert in

16  this case?

17  A  Yes, I was.  I was retained by Motley Rice in 2016, I

18  believe it was.

19  Q  Okay.  And when you say "retained," that means you're

20  getting -- you're getting compensated or paid for the work that

21  you're doing in this case; is that correct?

22  A  Yes, that's correct.  I performed an engineering

23  investigation based on the metallurgical issues that are at

24  issue in this matter.

25  Q  Okay.  And when you're first -- well, let me ask you this.

1  Prior to being involved in this case, had you or I -- had I
2  ever retained you in other investigations at all?
3  A   Yes.  I don't know the exact number, but I have worked -- I
4  worked with you while I was at McSwain Engineering, was
5  retained at McSwain Engineering, and then I have been retained
6  subsequent to leaving McSwain Engineering.
7  Q   Okay.  And in the times that I have requested that you be
8  involved in an investigation, have all of those then proceeded
9  to litigation?
10 A   No.  And it's typical of everything that I -- all of the
11 investigations that I've performed, if they're -- I've told
12 you, as well as other customers, clients, that I did not --
13 there was not a metallurgical engineering issue that I could
14 address.
15 Q   Okay.
16 A   Or maybe that the wreckage was too damaged for me to
17 assist.
18 Q   Okay.  As an investigator or as an expert, what is the
19 first step that you have to do as an investigator when you get
20 retained to investigate an accident?
21 A   Well, each issue is different.  And so the first thing
22 that, at least that I want to do, and that a good investigator
23 should do, is essentially clear the slate and start with an
24 open mind and an unbiased mind as far as what -- what needs to
25 be investigated and then, you know, become familiar with the

1  product.

2  Q   Okay.  So let's talk about this case.  In your

3  investigation, did you attend or participate in any

4  inspections?

5  A   Yes, there were a number -- in fact, there were a lot of

6  inspections related to this investigation, including the

7  initial one, which was two days in Soldotna and one day in

8  Anchorage.

9  Q   Okay.  And what -- what occurred at the first inspection?

10  A   Well, the Soldotna portion was primarily looking at the

11  airframe components.  The engine was there but had been what I

12  referred to as restacked so we couldn't see the individual

13  parts.  We could just take pictures from the outside.  The

14  airframe was there.

15      One of the -- an early focus, and, you know, I spent a lot

16  of time and a lot my initial work on the first day in

17  particular, was looking at the mount structure and the truss

18  that supported the engine.

19  Q   Okay.  And you said something that the engine was

20  "restacked."  The can you explain what you mean by that?

21  A   Basically the engine was back in the case.  If you just

22  look at it when we originally saw it, it looked like it had

23  been put back together -- like it was together still.

24  Q   Okay.  And did you subsequently learn that before you first

25  saw it in Soldotna that it had been taken apart?

A    Yes.  It had been taken apart as part of an original

teardown, and then as it was referred to, and as I referred to

it, the components were restacked back together or loosely

reassembled.  They weren't torqued to their specifications, but

it was put back together.

Q    Okay.  In all the years that you have been doing accident

investigation, once an engine has been torn down, have you ever

seen it reassembled?

A    This is -- that's the first time that I recall seeing one

that has been restacked and put back together that way.

Typically, all of the different components are individually

wrapped and separated so that as they are removed from the

engine, the condition that they come out is the condition that

we would see them in later.

Q    Okay.  And is that good investigative practices, the

preservation of evidence?  Is that why --

A    I mean, from my perspective it is.  That way when I look at

it, I know that, you know, at least it's not gotten marks from

being put back together or from, in this case, because it was

originally -- I subsequently found out it was torn down in

Phoenix and then shipped back to Alaska.

     So, you know, it's been shipped, in my opinion, in an

unprotected condition.

Q    Okay.  All right.  So you have the Soldotna inspection, and

then I think you said there was a day later a subsequent

1  inspection in Anchorage; is that correct?

2  A   That's correct.

3  Q   Okay.  And what was the inspection in Anchorage?

4  A   Well, after we realized in the Soldotna portion of the

5  inspection that the engine was there but that it had been put

6  back together or restacked, there was a facility in the

7  Anchorage area that was able to take the engine back apart so

8  that we could look at the individual components.

9  Q   Okay.  And I believe you said that the engine was -- this

10 first phase was in Soldotna, but the inspection took place in

11 Anchorage?

12 A   That's correct.

13 Q   All right.  So that engine had to be shipped from -- or

14 transported from Soldotna to Anchorage.

15 A   Yes.  As a matter of fact, in my pictures -- and I think it

16 was produced -- they used a pickup -- when I first saw it here

17 in Anchorage, it was in a pickup truck.  But yes, it had to

18 be -- it was transported from Soldotna to Anchorage for that

19 inspection on the third day.

20 Q   Okay.  And did you participate in that engine inspection in

21 Anchorage?

22 A   Yes.  I watched as the engine was disassembled and looked

23 at the various parts as it came apart or was unstacked.

24 Q   Okay.  And following the initial inspection of the engine

25 in Anchorage, was there some more subsequent inspections?  When

1  was the next one?

2  A    Yes.  If I could get my -- I've got a document which I

3  refer to as my chronological which will make it easier for me

4  to go through dates.

5      So the next inspection -- so the first inspection was at

6  Soldotna for two days looking at the wreckage and the airframe.

7      The second inspection was in Anchorage where the engine was

8  unstacked.

9      There had never been a teardown inspection of what's

10  typically referred to as some of the accessories or the other

11  things that go along with the engine.  So there was an

12  inspection, a teardown inspection, in Kansas City, Missouri, at

13  a place called TAE USA.

14  Q    Okay.  And when you say a "teardown inspection of the

15  accessories," what exactly are you talking about?

16  A    Well, in that particular case, we were looking at the FCU

17  and the propeller governor I believe were the two components --

18  the fuel control unit.  And for an engine, if there is what

19  appears to maybe at that point a power-related issue, we needed

20  to make sure that it wasn't related to the fuel control.  And

21  so we did an inspection of the fuel control which included --

22  first step would be to disassemble it and see if it was working

23  properly.

24  Q    Okay.  And in the other -- I know you mentioned that --

25  that that was the first time that you had ever seen that after

1    a teardown, an initial teardown inspection, that it was put

2    back together.  The fuel control unit and the prop governor, is

3    that something that's typically broken down at an initial

4    teardown?

5    A    I've seen them both ways.  But until you actually do the

6    inspection or the teardown, I would not want to assess whether

7    it was properly functioning or not, or if there was anything

8    broken inside.

9    Q    Okay.  And based on that inspection at TAU in Kansas City

10   regarding the fuel control unit and the prop governor, did you

11   reach any conclusions as to whether those two components had

12   any type of anomaly or problem?

13   A    I did not find anything in the teardown of those components

14   that seemed to be at issue.

15   Q    Okay.  And is there a -- was there a reason that it was

16   taken to those -- those two components were taken to the TAE in

17   Kansas City?

18   A    It's my recollection that they were -- I don't recall if

19   they were an overhaul facility, but they were qualified to do

20   that type of disassembly.

21   Q    Okay.  And when was the next inspection?

22   A    The next one would be another component teardown

23   inspection, which was on November 10th of 2016.  That was at

24   National Flight Services in Holland, Ohio.

25        And, again, it was the same process of tearing down --

1    basically, disassembling parts looking for broken parts -- or
2    anomalies within those components to see if they could have
3    affected the operation of the engine.
4    Q    Okay.  And what components were inspected at National
5    Flight Services?
6    A    It was a longer list so I'm looking for that one
7    specifically.
8        It included the fuel pump, propeller pitch control, shutoff
9    valve, torque sensor, feather valve, and I believe that's it.
10   Q    Okay.
11   A    It's been all of those -- we, basically, were examining all
12   of those components and those assemblies to see if there was
13   anything that looked anomalous.
14   Q    Okay.  And the components that you just discussed, in your
15   investigation did you find any anomalies or any reasons why --
16   well, did you find any problems with the data?
17   A    I did not.  And there would have been other people there
18   that if they had seen any other issues, then -- I mean, that
19   was one of the reasons that I attend as a metallurgist, to do
20   the failure analysis of any components that are deemed to be
21   anomalous.  And there was nothing addressed from that
22   inspection.
23   Q    Okay.  And was the torsion shaft also looked at National
24   Flight Services in Ohio?
25   A    I believe that it was there when we did that inspection.

Q   Okay.  Was there anything unique about the torsion shaft?

A   Other than the failure of it, and there were, you know,
basic comments that it was -- I do recall a technician saying
that he had not seen one in that condition before.

Q   Okay.  And following the inspection at National Flight
Services, was there any more follow-up inspections?

A   Yes.  The next inspection would have been a full, what I
call, lab inspections at Applied Technical Services in Atlanta,
Georgia.

THE COURT:  Mr. Brauchle, this might be a good time to
stop today.

MR. BRAUCHLE:  No problem.

THE COURT:  So, ladies and gentlemen, we are going to
finish for the day.  As I will remind you multiple times every
day, and I indicated as this trial started, you, as jurors,
will decide this case based solely on the evidence presented in
this courtroom.  This means that after you leave here for the
night, you must not conduct any independent research about this
case, the matters in the case, the legal issues in the case, or
the individuals or other entities involved with the case.  This
is important for the same reasons that jurors have long been
instructed to limit their exposure to traditional forms of
media information such as television and newspapers.

You also must not communicate with anyone in any way
about this case, and you must ignore any information about the

1    case that you might see while browsing the internet or your

2    social media feeds.

3            Thank you again.  Madam Clerk.

4        (Out of the presence and hearing of the jury panel.)

5            THE COURT:  Please be seated.

6            Mr. Hood, I apologize for cutting you off.  We had a

7    juror falling asleep, and I thought this might be the easier

8    way than to have to -- it's been a very long day.  But we will

9    begin tomorrow morning at 9:15, although are there any issues

10   we need to address before we break for the day?

11           MR. BRAUCHLE:  None from me.

12           MR. MCQUILLEN:  The only thing -- that door's open.

13   They can't hear anything?

14           THE COURT:  They'll take them down that way anyway.

15           MR. MCQUILLEN:  Though it may sound late, I would like

16   to move to strike Mr. Sommer's testimony and have it stricken

17   with respect to this last-minute opinion we got at the end of

18   this testimony about this conversation with Mr. Isham that

19   happened two days ago.  It was in that conversation where he

20   claims that he was told that he had a flight with nine people

21   aboard, and that was instrumental in Mr. Sommer's opinion,

22   expressed to this jury yesterday and today, that this plane is

23   safe to fly in an aft CG for the last three years.

24           A, it's a brand-new opinion that we have never heard a

25   basis for that opinion;

1          B, it's complete hearsay.

2          We first looked at this and thought it was -- Isham

3    was our blue smoke guy.  He's taking apparently something he

4    just learned five years after he was deposed, he learned two

5    days ago, and uses that as his springboard to say, it's safe to

6    fly at 158 because this happened on a flight with Isham and,

7    therefore, it must have happened for the last three years.

8          It's total hearsay, and it needs to being stricken.

9          THE COURT:  I do recall the testimony.  As far as --

10   there is a temporal distinction and a hearsay distinction.

11         Mr. Brauchle, any response?

12         MR. BRAUCHLE:  Sure.  Well, as the Court would

13   imagine, I didn't see it that way.  I believe he responded to a

14   direct question of, you don't know of anyone who flew on it,

15   you don't have any records, you don't know any of that.  And to

16   that direct question he said, well, I know that Mr. Isham flew

17   on it with seven people with all their gear.

18         He's answering a direct question.  You can't -- if --

19   I mean, you dive into that with your own peril.  And he said --

20   I obviously don't have the transcript in front of me, but I

21   think Mr. Sommer had said that he was -- what he was basing a

22   lot of that on was the pilot and the co-workers who worked at

23   Rediske, that talked about Rediske, that was in the NTSB

24   docket.

25         THE COURT:  My recollection, and before I issue any

1    ruling or contemplate striking testimony, I want to review the

2    transcript, but in general, my recollection was that

3    Mr. McQuillen had gone down this line of questioning.  There

4    was a suggestion from Mr. Sommer that he had some general,

5    albeit I think somewhat -- I don't want to say tenuous, but

6    life information about the use of this aircraft by Mr. Rediske

7    over these 300 flight hours he had.

8           But I want to look precisely at what was the question

9    asked and was it responsive, but also to the extent that

10   Mr. McQuillen did ask some follow-up questions, to highlight, I

11   guess, the gravity or weight that testimony should be given or

12   the lack there of.

13          So let me take a look at it.  I note your objection

14   and your request here.  Maybe we can talk about it after we've

15   all had an opportunity to review the transcript tomorrow

16   morning.

17          But I understand your point, I understand yours as

18   well, but I would like see the full transcript before I make

19   any definite ruling on this point.

20          Any additional issues?

21          MR. MCQUILLEN:  None, Your Honor.

22          THE COURT:  Very well.  So I will see you all at 9:15

23   tomorrow morning.  Thank you very much.

24          DEPUTY CLERK:  All rise.  This Court stands in recess

25   until 9:15 tomorrow.

1          (Whereupon, the Court adjourned at 4:22 p.m.)

2                              --o0o--

3                           CERTIFICATE

4       I, Stacy M. Baldwin, Federal Official Court Reporter in and
   for the United States District Court of the District of Alaska,
5  do hereby certify that the foregoing transcript is a true and
   accurate transcript from the original stenographic record in
6  the above-entitled matter and that the transcript page format
   is in conformance with the regulations of the Judicial
7  Conference of the United States.

8       Dated February 1, 2023.

9

10                         /s/ Stacy M. Baldwin
                           STACY M. BALDWIN, RCR, RMR
11                         FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25